**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Civil Action No. 9:16-cv-80060-MARRA**

**BRANDON LEIDEL, and**
**MICHAEL WILSON, individually,**
**and on behalf of All Others Similarly Situated,**

      **Plaintiffs,**

**v.**

**PROJECT INVESTORS, INC. d/b/a CRYPTSY,**
**a Florida corporation,**
**PAUL VERNON, an individual, and**
**LORIE ANN NETTLES, an individual,**

      **Defendants.**
_____/

**PLAINTIFFS' MOTION FOR ENTRY OF PRELIMINARY INJUNCTION**
**PROHIBITING THE TRANSFER, SALE, ENCUMBRANCE, OR**
**OTHER DISPOSITION OF REAL PROPERTY LOCATED AT**
**16832 CHARLES RIVER DRIVE, DELRAY BEACH, FLORIDA 33446**

Plaintiffs BRANDON LEIDEL and MICHAEL WILSON, individually, and on behalf of

all others similarly situated ("Plaintiffs"), through the undersigned counsel and pursuant to Rule

64, Fed. R Civ. P., file this Motion for Entry of Preliminary Injunction Prohibiting the Transfer,

Sale, Encumbrance, or Other Disposition of the Real Property Located at 16832 Charles River

Drive, Delray Beach, FL 33446 (the "Property") and state as follows in support thereof.

**I.**      **INTRODUCTION**

Plaintiffs are entitled to a preliminary injunction preventing the transfer, sale,

encumbrance, or other disposition of the Property because Defendants PAUL VERNON

("VERNON") and LORIE ANN NETTLES ("NETTLES") purchased the Property with assets

stolen by Defendants PROJECT INVESTORS, INC. d/b/a Cryptsy ("CRYPTSY") and

VERNON (collectively "the CRYPTSY Defendants") from Plaintiffs, and the Property was

subsequently fraudulently transferred to NETTLES in an attempt to conceal those assets and to place them outside Plaintiffs' reach as creditors of CRYPTSY. Importantly, Defendant NETTLES has refused to voluntarily agree to a temporary injunction or informal stay as to the sale of the Property, and declined to provide evidence of the source of the funds used to purchase the Property. The Property -- which was publicly listed for sale at $1,500,000.00 on February 19, 2016, is still listed for sale, and is being actively marketed[1] -- should therefore be frozen by entry of a Preliminary Injunction to preserve the *status quo ante* while Plaintiffs seek recovery through this proceeding.

Plaintiffs filed this nationwide class action on behalf of themselves and a class of similarly situated CRYPTSY users (the "Class Members"). The CRYPTSY Defendants operated an online business for general consumers and the public to exchange, invest, and trade in digital cryptocurrencies, including "Bitcoin" and "Litecoin." Similar to a bank, but existing only in the "virtual" world, CRYPTSY customers, including Plaintiffs, deposited their digital currency in accounts held at, and purportedly protected and managed by, CRYPTSY. The CRYPTSY Defendants acted unlawfully by denying account holders, including Plaintiffs, the ability to withdraw or use the funds in their accounts and by stealing for their own use and benefit the digital currency held in the CRYPTSY accounts. Among the benefits obtained by the CRYPTSY Defendants is the purchase of the Property – a $1.375 million waterfront mansion located in Palm Beach County, Florida.

The circumstantial evidence clearly indicates that Defendant VERNON converted Plaintiffs' and their fellow class members' digital currency and purchased the Property with those stolen proceeds. VERNON first had title to the Property issued in the names of himself

---

[1] *See*, *e.g.*, **Exhibit "A"** hereto.

and his wife, NETTLES, as tenants by the entireties, in an effort to place the Property beyond the reach of CRYPTSY's creditors, including Plaintiffs.  Defendant VERNON then fled Florida for the "safe" confines of the People's Republic of China, maintaining only a U.S. Post Office box as his address in Palm Beach County, Florida. Contemporaneously, VERNON's wife NETTLES initiated divorce proceedings. Through the divorce settlement agreement, VERNON fraudulently transferred the Property by transferring title solely to NETTLES, awarding her sole right, title and interest in the Property, including all proceeds of the sale of the Property, with the sale intended to proceed within 30-days of entry of the settlement agreement (*i.e.*, by March 4, 2016).  *See* Final Judgment of Dissolution of Marriage (Dated: February 3, 2016) attached hereto as **"B"** and Marital Settlement Agreement (Dated: January 29, 2016), attached hereto as **Exhibit "C"**.[2]

The Property, having apparently been directly acquired with the proceeds of VERNON's theft of Plaintiffs' and their fellow class members' assets, is subject to Plaintiffs' claims for fraudulent transfer under Florida's Uniform Fraudulent Transfer Act (Count VIII of the Amended Class Action Complaint ["Amend. Compl."]) and for imposition of a constructive trust and/or equitable lien (Amend. Compl. at sub-paragraphs (e)-(g) of "Prayer for Relief").  Because the Property is subject to those equitable claims, because the Property is the only known asset remaining within this Court's jurisdiction to satisfy Defendants' obligations to Plaintiffs, and because NETTLES is actively marketing and trying to sell the Property; Plaintiffs respectfully request that the Court enter a Preliminary Injunction precluding the transfer, sale, encumbrance or other disposition of the Property during the pendency of this proceeding.

