**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Civil Action No. 9:16-cv-80060-MARRA**

**BRANDON LEIDEL, and**
**MICHAEL WILSON, individually,**
**and on behalf of All Others Similarly Situated,**

      **Plaintiffs,**
**v.**

**PROJECT INVESTORS, INC. d/b/a CRYPTSY,**
**a Florida corporation,**
**PAUL VERNON, an individual, and**
**LORIE ANN NETTLES, an individual,**

      **Defendants.**
_____/


**PLAINTIFFS' UNOPPOSED MOTION FOR CLASS CERTIFICATION AND**
**INCORPORATED MEMORANDUM OF LAW IN SUPPORT THEREOF**

Plaintiffs BRANDON LEIDEL and MICHAEL WILSON, individually, and on behalf of all others similarly situated ("Plaintiffs"), pursuant to Fed. R. Civ. P. 23 and S.D. Fla. L.R. 23.1, respectfully move for class certification against Defendants Project Investors, Inc. d/b/a Cryptsy ("CRYPTSY"), Paul Vernon ("VERNON") and Lorie Ann Nettles ("NETTLES").  The Motion is unopposed because Defendants CRYPTSY and VERNON have defaulted, Defendant NETTLES, through her counsel, advised the undersigned that NETTLES does not oppose the relief sought herein, and the Receiver supports (and thus does not oppose) class certification.

## I.    INTRODUCTION

Plaintiffs filed this nationwide class action on behalf of themselves and a class of similarly situated CRYPTSY users (the "Class"). CRYPTSY and VERNON ("the CRYPTSY Defendants") operated an online business for general consumers and the public to exchange, invest, and trade in digital cryptocurrencies, including "Bitcoin" and "Litecoin." Similar to a bank, but existing only in the "virtual" world, CRYPTSY customers, including Plaintiffs, deposited their digital currency in accounts held at, and purportedly protected and managed by, CRYPTSY. The CRYPTSY Defendants acted unlawfully by denying account holders, including Plaintiffs, the ability to withdraw or use the funds in their accounts and by stealing for the CRYPTSY Defendants' own use and benefit the digital currency held in the CRYPTSY customer accounts. In total, Defendants stole approximately $5 million from the Plaintiff Class. Among the benefits obtained by the CRYPTSY Defendants is the purchase of a $1.375 million waterfront mansion located in Palm Beach County, Florida (the "Mansion") with funds unlawfully obtained from Plaintiffs and the Class. The Mansion was fraudulently transferred to Defendant NETTLES as part of a divorce settlement between VERNON and NETTLES.

Because of the fraudulent transfer and clear evidence of the dissipation of CRYPTSY's

assets by VERNON, Plaintiffs sought, and the Court appointed, a Receiver to oversee CRYPTSY and to investigate and recover assets to preserve the status quo pending the outcome of this litigation. The appointment of a Receiver in the context of a class action is an appropriate and efficient mechanism to preserve assets for the benefit of the Class while the case proceeds. The Receiver has no objection to class certification; he and proposed Class counsel have and will continue to work cooperatively to protect the interests of the Class members.

## II.    THE FACTS[1]

### A.    CRYPTOCURRENCY

Bitcoin is a virtual currency (a/k/a cryptocurrency) that can be traded on online exchanges for conventional currencies, including the U.S. dollar, or used to purchase goods and services online. *See* Amended Complaint (D.E. 8) ("Amd. Cmplt.") at ¶17. Bitcoin has no single administrator or central authority or repository. *Id*

### B.    CRYPTSY

CRYPTSY is a company that solicited members of the public to register new accounts, deposit Bitcoin or other cryptocurrency with CRYPTSY, and thereafter actively engage in the exchange and trade of Bitcoin as well as other cryptocurrencies. Amd. Cmplt. ¶20. Beginning in November 2015, many CRYPTSY users experienced difficulty withdrawing, or faced the complete inability to withdraw, any and all forms of currency from their accounts. Amd. Cmplt. ¶24. For over two months, CRYPTSY blamed the problems on a number of things including "server errors" and "denial of service attack." Amd. Cmplt. ¶¶25-31. Finally, on January 15, 2016 – just two days after this lawsuit was commenced – CRYPTSY retracted its earlier published excuses and made the stunning confession that CRYPTSY had been insolvent since

---

[1] The Clerk entered defaults against Defendants CRYPTSY (D.E. 25) and VERNON.  D.E. 51.

approximately Five Million Dollars ($5,000,000.00) in clients' assets "disappeared" in June 2014. *See* January 15, 2016 blog posting published at http://blog.cryptsy.com. (D.E. 23-4).

