## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CASE NO. 9:16-cv-80060-MARRA

BRANDON LEIDEL, individually, and
MICHAEL WILSON, individually, and on behalf
of All Others Similarly Situated,

      Plaintiffs,

v.

PROJECT INVESTORS, INC. d/b/a CRYPTSY, a
Florida corporation, PAUL VERNON, individually, and
LORIE ANN NETTLES, individually,

      Defendants.

_____/

### NOTICE OF FILING RECEIVER'S SECOND REPORT

      James D. Sallah, Esq., not individually but solely in his capacity as the court-appointed

Receiver (the "Receiver") for Defendant Project Investors, Inc. d/b/a Cryptsy ("Cryptsy"), hereby

files his Second Report.

Dated: August 2, 2016.               Respectfully submitted,

                          **PAYTON & RENGSTL, LLC**
                          *Counsel for the Receiver*
                          2 South Biscayne Blvd., Suite 1600
                          Miami, Florida 33131
                          Telephone:   (305) 372-3500
                          Facsimile:   (305) 577-4895

                          By: Patrick J. Rengstl, Esq.
                              Patrick J. Rengstl
                              FL Bar No. 0581631

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 2, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>s:/Patrick J. Rengstl</u>
Patrick J. Rengstl, Esq.

## SERVICE LIST

**David C. Silver, Esq.**
Silver Law Group
Counsel for Plaintiffs
11780 West Sample Road
Coral Springs, FL 33065
(Via CM/ECF)

**Marc Wites, Esq.**
Wites & Kapetan, P.A.
Co-counsel for Plaintiffs
4400 N Federal Hwy
Lighthouse Point, FL 33064
(Via CM/ECF)

**Mark A. Levy, Esq.**
**George J. Taylor, Esq.**
Brinkley Morgan
Counsel for Defendant Lorie Ann Nettles
200 E Las Olas Blvd Ste 1900
Fort Lauderdale, FL 33301
(Via CM/ECF)

**Paul Vernon**
(Via Email)

**PAYTON & RENGSTL, LLC**
One Biscayne Tower, 2 So. Biscayne Blvd., Suite 1600, Miami, FL 33131  305.372.3500

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 9:16-cv-80060-MARRA**

BRANDON LEIDEL, individually, and
MICHAEL WILSON, individually, and on behalf
of All Others Similarly Situated,

       Plaintiffs,

v.

PROJECT INVESTORS, INC. d/b/a CRYPTSY, a
Florida corporation, PAUL VERNON, individually, and
LORIE ANN NETTLES, individually,

       Defendants.

_____/

**SECOND REPORT OF RECEIVER JAMES D. SALLAH**

Pursuant to paragraph no. 39 of Section XVI of the Order Granting Plaintiffs' Renewed

Motion for Appointment of James D. Sallah, Esq. as Receiver/Corporate Monitor over Defendant

Project Investors, Inc. d/b/a Cryptsy [DE 33] (the "Appointment Order") dated April 4, 2016,

James D. Sallah, not individually but solely in his capacity as the Court-appointed receiver (the

"Receiver") for Defendant Project Investors, Inc. d/b/a Cryptsy ("Cryptsy"), submits the following

Second Report.[1]

**I.      Introduction**

On May 4, 2016, I filed my First Report. That was thirty (30) days after the Court's entry

of the Appointment Order. Therefore, the First Report explained the first month of the Cryptsy

receivership proceeding. Since then, and thus during the last ninety (90) days, much has occurred

---

[1] Pursuant to paragraph no. 39, the Appointment Order requires me to file a Second Report within
ninety (90) days of the First Report (*i.e.*, on or before August 2, 2016), and then additional reports
every ninety (90) days thereafter.

