UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 9:16-cv-80060-MARRA

BRANDON LEIDEL, individually, and
MICHAEL WILSON, individually, and on behalf
of All Others Similarly Situated,

       Plaintiffs,

v.

PROJECT INVESTORS, INC. d/b/a CRYPTSY, a
Florida corporation, PAUL VERNON, individually, and
LORIE ANN NETTLES, individually,

       Defendants.

_____/

## NOTICE OF FILING RECEIVER'S THIRD REPORT

       James D. Sallah, Esq., not individually but solely in his capacity as the court-appointed

Receiver (the "Receiver") for Defendant Project Investors, Inc. d/b/a Cryptsy ("Cryptsy"), hereby

files his Third Report.

Dated: October 31, 2016.

       Respectfully submitted,

       **PAYTON & RENGSTL, LLC**
       *Counsel for the Receiver*
       2 South Biscayne Blvd., Suite 1600
       Miami, Florida 33131
       Telephone:    (305) 372-3500
       Facsimile:     (305) 577-4895

       By: Patrick J. Rengstl, Esq.
           Patrick J. Rengstl
           FL Bar No. 0581631

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s:/Patrick J. Rengstl
Patrick J. Rengstl, Esq.

## SERVICE LIST

**David C. Silver, Esq.**
Silver Law Group
Counsel for Plaintiffs
11780 West Sample Road
Coral Springs, FL 33065
(Via CM/ECF)

**Marc Wites, Esq.**
Wites & Kapetan, P.A.
Co-counsel for Plaintiffs
4400 N Federal Hwy
Lighthouse Point, FL 33064
(Via CM/ECF)

**Mark A. Levy, Esq.**
Brinkley Morgan
Counsel for Defendant Lorie Ann Nettles
200 E Las Olas Blvd Ste 1900
Fort Lauderdale, FL 33301
(Via CM/ECF)


**Paul Vernon**
(Via Email)

**PAYTON & RENGSTL, LLC**
One Biscayne Tower, 2 So. Biscayne Blvd., Suite 1600, Miami, FL 33131  305.372.3500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 9:16-cv-80060-MARRA

BRANDON LEIDEL, individually, and
MICHAEL WILSON, individually, and on behalf
of All Others Similarly Situated,

       Plaintiffs,

v.

PROJECT INVESTORS, INC. d/b/a CRYPTSY, a
Florida corporation, PAUL VERNON, individually, and
LORIE ANN NETTLES, individually,

       Defendants.

_____/

## THIRD REPORT OF RECEIVER JAMES D. SALLAH

Pursuant to paragraph no. 39 of Section XVI of the Order Granting Plaintiffs' Renewed Motion for Appointment of James D. Sallah, Esq. as Receiver/Corporate Monitor over Defendant Project Investors, Inc. d/b/a Cryptsy [DE 33] (the "Appointment Order") dated April 4, 2016, James D. Sallah, not individually but solely in his capacity as the Court-appointed receiver (the "Receiver") for Defendant Project Investors, Inc. d/b/a Cryptsy ("Cryptsy"), submits the following Third Report.[1]

### I.    Introduction and Current Assets

The purpose of this Third Report is to more specifically advise the Court, account holders, and other interested persons as to the material actions that I have taken since the Second Report

---

[1] Pursuant to paragraph no. 39, the Appointment Order requires me to file a Third Report within ninety (90) days of the Second Report (*i.e.*, on or before October 31, 2016), and then additional reports every ninety (90) days thereafter.

1

during the last ninety (90) days (*i.e.*, from early August to late October).[2]   Defendant Vernon continues to refuse to cooperate with me and my team, so my job continues to be much more difficult and time-consuming regarding every issue involving Cryptsy.

