UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 9:16-cv-80060-MARRA

BRANDON LEIDEL, individually, and
MICHAEL WILSON, individually, and on behalf
of All Others Similarly Situated,

    Plaintiffs,

v.

PROJECT INVESTORS, INC. d/b/a CRYPTSY, a
Florida corporation, PAUL VERNON, individually,
LORIE ANN NETTLES, individually, RIDGEWOOD
INVESTMENTS, INC., a New Jersey corporation, and
KAUSHAL MAJMUDAR, individually,

    Defendants.
_____/

## FOURTH REPORT OF RECEIVER JAMES D. SALLAH

Pursuant to paragraph no. 39 of Section XVI of the Order Granting Plaintiffs' Renewed Motion for Appointment of James D. Sallah, Esq. as Receiver/Corporate Monitor over Defendant Project Investors, Inc. d/b/a Cryptsy [DE 33] (the "Appointment Order") dated April 4, 2016, James D. Sallah, not individually but solely in his capacity as the Court-appointed receiver (the "Receiver") for Defendant Project Investors, Inc. d/b/a Cryptsy ("Cryptsy"), submits the following Fourth Report.[1]

---

[1] Pursuant to paragraph no. 39, the Appointment Order requires a Fourth Report within ninety (90) days of the Third Report (*i.e.*, on or before January 30, 2017), and then additional reports every ninety (90) days thereafter.

## I. Introduction and Significant Receivership Accomplishments

The purpose of this Fourth Report is to more specifically advise the Court, account holders, and other interested persons as to the material actions that I have taken since my October 31, 2016 Third Report [DE 78] during the last ninety (90) days (*i.e.*, from November 1, 2016 to the present).[2] Plaintiffs' counsel, my receivership team, and I have worked cooperatively together from the very start of the receivership proceeding to maximize assets and monetized recoveries for the benefit of the receivership estate and the Class. I am pleased to report that the following significant receivership tasks have been accomplished since my appointment in early April last year:

i.  Negotiating and signing a settlement agreement [DE 73-1, 77-1] with Defendant Nettles to, upon Court-approval, deed over and to sell the Delray mansion previously purchased for approximately **$1.4 million**, which was the subject of a receivership motion to approve that was filed and recently granted [DE 77, 84];

ii. Securing **hundreds of thousands of dollars**[3] of different types of coins from Cryptsy's wallets on Cryptsy's servers and from at least one currency exchange (Bittrex);

iii. Filing a motion to liquidate several types of coins that are solely high liquidity coins [DE 70], which the Court granted [DE 71]; **more than $330,000** was recently recovered and deposited in the receivership

---

[2] As a matter of background and as a reminder to the Court, this proceeding is a class action lawsuit by Cryptsy cryptocurrency account holders who had an account with Cryptsy. Cryptsy was an online business for the public to exchange, invest, and trade digital cryptocurrencies. The Plaintiffs, class representatives of Cryptsy account holders, have alleged, among other things, that (1) Cryptsy's principal, Defendant Paul Vernon, previously shut down Cryptsy's operations and fled to China; (2) at least $5 million of account-holder funds and cryptocurrencies have been missing and unaccounted for many months; (3) account holders have been unable to access and use their Cryptsy accounts; and (4) Vernon and his now ex-wife, Defendant Lorie Ann Nettles, purchased in March 2015 a luxurious home in Delray Beach for $1,374,881 in cash from Cryptsy-derived funds and Nettles recently received the property in her divorce settlement from Vernon. Given these allegations (and others), Plaintiffs moved for the appointment of a corporate monitor or receiver [DE 18], which the Court granted and appointed me as Receiver in the Appointment Order on April 4, 2016.

[3] The value of digital coins changes each day and during the day that is, generally speaking, similar to the stock market. Therefore, the market value of the coins can go up or down each day.

