UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 9:16-cv-80060-MARRA

BRANDON LEIDEL, individually, and
MICHAEL WILSON, individually, and on behalf
of All Others Similarly Situated,

    Plaintiffs,

v.

PROJECT INVESTORS, INC. d/b/a CRYPTSY, a
Florida corporation, PAUL VERNON, individually,
LORIE ANN NETTLES, individually, RIDGEWOOD
INVESTMENTS, INC., a New Jersey corporation, and
KAUSHAL MAJMUDAR, individually,

    Defendants.
_____/

### RECEIVER'S UNOPPOSED MOTION FOR AUTHORIZATION TO SELL REMAINING CRYPTOCURRENCIES TO THREE PRIVATE BUYERS

James D. Sallah, Esq., not individually but solely in his capacity as the Court-appointed Receiver (the "Receiver") for Defendant Project Investors, Inc. d/b/a Cryptsy ("Cryptsy"), hereby moves, on an unopposed basis, for authorization to sell the remaining cryptocurrencies at issue in this receivership proceeding to three private buyers and states:

**A. Background**

    1.    On April 4, 2016, the Court issued the Order Granting Plaintiffs' Renewed Motion for Appointment of James D. Sallah, Esq. as Receiver/Corporate Monitor over Defendant Project Investors, Inc. d/b/a Cryptsy [DE 33] (the "Appointment Order").

    2.    Pursuant to the Appointment Order, the Receiver is authorized, among other things, to take possession and control of Cryptsy's assets and books and records for the benefit of the receivership estate and Cryptsy's account holders (*i.e.*, users or customers).

3.      As a matter of background, this proceeding is a class action lawsuit filed by Cryptsy cryptocurrency account holders who had an account with Cryptsy when Cryptsy shut off access to customer accounts. Cryptsy was an online business for the public to purchase, exchange, invest, and trade cryptocurrencies.

4.      The Plaintiffs, members of the Class of Cryptsy's account holders, have alleged, among other things, that (1) Cryptsy's managing principal, Defendant Paul Vernon, previously shut down Cryptsy's operations and fled to China; (2) at least $5 million of customer funds and cryptocurrencies have been missing and unaccounted for several months; and (3) account holders have been unable to access and use their Cryptsy accounts.

5.      Given these allegations (and others), Plaintiffs moved for the appointment of a corporate monitor or receiver [DE 18], which the Court granted and appointed the Receiver in the Appointment Order on April 4, 2016.

**B.  Cryptsy's Wallets of Cryptocurrencies**

6.      Cryptsy, through Defendant Vernon, controlled many wallets (or accounts) in Cryptsy's name that each separately held different types of cryptocurrencies for the benefit of Cryptsy's account holders. In other words, each Cryptsy wallet was separated based on the type of digital coin.

7.      For example, Cryptsy had a wallet for Bitcoin (generally the most well-known type of digital coin), which was separate from the Cryptsy wallet for Ethereum (a popular alternative coin), which was separate from any and all other Cryptsy wallets of other cryptocurrencies.

8.      The Cryptsy wallets contained cryptocurrencies for the benefit of Cryptsy's account holders. Each Cryptsy wallet for each specific type of coin was commingled with the same types of coins for all the Cryptsy account holders who held such coins through a customer account at

Cryptsy. For example, when a Cryptsy account holder transferred Bitcoins through his/her Cryptsy account, the Bitcoins were exchanged and deposited into Bitcoins in the Cryptsy Bitcoin wallet in a pro rata amount for each account holder who had Bitcoins in a Cryptsy account. The same "pro rata" rule of thumb applied to transactions of the other types of coins at Cryptsy.

9. Therefore, Cryptsy did not hold coins in each account holder's name in a segregated account or manner to trace the coins, or ownership of same, to that specific account holder, let alone any account holder. All coins deposited, exchanged, or otherwise used by account holders in Cryptsy accounts were commingled together by coin type in each Cryptsy wallet for that specific coin, and each Cryptsy wallet held a pro rata amount of coins for the benefit of each account holder who had that type of coin.