---

[2] The Marital Settlement Agreement was incorporated into, but not attached to, the Final Judgment of Dissolution of Marriage.

Civil Action No. 9:16-cv-80060-MARRA

## II.     THE FACTS

### A.     Cryptsy Was a Fraudulent Operation

On January 15, 2016 -- a mere two days after Plaintiffs commenced this lawsuit -- the

CRYPTSY Defendants confessed on the CRYPTSY blog to the truthfulness of a number of

Plaintiffs' allegations, including that:

> CRYPTSY has been insolvent since approximately Five Million Dollars
> ($5,000,000.00) in client assets "disappeared" in June 2014, and CRYPTSY
> has been actively concealing that fact from CRYPTSY's customers as well as
> from governmental and regulatory authorities;
>
> CRYPTSY lied to its customers about the nature of the problems that
> prevented CRYPTSY account holders from accessing their funds;
>
> CRYPTSY purposely refrained from filing with the government a Suspicious
> Activity Report relating to the "disappearance" of the $5 Million;
>
> CRYPTSY had essentially been operating a fraudulent financial scheme for
> nearly eighteen (18) months by which withdrawals from CRYPTSY accounts
> were not being funded from the assets purportedly safeguarded in each
> CRYPTSY account holders' account; rather, the funds that were withdrawn
> were purportedly being supplied by CRYPTSY itself from the profits in its
> own business operating account; and
>
> CRYPTSY plans to indefinitely suspend all trades and withdrawals from
> CRYPTSY accounts until the CRYPTSY Defendants can formulate their own
> brand of vigilante justice that would somehow resolve all of the crimes and
> misdeeds the CRYPTSY Defendants had perpetrated upon their customers.

Attached hereto as **Exhibit "D"** is a true and correct copy of the January 15, 2016 blog posting

published at http://blog.cryptsy.com. CRYPTSY has acknowledged it never reported the

alleged "disappearance" of funds to any government agency, despite being required to do so.

Numerous other reports have also emerged suggesting that VERNON drained CRYPTSY's

customers' accounts and that no hack occurred. *See* **Composite Exhibit "E"**.[3]

---

[3] The first of the articles in this composite exhibit is a March 13, 2016 article aptly titled
"ROFL: Cryptsy offers bounty for the return of 'stolen' Bitcoin in latest piece of absurd
theatrics."

Civil Action No. 9:16-cv-80060-MARRA

**B.      The Evidence Points to VERNON as Having Stolen Plaintiffs' Assets and Using Them to Purchase the Property**

Plaintiffs, through counsel, have also identified a number of facts indicating that the millions of dollars in customer assets that purportedly "disappeared" in June 2014 are not missing at all. Rather, it appears the virtual currency was taken by the CRYPTSY Defendants, and some or all of those stolen funds were converted into U.S. Dollars to pay for the CRYPTSY Defendants' own business and personal expenses, including VERNON'S all-cash-purchase of the $1,374,881 waterfront Property. That Property is the only asset presently identifiable as likely having been acquired using the proceeds of the CRYPTSY Defendants' theft of Plaintiffs and the class members' digital currency.  The facts supporting this conclusion are as follows.

VERNON and NETTLES acquired the Property by warranty deed dated March 23, 2015. *See* Special Warranty Deed attached hereto as **Exhibit "F(1)"**.  At the time of the acquisition, before the loss was disclosed to CRYPTSY's customers, over $5 million of CRYPTSY's clients' assets had purportedly "disappeared," and CRYPTSY was purportedly funding its clients' account withdrawals from its own operating account.  *See* **Exhibit "D"** hereto.  NETTLES and VERNON claim that the Property was their marital home and that NETTLES had claimed it as her homestead property. *See* Marital Settlement Agreement ¶10.2 (**Exhibit "C"**).

In fact, in 2015, the Property did <u>not</u> have Homestead status, which VERNON and/or Nettles did not apply for until 201x.  *See,* Composite **Exhibit "F(2)."** hereto. At the time VERNON and NETTLES acquired the Property, they already owned a home in Palm Beach County located at 8565 Tourmaline Boulevard, Boynton Beach, FL 33472, that they acquired in 2004.  *See*, August 31, 2004 Warranty Deed attached as **Exhibit "G"** hereto.