**1.      CRYPTSY Was a Fraudulent Operation**

On January 15, 2016, the CRYPTSY Defendants published a blog post which confessed to and conceded the truthfulness of a number of Plaintiffs' allegations, including that:

> ◆ CRYPTSY has been insolvent since approximately Five Million Dollars ($5,000,000.00) in client assets "disappeared" in June 2014, and CRYPTSY had been actively concealing that fact from CRYPTSY's customers as well as from governmental and regulatory authorities;

> ◆ CRYPTSY lied to its customers about the nature of the problems that prevented CRYPTSY account holders from accessing their funds;

> ◆ CRYPTSY purposely refrained from filing with the government a Suspicious Activity Report (SAR) relating to the "disappearance" of the $5,000,000.00;

> ◆ CRYPTSY had essentially been operating a fraudulent financial scheme for nearly eighteen (18) months by which withdrawals from CRYPTSY accounts were not being funded from the assets purportedly safeguarded in each CRYPTSY account holders' account; rather, the funds that were withdrawn were purportedly being supplied by CRYPTSY itself from the profits in its own business operating account; and

> ◆ CRYPTSY planned to indefinitely suspend all trades and withdrawals from CRYPTSY accounts until the CRYPTSY Defendants could formulate their own brand of vigilante justice that would somehow resolve all of the crimes and misdeeds the CRYPTSY Defendants had perpetrated upon their customers.

*See Id.* (D.E. 23-4). CRYPTSY acknowledged it never reported the alleged "disappearance" of funds to any government agency, despite being required to do so. Numerous other reports have also emerged suggesting that VERNON drained CRYPTSY's customers' accounts and that no hack occurred. *See* Composite Exh. E to Motion for Preliminary Injunction at D.E. 23-5.[2]

---

[2] The first of the articles in this composite exhibit is a March 13, 2016 article aptly titled "ROFL: Cryptsy offers bounty for the return of 'stolen' Bitcoin in latest piece of absurd theatrics." (D.E. 23-5, pp. 1 - 4).

Unfortunately, CRYPTSY's self-described "temporary" suspension and loss of access to accounts has now lasted over eight months, and users' transactions and their lawful right to withdraw their U.S. dollars or cryptocurrency are still being denied. Amd. Cmplt., ¶33. As a result of CRYPTSY's continuing freeze on withdrawals, customers have not had full and complete access to their funds. Amd. Cmplt. ¶34. This is confirmed by the Declarations of named Plaintiffs Leidel and Wilson, and 111 additional putative class members who are also CRYPTSY account holders. *See* Declaration of Brandon Leidel (D.E. 23-14, pp. 1 – 10); Declaration of Chris Kacher (D.E. 23-14, pp. 11 – 13); Declaration of Daniel Sutera (D.E. 23-15, pp. 1-4); Declaration of Gustavo Candia (D.E. 23-15, pp. 5 – 9); Declaration of Yu Han Jung (D.E. 23-15, pp. 10 – 14); Declaration of Cordearo Dadson (D.E. 23-15, pp. 15-16); and Declarations of Class Members in Support of Class Certification, attached hereto as Composite Exh. A. Each Declarant –all of whom are Class Members - reported being the victim of the same conduct at the same time with regard to CRYPTSY denying each of them access to their respective CRYPTSY accounts beginning in about November 2015. *Id.* Each reported having been unable either to regain possession of the assets in his Cryptsy account since then or to communicate with anyone from CRYPTSY about his account. *Id.* The total number of Cryptsy account holders unable to access their cryptocurrencies (i.e., the Class), thus totals at least 113 persons and, according to Defendants, likely includes 50,000 or more persons. *See* p. 9-11 *infra*.

### 2. VERNON Stole Plaintiffs' Assets and Used Them to Purchase the Mansion, Which He Then Fraudulently Transferred to NETTLES.

The millions of dollars in customer assets that purportedly "disappeared" in June 2014 are not missing at all. Amd. Cmplt., ¶3. Rather, the virtual currency was taken by the CRYPTSY Defendants, and some or all of those stolen funds were converted into U.S. dollars to pay for the CRYPTSY Defendants' own business and personal expenses, including VERNON's all-cash-

purchase of the $1,374,881 Mansion in Delray Beach, Florida. Amd. Cmplt., ¶¶4,5, 36-39. *See* Transcript of Deposition of Paul Vernon dated December 22, 2015 at 145:12-15, Exh. B1.

### C.   TO AVOID CREDITORS, VERNON FRADULENTLY TRANSFERRED TO NETTLES ASSETS IN CRYPTSY DEPOSITORS' ACCOUNTS.

VERNON and NETTLES acquired the Mansion by warranty deed dated March 23, 2015. *See* Special Warranty Deed at D.E. 23-6. At the time of the acquisition, before the loss was disclosed to CRYPTSY's customers, over $5 million of CRYPTSY's clients' assets had purportedly "disappeared," and CRYPTSY was purportedly funding its clients' account withdrawals from its own operating account. *See* D.E. 23-4. At the time VERNON and NETTLES acquired the Mansion, they already owned a home in Palm Beach County located at 8565 Tourmaline Boulevard, Boynton Beach, FL 33472 ("the Boynton Beach home"), that they had acquired in 2004. *See*, August 31, 2004 Warranty Deed at D.E. 23-8.