1

and much has been accomplished for the benefit of Cryptsy's account holders/users.[2]

Since my appointment, I, with the help of my counsel, deputy receiver, computer forensics consultant and staff, have been working diligently to secure assets in Cryptsy's name or derived from Cryptsy and/or its account holders. We have also taken steps necessary to secure corresponding account(s), wallet(s), and bank information and records. As of this Second Report, and as further discussed below, I am pleased to report that I have successfully secured the following Cryptsy-derived assets or funds for the benefit of Cryptsy's account holders:

    i.    **over $700,000** (estimated market value within the last month) of approximately forty (40) different types of cryptocurrencies, or digital coins;

    ii.    **$5,000.00** from a retainer amount in Cryptsy's name from a prior retention at a South Florida law firm;

    iii.    **$24.66** from a remaining balance at Coinbase, Inc; and

    iv.    multiple storage units that I secured containing, among other things, numerous Cryptsy computer servers, corporate records, artwork and household furnishings. In the near future, I will likely seek Court-approval to liquidate the personalty in a cost-efficient manner, while retaining the electronic and hard copy records.

I have continued to serve demand letters, document requests and numerous subpoenas on several parties and nonparties regarding relevant issues, and have received (or will be receiving)

---

[2] As a matter of background, this proceeding is a class action lawsuit by Cryptsy cryptocurrency account holders who had an account with Cryptsy. Cryptsy was an online business for the public to exchange, invest, and trade digital cryptocurrencies. The Plaintiffs, class representatives of Cryptsy cryptocurrency users, have alleged, among other things, that (1) Cryptsy's principal, Defendant Paul Vernon, previously shut down Cryptsy's operations and has fled to China; (2) approximately $5 million of account-holder funds and cryptocurrencies have been missing and unaccounted for several months; (3) account holders have been unable to access and use their Cryptsy accounts; and (4) Vernon and his now ex-wife, Defendant Lorie Ann Nettles, purchased in March 2015 a luxurious home in Delray Beach for $1,374,881 in cash from Cryptsy-derived funds and Nettles recently received the property in her divorce settlement from Vernon. Given these allegations (and others), Plaintiffs moved for the appointment of a corporate monitor or receiver [DE 18], which the Court granted and appointed me as Receiver in the Appointment Order on April 4, 2016.

and have analyzed (or will be analyzing) responsive information and documents.  The specific new demands, document requests, and subpoenas are discussed below.

There are former Cryptsy employees, some of whom I have contacted and who are cooperating with and assisting me.  I have retained one former employee as a receivership employee – Nicholas Mullesch, former Cryptsy Head of IT and Cryptocurrency Wallet Manager.  Mr. Mullesch has cooperated and assisted me and my team regarding recovering and securing a significant amount of coins from Cryptsy's servers and elsewhere, as well as analyzing relevant pre-receivership and post-receivership transactions and many other relevant issues.  I will continue to attempt to contact other former employees who can assist in the receivership proceeding.

As of this Second Report, Defendant Vernon continues to refuse to cooperate with me and my team, so my job continues to be much more difficult and time-consuming regarding every issue involving Cryptsy, especially wallet and account-holder information.

The purpose of this Second Report is to more specifically advise the Court, account holders, and other interested persons as to the material actions that I have taken since my First Report during the last ninety (90) days (*i.e.*, from early May to early August).

## II.    Gaining Access to Cryptsy's Servers

Shortly after my appointment, I learned that a South Florida-based company called Vault Networks, Inc. held Cryptsy's servers at a location in Downtown Miami.  I also learned that the servers would likely contain the wallets of whatever cryptocurrencies, or digital coins, remained after Vernon shut down Cryptsy's operations and fled to China.

Initially, I did not obtain immediate access to the servers from Vault Networks, so I was forced to move to compel Vault Networks to provide access [DE 43].  The Court immediately granted my motion, thus granted my access [DE 44], to which Vault Networks complied and

3

provided my counsel, computer forensics consultant and Mr. Mullesch access to the Cryptsy servers on May 6, 2016.

Vault Networks continues to cooperate with me and has provided repeated access to the servers to my team.  Vault Networks has also represented that it promptly disabled in or around mid-April Cryptsy's servers to prevent any loss or destruction of evidence on the servers. Unfortunately, and as discussed in detail below, I have reason to believe that Vernon had already destroyed key evidence on the servers.