As of this Third Report, and as further discussed below, I am pleased to report that I have successfully secured the following Cryptsy-derived assets or funds for the benefit of Cryptsy's account holders and/or have accomplished the following significant receivership tasks:

i.   Negotiating and signing a settlement agreement with Defendant Nettles to, upon Court-approval, deed over and to sell the Delray mansion previously purchased for approximately **$1.4 million**, which is the subject of a receivership motion to approve that I just filed [DE 77];

ii.   Negotiating and signing a settlement agreement with Defendant Nettles to, upon Court-approval, sell a Tiffany diamond ring previously purchased for over **$104,000**;

iii.   Confirming, through a very detailed and thorough tracing analysis of Cryptsy's wallets (and the coins therein), that the coins and their monetized currency deposited in Vernon's personal bank account, in fact, funded the purchase of the Delray mansion and the Tiffany ring. This receivership tracing analysis helped lead to a favorable settlement at mediation with Defendant Nettles because Nettles disputed whether the wallets of coins funded the purchase of the property and ring;

---

[2]   As a matter of background and as a reminder to the Court, this proceeding is a class action lawsuit by Cryptsy cryptocurrency account holders who had an account with Cryptsy. Cryptsy was an online business for the public to exchange, invest, and trade digital cryptocurrencies. The Plaintiffs, class representatives of Cryptsy account holders, have alleged, among other things, that (1) Cryptsy's principal, Defendant Paul Vernon, previously shut down Cryptsy's operations and fled to China; (2) at least $5 million of account-holder funds and cryptocurrencies have been missing and unaccounted for many months; (3) account holders have been unable to access and use their Cryptsy accounts; and (4) Vernon and his now ex-wife, Defendant Lorie Ann Nettles, purchased in March 2015 a luxurious home in Delray Beach for $1,374,881 in cash from Cryptsy-derived funds and Nettles recently received the property in her divorce settlement from Vernon. Given these allegations (and others), Plaintiffs moved for the appointment of a corporate monitor or receiver [DE 18], which the Court granted and appointed me as Receiver in the Appointment Order on April 4, 2016.

iv.   Securing **hundreds of thousands of dollars**[3] of different types of coins from Cryptsy's wallets on Cryptsy's servers and from one currency exchange (Bittrex);

v.    Filing a motion to liquidate fifteen (15) types of coins that are solely high liquidity coins [DE 70], which the Court granted [DE 71]; **more than $300,000** is expected from this liquidation without material consequences to each coin's market value[4];

vi.   Selecting the most appropriate exchange companies to liquidate the high liquidity coins, and selecting the appropriate dates on which to liquidate coins in order to diminish material effects on each coin's market;

vii.  Negotiating with potential buyers of the remaining low to medium liquidity coins and/or analyzing the alternative of filing a motion to conduct a sealed auction for such coins;

viii. Securing an Infiniti QX60 registered in Cryptsy's name that Vernon used as his daily driver at the Fort Lauderdale International Airport as a result of my diligent efforts and investigation;

ix.   Filing a motion to sell the secured Infiniti QX60 [DE 64], which the Court granted [DE 66];

x.    **$5,000.00** from a retainer amount in Cryptsy's name from a prior retention at a South Florida law firm; and

xi.   Securing multiple storage units containing, among other things, numerous Cryptsy computer servers, corporate records, artwork and household furnishings.  In the future, I intend to seek Court-approval to liquidate the personalty in a cost-efficient manner, while retaining the electronic and hard copy records.

**II.   The Mediation with Nettles**

   **A. The Delray Mansion**

Plaintiffs' counsel and I scheduled a mediation with Lorie Ann Nettles on August 15, 2016,

in an attempt to settle my pre-suit claims as to the Delray mansion and the Plaintiffs' pending

---

[3] The value of digital coins changes each day and during the day that is, generally speaking, similar to the stock market.  Therefore, the market value of the coins can go up or down each day.

[4] This is based on the value of Bitcoins as of this filing.

claims as to the property. My interest and the Plaintiffs' interest were aligned because the property would ultimately be for the benefit of the Cryptsy account holders – *i.e.*, the Class.[5] The mediator was retired Circuit Court Judge, the Honorable Howard Tescher, who has significant experience mediating receivership matters in Florida and around the Country. A receivership pre-suit mediation was the best course of action for the receivership, based on the status of pre-mediation settlement discussions between me, Plaintiffs and Nettles.

As stated above and in many prior filings, Nettles is the title owner of the Delray Beach property located at 16832 Charles River Drive, Delray Beach, Florida 33446 that she and Vernon (her husband at that time) purchased in March 2015 for $1,374,881 in cash. Nettles received the property from Vernon in their divorce settlement earlier this year. The problem for Nettles is that the property was fully purchased with coins/funds misappropriated by Vernon from Cryptsy and its account holders. Therefore, the property is receivership property and thus subject to turnover for the benefit of the approved account holders/the Class.