      estate account from this liquidation without material consequences to each coin's market value;

iv.    Negotiating and signing a settlement agreement with Defendant Nettles to, upon Court-approval, sell a Tiffany diamond ring previously purchased for over **$104,000**;

v.    Confirming, through a very detailed and thorough tracing analysis of Cryptsy's wallets (and the coins therein), that the coins and their monetized currency deposited in Vernon's personal bank account, in fact, funded the purchase of the Delray mansion and the Tiffany ring. This receivership tracing analysis helped lead to a favorable settlement at mediation with Defendant Nettles because Nettles disputed whether the wallets of coins funded the purchase of the property and ring;

vi.    Selecting the most appropriate companies to liquidate the high liquidity coins and convert the coins into fiat currency, and selecting the appropriate dates on which to do such in order to diminish material effects on each coin's market;

vii.    Negotiating with potential buyers interested in purchasing the remaining low to medium liquidity coins and/or analyzing the alternative of filing a motion to conduct a sealed auction for such coins;

viii.    Securing an Infiniti QX60 registered in Cryptsy's name that Vernon used as his daily driver at the Fort Lauderdale International Airport as a result of my diligent efforts and investigation;

ix.    Filing a motion to sell the secured Infiniti QX60 [DE 64], which the Court granted [DE 66] and I sold for **$26,000.00**;

x.    Securing **$5,000.00** from a retainer amount in Cryptsy's name from a prior retention at a South Florida law firm; and

xi.    Securing multiple storage units containing, among other things, numerous Cryptsy computer servers, corporate records, artwork and household furnishings. In the near future, I will seek Court-approval to liquidate the personalty in a cost-efficient manner, while retaining the electronic and hard copy records.

In addition to the above assets which currently total seven figures, and as more fully discussed in my three prior Reports, my professionals and I have accomplished other significant results, including, but not limited to:

i. Confirming that Plaintiffs' allegations against Vernon are true, including that significant amounts of money and cryptocurrencies were missing and unaccounted for, and that account holders did not have access to their Cryptsy accounts;

ii. Confirming that Vernon opened a personal Coinbase account in which it appears that he converted and misappropriated over $3.3 million in customer-derived coins that he converted into currency and deposited into his personal joint bank account;

iii. Securing access to Cryptsy's servers at Vault Networks and thereafter securing coins in Cryptsy's wallets located in the servers by transferring same to protected receivership wallets;

iv. Finding that Vernon apparently destroyed the database and backup database on the servers on April 4, 2016, the date of the Appointment Order and shortly after receiving notice of same. The database contained critical information regarding account holders' identification and current and prior balances of coins, as well as where coins had been improperly transferred pre-receivership;

v. Confirming that Vernon started a new exchange in China, called www.bitebi9.com, which went offline shortly before I reported same in my Second Report;

vi. Freezing accounts with certain types of coins at the Bittrex exchange, confirming through very detailed and thorough tracing analyses that the coins were derived from Cryptsy's wallets and ensuring their turnover to the Receiver;

vii. Investigating the nature and maintenance of Cryptsy's wallets of coins by type of coin, and confirming the commingled nature therein;

viii. Securing known servers and computerized files, thereby preserving as much as possible remaining electronic data for the duration of this proceeding and other potential proceedings. I transferred remaining files and computer data from prior Vernon-controlled storage units to receivership-controlled storage units for preservation of records;

ix. Contacting former Cryptsy employees regarding various issues and retaining one important former employee to assist in administering the estate, including assistance with securing remaining coins and the tracing of Cryptsy's wallets of coins to the purchase of the Delray mansion;

x. Serving several demand letters, document requests and dozens of

        subpoenas on the parties (Vernon and Nettles) and dozens of nonparties (such as various coin exchanges, banks and other third parties with relevant information and/or documents);

xi.    Analyzing the productions consisting of thousands of pages of documents from the demand letters and subpoenas, including tracking funds and assets to which the receivership estate would have an entitlement;

xii.    Communicating with countless account holders regarding the status of the proceeding, including creating a receivership website for registration by account holders and important updates to account holders and the public;

xiii.    Assisting Plaintiffs' counsel in the development of a plan of allocation and distribution procedure for the benefit of the Class of Cryptsy's account holders who are deemed legitimate claimants as a result of the Settlement Agreement with Nettles and non-settlement recoveries of assets, such as the various coins secured [DE 73]; the Court has preliminarily granted the settlement as to the Class [DE 74];

xiv.    Investigating the purported hack from July 29, 2014, confirming it, indeed, occurred and confirming that over $6 million in Bitcoins is still sitting at a specific coin address from the hack date;

xv.    Investigating the prior two premises that Cryptsy and Vernon had vacated; and

xvi.    Investigating, making demand on and/or suing potential targets, including Kaushal Majmudar, Ridgewood Investments, Inc. and Coinbase, Inc., for purposes of ancillary receivership or class litigation for the benefit of Cryptsy's account holders.