C. **The Receiver Secures Cryptsy's Servers**

10. Shortly after his appointment, the Receiver learned that a South Florida-based company called Vault Networks, Inc. held Cryptsy's servers at a location in Downtown Miami. The Receiver also learned that the servers would likely contain the wallets of whatever cryptocurrencies remained after Vernon had shut down Cryptsy's operations and left to China.

11. Initially, the Receiver did not obtain immediate access to the servers from Vault Networks, so the Receiver moved to compel Vault Networks to provide access [DE 43].

12. The Court immediately granted the Receiver access [DE 44], to which Vault Networks complied and provided the Receiver's counsel and computer forensics team access to the Cryptsy servers on May 6, 2016.

13. Two critical things occurred on May 6, 2016. First, the Receiver gained access to Cryptsy's servers and began the lengthy process of reviewing the many wallets on the servers to

determine what cryptocurrencies remain for the benefit of Cryptsy's account holders.[1]  Second, the Receiver learned that on April 4, 2016 (the date that the Court issued the Appointment Order), and literally hours after e-mail service of the Appointment Order on Defendant Vernon, Vernon or someone under his direction using his passcodes remotely logged into Cryptsy's servers and destroyed in three "shred" commands the database that contained, among other things, account holder information including contact information, principle amount of U.S. currency or cryptocurrency deposited with Cryptsy, amount withdrawn from the accounts and transaction history.

14.     The Receiver attempted to restore the deleted information from the shredded database, but it was not possible to do such.  The Receiver also attempted to secure backups which would contain the information that had been deleted, but, again, with limited success.

15.     In other words, it may be impossible for the Receiver to determine with exactitude from the Cryptsy servers: (1) what is currently owed to each Cryptsy account holder; (2) what cryptocurrencies, and amount of same, each account holder had in his/her Cryptsy account during Cryptsy's operations, including at the time Cryptsy shut off access to its account holders; and (3) the identity and contact information of Cryptsy's account holders.[2]

16.     However, and as stated repeatedly in prior filings, determining and confirming account-holder information is not a lost cause.  Other avenues exist from the account holders' end of the spectrum to confirm account-holder information, such as account statements saved by the

---

[1]  A review of the servers to determine what coins remain has taken months and many hours of work.

[2]  Although the most current version of the database server has been apparently destroyed by Vernon or someone under his direction, the Receiver has located what appears to be an earlier version of the database, which includes the identities of tens of thousands of account holders that the Receiver anticipates will assist the claims administrator in vetting claims.

account holders; emails saved by the account holders; documents they received from Cryptsy; and sworn declarations attesting to their investment, transactions, coins held and balance owed.

### D. The Receiver Secures Wallets and Cryptocurrencies

17. As stated above, the Receiver accessed Cryptsy's servers and began the lengthy and tedious review of the many wallets on the servers to determine what cryptocurrencies remain for the benefit of Cryptsy's account holders.

18. The Receiver successfully secured from Cryptsy's servers, and transferred to protected receivership digital wallets, dozens of different types of cryptocurrencies for the benefit of Cryptsy's account holders.

19. In addition to securing such wallets from Cryptsy's servers, the Receiver successfully secured additional coins traceable back to Cryptsy from at least one third party exchange company (Bittrex, LLC) that had received transfers of Cryptsy-derived coins from Vernon or someone under his direction.

20. The Receiver has continued the lengthy and tedious review of Cryptsy's wallets on the servers to determine what cryptocurrencies remain for the benefit of Cryptsy's account holders.

21. The most lucrative and most liquid coins were secured as soon as possible and took a significant amount of time to accomplish. The less lucrative and less liquid coins have been secured and continue to be secured, which has also taken a significant amount of time.