Within just a few months of VERNON and NETTLES' cash purchase of the Property, NETTLES commenced marital dissolution proceedings, that were concluded in less than four months with an arrangement (the Marital Settlement Agreement) under which NETTLES was granted sole ownership of the Property, the proceeds of any sale of the Property, and the Boynton Beach home and the proceeds of the sale of that home as well. *See* **Exhibit "C"** at ¶¶10.1 - 10.3.  *See also*, January 22, 2016 Quit Claim Deed attached hereto as **Exhibit "H".**

VERNON and NETTLES continued to own both the Property and their Boynton Beach home until January 29, 2016, when NETTLES and VERNON sold the Boynton Beach home simultaneously with their execution of the Marital Settlement Agreement.  *See* January 29, 2016 General Warranty Deed attached hereto as **Exhibit "I"**.  Therefore, they clearly did not use the proceeds of the January 2016 sale of the Boynton Beach home to pay for the Property, which had been purchased nearly a year earlier in March 2015.

According to NETTLES' filings in the divorce proceedings, she did not work outside the home and earned no income for the family. *See* NETTLES' Urgent Motion for Injunctive Relief to Prevent the Removal and/or Further Dissipation of Marital Assets and Income (the "Nettles Motion") at ¶4, attached hereto as **Exhibit "J"**.  Rather, VERNON was the sole breadwinner. *Id.* It would therefore have been virtually impossible for NETTLES to have supplied the cash used to acquire the Property, and she makes no such representation in the Marital Settlement Agreement. *See* Marital Settlement Agreement attached hereto as **Exhibit "C"**.

In the divorce proceeding, even NETTLES herself recognized the inherent risk of VERNON fleeing the jurisdiction with his assets given the ephemeral nature of virtual currency. NETTLES stated the following in the Nettles' Motion:

The Defendant Entities' business relate to the mining, trading and selling of virtual currencies, including, but not limited to, bitcoin. The assets generated by the Defendant Entities, whether through mining or the collection of fees from customers, are collected in the form of Virtual Currencies, like bitcoin. These Virtual Currencies, which are regulated domestically as commodities, exist as intangible assets (i.e. computer code), and can be copied onto a piece of portable media (like a flash drive, or an external hard drive) emailed from person to person, or stored online in cloud storage. Thus, this asset class is optimal for secretion out of the jurisdiction. Likewise, due to the inherent properties of virtual currencies, Husband could transfer all of his virtual currency assets to a third party in a matter of minutes. *See* Nettles' Motion ¶¶ 9-11 (**Exhibit "J"**).

Virtual currencies, unlike other common forms of value transfer function, do not use banks or any central entity to transmit value - evidence of virtual currency transfer exist on their communally maintained central transfer ledgers, known as blockchains, which record limited information about transfers. Among the limited information is a public key loosely corresponding to each transacting party. The public key itself does not directly identify the transacting party, but with additional information, identification of recipients of transfers across the blockchains related to the virtual currencies is difficult but possible. Because a majority, if not most, of the marital assets under the Husband's exclusive control are Virtual Currencies, it is imperative that the Court move quickly to prevent asset flight and to prevent the need for expensive and complex asset tracing should the Husband take any further action to dissipate these assets. *Id.* ¶12

The Wife's concerns and fears of dissipation of assets as alleged in her prior filed Motion for Temporary Relief have been substantiated by multiple sources which portend imminent, if not already completed, dissipation of marital assets. *Id.* ¶13.

The Husband intends to leave the country to travel to China. It is believed that he plans to leave the United States on November 9, 2015. The Husband has previously traveled to China. His most recent trip was scheduled for one month, but turned into a three-month trip. during which time his affair with a Chinese woman came to light. The Husband has put at least one of his companies into the Chinese girlfriend's name. He traveled back to the United States with his Chinese girlfriend, continuing supporting her and her child and now residing with them.  The Husband even paid for his girlfriend's child to attend Trinity Lutheran, the same private school his children of the instant marriage attend. It is believed the Husband is going to return to China with his girlfriend to start a new life, leaving the Wife and the minor children without any adequate remedy at law. *Id.* ¶¶17-18.

In addition, although the Wife does not have first-hand knowledge of the operations of Cryptsy, the Wife is deeply concerned that, given the existence of a criminal law enforcement investigation into Cryptsy, the allegations of service interruptions and key employees seeking work, that the Husband will not only flee to China, but will also shut down Cryptsy and or secret its assets. It is highly probable that the Husband may abscond with whatever funds he has from his remaining Defendant Entities to avoid the payment of any support for the Wife and minor children. *Id.* ¶¶19-20.