Within just a few months of VERNON and NETTLES' cash purchase of the Mansion, NETTLES commenced marital dissolution proceedings that were concluded in less than four months with a Marital Settlement Agreement that granted NETTLES sole ownership of the Mansion, the proceeds of any sale of the Mansion, and the Boynton Beach home and the proceeds of the sale of that home as well. *See* Marital Settlement Agreement at ¶¶10.1 - 10.3 (D.E. 23-3); *see also*, January 22, 2016 Quit Claim Deed at D.E. 23-9.

On January 29, 2016, NETTLES and VERNON sold the Boynton Beach home simultaneously with their execution of the Marital Settlement Agreement. *See* January 29, 2016 General Warranty Deed at D.E. 23-10. Therefore, they clearly did not use the proceeds of the January 2016 sale of the Boynton Beach home to pay for the Mansion, which had been purchased nearly a year earlier in March 2015.

Additionally, NETTLES' did not work outside the home and earned no income for the family. *See* NETTLES' Urgent Motion for Injunctive Relief to Prevent the Removal and/or Further Dissipation of Marital Assets and Income (the "Nettles Motion"), ¶4 at D.E. 23-11. VERNON was the sole breadwinner. *Id.* It would thus have been impossible for NETTLES to have supplied the cash used to acquire the Mansion, and she makes no such representation in the Marital Settlement Agreement. *See* Marital Settlement Agreement at D.E. 23-3.

### D.     VERNON FLED, LEAVING THE PLAINTIFF CLASS HOLDING THE EMPTY BAG

Given the ephemeral nature of virtual currency, the inherent risk of VERNON fleeing the jurisdiction with CRYPTSY's and the Class's assets was real. Even NETTLES recognized the risk; as explained by her in the Nettles Motion:

> The Defendant Entities' business relate to the mining, trading and selling of virtual currencies, including, but not limited to, bitcoin. The assets generated by the Defendant Entities, whether through mining or the collection of fees from customers, are collected in the form of Virtual Currencies, like bitcoin. These Virtual Currencies, which are regulated domestically as commodities, exist as intangible assets (i.e. computer code), and can be copied onto a piece of portable media (like a flash drive, or an external hard drive) emailed from person to person, or stored online in cloud storage. Thus, this asset class is optimal for secretion out of the jurisdiction. Likewise, due to the inherent properties of virtual currencies, Husband could transfer all of his virtual currency assets to a third party in a matter of minutes. *See* Nettles Motion ¶¶ 9-11 at D.E. 23-11.

> Virtual currencies, unlike other common forms of value transfer function, do not use banks or any central entity to transmit value - evidence of virtual currency transfer exist on their communally maintained central transfer ledgers, known as blockchains, which record limited information about transfers. Among the limited information is a public key loosely corresponding to each transacting party. The public key itself does not directly identify the transacting party, but with additional information, identification of recipients of transfers across the blockchains related to the virtual currencies is difficult but possible. *Id.* ¶12

> The Husband intends to leave the country to travel to China. It is believed that he plans to leave the United States on November 9, 2015. The Husband has previously traveled to China. His most recent trip was scheduled for one

month, but turned into a three-month trip. during which time his affair with a Chinese woman came to light. The Husband has put at least one of his companies into the Chinese girlfriend's name. . . . It is believed the Husband is going to return to China with his girlfriend to start a new life, leaving the Wife and the minor children without any adequate remedy at law. *Id.* ¶¶17-18.

In addition, although the Wife does not have first-hand knowledge of the operations of Cryptsy, the Wife is deeply concerned that, given the existence of a criminal law enforcement investigation into Cryptsy, the allegations of service interruptions and key employees seeking work, that the Husband will not only flee to China, but will also shut down Cryptsy and or secret its assets. It is highly probable that the Husband may abscond with whatever funds he has from his remaining Defendant Entities . . . *Id.* ¶¶19-20.

NETTLES' fears have come to fruition. VERNON fled to China. *See,* Marital Settlement Agreement signed and notarized by VERNON in China at D.E. 23-3, p. 31. He also stated under oath that the Mansion represented 85% of his personal net worth. *See* VERNON's Financial Affidavit previously filed as D.E. 23-12. He also stated under oath that, as of December 22, 2015, he was not taking any salary from CRYPTSY, and that it was his intention "to dissolve CRYPTSY due to economic conditions." *Id.* He identified no other source of income, and he identified only a few other, very limited assets. *Id.* Meanwhile, NETTLES has tried to insulate herself from her former husband's fraud by accepting the transfer of the Mansion and the proceeds of the Boynton Beach home, and by filing for homestead exemption protection for the Mansion while simultaneously trying to sell it. *See* Marital Settlement Agreement ¶¶10.2 and 10.3 (D.E. 23-3); and real estate listing previously filed at D.E. 23-1. Plaintiffs, on behalf of themselves and the Class, and in cooperation with the Receiver, are seeking to recover the $5 million Defendants stole from Plaintiffs and the Class.