In the next thirty (30) days, I will be working with Vault Networks on a plan to physically transfer the servers to a new receivership location and discuss the past due receivable owed to Vault Networks for storing the servers.  Assuming I am able to come to an agreement with Vault Networks, I will file a motion for approval of same.  If Vault Networks and I are unable to come to an agreement, Vault Networks will be relegated to submitting a claim as a trade vendor/creditor in the yet-to-be-determined claims procedure.   Vault Networks has been served with the Appointment Order and has been advised since the first demand back in April of its duty to preserve and protect the servers and evidence on same as receivership property.

I discovered two critical things when my receivership team gained access to Cryptsy's servers.  First, and through the efforts of my team, I successfully accessed Cryptsy's servers, made a backup of the wallets on them and began the lengthy and tedious process of reviewing the hundreds of wallets on the servers to determine what cryptocurrencies remain for the benefit of Cryptsy's account holders.  This review process has taken, and continues to take, several months by my team.

Second, I learned that on April 4, 2016 (the date that the Court issued the Appointment Order), and literally hours after e-mail service of same on Vernon, Vernon or someone under his

direction using his password remotely logged into Cryptsy's servers and destroyed in three attempts the database that contained, among other things, the number of, identity of and account balances of all of Cryptsy's account holders.  I know this because Vernon's name was on the screen-shot with three repeated "shred" commands when the database was powered up.

I have, through my computer forensics team, attempted to restore the deleted information from the database, but it was not possible to do such to date.  I have also attempted to secure backups which would contain the information that had been deleted, but, again, it was not possible to do such to date.  I will continue to attempt to restore this information, locate backups and find alternative ways to confirm account-holder information.  In other words, as of this filing, it is impossible for me to determine or know on Cryptsy's end: (1) what is currently owed to each Cryptsy account holder; (2) what cryptocurrencies/coins and amount of same each account holder had in his/her Cryptsy account during Cryptsy's operations, including at the time Cryptsy shut off access to account holders; and (3) the identity and contact information of all of Cryptsy's account holders.

However, and as discussed below, determining and confirming account-holder information is not completely a lost cause.  Other avenues exist from the account holders' end of the spectrum to potentially confirm the above account-holder information, such as account statements saved by the account holders; emails saved by the account holders; documents they received from Cryptsy; and sworn declarations attesting to their investment, transactions, coins held and balance owed.

## III.    Securing the Remaining Wallets and Cryptocurrencies

As stated above, I have begun the lengthy and tedious review of the wallets on the servers to determine what cryptocurrencies remain for the benefit of Cryptsy's account holders.  I am pleased to report that my team has successfully secured from Cryptsy's servers, and have

transferred to protected receivership digital wallets, approximately forty (40) different types of cryptocurrencies for the benefit of Cryptsy's account holders.

In addition to securing such wallets from Cryptsy's servers, I have successfully secured additional coins traceable back to Cryptsy from at least one third party exchange company – *i.e.*, Bittrex, LLC – that had received transfers of Cryptsy-derived coins from Vernon or someone under his direction or control.

On Sunday, April 10, 2016, certain cryptocurrency activity took place at Bittrex which had been previously associated with Cryptsy.  Knowledgeable experts in the industry who were aware of the receivership contacted Bittrex and me regarding such activity.

On Monday morning, April 11, 2016, I served Bittrex with a demand letter and subpoena. The demand letter was an exhibit to my First Report.  In the demand letter, I requested that Bittrex freeze any accounts or wallets in Cryptsy's name or derived from Cryptsy.  In the subpoena (also an exhibit to my First Report), I requested, among other things, documents regarding account activity associated with Cryptsy-derived coins.  I discussed the above in my First Report.

Bittrex froze the subject coins in an abundance of caution and has fully cooperated with me.  After several verbal and written discussions with Bittrex, including providing several comprehensive sets of tracing analyses regarding the coins that Bittrex had frozen, Bittrex agreed to transfer the frozen coins, which included Unobtanium, Archcoin, Digibyte, Netcoin, Positron, Startcoin and Uro, that were traceable back to Cryptsy to me.

Attached as Exhibit A is a chart of the cryptocurrencies that I have currently secured as of this Second Report.[3]  There are currently approximately forty (40) different types of coins.  The

---

[3]  In the event I secure additional coins, I will provide an updated chart in my Third Report and/or in the appropriate future filings.