Before mediation, I provided a thorough and comprehensive written tracing analysis to Nettles' counsel for purposes of the mediation to establish the tracing of digital coins from Cryptsy's wallets, to deposits in Vernon's personal Coinbase account, to conversion into and deposits of currency in Vernon's and Nettles' joint bank account, to the purchase of the property.

**B. Tracing the Purchase of the Property to Cryptsy's Wallets**

My investigation reflects that Vernon opened a personal account at Coinbase in May 2013 (when Cryptsy was beginning its operations), which Coinbase finally closed in December 2015 (when Cryptsy was winding down its operations and amid public allegations of misconduct).

---

[5] My receivership team, Plaintiffs' counsel and I have worked cooperatively together from the very start of the receivership proceeding to maximize recoveries for the benefit of the receivership estate and the Class.

During that period of two (2) years and seven (7) months, Vernon transferred and converted over 1,100 Bitcoins into currency in the amount of over $3.3 million. That $3.3 million-plus was deposited into Vernon's and his now ex-wife's (Defendant Nettles') joint bank account. A portion of that $3.3 million – $1,374,881 – was used to purchase the Delray Beach mansion now owned by Nettles.

I forensically and cryptographically traced the source of a vast majority of the coins converted through Vernon's personal Coinbase account back to Cryptsy wallets and its account holders, meaning that the source of funds to purchase the Delray mansion were the coins in Cryptsy's wallets and thus rendering the property a receivership asset for the benefit of Cryptsy's account holders. My tracing findings are summarized below.

It appears that when Vernon misappropriated and liquidated Bitcoins into currency, Vernon on a daily to weekly basis transferred Bitcoins from the Cryptsy "hot" wallet to his personal Coinbase account, where the coins were liquidated and resulting currency deposited into his personal joint account. Vernon also transferred Bitcoins from the Cryptsy "hot" wallet to a wallet under his control before transferring them to his personal Coinbase account and liquidating them into currency deposited into his personal joint account. It appears that Vernon misappropriated and converted over $2.2 million in this manner.

In addition, it appears that when Vernon misappropriated and liquidated alternative coins, or altcoins, into currency, Vernon used exchanges such as Bittrex, BTER and CEX.IO to convert the alternative coins into Bitcoins before transferring the Bitcoins to his personal Coinbase account to deposit and liquidate into currency for deposit into his personal joint account. There would have been no Cryptsy business purpose to transfer any coins to exchanges such as Bittrex, BTER or CEX.IO during Cryptsy's operations except for an improper or ulterior purpose such as Vernon's

misappropriating coins and funds.  It appears that Vernon misappropriated and converted over $600,000 in this manner.

In all, Vernon transferred and liquidated a massive number of Bitcoins and other digital coins of more than $3.3 million through his personal Coinbase account and deposited this amount of money into his personal joint account with Nettles.

I also had filed and recorded a lis pendens on the property for the account holders' benefit. This was necessary to stop Nettles from selling the property which she had been trying to do since finalizing her divorce.  The property had been listed on the market for $1.5 million, but was later removed as a result of my demand, Plaintiffs' litigation efforts and the scheduled mediation.

### C.  Other Nettles' Assets

In addition to the Delray mansion, Nettles owns other assets purchased with funds derived, and misappropriated, from Cryptsy and ultimately its account holders.  These assets include a Tiffany diamond ring purchased for over $104,000 (in cash), an Infiniti QX80 purchased for over $82,000 (in cash), and household furnishings in the Delray mansion.  These assets were the subject of the August 15, 2016 mediation as well.

I am pleased to report that the parties agreed to settle all claims that the Plaintiffs and I have against Nettles at mediation.