**II.**    **Receivership Assets**

    **A. The Delray Mansion**

Nettles and Vernon (her husband at that time) purchased the property located at 16832 Charles River Drive, Delray Beach, Florida 33446 in March 2015 for $1,374,881 in cash. Nettles received the property from Vernon in their divorce settlement in early 2016. The property was fully purchased with coins/funds misappropriated by Vernon from Cryptsy and its account holders. I forensically and cryptographically traced the source of a vast majority of the coins converted

through Vernon's personal Coinbase account back to Cryptsy wallets and its account holders, meaning that the source of funds to purchase the Delray mansion were the coins in Cryptsy's wallets, thus rendering the property a receivership asset for the benefit of Cryptsy's account holders.

As stated in prior filings, the parties agreed at mediation[4] to settle the receivership's and Plaintiffs' interests in the Delray mansion, the future sale of which is anticipated to generate more than $1 million in net sales proceeds for the benefit of Cryptsy's victims/the Class.[5]

I filed a receivership motion to approve the Nettles' settlement, which the Court recently granted [DE 77, 84].[6] I also drafted a receivership deed to take ownership of the property, which Nettles recently signed and was recently recorded in public records.

---

[4] The mediator was retired Circuit Court Judge, the Honorable Howard Tescher, who has significant experience mediating receivership matters in Florida and around the Country. The resolution as to the receivership was pre-suit, meaning a large amount of receivership fees and expenses have been saved as a result of the settlement now, rather than later after significant litigation (and the resulting significant expenses). Finally, the resolution avoided, naturally, the risk inherent in all litigation. Given these circumstances, the resolution was a huge success for the receivership and the Class.

[5] My interest and the Plaintiffs' interest were aligned because the property would ultimately be monetized for the benefit of Cryptsy's victims/account holders – *i.e.*, the Class

[6] Through the date of closing the sale of the property, Nettles will continue to maintain the property, and will be responsible and pay for all expenses to maintain the property, including, but not limited to, real estate taxes, adequate homeowner's and hurricane insurances, homeowner's association fees, pool care, lawn and landscaping, and all other expenses for maintaining the property. At closing, Nettles will receive $250,000.00, less any amounts that Nettles is obligated to pay but has failed to pay, such as further encumbering the property, taxes, insurances, association fees, other fees or other monies due on or for the property before or on the date of the closing. The remaining sales funds net of closing costs, realtor fees and other closing-related expenses and also net of Nettles' $250,000.00 agreed-to amount will be held in escrow by me for the benefit of approved Cryptsy account holders/the Class, pending final approval of the Plaintiffs' separately-filed motion for approval of the Settlement Agreement regarding the many class protocols and procedures, including the plan of allocation/distribution, claims procedures, notice form, claim form, objection/appeal periods, payment of fees and expenses, etc. Such class protocols and procedures are incorporated as part of the Nettles Settlement Agreement because the underlying case is a class action lawsuit, and it is required and standard for such protocols and

I have hired a realtor with prior experience in marketing and selling receivership properties for the purpose of marketing and selling the subject property. I have also hired three appraisers to independently appraise the value of the property and have received the three appraisal reports. The appraisals are necessary for my future motion for confirmation of the proposed sale to a buyer and complying with the federal receivership statute on selling receivership property (28 U.S.C. § 2001). The property is currently on the market for sale with a list price of $1,499,000. I intend to find a qualified buyer as soon as possible. The sale to a buyer will be subject to an upcoming motion under 28 U.S.C. § 2001 and Court Order for the benefit of Cryptsy's victims/the Class.

### B. The Coins/Wallets

I have continued the lengthy and tedious review of Cryptsy's wallets on the servers to determine what cryptocurrencies remain for the benefit of Cryptsy's account holders. The most lucrative and most liquid coins were secured as soon as possible and took a significant amount of time to accomplish. The less lucrative and less liquid coins have been secured and continue to be secured, which has also taken a significant amount of time.

As stated in my prior Reports, I am pleased to report that my team has successfully secured from Cryptsy's servers, and have transferred to protected receivership digital wallets, dozens upon dozens of Cryptsy wallets of different types of cryptocurrencies. Attached as Exhibit A is a chart of the cryptocurrencies that have been secured and have not been liquidated.