22. Below is a summary of the time-consuming process that the Receiver's computer forensics team has faced to secure the coins from Cryptsy's servers: (i) Cryptsy had an entire array of servers running the wallets and syncing block chains, as well as a team of employees that maintained smooth operation of the wallets; (ii) there are numerous wallets containing different alternative coins that are under the Receiver's control; (iii) each alternative coin wallet requires its

own unique software to run its own block chain; (iv) the receivership estate has billions of individual alternate coins under its control, each coin has its own block chain, and the entire block chain history needs to be linked with the recovered wallets in order to verify the current balance of coins in that wallet; and (v) due to the fact that Cryptsy was an exchange, each wallet contains hundreds of thousands of entries for transactions, and in many cases, the wallets have become corrupted, clogged and unresponsive requiring more time and effort to recover remaining coins in that wallet.

### E. Liquidation of the High Liquidity Coins

23.     As stated in prior filings, there are two types of coins that the Receiver secured. One type has a strong or high liquidation value, meaning if the coins are sold through a cryptocurrency exchange, the net remaining monetary value in all probability would be close to market value.  Moreover, they are easily monetized given the demand for such coins.

24.     The Receiver analyzed, with the assistance of his cryptocurrency forensics team, which coins have a strong or high liquidation value, including, but not limited to, Bitcoin, Ethereum, Ethereum Classic, Dash, Dodge, and Litecoin

25.     Pursuant to the self-executing Order [DE 71] granting the Receiver's motion for authorization to liquidate/sell the high liquidity coins [DE 70], the Receiver liquidated the majority of the high liquidity coins.

26.     The liquidation was accomplished with minimal market effects and at values at or close to market value on the dates of liquidation.  The Receiver accomplished this overall result by closely monitoring the different markets for each specific coin on a daily basis over a two to three-week period in October 2016 of thousands of individual trades in this liquidation process to maximize recoveries.

27. The Receiver recovered from the liquidation of the high liquidity cryptocurrency a total monetized amount of more than $330,000 for the benefit of the receivership estate and the Class.[3]

### F. The Remaining Low to Medium Liquidity Coins

28. On the other hand, the Receiver secured many other types of coins that have a low to medium liquidation value, meaning that if the coins are sold through a cryptocurrency exchange, the net remaining monetary value would be significantly less than the market value of the coins.

29. Given the lack of market depth (*i.e.*, demand), generally and objectively speaking, an attempt to liquidate any significant amount of such would adversely impact the market price. Therefore, those types of coins should not be sold through an exchange.

30. Since the receivership began last year, the Receiver has discussed selling some or all the low to medium liquidity coins to private buyers. The Receiver has considered the pros and cons of selling the coins to private buyers or, alternatively, in an auction.

31. After thoroughly and carefully considering the issues for many months, the Receiver has come to the conclusion that an auction will not maximize the monetary return of the remaining coins. In the Receiver's opinion, there is simply not enough market interest to have a successful, worthwhile auction for the remaining coins. An auction, in all probability, would not result in selling all or most of the remaining coins, would only further delay monetizing the remaining coins and would create additional and potentially significant receivership expenses to effectuate.

32. Coming to this recent conclusion, the Receiver has recently ramped up negotiations

---

[3] The high liquidity alternative coins were liquidated into Bitcoins and the Bitcoins were then liquidated and monetized into U.S. currency. This amount included 3.5 Bitcoins that were also recovered from a Cryptsy wallet and liquidated during this process.

with a few interested buyers to purchase all the remaining coins in the receivership estate.

33. The Receiver has identified and negotiated separately with three private buyers who will purchase the inventory of the remaining coins. The three Asset Purchase Agreements are attached as Composite Exhibit 1, which include the breakdown of the specific coins that each buyer has agreed to purchase in an exhibit to each agreement.

34. The buyers have also requested that their individual identities be kept confidential in this proceeding, to which the Receiver has no objection. Therefore, their identities have been redacted in the attached Asset Purchase Agreements (Composite Exhibit 1).

35. Collectively, the buyers have agreed to buy the remaining coins for a total amount of $49,500.00, as follows: (i) buyer #1 ($28,000.00); (ii) buyer #2 ($16,500.00); and (iii) buyer #3 ($5,000.00).

36. Pursuant to the terms of the three Asset Purchase Agreements, all three buyers have already transferred the total purchase funds upon signing the agreements, so the Receiver has already received the $49,500.00 total purchase price from the buyers. The only way that the money would be refunded is if the Court denies this Motion.