Because of the ephemeral nature of virtual currencies, it is also in the best interest of the minor children and the Wife that this Court freeze all current depository and virtual currency accounts associated with Cryptsy International Ltd.; Project Investors, Inc.; Hashmax USA, LLC; Teraboss, Inc.; HashMax Inc.; and Vergent Data, Inc. To implement the freeze, the Husband should be required to (a) disclose in writing all public keys or public ID's related to all virtual currency wallets in his or his entities' possession, custody or control forthwith. Husband should also be required to disclose all transactions made by him to move any assets, including all virtual currency assets, from his control to the control of any third party from the date of service of the summons and petition in this matter to present, including the date, time, and identity of all parties to all transactions by name and wallet public key/ public ID. *Id.* ¶24.

NETTLES' fears have now come to fruition. VERNON fled to China. *See*, **Exhibit "C"** hereto (Marital Settlement Agreement signed and notarized by VERNON in China). He also stated under oath that the Property represents 85% of his personal net worth. *See*, **Exhibit "K"** (VERNON's Financial Affidavit filed in the divorce proceeding). He has also stated under oath that, as of December 22, 2015, he was not taking any salary from CRYPTSY, and that it was his intention "to dissolve Cryptsy due to economic conditions." *Id.* He identified no other source of income, and he identified only a few other, very limited assets. *Id.* Meanwhile, NETTLES has tried to insulate herself from her former husband's fraud by accepting the transfer of the Property and the proceeds of the Boynton Beach home, and by filing for homestead exemption protection for the Property (*see* **Exhibit "F2"**), although she is now trying to sell the Property. *See* Marital Settlement Agreement ¶¶10.2 and 10.3 (**Exhibit "C"**) and real estate listing (**Exhibit "A"**).

Civil Action No. 9:16-cv-80060-MARRA

As a result of the foregoing scheme, the risk of asset dissipation and dispersion now falls squarely on Plaintiffs' and the potential class members' shoulders, while NETTLES seeks to reap the benefits of her former husbands' fraud and theft.  Given these facts, Plaintiffs are entitled to a preliminary injunction to freeze the Property and thus preserve the *status quo ante* pending the outcome of this litigation.

## III.   LEGAL ARGUMENT

Rule 64 of the Federal Rules of Civil Procedure provides that when state law authorizes a prejudgment remedy to secure assets subject to a plaintiff's state law claims, state law governs such relief. Rule 64, Fed.R.Civ.P.; *Granny Goose Foods, Inc. v. Bhd. of Teamsters Local 70*, 415 U.S. 423, 436 n. 10, 94 S.Ct. 1113, 1123 n. 10, 39 L.Ed.2d 435 (1974). Here, Plaintiffs seek pre-judgment equitable relief to secure the Property based on two claims asserted in the Amended Complaint: Fraudulent Transfer under Florida Statute §726.105(1)(a) (Count VIII) and by seeking imposition of a Constructive Trust as a remedy (subparagraph (f) of "Prayer for Relief").

Although the Supreme Court ruled in *Grupo Mexicano de Desarrollo, SA. v. Alliance Bond Fund. Inc.* that injunctive relief is not available in cases seeking only money damages, the Court suggested that when equitable claims are at issue, as opposed to solely legal damages claims, the rule barring issuance of a preliminary injunction freezing assets is inapplicable as well. 527 U.S. 308, 324-325, 144 L. Ed. 2d 319, 119 S. Ct. 1961 (1999); s*ee also*, *In re Focus Media, Inc.*, 387 F.3d 1077, 1084 (9th Cir. 2004) (citations omitted).  In *Focus Media*, the Ninth Circuit specifically noted that the rule against injunctive relief as articulated in *Grupo Mexicano* did not apply to the underlying claims for fraudulent conveyance and constructive trust, ultimately concluding that the trial court's entry of a preliminary injunction had been proper. *Id*. at 1085.

The Uniform Fraudulent Transfer Act thus gives plaintiffs the intermediate remedy of a preliminary injunction in order to preserve the *status quo* and prevent the further transfer of specific, identifiable assets. For example, in *United States ex rel. Rahman v. Oncology Assoc.*, the Court of Appeals for the Fourth Circuit summarized a plaintiff's right to a preliminary injunction in a fraudulent transfer case as follows:

> [W]hen the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the status quo pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested. This nexus between the assets sought to be frozen through an interim order and the ultimate relief requested in the lawsuit is essential to the authority of a district court in equity to enter a preliminary injunction freezing assets.

198 F.3d 489, 496-97 (4th Cir. 1999); *see also Walczak v. EPL Prolong, Inc.*, 198 F.3d 725 (9th Cir. 1999) (affirming district Court's entry of preliminary injunction on fraudulent conveyance action and stating "the injunction appropriately preserved the *status quo* and prevented the irreparable loss of rights before judgment.").