## III.   LEGAL ARGUMENT

A class action plaintiff must, as a threshold matter, establish standing.  *E.g., C-Mart, Inc., v. Metropolitan Life Ins. Co.*, 299 F.R.D. 679, 687 (S.D. Fla. 2014)(citations omitted). As set

forth above and below, Plaintiffs (and the Class) clearly have standing as result of Defendants'

conversion of their cryptocurrencies and use of the proceeds from such currencies for their

personal benefit because the loss of their currencies is unquestionably an "injury in fact", there is

a causal connection between Defendants' conduct and the damages suffered by Plaintiffs, and it

is likely that a favorable decision here will provide redress to Plaintiffs. *Id.* (citations omitted).

Pursuant to Rule 23(a) and (b)(3), Fed.R.Civ.P., Plaintiffs seek the certification of a class

defined as follows:

> All CRYPTSY account owners who held Bitcoins, alternative cryptocurrencies,
> or any other form of monies or currency at CRYPTSY as of November 1, 2015 to
> the present.  Excluded from the Class are: (1) employees of CRYPTSY, including
> its shareholders, officers and directors and members of their immediate families;
> (2) any judge to whom this action is assigned and the judge's immediate family;
> and (3) persons who timely and validly opt to exclude themselves from the Class.

Plaintiffs' class definition satisfies the ascertainability requirement because membership

in the Class is not contingent upon the outcome of the case and can be determined by objective

criteria. *E.g., Sanchez-Knutson v. Ford Motor Co*., 310 F.R.D. 529, 534-35 (S.D. Fla.

2015)(citations omitted). Moreover, while Plaintiffs' investigation to date reveals that Defendant

Vernon destroyed at least some of CRYPTSY's databases that contain information about the

identity of CRYPTSY account owners (*see* p. 10 *infra* and Exh. C), Class Members may still be

identified through objective criteria and minimal effort. First, Class Members may establish their

membership in the Class through the production of (a) CRYPTSY account statements that

evidence their status as CRYPTSY account owners and their holdings (*see, e.g.,* Exh. A1), (b)

emails and other documents they received from CRYPTSY (*see, e.g.,* Exh. A2) and (c) through

declarations. *See, e.g*., Exhs. A1-A3. Moreover, while Plaintiffs have presented through this

Motion the existence of a sufficient number of Class Members that satisfy the numerosity

requirement and ascertainability requirement, Plaintiffs will continue their efforts to obtain from

Defendants and third parties additional records through which class membership may be ascertained.

A.  **A CLASS ACTION IS THE PROPER MEANS TO ADJUDICATE PLAINTIFFS' ALLEGATIONS OF FRAUD, NEGLIGENCE, CONVERSION, AND DECEPTIVE AND UNFAIR TRADE PRACTICES**

1.  **Legal Standard**

In order to maintain a class action, a plaintiff must satisfy the four requirements of Rule 23(a) and at least one of the standards of Rule 23(b). *Busby v. JRHBW Realty, Inc*., 513 F.3d 1314, 1321 (11th Cir. 2008). Consumer protection claims, such as the claims at issue here, are ideal for class certification. *See, e.g., Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997); *Collins v. Erin Capital Mgmt., LLC*, 290 F.R.D. 689, 694 (S.D. Fla. 2013) (certifying FDCPA consumer class action); *Veal v. Crown Auto Dealerships, Inc*., 236 F.R.D. 572, 581 (M.D. Fla. 2006) (certifying FDUTPA claim and noting that "Plaintiff alleges that Defendant committed the same or very similar unlawful acts utilizing the same methodology against the entire class"). As shown above, the wealth of evidence that Defendants have engaged in a uniform scheme to deprive Plaintiffs and the Class members of their assets in a manner that is identical as to all class members fully satisfies the burden of proof to establish the propriety of class certification.

2.  **Plaintiffs Satisfy the Prerequisites of Rule 23(a)**

The four prerequisites to class certification under Rule 23(a) are commonly referred to as: (1) numerosity;  (2) commonality;  (3) typicality;  and  (4) adequacy of representation. Each of these requirements are clearly met here.

a.  **Numerosity Is Met**

The Class satisfies Rule 23(a)(1), which requires the class to be so numerous that joinder of individual class members is impracticable. The general rule is that a class of at least 40 persons satisfies the numerosity requirement, and depending on the circumstances as few as 22 class members may be sufficient. *Hirsch v. Jupiter Golf Club, Inc*., 2015 WL 2254471, * 2 (S.D.

Fla. 2016)(citation omitted); *Collins v. Erin Capital Mgmt., LLC*, 290 F.R.D. 689, 694 (S.D. Fla. 2013). Plaintiffs have been unable to obtain discovery from Defendants *in this proceeding* about numerosity because Defendants CRYPTSY and VERNON have defaulted and are otherwise not participating in this proceeding or communicating with Plaintiffs. Further, on April 1, 2016, Defendant VERNON deleted the data in the database of Defendant CRYPTSY that Plaintiff has thus far identified, thereby destroying the evidence of the number of Class Members that presumably was available there. *See* Declaration of Receiver James D. Sallah, Exh. C.  Plaintiffs, however, have compiled the following evidence which more than satisfies the numerosity requirement (and the ascertainability requirement, as detailed above).