6

chart lists, among other things, the types of coins, the amount of coins and the estimated market value of the coins (estimated within the last thirty (30) days).  The estimated total market value within the last month is over $700,000.

I am continuing to investigate, search for and secure additional wallets and coins in Cryptsy's name or derived from Cryptsy for the account holders' benefit.

### IV.    How Cryptsy Maintained its Wallets

I have investigated how Cryptsy maintained its wallets.  Cryptsy, through Vernon, controlled over 300 wallets (or accounts) in Cryptsy's name that each separately held different types of cryptocurrencies for the benefit of Cryptsy's account holders.  In other words, each Cryptsy wallet was separated based on the type of digital coin.

For example, Cryptsy had a wallet for Bitcoin (generally the most well-known type of digital coin), which was separate from the Cryptsy wallet for Ethereum (a popular alternative coin), which was separate from any and all other Cryptsy wallets of other cryptocurrencies.  The Cryptsy wallets contained cryptocurrencies for the benefit of Cryptsy's account holders.

Each Cryptsy wallet for each specific type of coin was commingled with the same types of coins for all the Cryptsy account holders who held such coins through Cryptsy.  For example, when a Cryptsy account holder transferred Bitcoins through his/her Cryptsy account, the Bitcoins were exchanged and deposited into Bitcoins in the Cryptsy Bitcoin wallet in a pro rata amount for each account holder who had Bitcoins through Cryptsy.  The same "pro rata" rule of thumb applied to transactions of the 300-plus other types of coins at Cryptsy.

Therefore, Cryptsy did not hold coins in each account holder's name in a segregated account or manner to trace the coins, or ownership of same, to that specific account holder, let alone any account holder.  All coins deposited, exchanged or otherwise used by account holders

7

in Cryptsy accounts were commingled together by coin type in each Cryptsy wallet for that specific coin, and each Cryptsy wallet held a pro rata amount of coins for the benefit of each account holder who had that type of coin.

**V.      The Next Step with the Secured Cryptocurrencies**

Many account holders have demanded back the cryptocurrencies they had in their Cryptsy account or the equivalent monetary value.  I am currently evaluating the options and potential procedures of what is the appropriate next step with the secured cryptocurrencies.  I intend to file a motion regarding the recommended procedure on disposition of the secured cryptocurrencies in the next thirty (30) to forty-five (45) days.

The recommended procedure will be a function of two basic realities and potential hurdles. First, and as stated above, it appears that Vernon or someone under his direction destroyed the database which contained details concerning, among other things, each account holder's account balance, coins held and account activity, including, but not limited to, all coins purchased, traded and converted.  Second, and as also stated above, each Cryptsy wallet for each specific type of coin was commingled with the same types of coins for the benefit of the Cryptsy account holders who had such coins through Cryptsy.

**VI.     It Appears That Vernon Misappropriated Millions of Dollars
in Coins and Funds from Cryptsy and Its Account Holders**

Cryptsy had an account at Coinbase, Inc. ("Coinbase").  Coinbase converted Bitcoins into currency for purposes of Cryptsy's operations.  As stated in my First Report, I served a subpoena on Coinbase and Coinbase produced responsive documents.

As it turns out, Vernon opened a personal account at Coinbase in May 2013 (when Cryptsy was beginning its operations), which Coinbase finally closed in December 2015 (when Cryptsy was winding down its operations and in the wake of public allegations of misconduct).  During

that period of two (2) years and seven (7) months, Vernon transferred and converted over 1,100 Bitcoins into currency in the amount of over $3.3 million.  That $3.3 million-plus was deposited into Vernon's and his now ex-wife's (Defendant Lorie Ann Nettles') joint bank account.  Part of that $3.3 million – $1,374,881 to be exact – was used to purchase the Delray Beach mansion now owned by Nettles.

Such activities appear to be a classic theft of cryptocurrencies by Vernon during Cryptsy's operations.  Because Vernon apparently destroyed the database on April 4, 2016, it will be very difficult, and maybe impossible, to determine the full extent of misappropriated cryptocurrencies. The database had the necessary information for me to trace every misappropriated cryptocurrency.