### III.   The Settlement Agreement with Nettles

The material terms of Nettles' settlement obligations are as follows:

i.  I would file a motion to approve (which just occurred) the Settlement Agreement promptly upon execution of the Settlement Agreement;

ii.  Upon the granting of the motion, Nettles shall deed the property to me;

iii.  I then shall market and sell the property to a buyer, subject to a separately-filed motion to approve the proposed sale at the appropriate time in the future and Court-approval of that motion;

6

iv.   Through the date of closing the sale of the property, Nettles and her daughters may continue to occupy and live in the property.  Therefore, Nettles and her daughters shall vacate the property on or before the closing date;

v.   Through the date of closing the sale of the property, Nettles shall continue to maintain the property, and shall be responsible and pay for all expenses to maintain the property, including, but not limited to, real estate taxes, adequate homeowner's and hurricane insurances, homeowner's association fees, pool care, lawn and landscaping, and all other expenses for maintaining the property;

vi.   At closing, Nettles shall receive $250,000.00, less any amounts that Nettles is obligated to pay but has failed to pay, such as further encumbering the property, taxes, insurances, association fees, other fees or other monies due on or for the property before or on the date of the closing;

vii.   The remaining sales funds net of closing costs, realtor fees and other closing-related expenses and also net of Nettles' $250,000.00 agreed-to amount shall be held in escrow by me for the benefit of approved Cryptsy account holders/the Class, pending final approval of the Plaintiffs' separately-filed motion[6] for approval of the Settlement Agreement regarding the many proposed class protocols and procedures, including the proposed plan of allocation/distribution, proposed claims procedures, proposed notice form, proposed claim form, proposed objection/appeal periods, proposed payment of fees and expenses, etc.[7];

viii.   The Tiffany diamond ring shall be (and has already been) turned over to me and held by me in escrow until final approval of the Plaintiffs' motion for approval of the Settlement Agreement.  Upon final approval by the Court, I then shall market and sell the diamond ring to a buyer, subject to a separately-filed motion at the appropriate time in the future and Court-approval of that motion; and

ix.   Nettles shall retain the Infiniti QX80 and household furnishings.

---

[6] The Plaintiffs recently filed this motion for approval [DE 73], which the Court preliminarily granted [DE 74].

[7] Such proposed class protocols and procedures are incorporated as part of the attached Settlement Agreement because the underlying case is a class action lawsuit, and it is required and standard for such proposed protocols and procedures to be expressly incorporated in class settlement agreements (such as the subject Settlement Agreement) with class defendants (such as Nettles).

The resolution as to the Delray mansion is anticipated to generate more than $1 million in net sales proceeds for the benefit of Cryptsy's victims/the Class.  The Tiffany ring will obviously generate additional proceeds on top of the mansion.  The resolution as to the receivership is pre-suit, meaning a large amount of receivership fees and expenses have been saved as a result of this settlement now, rather than later after significant litigation (and the resulting significant expenses).  Finally, the resolution avoids, naturally, the risk inherent in all litigation.

Given these circumstances, the resolution is a huge success for the receivership and for the Class.  I am recovering a significant amount in the context of a pre-suit mediation, which is one of the most – if not the most – efficient and cost-effective manners possible.

As a result, I filed a receivership motion to approve the Settlement Agreement [DE 77].  Upon Court-approval, I will be taking ownership of the property by Deed and will market the property for sale.  I intend to find a qualified buyer as soon as possible.  The sale to a buyer will be subject to an upcoming motion and Court Order for the benefit of Cryptsy's victims/the Class.

## IV.  Proposed Class Procedures, Including Claims Procedure

There is currently a proposed claims procedure to repay approved Cryptsy account holders.  The claims procedure, as well as several other class-related protocols and procedures, including the proposed plan of allocation/distribution, proposed notice form, proposed claim form, proposed objection/appeal periods, proposed payment of fees and expenses, etc., are expressly listed and incorporated as part of the Nettles Settlement Agreement because the underlying case is a class action lawsuit, in which such proposed protocols and procedures are expressly incorporated in class settlement agreements.  In summary, the proposed claims procedure would repay approved claimants a pro rata distribution amount based on the monetized value of their coin holdings at Cryptsy as of a certain date.  To minimize and essentially eliminate significant receivership fees

in a claims procedure, a claims administrator will be selected by Plaintiffs' counsel and me to take the lead in the claims procedure, including reviewing and approving claim forms. The cost savings should be significant for the victims' benefit. The Plaintiffs recently filed a motion for approval of the Settlement Agreement as to the proposed class protocols and procedures [DE 73], which the Court preliminarily granted [DE 74].