Below is a summary of the time-consuming process that my computer forensics team has faced to secure the coins from Cryptsy's servers: (i) Cryptsy had an entire array of servers running the wallets and syncing block chains, as well as a team of employees that maintained smooth

---

procedures to be expressly incorporated in class settlement agreements (such as the subject Settlement Agreement) with class defendants (such as Nettles).

operation of the wallets; (ii) there are numerous wallets containing different alternative coins that are under my control; (iii) each alternative coin wallet requires its own unique software to run its own block chain; (iv) the receivership estate has billions of individual alternate coins under its control, each coin has its own block chain, and the entire block chain history needs to be linked with the recovered wallets in order to verify the current balance of coins in that wallet; and (v) due to the fact that Cryptsy was an exchange, each wallet contains hundreds of thousands of entries for transactions, and in many cases, the wallets have become corrupted, clogged and unresponsive requiring more time and effort to recover remaining coins in that wallet.

### 1. Liquidation of the High Liquidity Coins

As stated in prior filings, there are two types of coins that I have secured. One type has a strong or high liquidation value, meaning if the coins are sold through a cryptocurrency exchange, the net remaining monetary value in all probability would be close to market value. Moreover, they are easily monetized given the demand for such coins. I have analyzed, with the assistance of my cryptocurrency forensics team, which coins have a strong or high liquidation value, including, but not limited to, Bitcoin, Ethereum, Ethereum Classic, Dash, Dodge, and Litecoin

Pursuant to the self-executing Order [DE 71] granting my motion for authorization to liquidate/sell the high liquidity coins [DE 70], I have liquidated the majority of the high liquidity coins. The liquidation was accomplished with minimal market effects and at values at or close to market value on the dates of liquidation. I accomplished this overall result by closely monitoring the different markets for each specific coin on a daily basis over a two to three-week period in October 2016 of more than 2,000 individual trades in this liquidation process to maximize

recoveries. I recovered from the liquidation of the high liquidity cryptocurrency a total monetized amount of more than $330,000 for the benefit of the receivership estate and the Class.[7]

### 2. The Remaining Low to Medium Liquidity Coins

On the other hand, I have secured many other types of coins that have a low to medium liquidation value, meaning that if the coins are sold through a cryptocurrency exchange, the net remaining monetary value would be significantly less than the market value of the coins. Given the lack of market demand, generally and objectively speaking, an attempt to liquidate any significant amount of such would adversely impact the market price. Therefore, and as of this time, those types of coins should not be sold through an exchange, but should be sold to private buyer(s) or in an auction, where their value can be maximized as much as possible. I have been speaking and will continue to speak with potential private buyers of some or all such coins. If there is an acceptable offer to purchase from any private buyer(s), I will file a motion for authorization to sell to the buyer(s), and/or if such offers do not materialize, to conduct an auction.

### C. The Tiffany Ring

In addition to the Delray mansion, Nettles has turned over to me a Tiffany diamond ring purchased by Vernon for over $104,000 (in cash) that was derived from Cryptsy wallets of coins/funds. I am holding the ring in escrow until final approval of the Plaintiffs' motion for approval of the Nettles Settlement Agreement. Upon final approval by the Court, I shall market and sell the diamond ring to a buyer, subject to a separately-filed motion at the appropriate time in

---

[7] The high liquidity alternative coins were liquidated into Bitcoins and the Bitcoins were then liquidated and monetized into currency. This amount includes 3.5 Bitcoins that were also recovered from a Cryptsy wallet and liquidated during this process.

the future and Court-approval of that motion. The Tiffany ring will obviously generate additional proceeds on top of the Delray mansion.

### D. Storage Items

As stated in prior filings, I moved to compel Public Storage to provide immediate access to the storage units – even if they are in Vernon's name – to inspect, inventory and determine what is (and what is not) subject to the receivership [DE 56]. The Court thereafter granted the motion [DE 57]. I promptly coordinated a date and time for accessing and inspecting the storage units with Public Storage's in-house counsel, who cooperated and complied. I also requested and received from Public Storage relevant documents regarding the storage units.

On July 14, 2016, Mr. Carey (my deputy receiver and receivership consultant), my team and law enforcement accessed three – as opposed to two – storage units at Public Storage associated with Cryptsy and/or Vernon. New locks were placed on the units to prevent theft.