37. The Receiver believes that the total purchase price of $49,500.00 is reasonable. The Receiver's forensics team also believes that the total purchase price of $49,500.00 is reasonable.

38. In an abundance of caution, and to further confirm the reasonableness of the total purchase price, the Receiver has employed an independent coin consultant (Darrell Duane of DC Blockchain), whose CV is attached as Exhibit 2.

39. The independent coin consultant has confirmed that the total purchase price of $49,500.00 is reasonable for the remaining coins.

40. The Receiver requests authorization to sell the subject coins pursuant to the three attached Asset Purchase Agreements (Composite Exhibit 1).

### G. Requested Exemption from 28 U.S.C. § 2001 and 28 U.S.C. § 2004

41. Regarding the sale of personalty subject to a receivership proceeding, 28 U.S.C. § 2004 states that a receiver should follow the requirements of 28 U.S.C. § 2001 "unless the court orders otherwise." Specifically, 28 U.S.C. § 2001 requires, among other things, that: (1) three disinterested appraisers appraise the items sold; (2) the sale be at least two-thirds of the appraised value; (3) the terms of the sale be published in a newspaper of general circulation at least ten (10) days before confirmation of the sale; and (4) no confirmation of the sale if a bona fide offer is made of at least ten (10) percent above the offered price.

42. Requiring the Receiver to comply with 28 U.S.C. § 2001 is not the best alternative under the above-discussed circumstances. Therefore, the Receiver respectfully requests that he not be required to sell the subject coins pursuant to 28 U.S.C. § 2001 and/or 28 U.S.C. § 2004.

43. The Court has previously exempted the Receiver from 28 U.S.C. § 2001 and/or 28 U.S.C. § 2004 in selling the high liquidity coins [DE 70, 71] and in selling the Infiniti QX60 [DE 64, 66] in this receivership proceeding.

44. A proposed Order granting this Motion is attached as Exhibit 3. Plaintiffs and Defendant Lorie Ann Nettles have no objection to this Motion. Defendants Kaushal Majmudar and Ridgewood Investments, Inc. take no position. As of this filing, Defendant Paul Vernon has not appeared in this action and continues to refuse to cooperate with the Receiver.

WHEREFORE, the Receiver respectfully requests that this Court enter the proposed Order, attached as Exhibit 3, seeking authorization to sell the remaining coins pursuant to the three attached Asset Purchase Agreements.

Dated: March 1, 2017.                                  Respectfully submitted,

**PATRICK J. RENGSTL, P.A.**
*Counsel for the Receiver*
7695 SW 104th Street, Suite 210
Miami, Florida 33156
Telephone: (305) 663-3333
Facsimile:   (305) 668-0003
pjr@rengstl-law.com

By: Patrick J. Rengstl, Esq.
       Patrick J. Rengstl
       FL Bar No. 0581631

### CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s:/Patrick J. Rengstl
Patrick J. Rengstl, Esq.

## **SERVICE LIST**

**David C. Silver, Esq.**
Silver Law Group
Counsel for Plaintiffs
11780 West Sample Road
Coral Springs, FL 33065
(Via CM/ECF)

**Marc Wites, Esq.**
Wites & Kapetan, P.A.
Co-counsel for Plaintiffs
4400 N Federal Hwy
Lighthouse Point, FL 33064
(Via CM/ECF)

**Mark A. Levy, Esq.**
**George J. Taylor, Esq.**
Brinkley Morgan
Counsel for Defendant Lorie Ann Nettles
200 E Las Olas Blvd Ste 1900
Fort Lauderdale, FL 33301
(Via CM/ECF)

**Jose G. Sepulveda, Esq.**
**Samuel O. Patmore, Esq.**
Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
Counsel for Defendants Ridgewood Investments, Inc. and Kaushal Majmudar
Museum Tower, Suite 2200
150 West Flagler Street
Miami, FL 33130
(Via CM/ECF)

**Paul Vernon**
(Via Email)