Florida law, as applied in this case through Rule 64, Fed. R. Civ. P., also explicitly authorizes interim equitable relief based on Plaintiffs' fraudulent transfer claim and constructive trust claim. With regard to the fraudulent transfer claim, Florida's Uniform Fraudulent Transfer Act directly authorizes equitable relief. §726.108, Fla. Stat.  With regard to the claim for imposition of a constructive trust, Florida courts have authorized equitable injunctive relief to secure the assets subject to the claim. *Friedman v. Heart Institute of Port St. Lucie, Inc.*, 863 So.2d 189, 192 (Fla. 2003); *Briceño v. Bryden Investments, Ltd.*, 973 So.2d 614, 617 (Fla. 3d DCA 2008) (and cases cited therein).

To be entitled to a preliminary injunction, Plaintiffs must establish the following: (1) the likelihood of irreparable harm; (2) the unavailability of an adequate remedy at law; (3) the

substantial likelihood of success on the merits; (4) the threatened injury to the petitioner outweighs the possible harm to the respondent; and (5) a temporary injunction will not disserve the public interest. *City of Miami Beach v. Kuoni Destination Mgmt., Inc.*, 81 So. 3d 530, 532 (Fla. 3d DCA 2012); *see also Siegel v. LePore,* 234 F.3d 1163, 1179 (11th Cir. 2000), *cert. denied*, 531 U.S. 1005, 121 S. Ct. 510, 148 L. Ed. 2d 478 (2000) (citations omitted).  As shown below, Plaintiffs have established each element.

### A.     Plaintiffs Have a Substantial Likelihood of Success on the Merits of Both Their Fraudulent Transfer and Constructive Trust Claims.

### 1.     The Fraudulent Transfer Claim

The Florida Uniform Fraudulent Transfer Act provides, in pertinent part:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>> (a)  With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>>
>> (b)  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>
>>> 1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>>
>>> 2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

§726.105(1), Fla. Stat.

Because direct evidence of actual intent to defraud creditors is often difficult to adduce, the statute lists badges of fraud that, when shown, establish the "actual intent" required to prove

a claim under this provision.  §726.105(2), Fla. Stat.; *Beal Bank SSB v. Almand & Assocs.*, 780

So.2d 45, 60 (Fla. 2001). These statutory badges of fraud include:

> (a) The transfer or obligation was to an insider.

> (b) The debtor retained possession or control of the property transferred after the transfer.

> (c) The transfer or obligation was disclosed or concealed.

> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

> (e) The transfer was of substantially all the debtor's assets.

> (f) The debtor absconded.

> (g) The debtor removed or concealed assets.

> (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

> (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

> (j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

> (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

§ 726.105(2), Fla. Stat.

Based on the facts admitted by the CRYPTSY Defendants, Plaintiffs have a substantial

likelihood of success on the merits of their fraudulent transfer claim.  First, Plaintiffs each owned

virtual currency held in accounts at CRYPTSY, and Plaintiffs cannot retrieve their currency.

Second, the CRYPTSY Defendants admitted Plaintiffs' and their fellow class members' virtual

currency "disappeared" approximately 20 months ago. **Exhibit "D"** hereto. Third, the

CRYPTSY Defendants admitted that CRYPTSY is insolvent and has been insolvent for some

time. *Id*. Fourth, VERNON stated under oath that he intends to dissolve CRYPTSY, leaving no assets to satisfy Plaintiffs' claims. **Exhibit "K"** hereto. Fifth, Defendants VERNON and NETTLES acquired the Property, in cash, at the same time CRYPTSY had admittedly "lost" over $5 million in Plaintiffs' and the class members' assets. **Exhibit "D"** hereto. By their own admission in the divorce proceedings, neither NETTLES nor VERNON had personal assets or income sufficient to purchase the Property with cash. **Exhibit "K" and "L" (¶ 8)** hereto.

Additionally, the transfer of the Property to NETTLES bears a number of the statutory badges of fraud, including: (i) the transfer was to an insider, namely VERNON's wife (**Exhibit "H"**)[4]; (ii) VERNON had been sued before the transfer was made; (iii) VERNON removed or concealed his assets as stated in the Nettles Motion (**Exhibit "J"**); (iv) the transfer was of all or substantially all of VERNON's assets based on his sworn verification that the Property constituted approximately 85% of his total net worth (**Exhibit "K"**); and (v) VERNON has absconded as evidenced by his fleeing to China. (**Exhibit "J"** [alleging "*that the Husband will not only flee to China, but will also shut down Cryptsy and secret its assets*"]; **Exhibit "C"** [VERNON's signature on Marital Settlement Agreement was notarized at U.S. Embassy in People's Republic of China]); and **Exhibit "H"** [VERNON's signature on Quit Claim Deed was notarized at U.S. Embassy in People's Republic of China]). The inescapable conclusion is that the Property was acquired with monies fraudulently obtained from Plaintiffs and the Class. *See*