First, 107 CRYPTSY account holders have submitted sworn declarations in support of the instant motion that establish their membership in the Class. Of these Class Member Declarations:

i.     72 of the Declarations include screen shots showing the Class Members' holdings at CRYPTSY. *See* Exh. A1.

ii.     20 Declarations are based on testimony that such persons are CRYPTSY account holders who were unable to capture such information prior to Defendants shutting down CRYPSTY's systems but possess other evidence that establishes their membership in the Class, such as emails and other records received from Defendant CRYPTSY. *See* Exh. A2; and

iii.     15 submitted Declarations attesting to their membership in the class. *See* Exh. A3.

These declarations, along with the previously submitted declarations of the named plaintiffs and the 6 class members who submitted declarations in support of Plaintiff's Motion for Preliminary

Injunction (D.E. 23), establish that the Class includes at least 113 persons.[3]

Second, Receiver James Sallah, through his investigation in this case, which includes forensic examination of CRYPTSY's computer systems and interviews with former CRYPTSY employees, has determined that tens of thousands of CRYPTSY account holders are unable to access their cryptocurrencies due to Defendants' actions. *See* Sallah Dec. at ¶¶3 and 7, Exh. C.

Third, Defendant Vernon testified on December 29, 2015, in his divorce proceeding, that as of that date Defendant CRYPTSY had more than 50,000 users that had cryptocurrency deposits at CRYPTSY.  *See* Vernon Deposition Transcript, dated 12/29/15 at 102, 7-25, Exh. B2.

Fourth, CRYPTSY employee Stacey West Taylor, in an email dated February 12, 2014, provided Defendant VERNON with a list of all CRYPSTY account holders by state.  *See* Taylor Email, Exh. D.  The list identifies a total of 55,303 account holders, including 3,083 in Florida alone. *Id*.

Thus, Plaintiffs have presented evidence that the Class includes at least 114 class members and, according to Defendants, at least 50,000 persons. *See Diakos v. HSS Sys., LLC*, Case No. 14-61784, 2015 WL 5921585 *4 (S.D. Fla. September 29, 2015)( The sheer number of class members and their geographic diversity makes joinder of individual class members impracticable, if not impossible). Whether at either end of this spectrum, or anywhere in between, Plaintiffs have satisfied the numerosity requirement.

### b.    Commonality

The commonality requirement is met if there is at least one question of law or fact common to the members of the Class. Fed. R. Civ. P. 23(a)(2). As the Supreme Court explained,

---

[3]     The Declarations of Class Members that presented evidence of their CRYPTSY account ownership and account holdings, along with those of the named plaintiffs, are enough, standing alone, to satisfy the numerosity (and ascertainabilty) requirement.  *See* Exhs. A1and A2.

commonality means that the class members "have suffered the same injury" that is "capable of class-wide resolution." *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 351 (2011). "Generally, the commonality requirement is met if the allegations involve a common course of conduct by the defendant." *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 695 (S.D. Fla. 2015). The Rule 23(a) requirement of commonality is a "low hurdle," and even a single common question can be sufficient to satisfy this element. *Diakos*, 2015 WL 5921585 at *4. The primary issue in such an analysis is whether there are issues in the case that are "susceptible to class-wide proof." *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001); *Sarris*, 311 F.R.D. at 695.

Here, the common questions or law and fact include, but are not necessarily limited to:

- Whether the CRYPTSY Defendants have refused Plaintiffs and the Class access to their funds;

- Whether Plaintiffs and the Class had a right to possesses the virtual currency in their accounts at CRYPTSY;

- Whether CRYPTSY had a right to deny Plaintiffs and the Class access to the virtual currency in their accounts at CRYPTSY;

- Whether Defendants have converted the cryptocurrencies and funds belonging to Plaintiffs and the Class;

- Whether the CRYPTSY Defendants owed duties to Plaintiffs and the Class, including without limitation the duty to secure and protect Plaintiffs' and the Class Members' funds and to ensure their ability to access those funds;

- Whether the CRYPTSY Defendants breached those duties;

- Whether the CRYPTSY Defendants' breaches of their duties directly and proximately caused damages to Plaintiffs and the Class;

- Whether the CRYPTSY Defendants conduct was unfair, deceptive, or unlawful;

- Whether the CRYPTSY Defendants failed to inform Plaintiffs and the Class that their CRYPTSY accounts were not secure and free from security breaches, and CRYPTSY's computer systems were subject to computer development issues due to a lack of experience in coding and debugging;

- Whether the CRYPTSY Defendants intentionally, recklessly, or negligently misled Plaintiffs and the Class about the security of the assets held in their CRYPTSY Accounts;