Despite the destruction of the database, I have still been able to forensically and cryptographically trace the source of a vast majority of the coins converted through Vernon's personal Coinbase account back to Cryptsy wallets and its account holders.  Again, if the database still existed, I would have been able to trace all transactions.  My preliminary results are below.

It appears that when Vernon misappropriated and liquidated Bitcoins into currency, Vernon on a daily to weekly basis transferred Bitcoins from the Cryptsy "hot" wallet to his personal Coinbase account, where the coins were liquidated and resulting currency deposited into his personal joint account.  Vernon also transferred Bitcoins from the Cryptsy "hot" wallet to a wallet under his control before transferring them to his personal Coinbase account and liquidating them into currency deposited into his personal joint account.  It appears that Vernon misappropriated and converted over $2.2 million in this manner.

In addition, it appears that when Vernon misappropriated and liquidated alternative coins, or altcoins, into currency, Vernon used exchanges such as Bittrex, BTER and CEX.IO to convert the alternative coins into Bitcoins before transferring the Bitcoins to his personal Coinbase account

9

to deposit and liquidate into currency for deposit into his personal joint account. There would have been no Cryptsy business purpose to transfer any coins to exchanges such as Bittrex, BTER or CEX.IO during Cryptsy's operations except for an improper or ulterior purpose such as Vernon's misappropriating account-holder coins and funds. It appears that Vernon misappropriated and converted over $600,000 in this manner.

In all, Vernon transferred and liquidated a massive amount of Bitcoins and other digital coins of more than $3.3 million through his personal Coinbase account and deposited this amount of money into his personal joint account with Nettles.

### VII.  It Appears That Vernon Is Continuing to Misappropriate Coins and Funds from Cryptsy and Its Account Holders Post-Receivership

It appears that Vernon has transferred, and continues to transfer, a large amount of coins traceable back to Cryptsy wallets to new addresses beyond my control after my appointment. This is a classic violation of the Appointment Order which requires Vernon and any third parties who have Cryptsy-derived coins to return same to me.

I have been able to confirm this movement of coins post-receivership from my team's analysis of the wallets on Cryptsy's servers. I do not have the ability to know where these coins are currently located, whether at a third party exchange or in a private wallet. The total value of coins transferred after my appointment that are traceable back to Cryptsy exceeds $600,000, including, but not limited to, Earthcoin, Ethereum, Vertcoin, Worldcoin and Primecoin. These coins were likely transferred through overseas exchanges. I have sent several demand letters to overseas exchanges which may have these Cryptsy-derived coins, but with the exception of one overseas exchange which cooperated and confirmed it held no traceable coins, all such exchanges have not responded to my letters because they are overseas and not bound to follow the Appointment Order.

## VIII. Besides Apparently Misappropriating Millions, It Also Appears That Vernon Destroyed Critical Evidence and Information

As stated above, on May 6, 2016, my counsel and computer forensics team accessed Cryptsy's servers at Vault Networks in Miami. My team attempted to access and restore the database, which contained, among other things, critical account-holder information, such as account holders' contact information, investment information and account balances. The database also contained information to trace cryptocurrencies transferred by Vernon during and after Cryptsy's operations.

My team discovered that Vernon or someone under his direction with his password accessed the servers and electronically deleted the database from a remote location in three successive and successful attempts on April 4, 2016, shortly after receiving service of the Appointment Order. I know this from the information on the screen-shot when the servers were powered up. Attempts to recover the information on the deleted database have failed, including attempts to locate the information on any backups. Therefore, as a result of Vernon's apparent destruction of the database, the primary and best way for me to confirm who Cryptsy account holders are, what they are owed, what coins they had and what coins Vernon has transferred and/or misappropriated is gone and not available for me to use to properly repay the victims and to determine the full extent of Vernon's misconduct.

## IX. After Fleeing to China, Vernon Started a New Exchange Called Bitebi9

Earlier this year, Vernon fled to China and started a new digital currency exchange called Bitebi9 at the site www.bitebi9.com. Vernon intentionally placed the company in his girlfriend's name. Vernon's girlfriend has her primary residence in China as well. In addition, to start up

Bitebi9, Vernon withdrew Cryptsy-derived funds and used several former Cryptsy employees and associated persons to assist him.  This began in 2015 when Cryptsy was still operating.