## V.    Continuing to Secure the Remaining Wallets and Cryptocurrencies

I have continued the lengthy and tedious review of the wallets on the servers to determine what cryptocurrencies remain for the benefit of Cryptsy's account holders. The most lucrative and most liquid coins were secured as soon as possible and took a significant amount of time to accomplish. The less lucrative and less liquid coins have been secured and continue to be secured, which has also taken a significant amount of time.

I am pleased to report that my team has successfully secured from Cryptsy's servers, and have transferred to protected receivership digital wallets, more than fifty (50) different types of cryptocurrencies. Attached as Exhibit A is a chart of the cryptocurrencies that I have secured as of this Third Report.[8]  The chart lists, among other things, the types of coins (including high liquidity) and the amount of coins.

Below is a summary of the technical and time-consuming process that my computer forensics team has undertaken to secure the coins from Cryptsy's servers:

i.   Cryptsy had an entire array of servers running the wallets and sinking block chains, as well as a team of employees that maintained smooth operation of the wallets;

ii.  There are currently in excess of 200 wallets containing different alternative coins that are under the Receiver's control;

---

[8]   In the event I secure additional coins, I will provide an updated chart in my Fourth Report and/or in the appropriate future filings.

iii. Each alternative coin wallet requires its own unique software to run its own block chain;

iv. The receivership estate has billions of individual alternate coins under its control. My computer forensics team are also continuing to secure additional coins. Each coin has its own block chain, and the entire block chain history needs to be linked with the recovered wallets in order to verify the current balance of coins in that wallet; and

v. Due to the fact that Cryptsy was an exchange, each wallet contains hundreds of thousands of entries for transactions, and in many cases, the wallets have become clogged and unresponsive requiring additional time and effort to recover any remaining coins in that wallet.

## VI.    Liquidation of the High Liquidity Secured Coins

As a result of my investigation, and as stated in many prior filings, I cannot return or digitally transfer the secured coins to legitimate account holders for two basic reasons. First, and as stated in prior filings, Defendant Vernon destroyed the database which contained, among other things, each account holder's account balance, coins held and account activity. Second, and as also stated in prior filings, each secured Cryptsy wallet for each specific type of coin was commingled with the same types of coins for the benefit of the Cryptsy account holders who had such coins in his/her account at Cryptsy. Therefore, account holders who had a certain type of coin at Cryptsy had a pro rata interest in the Cryptsy wallet for that specific type of coin. Cryptsy did not hold coins in each account holder's name in a segregated account or manner to trace the coins, or ownership of same, to any specific account holder.[9]

Based on the above, it is not appropriate for me to return or transfer the secured coins to Cryptsy's account holders. Because the secured coins should not be transferred to account holders, they must be liquidated into currency for the benefit of the account holders.

_____

[9] Even if Vernon had not destroyed the database and I knew the account holders' account balances, I could not recommend returning the secured coins to the account holders because the account holders had a pro rata interest in the commingled Cryptsy wallets of coins.

10

From a liquidation point of value, there are two types of coins that I have secured.  One type has a strong or high liquidation value, meaning if the coins are sold through a cryptocurrency exchange, the net remaining monetary value in all probability would be close to market value.  Moreover, they are easily monetized given the demand for such coins.  I have analyzed, with the assistance of my cryptocurrency forensics team, which coins have a strong or high liquidation value.  The secured coins that I believe have a strong or high liquidation value are the following: Ethereum, Ethereum Classic, Bitcoin, Dash, Dodge, Litecoin, Namecoin, Startcoin, Novacoin, Peercoin, Vericoin, Rubycoin, Digibyte, Earthcoin, and I/Ocoin.

On the other hand, I have secured many other types of coins that have a low to medium liquidation value, meaning that if the coins are sold through a cryptocurrency exchange, the net remaining monetary value would be significantly less than the market value of the coins.  Given the lack of demand, an attempt to liquidate any significant amount of such would adversely impact the market price.  Therefore, and as of this time, those types of coins should not be sold through an exchange, but should be sold in a different type of procedure, such as to a private buyer or in an auction, where their value can be maximized as much as possible.  As such, and only for the secured coins with a low to medium liquidation value, I will be separately filing in the future motion(s) for authorization to sell to interested buyer(s) and/or to conduct an auction.