In the storage units were numerous computer servers, computers, hard drives, thumb drives, boxes of business documents, a gold/diamond ring, high-end women's clothing, household furnishings, and furniture. The secured computer and electronic equipment were imaged and forensically analyzed to the extent possible. From the office items in storage compared to the office items I understand Cryptsy had, it appears that a large amount of Cryptsy office equipment and furniture were disposed of pre-receivership by Vernon. This is also consistent with reports from third parties.

It is my position that most – if not all – of the items secured in the storage units are receivership property. For example, the storage units contained Vernon's girlfriend's household items and clothing, but most – if not all – of those items were purchased with funds derived, and

misappropriated, from Cryptsy and its account holders. Vernon had relocated his girlfriend from China to Boca Raton and financed, again with Cryptsy-derived money, her life in South Florida.

In the near future, and excluding the computer and electronic equipment, I intend to file a motion regarding the disposition of the secured personal property from the storage units. This will also reduce expenses to the receivership estate, because I will be able to cancel rental of the storage units.

I am in the process of obtaining an estimate or appraisal of the storage items, after which I will file a motion to approve my recommended sale or disposition of same. Until then, the secured storage items will continue to be preserved under my supervision at new receivership storage units.[8]

### III. Class Procedures, Including Claims Procedure

The Plaintiffs filed a motion for approval of the Nettles' Settlement Agreement as to the proposed class protocols and procedures [DE 73], which the Court preliminarily granted [DE 74]. The claims procedure, as well as several other class-related protocols and procedures, including the plan of allocation/distribution, notice form, claim form, objection/appeal periods, payment of fees and expenses, etc., were expressly listed and incorporated as part of the Nettles Settlement Agreement because the underlying case is a class action lawsuit, in which such protocols and procedures are expressly incorporated in class settlement agreements. In summary, the claims procedure will repay approved claimants a pro rata distribution amount based on the monetized value of their coin holdings at Cryptsy as of November 1, 2015 to the present. Notices to potential claimants have not been sent out, as Plaintiffs await preliminary approval on the Ridgewood

---

[8] The computer and electronic equipment will continue to be held by me and/or turned over to the appropriate authorities.

settlement (discussed below) and a new proposed notice that addresses both the Nettles and Ridgewood settlements.

To minimize and essentially eliminate significant estimated receivership fees in a class claims procedure, Plaintiffs' counsel has selected Angeion Group (www.angeiongroup.com), which provided the most competitive quote, as the claims administrator for this proceeding. Angeion Group will take the lead in the claims procedure, including reviewing and approving or rejecting claim forms. The cost savings through a claims administrator in this class action context should be significant for the victims' benefit. There will also be a separate claims/settlement website (www.cryptsysettlement.com), which is currently under construction and should be "live" in a few weeks, and a toll-free phone number through the claims administrator to facilitate the claims procedure. The receivership website (www.cryptsyreceivership.com) will also continue to be updated appropriately.

The Final Approval Hearing on the Nettles' settlement is scheduled for April 21, 2017, at 10:00 a.m. [DE 85]. Once and assuming the Court enters the Order of final approval, the settlement terms will become fully effective in the class context.

**IV.     It Appears That Vernon Is Continuing to Misappropriate Coins
and Funds from Cryptsy and Its Account Holders Post-Receivership**

It appears that Vernon has transferred on his own, or sold to third parties on the black market, to new addresses beyond my control after my appointment a large amount of Cryptsy-derived coins to which he had access as Cryptsy's president and/or to which he had sole access through encrypted passcodes. This is a classic violation of the Appointment Order which requires Vernon and any third parties who have Cryptsy-derived coins to return same to me.

I have been able to confirm this movement of coins post-receivership from my team's analysis of the wallets on Cryptsy's servers. I do not have the ability to know where these coins

are currently located, whether at a third party exchange or in a private wallet. The coins transferred after my appointment that are traceable back to Cryptsy include, but are not limited to, Earthcoin, Ethereum, Vertcoin, Worldcoin, Primecoin, Mooncoin, T#tcoin, Potcoin, Huntercoin and Ripple. The majority of these coins were likely transferred through overseas exchanges.

I have sent several demand letters, demand emails and other requests to overseas exchanges which may have these Cryptsy-derived coins, such as localbitcoins.com, alcurEX, BTC38 and BTER, but nearly all such exchanges have not responded to me or my agents because they are overseas and apparently do not feel compelled to respond to the Appointment Order.