---

[4] *See*, Fla. Stat. § 726.102(8)(a) (defining "a relative of the debtor" as an "insider"). *See also*, *German Am. Capital Corp. v. Morehouse*, 2014 U.S. Dist. LEXIS 76008, at *5 (S.D. Fla. June 4, 2014) (nullifying and voiding as fraudulent a debtor's transfer of real property to his wife, identifying her as an "insider"); *In re Wainsztein*, 117 B.R. 742, 745 (S.D. Fla. Bankr. 1990) (setting aside transfer to debtor's wife as fraudulent and identifying the spouse as an "insider").

Plaintiff and Class Members Declarations attached hereto as Composite **Exhibit "M"** (detailing deposits of Bitcoin with Cryptsy prior to the purchase of the Property).[5]

Plaintiffs are therefore clearly creditors; CRYPTSY and VERNON and clearly debtors; and the Property, having been purchased using the proceeds of the CRYPTSY Defendants' fraud, is a property which is applicable by law to the payment of the debt due. *Johnson v. Dowell*, 592 So.2d, 1194, 1196 (Fla. 2d DCA 1992). Moreover, while "[a] single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance . . . , several of them when considered together may afford a basis to infer fraud." *Johnson,* 592 So.2d at 1197 (Fla. 2d DCA 1992); *see also Wiand v. Lee*, 753 F.3d 1194, 1200 (11th Cir. 2014) (applying Florida law). Here, the evidence demonstrates the existence of at least five (5) badges of fraud.  Thus, Plaintiffs have a substantial likelihood of success on the merits of their claim.  *See Mejia v. Ruiz*, 985 So.2d 1109, 1113-1114 (Fla. 3d DCA 2008).

### 2.      The Constructive Trust Claim

Plaintiffs also seek to impose a constructive trust with the Property serving as the *res* of the trust. Under Florida law, a constructive trust is appropriately imposed as follows:

> [A] court of equity will raise a constructive trust and compel restoration where one through actual fraud, abuse of confidence reposed and accepted, or through order questionable means gains something for himself which equity and good conscience he should not be permitted to hold.

*Quinn v. Phipps*, 93 Fla. 803, 113 So. 419, 422 (Fla. 1930) (citations omitted).  A constructive trust is "created by law to do equity under the circumstances without regard to intent." *Palmland Villas I Condo. Ass'n, Inc. v. Taylor*, 390 So.2d 123, 125 (Fla. 4th DCA 1980).  A constructive

---

[5]  The Declarations only address the Bitcoin lost by the Declarants.  The Declarants also  have lost access to and value in several other cryptocurrencies (such as Dogecoin, Litecoin, Earthcoin, and Digiyte, etc.) unlawfully locked up and stolen by Cryptsy as well.

trust is therefore appropriately established "to right a wrong committed and to prevent unjust enrichment of one person at the expense of another either as a result of fraud, undue influence, abuse of confidence or mistake in the transaction." *In re Fin. Federated Title and Trust, Inc.*, 347 F.3d 880, 891 (11th Cir. 2003) (applying Florida law).   Among the circumstances when a constructive trust is properly imposed is when one party has acquired real property with the proceeds of a fraudulent transfer of the other party's assets.  *Id.*

Here, the CRYPTSY Defendants stole Plaintiffs' and the class members' assets, converted them to U.S. Dollars, and then used a portion of those assets to purchase the Property. No other source of funds for the purchase of the Property is evident from the available records, and NETTLES has failed to offer any proof to the contrary. VERNON then transferred the Property to NETTLES at the same time he absconded to China and after this lawsuit was filed. Under similar circumstances, the Eleventh Circuit held that a constructive trust was properly imposed over the property that was acquired with the proceeds of the debtor's fraud. *In re Fin. Federated Title and Trust, Inc.*, 347 F.3d at 892.

### 3. NETTLES' Anticipated Defense Based on the Florida Homestead Exemption Is Unavailing.

Plaintiffs anticipate that NETTLES will assert the homestead exemption as a defense to imposition of any equitable remedy against the Property. However, the homestead exemption does not apply. Under Florida law, if funds obtained by fraud or egregious conduct are used "to invest in, purchase, or improve the homestead," the homestead exemption does not protect the property from imposition of an equitable lien against the property for the benefit of the defrauded party. *Havoco of America, Ltd. v. Hill*, 790 So.2d 1018, 1028 (Fla. 2001). As stated by the Florida Supreme Court: "[W]here equity demands it[,] this Court has not hesitated to permit equitable liens to be imposed on homesteads beyond the literal language of article X, section 4.