- Whether the CRYPTSY Defendants intentionally, recklessly, or negligently misled or concealed from Plaintiffs and the Class facts about the nature of CRYPTSY's problems that prevented Plaintiffs and the Class from accessing their funds;

- Whether the CRYPTSY Defendants intentionally, recklessly, or negligently misled or concealed from Plaintiffs and the Class the fact that withdrawals from CRYPTSY accounts were not being funded from assets purportedly safeguarded in each account holder's account but were purportedly being supplied by CRYPTSY itself from the purported profits in its own operating account;

- Whether the CRYPTSY Defendants breached their contracts with Plaintiffs and the Class;

- Whether Defendants have been unjustly enriched;

- Whether Defendants engaged in a conspiracy to deprive Plaintiffs and the Class of their cryptocurrencies and convert such currencies;

- Whether the Defendants' acquisition of the Mansion and subsequent transfer of the Mansion to Defendant NETTLES constituted conversion, civil theft and/or fraudulent transfer; and

- Whether Plaintiffs and the Class have sustained damages as a result of Defendants' conduct.

Defendants' conduct with regard to these issues is uniform as to all class members. The freezing of accounts, negligence, conversion, and fraudulent transfer at issue were directed against Plaintiffs and all Class Members in the same way. Simply put, the claims at issue here are not based on individualized treatment of different class members based on individualized representations or individualized issues of reliance. Rather, the claims are premised on Defendants' singular scheme to improperly freeze, convert, and deny access to all of the Class Members' accounts and the assets held therein.

This case is highly analogous to *Evans v. Linden Research, Inc.*, which is the only other case Plaintiffs have found that specifically addressed class certification involving claims arising

from the alleged improper freezing or closure of cryptocurrency accounts and seizure of cryptocurrency from those accounts. Case No. C 11-01078, 2012 WL 5877579 (N.D. Cal. Nov. 20, 2012). In that case, the class plaintiffs were participants in the online virtual world known as Second Life. The plaintiffs maintained online accounts with the company ("Linden Research, Inc.") that operated Second Life. *Id.* at *1. The plaintiffs deposited cryptocurrency known as "linden currency" in those accounts. *Id.* Players used their "lindens" to perform "in-world" monetary transactions. *Id.* Such transactions included purchasing virtual land and paying monthly "tier fees" that are similar to property taxes and are based on the size of the virtual land owned by a given participant. *Id.* The linden currency could be purchased with and exchanged into U.S. dollars. *Id.*

The plaintiffs in *Linden Research* alleged that defendant wrongfully closed their accounts and seized their "in-world" assets, including the cryptocurrency deposited in their accounts. *Id.* at *3. The plaintiffs alleged that defendant's policy of closing accounts and wrongfully seizing their assets was based on a uniformly imposed "terms of service" that was unenforceable and unconscionable and applied to all similarly situated game participants whose accounts were closed by Linden. *Id.* at *12.

The Court in *Linden Research* certified the class. *Id.* at *19. The Court found that the case principally turned on common questions including: "(1) whether the [terms of service], which allows Linden to confiscate class members' virtual land and items, is unconscionable or otherwise unenforceable against Second Life users whose accounts Linden suspended or terminated; (2) whether Subclass A members have an "ownership" right in virtual land and virtual items, and if so, what is nature of that right; (3) whether Linden has an obligation to reimburse Subclass A members for currency (either lindens or U.S. dollars) remaining in an

account upon account closure by Linden; and (4) whether Linden has an obligation to reimburse Subclass A members for virtual land and virtual items in an account upon account closure by Linden." *Id.* at *12.

The court in *Linden Research* further held that commonality was satisfied because the issues related to the uniform treatment of account holders based on a uniform set of terms of service and uniform seizure of class members' virtual property applied to all class members uniformly. *Id.* at *11-*12. The same is true here. Plaintiffs and the Class's claims all rise and fall based on the same common issues of ownership of the virtual currency in their accounts and the propriety of Defendants' freezing the accounts, their efforts, or lack thereof, in protecting the assets, or their unlawfully seizing the assets and retaining them for Defendants' own benefit.

### c.      Typicality

Rule 23(a)(3)'s typicality requirement ensures that the class representative has the same interests as the other members of the class. That is, "[t]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Busby*, 513 F.3d at 1322; *see also Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). The typicality requirement, like commonality, is not demanding. *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 532 (M.D. Fla. 1996). Similarly, typicality does not require that all putative class members share identical claims. *Aranaz v. Catalyst Pharmaceutical Partners, Inc.*, 302 F.R.D. 657, 665 (S.D. Fla. 2014). Rather, all that is required is that the claims of the named plaintiff have the same essential characteristics as the other members of the class. "[A] strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences." *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985); *see also Linden Research, Inc.*, 2012 WL 5877579 *12.