From my investigation, I have learned that Vernon likely falsified database entries for Bitebi9.  Vernon purportedly intended to use a script to fix missing deposits for users. The script essentially would create fake cryptocurrency assets in the Bitebi9 database.

In order for coins to get into the platform, the coins must be transferred via the blockchain. Vernon's Bitebi9 script would bypass the blockchain and inject fake values directly into the Bitebi9 database.  This could, and likely was used by Vernon, to give himself free cryptocurrency assets in the Bitebi9 platform.  For example, Vernon could give himself "x" number of coin "A" and fill any open buy order on the coin "A"/Bitcoin market. This would give Vernon Bitcoins the exchange legitimately had in exchange for the coin "A" coins that he created with falsified database entries.  Vernon could use this to drain any legitimate funds held on the exchange leaving customers with assets they are unable to withdraw because they never truly existed.

The Bitebi9 site was active for some time, but as of a few weeks ago, is now offline.  I will continue to investigate Bitebi9.

## X.     The Account Holders

There are a significant amount of account holders who invested through Cryptsy.  As stated above, and from the Cryptsy end of the spectrum, I am currently unable to confirm their number, identity, investment amount, types and amount of coins invested, which account holders are owed money (and how much), which account holders made money (and how much and when), and which account holders received any money back (and how much and when), because Vernon apparently destroyed the database.

However, determining and confirming account-holder information is not completely a lost cause.  There are, and will be, other avenues from the account holders' end of the spectrum to potentially confirm the above account-holder information, such as account statements saved by the account holders; emails saved by the account holders; documents they received from Cryptsy; and sworn declarations attesting to their investment, transactions, coins held and balance owed.  I will continue to attempt to find a solution to this major hurdle in the receivership.

Confirming account-holder information from the account holders themselves will be much more difficult, time-consuming and ripe for fraudulent claims, but my team and I are prepared for the challenge.  In addition, Plaintiffs' counsel, who represent the Class of account holders, will likely be a tremendous source of account-holder information and confirming the legitimacy of same.

Given the current circumstances, it is still too premature for me to recommend and obtain Court-approval on a procedure for repaying and/or returning funds and/or cryptocurrencies to account holders who are legitimately owed such.

## XI.   Lorie Ann Nettles and the Delray Beach Property Purchased with Misappropriated Funds

I have scheduled a mediation with Lorie Ann Nettles on August 15, 2016.  The mediator will be retired Circuit Court Judge, the Honorable Howard Tescher, who has a significant amount of experience mediating receivership matters in Florida and around the Country.  A receivership pre-suit mediation is currently the best course of action for the receivership based on the status of pre-mediation settlement discussions between me and Nettles.  It will also be a global mediation involving Plaintiffs, who have already sued Nettles.

If mediation is unsuccessful, I will be promptly filing a lawsuit against Nettles for the reasons stated in my First Report and below.  If filed, I will seek to transfer the lawsuit to this

Court as an ancillary receivership lawsuit related or similar to the underlying class action/main receivership proceeding.

Nettles is the title owner of the Delray Beach property located at 16832 Charles River Drive, Delray Beach, Florida 33446 that she and Vernon (her husband at that time) purchased in March 2015 for $1,374,881 in cash. Nettles received the property from Vernon in their divorce settlement earlier this year. The problem is that the property was fully purchased with funds misappropriated from Cryptsy and its account holders. Therefore, the property is receivership property and thus subject to turnover to me for the benefit of the account holders.

I have agreed to provide a written tracing analysis to Nettles' counsel solely for purposes of the mediation to establish the tracing of digital coins from Cryptsy wallets, to deposits in Vernon's personal Coinbase account, to conversion into and deposits of currency in Vernon's and Nettles' joint bank account, to the purchase of the property. I have also filed and recorded a lis pendens on the property for the account holders' benefit. This was necessary to stop Nettles from selling the property which she has been trying to do since finalizing her divorce. The property had been listed on the market for $1.5 million, but has been removed as of this filing.