There is no reason to auction or sell at a discount to private-party buyers coins with a strong or high liquidation value because bids for such coins would likely be less, and possibly significantly less, than the net amount realized upon sale through an exchange.  Therefore, I filed a motion for authorization to liquidate/sell [DE 70] the high liquidity coins through an exchange and on dates of my choice, which the Court granted [DE 71].

11

As of this Third Report, I have almost finished liquidating the majority of the 15 high liquidity coins with minimal market effects and at values at or close to market value on the dates of liquidation.  I was able to accomplish this by closely monitoring the different markets for each specific coin on a daily basis over a two to three-week period of more than 2,000 individual trades in this liquidation process to maximize recoveries.  I anticipate recovering more than $300,000[10] for the benefit of the receivership estate and the Class.

## VII.    The Remaining Coins

As stated above, I have secured many other types of coins that have a low to medium liquidation value, meaning that if the coins are sold through a cryptocurrency exchange, the net remaining monetary value would be significantly less than the market value of the coins or the market value of the coins would be significantly affected or even destroyed.  Therefore, I intend to sell those types of coins to private buyer(s) or in an auction, where their value can be maximized as much as possible.  I have recently received and continue to receive offers from several interested potential private buyers.  I will be filing in the future motion(s) for authorization to sell to buyer(s), and/or if such offers do not materialize, to conduct an auction.

## VIII.   Liquidation of the Infiniti QX60

When the receivership began, I learned that Defendant Vernon drove a 2014 Infiniti QX60 as his daily driver.  I had no evidence that Vernon had sold or otherwise disposed of the subject Infiniti pre- or post-receivership.  Therefore, I continued to investigate to determine the subject Infiniti's whereabouts.

I ultimately learned that the subject Infiniti was registered in the name of Project Investors Inc. – *i.e.*, Cryptsy.  I also learned that Cryptsy funded the purchase of this Infiniti on or about

---

[10]  This is based on the value of Bitcoins as of this filing.

12

November 12, 2013, for at least $51,008.00 in cash from its SunTrust account via a cash withdrawal and purchase of a bank check on that date. Therefore, this Infiniti was an undisputed receivership asset that I was entitled to secure and liquidate for the victims' benefit.

I further investigated the location of this Infiniti and learned that it might be located at the Fort Lauderdale International Airport. I continued to investigate and learned that this Infiniti, in fact, was located at the Fort Lauderdale International Airport. It was left there on or about July 7, 2016, likely by either Defendant Vernon and/or his girlfriend, because the parking ticket was left in the vehicle.

I then secured and took possession of the Infiniti because, as stated above, it is an undisputed receivership asset. The Infiniti had approximately 29,000 miles on it. I paid the parking amount, paid the Broward County Port Authority, had the vehicle transported to a secure receivership location, paid for a replacement key/fob in order to be able to sell the vehicle, and obtained quotes/offers from local car dealers that would purchase the vehicle.

The prior quotes/offers were: $28,000.00 from CarMax; and $26,000.00 from a local Infiniti dealer. The highest quote/offer was approximately 90% of the Kelley Blue Book value and approximately 96% of the edmunds.com value.

I filed a motion for authorization [DE 64] to sell the Infiniti to the highest quote/offer of the quotes/offers obtained, which the Court granted [DE 66].

IX. **It Appears That Vernon Is Continuing to Misappropriate Coins and Funds from Cryptsy and Its Account Holders Post-Receivership**

It appears that Vernon has transferred, and continues to transfer, a large amount of coins traceable back to Cryptsy wallets to new addresses beyond my control after my appointment. This is a classic violation of the Appointment Order which requires Vernon and any third parties who have Cryptsy-derived coins to return same to me.

13

I have been able to confirm this movement of coins post-receivership from my team's analysis of the wallets on Cryptsy's servers. I do not have the ability to know where these coins are currently located, whether at a third party exchange or in a private wallet. The coins transferred after my appointment that are traceable back to Cryptsy include, but are not limited to, Earthcoin, Ethereum, Vertcoin, Worldcoin, Primecoin, Mooncoin, T#tcoin and Potcoin. The majority of these coins were likely transferred through overseas exchanges. I have sent several demand letters to overseas exchanges which may have these Cryptsy-derived coins, such as localbitcoins.com, alcurEX, BTC38 and BTER, but nearly all such exchanges have not responded to my letters because they are overseas and apparently do not feel compelled to respond to the Appointment Order.