I traced some of the misappropriated coins to two U.S.-based exchanges, Bittrex and Poloniex, which apparently have accounts holding some of these coins. I have been working with Bittrex and Poloniex on these issues, which have represented that they have frozen the subject accounts.

## V.    Receivership and Class Targets

Plaintiffs and I, through my special receivership litigation counsel, have evaluated and continue to evaluate individuals and entities that bear responsibility for the Cryptsy debacle, as well as those who improperly received money or assets derived from Cryptsy, for the benefit of the account holders.

### A. Kaushal ("Ken") Majmudar and Ridgewood Investments, Inc.

On November 17, 2016, Plaintiffs and I attended a second mediation before Judge Howard Tescher (ret.) with two parties that Plaintiffs intended to add, but had not yet added, to the case, *to wit*: Ridgewood Investments, Inc. ("Ridgewood") and Kaushal ("Ken") Majmudar ("KM"). At the mediation, the parties reached a settlement to resolve the claims of Plaintiffs and the Class, and

the Receiver, against Ridgewood and KM. That agreement was subsequently documented by the Ridgewood Settlement Agreement.

The Ridgewood Settlement Agreement has been fully executed, with the last signatory signing the document on January 4, 2017. Pursuant to Section III(B) of the Ridgewood Settlement Agreement, Plaintiffs filed a motion for leave to file the second amended complaint [DE 89], which the Court granted [DE 90]. The Second Amended Complaint names Ridgewood and KM as defendants, and adds one additional count for unjust enrichment which is pled against only Ridgewood and KM.

In the Ridgewood Settlement Agreement, Ridgewood and KM consented to the filing of the Second Amended Complaint. As detailed in the Ridgewood Settlement Agreement, upon the entry of the Court's Order granting the motion for leave (which occurred), Plaintiffs would file and, indeed, have filed a motion for preliminary approval of the Ridgewood Settlement Agreement [DE 96], which seeks to combine the class action settlement approval process for both the Nettles Settlement Agreement and the Ridgewood Settlement Agreement. The Ridgewood Settlement Agreement serves to add an additional $220,000.00 to the settlement fund initially established through the Nettles Settlement Agreement.

As stated above, the Court has set the date for the Final Approval Hearing as to the Nettles Settlement Agreement for April 21, 2017, and Plaintiffs are working towards completing a schedule that will allow for the Final Approval Hearing as to both settlement agreements to occur on that date.

### B. Coinbase, Inc.

In December 2016, Plaintiffs and I, through my special receivership counsel, filed a federal nationwide class action lawsuit in the Southern District of Florida (Case No. 9:16-cv-81992),

14

against California-based Money Services Business and cryptocurrency exchange operator, Coinbase, Inc. ("Coinbase"). The lawsuit asserts claims for aiding and abetting breach of fiduciary duty, aiding and abetting conversion, negligence, and unjust enrichment.

As alleged in the complaint, Vernon converted approximately $8.2 million in Cryptsy customer assets over a three-year period and liquidated to his own benefit those misappropriated funds through accounts Vernon and Cryptsy maintained at Coinbase. Vernon told Coinbase that the $8.2 million represented either a portion of the revenues Cryptsy had generated from its business or represented Bitcoin that Vernon himself personally owned. Despite Vernon's representations of business revenue and personal ownership, Coinbase, as a Money Services Business regulated under the FinCEN division of the U.S. Treasury Department, was required to reasonably verify those facts. Vernon's representations were patently false, and Coinbase failed to satisfy its regulatory requirements or perform any reasonable investigation into the suspicious activity in Vernon's and Cryptsy's Coinbase accounts. The value of the digital funds improperly transferred through Coinbase exceeds $8.2 million.

### C. Other Targets

Plaintiffs and I will continue to evaluate individuals and entities that bear responsibility for the Cryptsy debacle, as well as those who improperly received money or assets derived from Cryptsy, for the benefit of the account holders. Plaintiffs and I will continue to make the appropriate pre-suit demands and/or file the appropriate lawsuits against the appropriate targets for the benefit of the account holders.