* * *  [T]he homestead exemption is intended to be a shield, not a sword." *Palm Beach Sav. & Loan Ass'n, F.S.A. v. Fishbein*, 619 So.2d 267, 270-71 (Fla. 1993).  Moreover, it is not relevant whether the title holder of the property was complicit in the fraud or not. *Id.* at 270.  Finally, under such circumstances, the fraudulently obtained homestead property is also subject to imposition of a constructive trust. *In re Fin. Federated Title and Trust, Inc.*, 347 F.3d at 881.

As explained above, the evidence strongly indicates that VERNON purchased the Property using the proceeds of the fraud committed against Plaintiffs and the other class members.  No other assets are readily identifiable as the source of the cash purchase, and the timing of the purchase coincides with the time VERNON was still concealing the "disappearance" of the Plaintiffs' and putative class members' assets. Accordingly, Plaintiffs have a substantial likelihood of success on the merits of their claims and are thus entitled to equitable interim relief to preserve their equitable rights against the Property pending the outcome of these proceedings.

### B.    The Plaintiff Will Suffer Irreparable Harm if the Transfer or Encumbrance of the Property Is Not Enjoined.

As noted above, Plaintiffs and the putative Class seek to recover a judgment in excess of $5 million from VERNON and CRYPTSY for their involvement in the "disappearance" (*i.e.*, theft) of Plaintiffs' virtual currency. Plaintiffs have identified a single asset valued at only a fraction of the total damages Plaintiffs seek that is recoverable to satisfy those claims. If Defendants are allowed to transfer or encumber the Property, the value and/or equity in the Property will be lost, any rights Plaintiffs would have to recover the Property would be lost, and Plaintiffs will be further frustrated in their attempt to recover funds for themselves and the other defrauded class members.  The risk of this loss is further exacerbated by the fact that NETTLES intends to sell the Property immediately. If the Property is sold, VERNON and NETTLES will

have successfully put the CRYPTSY account holders' stolen funds beyond Plaintiffs' and the putative Class Members' reach -- funds that would have been available to Plaintiffs and the potential Class Members at some point in time but for VERNON and NETTLES' fraudulent conveyance. Plaintiffs will therefore be irreparably harmed absent preliminary injunctive relief.

### C.    There Is Little Prejudice to Defendants If the Injunction Is Entered

While Plaintiffs would be severely prejudiced if the Property were transferred and lost, Defendants face no such prejudice. VERNON has already waived and released any claim he may have had to the Property in the divorce settlement.  NETTLES will not lose the Property by virtue of the injunction. She will, instead, simply be prohibited from selling, transferring or encumbering the Property while this litigation proceeds.  Ultimately, if Plaintiffs succeed, the Property will be subject to an equitable lien/constructive trust and may be sold to repay Plaintiffs the money stolen from them and used to purchase the Property.  NETTLES, however, would be in no worse position because she would then have never had a valid ownership interest in the Property from the outset.  Alternatively, if Plaintiffs' claims fail, NETTLES will still have full title to the Property.

Moreover, if Nettles were to find a prospective purchaser for the Property, she can apply to the Court to lift the injunction as to the Property and substitute the sales proceeds in place of the Property. In addition, injunction of any transfer, sale, or encumbrance of the Property will have no effect on Defendants' other assets. Thus, while the prejudice to Plaintiffs is severe if the Property is transferred away, maintaining the *status quo* does not affect Defendants in any detrimental manner at all.  *See Crawford v. Silette*, 608 F.3d 275, 279 (5th Cir. 2010) (applying Florida law).

**D.**     **Plaintiffs Have No Adequate Remedy at Law**

Plaintiffs' only remedy to recover the Property is through their right to equitable relief in the form of an injunction to preserve a fraudulent transfer and through imposition of a constructive trust to prevent the dissipation of the Property.  A legal remedy for monetary relief alone will not adequately protect Plaintiffs' equitable ownership interest in the Property.

**E.**     **Entering an Injunction Is In the Public Interest**

Entering a preliminary injunction would serve the public interest by preserving the integrity of Money Services Businesses (of which CRYPTSY is one), preserving and stabilizing the worldwide use of cryptocurrencies, and promoting the objectives of FinCEN (a division of the U.S. Department of the Treasury) by providing assurance that courts will protect investors' assets from theft and will aid investors in their recovery of stolen assets when they can be readily located and traced to specific locations, like the Property in this action.