Typicality is met here, as Plaintiffs and the proposed Class assert precisely the same claims, which arise from the same course of conduct: Defendants' freezing the class representatives' accounts and depriving them of access to and ownership of the assets deposited in their CRYPTSY accounts. Since Plaintiffs seeks to prove that Defendants "committed the same unlawful acts in the same method against an entire class . . . [which means that] all members of this class have identical claims," the typicality requirement is satisfied. *Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir. 1983); *accord Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 722-25 (11th Cir. 1987); *Veal*, 236 F.R.D. at 577 (finding typicality prong satisfied, and noting that "factual differences among the claims of the putative class members do not defeat certification").

### d.    Adequacy of Representation

Rule 23(a) also requires a showing that the representative party will fairly and adequately protect the interests of the class. This requirement has two components: (1) the proposed representative has interests in common with, and not antagonistic to, the interests of the class; and (2) the plaintiff's attorneys are qualified, experienced, and generally able to conduct the litigation. *Kirkpatrick*, 827 F.2d at 726; *Hamilton Partners, Ltd. v. Sunbeam Corp.*, No. 99-CV-8275, 2001 WL 34556527, at *3 (S.D. Fla. July 3, 2001); *see also Veal*, 236 F.R.D. at 578-579.

Here, both components of the adequacy of representation requirement are satisfied. Plaintiffs do not have any interests antagonistic to the Class, and Plaintiffs are willing and able to vigorously prosecute this action on behalf of the class. *See* Leidel Declaration, Exh. E and Wilson Dec., Exh. F.

Secondly, the law firms of Wites & Kapetan, P.A. and Silver Law Group represent Plaintiffs. Both are highly competent law firms. Wites & Kaptean has substantial experience litigating class action lawsuits and investment disputes, and Silver Law Group has considerable

experience in investor disputes, as well as class action experience. Both Firms have been appointed as class counsel in numerous class actions, and have affirmed that they will devote the necessary time and resources to prosecute this action for the Class.  *See* Declaration of Marc A. Wites of Wites & Kapetan, P.A.,  Exh. G, and Declaration of David C. Silver of The Silver Law Group, Exh. H.  Accordingly, the adequacy of representation requirement is satisfied.

### 3.      Rule 23(b)(3) Is Satisfied

Plaintiffs also satisfy the requirements of Rule 23(b)(3), which requires that common questions of law or fact predominate over individual questions, and that class action treatment is superior to other available methods of adjudication. As set forth below, this action meets the criteria set forth in Rule 23(b)(3).

### a.      Predominance

Common questions of law or fact predominate over individual questions when the issues in the class action are subject to generalized proof that applies to the case as a whole. *Rutstein v. Avis Rent-A-Car Sys.*, 211 F.3d 1228, 1233 (11th Cir. 2000); *Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud."). Thus, in deciding whether common questions predominate under Rule 23(b)(3), the focus is generally on whether there are common liability issues that may be resolved on a class-wide basis. *See*, *e.g.*, *Klay v. Humana*, 382 F.3d 1241, 1269 (11th Cir. 2004). "'[I]t is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions.'" *Busby*, 513 F.3d at 1324.

The predominant issue here for each of the plaintiffs is whether Defendants improperly froze the Class members' accounts, negligently allowed Class members' virtual currency to be stolen, or converted the Class members' virtual currency for Defendants' own use. Indeed,

regardless of whether Plaintiffs' claims are ultimately found to be true or false, all of the Class members' claims will be resolved in one fell swoop based on these predominant issues.

Indeed, the only issue on which Class Members differ is the amount of their damages. However, the law is well settled that differences in the calculation of damages are not a bar to finding common issues predominate. *E.g., Brown v. Electrolux Home Prods., Inc.*, 26 Fla. L. Weekly Fed. C 144, 2016 WL 1085517 *9 (11th Cir. March 21, 2016). For these reasons, the common issues to be resolved in this matter that apply to all class members predominate over any individualized questions that may arise.

> **b.     A Class Action Is Superior to Other Available Methods of Adjudicating the Issues Raised**

Rule 23(b)(3) lists four factors that the Court should consider in evaluating whether a class action is superior to other methods for adjudicating this action: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). "[T]he improbability that large numbers of class members would possess the initiative to litigate individually" further compels a finding of superiority. *Fabricant v. Sears Roebuck & Co.*, 202 F.R.D. 310, 318 (S.D. Fla. 2001); *See also, Amchem*, 521 U.S. at 617 (same); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (same).

The Rule 23(b)(3) "superiority" factors weigh heavily in favor of class certification here for several reasons. First, Defendants would necessarily gain an unconscionable advantage if they were allowed to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources. Second, the costs of individual suits could

unreasonably consume the amounts that would be recovered. For example, numerous Class Members have very small claims, having been denied access to virtual currency valued at less than $500. Third, proof of a common course of conduct to which Plaintiffs were each exposed is representative of that experienced by the Class and will establish the right of each member of the Class to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

Additionally, numerous putative Class Members have attempted to communicate with CRYPTSY regarding the interminable delays they have experienced and their inability to access their funds but, as of the date of this Motion, have not received a response from CRYPTSY and have not been able to access or withdraw their funds. *See, e.g.,* Exh. A. It is neither economically feasible, nor judicially efficient, for the hundreds, if not more than a thousand, Class members to pursue their claims against Defendants on an individual basis, especially where there are limited known assets available to satisfy the Class members' claims. There simply is no other practical method of adjudicating these claims.