In addition to the Delray mansion, Nettles owns other assets purchased with funds derived, and misappropriated, from Cryptsy and its account holders. These assets include a Tiffany ring purchased for over $104,000 (in cash), an Infiniti QX80 purchased for over $82,000 (in cash) and expensive household furnishings in the Delray mansion. These assets will be the subject of the upcoming mediation as well.

## XII.   The Premises

The company shut down months before my appointment. Therefore, Cryptsy has no current physical premises or offices to secure. Cryptsy previously operated out of the premises

located at 1300 NW 17th Avenue, Suite 152, Delray Beach, Florida 33445 and 160 Congress Park Drive, Suite 101, Delray Beach, Florida 33445.  I will be contacting the landlords to discuss certain issues regarding Cryptsy.

Because there is no physical office space to secure, there are presently no hard files, computers, furniture or equipment to secure in an office.  However, my team and I will continue to investigate and search for the same.

**XIII.   Public Storage**

I learned that there were at least two storage units associated with Vernon and/or Cryptsy. During Vernon's December 2015 deposition in his divorce case, he testified that there are at least two storage units at Public Storage, at least one of which is "rented by" Cryptsy. In addition, from my investigation, I understood that at least one of the storage units has Cryptsy server(s) which may have relevant information for the receivership.

I contacted Public Storage to attempt to gain access to the storage units and served a demand letter.  However, Public Storage refused to provide access.  In addition, my deputy receiver, Robert G. Carey, Esq., attempted to resolve any issues with Pubic Storage's in-house counsel, similarly without success because the two storage units were allegedly rented by Vernon. Accordingly, I moved to compel Public Storage to provide immediate access to the storage units – even if they are in Vernon's name – to inspect, inventory and determine what is (and what is not) subject to the receivership [DE 56].  The Court thereafter granted the motion [DE 57].  I promptly coordinated a date and time for accessing and inspecting the storage units with Public Storage's in-house counsel, who cooperated and complied.  I also requested and received from Public Storage relevant documents regarding the storage units.

15

On July 14, 2016, Mr. Carey and my team accessed three – as opposed to two – storage units at Public Storage associated with Cryptsy and/or Vernon.  New locks were placed on the units to prevent any theft or loss.

In the storage units were numerous computer servers, computers, hard drives, thumb drives, boxes of business documents, a gold/diamond ring, high-end women's clothing, household furnishings, and furniture.  The secured computer and electronic equipment will be forensically analyzed.  From the office items in storage compared to the office items I understand Cryptsy had, it appears that a large amount of Cryptsy office equipment and furniture were disposed of pre-receivership by Vernon.  This is also consistent with reports from third parties.

It is my position that most – if not all – of the items secured in the storage units are receivership property.  For example, the storage units contained Vernon's girlfriend's household items and clothing, but most – if not all – of those items were purchased with funds derived, and misappropriated, from Cryptsy and its account holders.  Vernon had relocated his girlfriend from China to Boca Raton to continue his affair and financed, again with Cryptsy-derived money, her life in South Florida.

In the near future, I will be filing a motion regarding the disposition of the secured property from the storage units.  Until then, the secured storage items will be preserved under my supervision at new receivership storage units.

## XIV.   The Alleged Hack

There was an alleged hack of Cryptsy's network pre-receivership.   My preliminary investigation has revealed that: (i) the alleged hack occurred in or about June or July 2014; (ii) Vernon instructed employees with direct knowledge of the matter not to disclose it to anyone, whether account holders, law enforcement or the Government; (iii) millions of dollars in coins,

especially Bitcoin and Litecoin, were stolen or unaccounted for; and (iv) the hack occurred after, not before, the beginning of Vernon's above-described misappropriation of coins and funds from Cryptsy and its account holders. I will continue to investigate these issues, including the extent that Cryptsy and/or Vernon covered or funded subsequent account-holder transactions. However, my investigation is, and will be, compromised by the fact that Vernon apparently destroyed the database.