I am currently working with Bittrex (U.S.-based) regarding certain coins derived from Cryptsy that appear to be held in at least one additional account there. Bittrex is cooperating and has frozen that account.

## X.    The Account Holders

There are a significant amount of account holders who invested through Cryptsy. As stated in prior filings, and from the Cryptsy end, I am currently unable to confirm their number, identity, investment amount, types and amount of coins invested, which account holders are owed money (and how much), which account holders made money (and how much and when), and which account holders received any money back (and how much and when), because Vernon apparently destroyed the database.

However, determining and confirming account-holder information is not completely a lost cause. There are, and will be, other avenues from the account holders' end to potentially confirm the above account-holder information, such as account information saved by the account holders

or screen shots taken by them; emails saved by the account holders; documents they received from Cryptsy; and sworn declarations attesting to their investment, transactions, coins held and balance owed. Plaintiffs' counsel and I will work with the mutually-selected claims administrator to ensure the claims process and review of claim forms goes as smoothly as possible under the circumstances.

## XI.    Cryptsy's Servers at Vault Networks

I will be working with Vault Networks, where Cryptsy's servers were maintained, on a plan to physically transfer the servers to a new receivership location. Vault Networks has been served with the Appointment Order and has been advised since the first demand back in April of its duty to preserve and protect the servers and evidence on same as receivership property.

## XII.    Public Storage

As stated in prior filings, I moved to compel Public Storage to provide immediate access to the storage units – even if they are in Vernon's name – to inspect, inventory and determine what is (and what is not) subject to the receivership [DE 56]. The Court thereafter granted the motion [DE 57]. I promptly coordinated a date and time for accessing and inspecting the storage units with Public Storage's in-house counsel, who cooperated and complied. I also requested and received from Public Storage relevant documents regarding the storage units.

On July 14, 2016, Mr. Carey, my team and law enforcement accessed three – as opposed to two – storage units at Public Storage associated with Cryptsy and/or Vernon. New locks were placed on the units to prevent any theft or loss.

In the storage units were numerous computer servers, computers, hard drives, thumb drives, boxes of business documents, a gold/diamond ring, high-end women's clothing, household furnishings, and furniture. The secured computer and electronic equipment will be forensically

analyzed.  From the office items in storage compared to the office items I understand Cryptsy had, it appears that a large amount of Cryptsy office equipment and furniture were disposed of pre-receivership by Vernon.  This is also consistent with reports from third parties.

It is my position that most – if not all – of the items secured in the storage units are receivership property.  For example, the storage units contained Vernon's girlfriend's household items and clothing, but most – if not all – of those items were purchased with funds derived, and misappropriated, from Cryptsy and its account holders.  Vernon had relocated his girlfriend from China to Boca Raton to continue his affair and financed, again with Cryptsy-derived money, her life in South Florida.

In the future, I intend to file a motion regarding the disposition of the secured property from the storage units.  Until then, the secured storage items will be preserved under my supervision at new receivership storage units.

## XIII.   The Hack

Since the Second Report, I have confirmed that the hack of Bitcoin and Litecoin occurred on the morning of July 29, 2014.  I have also confirmed that over $6 million in Bitcoins is still sitting at a specific coin address from the hack date.  As stated in the Second Report, Vernon instructed employees with direct knowledge of the hack not to disclose it to anyone, whether account holders, law enforcement or the Government and the hack occurred after, not before, the beginning of Vernon's above-described misappropriation of coins and funds from Cryptsy and its account holders.  I will continue to investigate these issues.

## XIV.   Subpoenas and Document Requests

I previously served dozens of subpoenas and document requests on parties and several relevant nonparties shortly after my appointment.  These subpoenas and document requests were

16

discussed and attached to the First and Second Reports. Vernon refused and continues to refuse to produce any information or documents to help Cryptsy's account holders.

Since the Second Report, I have served several additional subpoenas to relevant third parties, have received responsive documents and expect to receive additional documents.

I will continue to review produced records for the most significant and relevant monetary transactions for the account holders' benefit and will continue to issue relevant subpoenas.