### VI. Receivership Website

My team and I continue to correspond and speak with account holders, who are estimated to number in the tens of thousands, and continue to update the receivership website with relevant

filings and other material information at www.cryptsyreceivership.com. The website informs account holders regarding important updates, relevant court filings (such as reports and motions affecting account holders), and the general progress of the receivership proceeding. The website also has a registration link for account holders to complete, so I can keep track of their names, contact information, investment history and other relevant information to provide to Plaintiffs' counsel and the claims administrator for the claims procedure. The website is the best way for me to communicate with a large amount of account holders. As stated above, the receivership website will post updates on the claims procedure and will direct inquiries to the claims administrator.

### VII. Conclusion

My overall investigation will continue. I am pleased to report significant progress regarding recovery of assets, in light of the dire circumstances that existed before and at the time of my appointment. I will continue to: (i) search for and attempt to secure assets, funds, cryptocurrencies, accounts and wallets in Cryptsy's name or derived from Cryptsy; (ii) market and liquidate receivership assets, such as the secured coins, Delray mansion and Tiffany ring, all pursuant to Court Order; (iii) assist in the class procedures; (iv) review relevant bank and exchange records; (v) investigate, make demand on and/or sue appropriate third parties; and (vi) communicate with and update account holders.

I will supplement this Report with my Fifth Report within ninety (90) days from today.

_____
James D. Sallah,
Receiver

Dated: January 30, 2017

## Exhibit A

|    | Currency       | Coins Recovered    |
|----|----------------|--------------------|
| 1  | Anoncoin       | 159,759.76         |
| 2  | 42 Coin        | 6.90               |
| 4  | Cryptobullion  | 124,649.17         |
| 5  | Feathercoin    | 6,132,660.10       |
| 6  | Quarkcoin      | 7,527,236.00       |
| 7  | Megacoin       | 347,998.00         |
| 10 | Urocoin        | 3,999.98           |
| 14 | Unbreakablecoin| 794,790.75         |
| 15 | Bitbar         | 8,489.94           |
| 16 | Unobtanium     | 15,080.11          |
| 19 | Goldcoin       | 8,148,476.50       |
| 20 | Paycoin        | 810,628.65         |
| 22 | whitecoin      | 7,414,340.26       |
| 24 | Monacoin       | 71,754.82          |
| 26 | Vertcoin       | 49.00              |
| 28 | Vericoin       | 80.00              |
| 29 | Bitbean        | 18,396,603.91      |
| 30 | Boostcoin      | 433,664.34         |
| 31 | Securecoin     | 75,036.54          |
| 32 | DNotes         | 317,124.39         |
| 34 | Devcoin        | 324,855,328.00     |
| 35 | casinocoin     | 399,365.13         |
| 36 | casinocoin     | 149,000.00         |
| 37 | ultracoin      | 1,981,994.00       |
| 38 | coinMagi       | 20.69              |
| 39 | bytecent       | 2,926.25           |
| 42 | Silkcoin       | 1,064,204.50       |
| 43 | diamond        | 10,000.31          |
| 44 | truckcoin      | 203,581.23         |
| 45 | cannabiscoin   | 886.38             |
| 47 | stealthcoin    | 442,473.96         |
| 48 | ambercoin      | 11,697.92          |
| 49 | ratecoin       | 264,722.27         |
| 50 | smartcoin      | 4,570,307.00       |
| 52 | TEKcoin        | 2,446,357.80       |
| 53 | fluttercoin    | 1,742.40           |
| 54 | royalcoin (RYC)| 5,544,000.00       |
| 55 | dimecoin       | 102,728,998,504.00 |
| 56 | terracoin      | 2,329,813.99       |
| 59 | mooncoin       | 8,421,008,915.00   |
| 62 | lottocoin      | 25,067,286.00      |
| 63 | tittiecoin     | 115.09             |
| 64 | philosopherstone | 90,206.00        |

## Exhibit A

| | | |
|---|---|---:|
| 65 | tagcoin | 39,503.13 |
| 66 | MasterTrader | 6,874.14 |
| 67 | Globalcoin | 8,676,658.00 |
| 68 | Kittehcoin | 17,000,132.00 |
| 69 | Fastcoin | 1,000.00 |
| 70 | Bottlecaps | 55,136.08 |
| 71 | Hobonickels | 324,403.00 |
| 72 | egulden | 332.00 |
| 73 | sterlingcoin | 514,445.78 |
| 76 | cashcoin | 3,204,710.97 |
| 77 | Teslacoin | 22.19 |
| 78 | Cloakcoin | 479.69 |