**F.**     **The Court Should Exercise Its Discretion to Limit the Amount of an Injunction Bond to the Value of the Named Plaintiffs' Lost Virtual Currency.**

Courts retain extensive discretion to set the amount of a bond required as a condition for issuing a preliminary injunction and may, in fact, elect to require no bond at all.  *BellSouth Telecom., Inc. v. MCI Metro Access Transmission Svcs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005); *Towbin v. Antonacci*, 885 F.Supp.2d 1274, 1295 (S.D. Fla. 2012). Plaintiffs suggest that pending class certification, an appropriate bond be limited to the value of the presently named Plaintiffs' liquidated losses from their CRYPTSY accounts.  These losses are valued as follows: Plaintiff Leidel - $40,752.47 (Amend. Compl. ¶59); and Plaintiff Wilson - $2,748.48 (Amend. Compl. ¶69), for a total of $43,500.95.  This amount represents a fair and adequate bond to protect NETTLES' rights pending class certification; as until the class is certified, only the

presently named Plaintiffs' claims and damages are fully before the Court.  If the Court ultimately certifies the Class, the Court may then revisit the amount of the bond, if necessary.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court find that Plaintiffs have satisfied the elements of their claim for a preliminary injunction and that the Court enter a preliminary injunction preventing and prohibiting the transfer, sale, encumbrance or other disposition of the real property located at 16832 Charles River Drive, Delray Beach, FL 33446 in order to preserve the *status quo ante* pending the full adjudication of Plaintiffs' claims.  Plaintiffs further request that the Court limit to $43,500.95 the amount of any bond required as a condition for entry of the injunction.

### **REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b)(2), S.D. Fla. L.R., and to the extent the Court deems it necessary, Plaintiffs request the Court schedule an **expedited hearing** on this matter to evaluate this motion and the relief sought herein. Plaintiffs desire an expedited hearing because Defendant NETTLES has refused to the voluntary entry of an injunction or informal stay as to the sale of the real property at issue, even on a temporary basis, and all of the available evidence demonstrates that such property was purchased with funds fraudulently obtained from Plaintiffs and the Class through CRYPTSY.  A hearing would be helpful to the Court, as disputes involving Bitcoin thefts are a relatively new issue in this District, and the Court may have questions about the Bitcoin market or this action which may be better addressed through oral argument.  Plaintiffs estimate that one (1) hour is required for the hearing.

Civil Action No. 9:16-cv-80060-MARRA

## CERTIFICATE OF GOOD FAITH

Pursuant to Local Rule 7.1(a)(3), prior to filing this Motion the undersigned counsel attempted to confer with Defendants.  The undersigned requested that Defendants CRYPTSY and VERNON agree to the relief sought by contacting them through their email addresses and CRYPTSY website.  As of the date of this filing, they have not responded.  The undersigned conferred with Defendant NETTLES' counsel, and requested that NETTLES: (1) agree to the entry of a temporary injunction or information stay and/or (2) provide evidentiary proof that the real property was purchased with funds other than those obtained through or from CRYPTSY.  Defendant NETTLES, through her counsel, declined those requests.

Respectfully submitted,

**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, Florida 33065
Phone: (954) 755-4799/Fax: (954) 755-4684

By: _/s/ David C. Silver_
DAVID C. SILVER
Florida Bar No. 572764
E-mail:  DSilver@silverlaw.com
SCOTT L. SILVER
Florida Bar No. 095631
E-mail:  SSilver@silverlaw.com
JASON S. MILLER
Florida Bar No. 072206
E-mail: JMiller@silverlaw.com

- and -

_/s/ Marc A. Wites_
MARC A. WITES
Florida Bar No. 024783
E-mail: mwites@wklawyers.com
**WITES & KAPETAN, P.A**.
4400 N. Federal Highway
Lighthouse Point, Florida 33064
Phone: (954) 570-8989/Fax: (954) 354-0205

_Attorneys for Plaintiffs and the Class_

Civil Action No. 9:16-cv-80060-MARRA

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was electronically filed with the Clerk of Court on this  24th day of March 2016 by using the CM/ECF system and that a true and correct copy will be served in accordance with the Federal Rules of Civil Procedure and/or the District's Local Rules and procedures to: **PROJECT INVESTORS, INC. d/b/a Cryptsy c/o Paul Vernon, President and Registered Agent**, P.O. Box 7646, Delray Beach, FL 33482, E-mail: support@cryptsy.com**; PAUL VERNON**, **individually**, P.O. Box 7646, Delray Beach, FL 33482, E-mail: PaulEVernon@yahoo.com; and **MARK A. LEVY, ESQ.**, BRINKLEY MORGAN, *Counsel for Defendant Lorie Ann Nettles*, 200 East Las Olas Blvd. - 19th Floor, Fort Lauderdale, FL 33301; E-mail: Mark.Levy@brinkleymorgan.com.

*/s/ Marc A. Wites*
Marc A. Wites