### B. THE APPOINTMENT OF A RECEIVER SUPPORTS CERTIFICATION

Certifying the Class in this case, in conjunction with the appointment of the Receiver to protect the assets subject to Plaintiffs and the Class's claims, is the most efficient and effective means to resolve this matter and protect the interests of the Class. Courts have certified plaintiff classes where a receiver has also been appointed to take over the operation of a defendant or to protect its assets. *See, e.g., Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) (receiver appointed in class action to manage properties owed by defendants during pendency of action); *In re Washington Mut. RESPA Fee Litigation Cassese v. Washington Mut., Inc.*, 255 F.R.D. 89, 98 (E.D.N.Y. 2008) (certifying class where Defendant was under FDIC-appointed receivership); *Liberte Capital Group v. Capwill*, 229 F.Supp.2d 799, 801 (N.D. Ohio 2002) (combining

appointment of receiver over defendant's assets and certification of plaintiff class to promote efficient resolution of proceeding), *aff'd* 148 Fed. Appx. 426 (6th Cir. 2005); *Mills v. Roanoke Indus. Loan and Thrift*, 70 F.R.D. 448, 451-52 (W.D. Va. 1975) (certifying plaintiff class notwithstanding that defendant was also in receivership proceedings).

Class certification is particularly appropriate here where the Receiver was appointed at the request of the putative class representatives to preserve and recover Defendants' assets for the benefit of the Class. *See* Plaintiffs' Motions to Appoint Receiver at D.E. 9 and 18. Not certifying the class would undermine the purpose of appointing the Receiver in the first place. Notably, the Receiver has no objection to class certification (*see* Sallah Dec., Exh. C), and class counsel and the Receiver have and will continue to work cooperatively to protect the interests of the class members while also preserving Defendants' assets for the benefit of Plaintiffs and the Class should the Court determine that Plaintiffs are not entitled to any relief. In sum, certifying the class in conjunction with the appointment of the Receiver promotes the underlying purpose of class actions to serve as a superior means of adjudicating claims such as this one.

## III.    CONCLUSION

Based on the foregoing reasons, Plaintiffs respectfully ask this Court to grant this Motion and issue an order certifying this action as a class action, and to grant all other relief that this Court deems just and proper.

Although not required by Local Rule 7.1(a)(3), the undersigned conferred with counsel for Defendant NETTLES and with the Receiver prior to filing this Motion. Defendant NETTLES, through counsel, states that NETTLES does not oppose the relief sought herein, and the Receive supports, and does not object to, class certification.

Respectfully submitted,

*/s/ Marc A. Wites*
MARC A. WITES
Florida Bar No. 024783
E-mail: mwites@wklawyers.com
**WITES & KAPETAN, P.A**.
4400 N. Federal Highway
Lighthouse Point, Florida 33064
Phone: (954) 570-8989/Fax: (954) 354-0205

**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, Florida 33065
Phone: (954) 755-4799/Fax: (954) 755-4684

By: */s/ David C. Silver*
DAVID C. SILVER
Florida Bar No. 572764
E-mail: DSilver@silverlaw.com
SCOTT L. SILVER
Florida Bar No. 095631
E-mail: SSilver@silverlaw.com
JASON S. MILLER
Florida Bar No. 072206
E-mail: JMiller@silverlaw.com

*Attorneys for Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a copy of the foregoing was electronically filed with the Clerk of Court on this 27st day of July, 2016 by using the CM/ECF system and that a true and correct copy will be served <u>in</u> <u>accordance</u> <u>with</u> <u>the</u> <u>Federal</u> <u>Rules</u> <u>of</u> <u>Civil</u> <u>Procedure</u> <u>and/or</u> <u>the</u> <u>District's</u> <u>Local</u> <u>Rules</u> <u>and</u> <u>procedures</u> to: **PROJECT INVESTORS, INC. d/b/a Cryptsy c/o Paul Vernon, President and Registered Agent**, P.O. Box 7646, Delray Beach, FL 33482, E-mail: <u>support@cryptsy.com</u>**; PAUL VERNON**, **individually**, P.O. Box 7646, Delray Beach, FL 33482, E-mail: <u>PaulEVernon@yahoo.com</u>; and **MARK A. LEVY, ESQ.**, Brinkley Morgan, *Counsel for Defendant Lorie Ann Nettles*, 200 East Las Olas Blvd. - 19th Floor, Fort Lauderdale, FL 33301; E-mail: <u>Mark.Levy@brinkleymorgan.com</u>.

*/s/ Marc A. Wites*
Marc A. Wites