### XV.   Subpoenas and Document Requests

I previously served several subpoenas and document requests on parties and several relevant nonparties shortly after my appointment, including, but not limited to, Vernon, Nettles, Ken Majmudar and his company Ridgewood Investments, Coinbase, TD Bank, SunTrust Bank, and Bittrex. These subpoenas and document requests were discussed and attached to my First Report. As stated above, Vernon refused and continues to refuse to produce any information or documents to help Cryptsy's account holders.

Since my First Report, I have served numerous additional subpoenas to the following third parties: Coinbase (regarding, among other things, certain other accounts), TD Bank (regarding certain records in the joint account and accounts in Vernon's name, Nettles' name and/or Vernon's girlfriend's name), Bank of America (regarding account records for accounts in Nettles' name), Poloniex Inc. (regarding records associated with Vernon or Cryptsy), Google (regarding Vernon's emails in Cryptsy's email accounts), Yahoo! (regarding Vernon's emails), law firm Greenspoon Marder (regarding retainers, invoices and files opened for Cryptsy), law firm Gunster Yoakley (same), law firm Nesenoff Miltenberg (same), accounting firm Daszkal Bolton (same), Public Storage (regarding records associated with storage units opened and/or paid by Cryptsy and/or Vernon), Omnisource Legal Group PLLC (regarding payments received from Cryptsy and/or

17

Vernon), Empire Legal PLLC (regarding Cryptsy and Vernon), Leonnel Iruke (same), FinalHash LLC (same), Scottrade (regarding Vernon's girlfriend's account), Marshall Long (regarding Cryptsy and Vernon), H & J Electronics (regarding Cryptsy and Vernon), ServerPronto (same), Servstra (same), Incapsula (same), ExecRank (same) and Lendini (same).  Copies of these new subpoenas are attached as Composite Exhibit B.  I have also served follow-up receivership document requests to Nettles in preparation for the upcoming mediation.

As a result of my subpoenas, I learned that the Gunster Yoakley firm was still holding $5,000.00 as a retainer for Cryptsy's benefit.  Because the $5,000 is a receivership asset, Gunster Yoakley cooperated and promptly transferred the $5,000 to me for the benefit of the account holders.  As a result, I have opened a receivership account at Northern Trust and have deposited the $5,000, as well as the $24.66 provided by Coinbase and discussed in my First Report.

I have reviewed and will continue to review produced records for the most significant and relevant monetary transactions for the account holders' benefit.  I expect to receive the remaining subpoenaed records in the near future.

## XVI.   Receivership Website

My team and I continue to correspond and speak with account holders, usually on a daily basis.  To facilitate communication with account holders and provide them with prompt relevant updates, I recently created and posted live a receivership website at www.cryptsyreceivership.com.

The website informs account holders regarding important updates, relevant court filings (such as reports and motions affecting account holders), and the general progress of the receivership proceeding.  The website also has a registration link for account holders to complete, so I can keep track of their names, contact information, investment history and other relevant information before a formal claims procedure is recommended to and approved by the Court.  The

website is the easiest and most efficient way for me to communicate with a large amount of account holders.

## XVII.  Forensic Accounting and Discovery

I may retain a forensic accounting firm to assist me in my receivership obligations.  I will file a formal motion with the Court to retain the accounting firm when it is appropriate.  One important issue will be to determine the status of, and properly address, Cryptsy's tax returns for prior tax years, especially tax year 2015.

## XVIII. Receivership Targets

I have evaluated and will continue to evaluate persons and companies that bear responsibility for the Cryptsy debacle, as well as those who improperly received money or assets derived from Cryptsy.  As stated above, and needless to say, Vernon and Nettles are at the top of the list and are subject to pending litigation in this lawsuit for the benefit of the account holders. Other receivership targets will be the subject of upcoming demand letters and/or lawsuits for the benefit of the account holders.

## XIX.  Conclusion

My overall investigation is still early and will be ongoing.  I will continue to search for and attempt to secure assets, funds, cryptocurrencies, accounts and wallets in Cryptsy's name or derived from Cryptsy.  I will continue to review relevant bank and exchange records.  I will continue to investigate potential claims against third parties.  I will continue to communicate with account holders.

I will supplement this Second Report with my Third Report within ninety (90) days from today.

_____
James D. Sallah,
Receiver

Dated: August 2, 2016