### XV.    Receivership Website

My team and I continue to correspond and speak with account holders, who are estimated to number in the tens of thousands, and continue to update the receivership website with relevant filings and other material information at www.cryptsyreceivership.com. The website informs account holders regarding important updates, relevant court filings (such as reports and motions affecting account holders), and the general progress of the receivership proceeding. The website also has a registration link for account holders to complete, so I can keep track of their names, contact information, investment history and other relevant information to provide to the claims administrator for the claims procedure. The website is the best way for me to communicate with a large amount of account holders.

### XVI.   Tax Issues and Forensic Accounting

As stated in the Second report, one important issue will be to determine the status of, and properly address, Cryptsy's tax returns for prior tax years, especially tax year 2015. I intend to address such in the future.

### XVII.  Receivership Targets

I continue to evaluate individuals and entities that bear responsibility for the Cryptsy debacle, as well as those who improperly received money or assets derived from Cryptsy, for the

benefit of the account holders.  I recently moved to retain special litigation counsel for this purpose [DE 72].

**XVIII. Conclusion**

My overall investigation will be ongoing.  I am pleased to report significant progress regarding recovery of assets, in light of the dire circumstances that existed before and at the time of my appointment.  I will continue to: (i) search for and attempt to secure assets, funds, cryptocurrencies, accounts and wallets in Cryptsy's name or derived from Cryptsy; (ii) market and liquidate receivership assets, such as the secured coins, Delray mansion, Tiffany ring and Infiniti automobile, all pursuant to Court Order; (iii) assist in the proposed class procedures; (iv) review relevant bank and exchange records; (v) investigate potential claims against third parties; and (vi) communicate with and update account holders.

I will supplement this Third Report with my Fourth Report within ninety (90) days from today.

James D. Sallah,
Receiver

Dated: October 31, 2016

18

| COINS | # OF COINS |
|---|---|
| Ethereum | 5,000.17458 |
| Ethereum Classic | 5,000.17458 |
| Dash | 1,052.90 |
| Anoncoin | 159,759.7615 |
| 42 Coin | 6.9 |
| Auroracoin | 639,159.97 |
| Cryptobullion | 124,649.17 |
| Feathercoin | 6,132,660.1 |
| Quarkcoin | 7,527,236 |
| Megacoin | 347,998 |
| Bitcoin | 3.55106959 |
| Unbreakablecoin | 794,790.7498 |
| Bitbar | 8,489.939453 |
| Unobtanium | 15,080.11 |
| Dogecoin | 5,194,474.311 |
| Litecoin | 100 |
| Goldcoin | 8,148,476.5 |
| Paycoin | 810,628.65 |
| Novacoin | 173.398 |
| Digibyte | 220,190,328.2 |
| Startcoin | 340,102.4437 |
| Monacoin | 71,754.81743 |
| Earthcoin | 63,464,031.34 |
| Vertcoin | 49 |
| Peercoin | 31.94 |
| Vericoin | 80 |
| Boostcoin | 421,473.5773 |
| Securecoin | 75,036.53846 |
| DNotes | 317,124.39 |
| Rubycoin | 18,278.782 |
| Devcoin | 324,855,328 |
| Namecoin | 75,110.08 |
| Silkcoin | 1,064,204.5 |
| Cloackcoin | 479.687933 |
| Archcoin | 16,254.79 |
| Urocoin | 3,999.98 |
| Netcoin | 1,541,860.385 |
| Whitecoin | 7,414,340.255 |
| Bitbean | 18,222,603.31 |



EXHIBIT

A

| | |
|---|---|
| I/Ocoin | 63,744.66538 |
| TEKcoin | 381,053.9199 |
| Stealthcoin | 442,473.9643 |
| WildBeastCoin | 12,504.65369 |
| Casinocoin | 548,365.13 |
| Magi | 20.69217036 |
| Bytecent | 2,926.25 |
| Diamond | 10,000.31 |
| Cannabiscoin | 886.3842093 |
| Fuelcoin | 136,595.7229 |
| Mooncoin | 8,421,008,915 |
| T#tcoin | 1,378,839 |
| Tagcoin | 39,503.13447 |
| Sterlingcoin | 514,445.776 |
| Einstenium | 5,100,031.8 |
| Florincoin | 3,737,384.79 |
| Clamcoin | 540.3972977 |