UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

BRANDON LEIDEL, individually,                                CASE NO. 9:16-cv-80060-KAM
And on behalf of All others Similarly Situated,

        Plaintiffs,

v.

PROJECT INVESTORS, INC. d/b/a
CRYPTSY, a Florida corporation, and
PAUL VERNON, an individual,

        Defendants.

_____/


**MOTION FOR ORDER TO SHOW CAUSE WHY CONTEMPT
SANCTIONS SHOULD NOT BE IMPOSED AGAINST BINANCE**

North Field Technology Ltd. ("North Field" or "Assignee"), assignee of the Court's Amended Judgment (as defined herein), respectfully moves this Court for entry of an Order to Show Cause why contempt sanctions should not be imposed against Binance Holdings Limited ("Binance") for its willful violation of the Order for Asset Freeze Injunction and to Transfer the Stolen Bitcoin to Assignee [ECF No. 177] ("Permanent Injunction"). After receipt of this Court's Permanent Injunction, and repeated notices and requests from counsel for the Plaintiff Class and North Field, Binance allowed Defendant Paul Vernon ("Vernon") to launder through Binance at least 669.7 BTC – presently worth $17.6 million– through Binance's exchange, even though the assets are subject to the Permanent Injunction and Amended Judgment and are the property of the Plaintiff Class. In fact, it now appears that Binance's actions were much worse than passively allowing the 669.7 BTC to be laundered through its exchange. Rather, months after receiving copies of the Permanent Injunction, Binance affirmatively warned its customers that their accounts had been "flagged" and service would be "terminated," and then Binance gave them an out. It told these customers that they could "fully withdraw" their funds and that they had a full week to do so before the account would be terminated. Thus, not only did Binance intentionally delay its alleged compliance with the Court's Orders, but it also did so with a "wink" to its customers, actively encouraging them to "fully" empty their accounts before the freeze ordered by this Court would even be put in place. Thus, North Field respectfully requests that this Court enter an Order requiring Binance to show cause why this Court should not impose contempt sanctions against Binance, and, if Binance fails to do so, requiring Binance to immediately transfer a monetary sum of 669.7 BTC or its equivalent in U.S. Dollars to North Field to be distributed in this proceeding.[1]

## MEMORANDUM OF LAW

### INTRODUCTION

Following the Court's entry of the a Permanent Injunction [ECF No. 177] in this action,

---

[1] The requested relief is precisely the same relief that the Court ordered in holding the Ren Project ("Ren") in contempt. [ECF No. 210, at 5].

Vernon commenced efforts to launder nearly all of the digital assets stolen from the Plaintiff Class (the "Stolen Bitcoin" as defined herein). However, the Permanent Injunction applies not only to the original wallets to which Vernon first moved the Stolen Bitcoin, but also to the subsequent wallets to which Vernon and all those acting in concert with him continue to move the Stolen Bitcoin in an effort to conceal, launder, and ultimately liquidate them. [ECF No. 193]

The Permanent Injunction applies to cryptocurrency exchanges, like Binance, that received notice of the Permanent Injunction. In this instance, Binance—"the world's largest centralized digital asset exchange"[2]—received multiple copies of the Permanent Injunction and Amended Judgment. The Permanent Injunction, moreover, places unambiguous obligations on exchanges including Binance, to (i) freeze any of the Stolen Bitcoin transferred to the exchange, (ii) freeze customer accounts related to the Stolen Bitcoin, and (iii) transfer the Stolen Bitcoin to North Field.

Instead of timely complying with the Permanent Injunction, Binance ignored the Permanent Injunction for months. When Binance finally decided to freeze certain accounts, it actively alerted its customers that it would be deactivating their accounts and encouraged the customers to "fully withdraw [their] funds" from their accounts before their accounts were terminated. Binance sent such notices to its customers a week prior to actually disabling the accounts. Thus, Binance was aware of the Permanent Injunction and in a position to comply with it, and instead, actively encouraged its customers to move the Stolen Bitcoin out of their accounts before Binance would freeze the assets. In so doing, Binance elected to become an accessory to Vernon's laundering of the Stolen Bitcoin, and to encourage its customers to frustrate the purpose of the Injunction. As such, Binance should be required to show cause why it should not be held in contempt, and failing such showing, this Court should require that Binance immediately turn over a monetary sum of 669.7 BTC, the amount belonging to the Plaintiff Class that it allowed its customers to receive and launder, together with such sanctions as this Court may deem appropriate.

---

[2] *CFTC v. Zhao*, No. 1:23-cv-01887, Doc. 1, at 1 (N.D. Ill. Mar. 27, 2023).

## FACTUAL BACKGROUND

**I.     The Amended Final Default Judgment and Order of Permanent Injunction**

On July 27, 2017, the Court entered a Final Default Judgment against Vernon authorizing the Plaintiff Class to recover, among other things, the 11,325.0961 bitcoin that Vernon stole from Cryptsy customers on or before July 29, 2014 (the "Final Judgment") [ECF No. 123]. The Court's Judgment identified the number of stolen bitcoin (11,325.0961) ("Originally Identified Stolen Bitcoin") and the wallet addresses in which those stolen bitcoin were stored at the time. The Court's Judgment also declared that the 11,325.0961 bitcoin belong to the Plaintiff Class. [*Id.*][3]

On May 24, 2021, this Court rendered an Amended Judgment ("the Amended Judgment"), which added 500.052319 Newly Discovered Bitcoin identified in the Amended Temporary Restraining Order ("TRO") and all associated forked assets ("the Newly Discovered Forked Assets") to the assets identified in the Final Judgment. [ECF No. 157]. The Amended Judgment declares that the 11,325.0961 Originally Identified Stolen Bitcoin and 500.052319 Newly Discovered Bitcoin ("the Stolen Bitcoin") are property of the Plaintiff Class. *Id.*

On June 22, 2021, this Court issued an order granting the motion for a permanent injunction (the "Permanent Injunction"). [ECF No. 177].[4]

---

[3] On September 18, 2020, the Court entered an Order approving the terms and conditions of the Assignment Agreement, [ECF No. 139-1], pursuant to which the Plaintiff Class assigned all rights, title, and interest in Section 6 of the Final Judgment to North Field so that North Field, along with Class Counsel, could pursue collection of the Stolen Bitcoin on a contingency, non-recourse basis.
[4] On April 8, 2022, North Field moved to clarify that the Permanent Injunction and Amended Judgment apply to all secondary wallet addresses into which Defendant Vernon and his conspirators have transferred and in the future may transfer the Stolen Bitcoin. [ECF No. 191]. On April 14, 2022, this Court issued an order granting the motion (the "Clarification Order"). [ECF No. 193]. In this Order, the Court clarified that "the Amended Judgment by its terms awards the 11,825.1484 Stolen Bitcoin and Forked Digital Assets to the Plaintiff Class as its property, regardless of which digital wallet addresses presently holds those assets[.]" *Id.* The Court likewise clarified "that all subparts of Paragraph 4 of the Permanent Injunction apply not only to the original wallet addresses listed in Tables 1 and 2 but also to any and all subsequent wallet addresses into which the Stolen Bitcoin and Forked Digital Assets have been or are in the future transferred." *Id.*

## II.     Binance and its history of illicit conduct.

Binance "operates the world's largest centralized digital asset exchange, emerging through an opaque web of corporate entities, all of which are ultimately controlled by [Changpeng] Zhao, the Chief Executive Officer ("CEO") of Binance, and constitute a common enterprise called 'Binance' or the 'Binance ecosystem.'" *CFTC v. Zhao*, No. 1:23-cv-01887, Doc. 1, at 1 (N.D. Ill. Mar. 27, 2023). Much of Binance's reported trading volume, and its profitability, "has come from its extensive solicitation of and access to customers located in the United States[.]" *Id.* at 1-2. The CFTC has alleged that, "[b]eginning no later than July 2019 and continuing through the present . . . , Binance, under Zhao's direction and control . . . , has solicited and accepted orders, accepted property to margin, and operated a facility for the trading of futures, options, swaps, and leveraged retail commodity transactions involving digital assets that are commodities including bitcoin (BTC) . . . for persons in the United States." *Id.* at 2.[5]

To realize its significant profits, Binance routinely turns a blind eye to illicit transactions conducted on its platform. According to the CFTC, "Binance officers, employees, and agents have acknowledged that the Binance platform has facilitated illegal activities[,]" and Binance's Money Laundering Reporting Officer acknowledged that Binance tolerates the use of the platform to facilitate illegal activities: "[Binance] see[s] the bad, but we close 2 eyes.'" *CFTC v. Zhao*, Doc. 1, at 33. The CFTC has also stated that, when confronted with a Binance customer using the Binance platform to conduct $5 million in trades "associated with illicit activity," Binance's Chief Compliance Officer ("CCO") told a compliance colleague to close the customer's account, but then allow the customer to open a new account. *Id.* at 33-34.

Here, North Field repeatedly warned Binance that Vernon was using Binance's platform

---

[5] Binance's generates revenue through transaction fees charged to the user for making trades on its platform, including users in the United States. *Id.* at 16. In a "December 2022 interview . . . Zhao estimated that transaction revenue accounts for approximately 90 percent of Binance's revenue." *Id.* "Binance's own documents for the month of August 2020 [show that] approximately 16% of its accounts were held by customers . . . located in the United States." *Id.* at 3.

to launder the Stolen Bitcoin, and Binance chose for months to turn a blind eye to it.

**III.    Vernon launders the Stolen Bitcoin through Binance.**

Vernon is trying to launder and hide from this Court, the Plaintiff Class, and North Field *all* of the Stolen Bitcoin. He has transferred the entire corpus of the Stolen Bitcoin into secondary wallet addresses and continues to move significant portions of the Stolen Bitcoin to cryptocurrency exchanges in an effort to liquidate these assets and walk away with them. *See* Declaration of Roman Bieda In Support of Motion for Order to Show Cause ("Bieda Decl."), ¶¶ 10-11.

On March 29, 2022, Vernon in a single day moved the entirety of the 11,325.0961 Originally Identified Stolen Bitcoin—originally held in the wallet addresses listed in Table 1 of the Amended Judgment and Permanent Injunction—to private secondary wallet addresses. *Id.* ¶¶ 8, 10. As a result, all of the Stolen Bitcoin are now held in private secondary wallet addresses or have been moved onto cryptocurrency exchanges. *Id.*

The identities of the wallet addresses where the Stolen Bitcoin is being shifted are constantly moving targets because Vernon is actively moving and breaking up these assets on a daily basis into new secondary wallet addresses and onto various exchanges. Binance is one of the exchanges where Vernon actively deposits the Stolen Bitcoin. To date, Vernon has deposited at least 669.7 BTC on Binance's platform. *See* Bieda Decl., ¶ 11. Binance receives a fee for every transaction conducted on its platform. *CFTC v. Zhao*, Doc. 1, at 16.

**IV.    North Field's multiple notices to Binance of the Injunctive Relief.**

Binance was among the exchanges that North Field immediately notified upon Vernon's movement of the Stolen Bitcoin in March 2022. Binance received notice of the Amended Judgment and TRO in this matter ten months *before* Vernon's movements began in March 2022, as follows:

- **May 22, 2021**: Plaintiff Class's counsel emailed a copy of the amended TRO, [ECF No. 155] to Binance's legal and customer support email addresses under a cover letter that informed Binance of the TRO, issued on May 18, 2021, and attached the same. The notice informed Binance that on information and belief, Vernon had accounts on Binance's platform holding assets "subject to the Court's Order." *See* Declaration of Kara L. Kapp In Support of Motion for Order to Show Cause ("Kapp Decl."), ¶ 2 & Ex. 1.

- **March 30, 2022**: immediately after Vernon began moving the Stolen Bitcoin from the original wallet addresses listed in the Amended Judgment and Permanent Injunction, North Field emailed the Permanent Injunction to Binance's legal and customer support email addresses.[6] *Id.* ¶ 5, Ex. 2. The cover letter informed Binance that Vernon had moved certain of the Stolen Bitcoin onto Binance's platform and that, under the Permanent Injunction, it must freeze those assets and future deposits of the Stolen Bitcoin onto its platform. Ex. 2.

- **April 4, 2022**: North Field sent a second notice to Binance at its legal and customer support email addresses alerting it that additional Stolen Bitcoin belonging to the Class had been deposited with Binance's exchange. *Id.* ¶ 8 & Ex. 4.

- **April 8, 2022**: North Field sent a third notice to Binance at two of its legal email addresses and one customer support email address alerting it that an additional 14 Stolen Bitcoin belonging to the Class had been deposited with Binance's exchange since March 30, 2022. *Id.* ¶ 10 & Ex. 6.

- **April 20, 2022**: North Field sent a fourth notice to Binance at two of its legal email addresses, and a known email address for an employee at Binance, Alex Ma. This notice informed Binance that the Permanent Injunction explicitly applied to secondary wallet addresses, like those on the Bitcoin exchange, to which Stolen Bitcoin have been transferred and that, since March 30, 2022, Vernon had deposited an additional 62.9 Stolen Bitcoin on Binance's exchange. *Id.* ¶ 12 & Ex. 8.

- **April 22, 2022**: North Field sent a fifth notice to Binance, at Mr. Ma's email address and Binance's legal email addresses, legal@binance.com and case@binance.com, notifying Binance that an additional 10.7 BTC of the Stolen Bitcoin had been deposited with Binance after North Field sent its April 20 notice. *Id.* ¶ 14 & Ex. 10.

- **April 25, 2022**: Binance's legal team chose, for the first time, to reply to North Field's repeated notices, confirming receipt of the April 20, 2022 notice email and attachments. In that response, Binance ignored North Field's request to freeze the Stolen Bitcoin, misread North Field's request as one for KYC data, and demanded to speak with law enforcement. *Id.* ¶ 16 & Ex. 12.

- **April 27, 2022**: North Field replied, clarifying that it was not requesting KYC data but was "requesting that Binance simply freeze the criminal proceeds belonging to the Cryptsy class as required of Binance by the attached court order and injunction" and requested Binance to confirm that the assets had been frozen by April 28, 2022. *Id.* ¶ 17 & Ex. 13.

---

[6] The notice requested that Binance "immediately freeze certain assets subject to the Amended Judgment that have been recently transferred to [its] exchange, and to freeze any and all assets originating from the wallet addresses listed in the Amended Judgment and Permanent Injunction should they hereafter make their way to [its] exchange." *Id.* ¶ 6 & Ex. 2. The letter also highlighted Binance's obligations under Paragraphs 2 and 4 of the Permanent Injunction to "freeze, or assist in or facilitate the freezing of, the Stolen Bitcoin...," and to "freeze all customer accounts related to the Stolen Bitcoin...." *Id.*

- **April 28, 2022**: April 28 came and went and Binance failed to freeze the assets or confirm to North Field that it had done so. *Id.* ¶ 17.

- **May 20, 2022**: North Field sent a sixth notice to Audrey Tran, a lawyer at Binance.US, as well as Binance's legal email addresses, legal@binance.com, and case@binance.com. North Field alerted Binance to the fact that as of May 20, "Binance ha[d] received a total of **193.69 BTC** since it received notice of the judgment and injunctive relief in this case[.]" North Field "ask[ed] that [Ms. Tran] provide [it] with contact information for a specific person within Binance.com's legal team so that [North Field could] directly discuss with them this extremely time-sensitive issue." *Id.* ¶ 18 & Exs. 15 & 16.

North Field received auto replies on March 30, April 4, April 8, April 20, and May 20 from the Binance legal email addresses confirming receipt. *Id.* ¶¶ 7, 9, 11, 13, 19.

On July 14, 2022, Ms. Tran connected North Field with in-house counsel at Binance.com, William Wang. *See id.* ¶ 20 & Ex. 18. Mr. Wang put North Field in touch with outside counsel for Binance, Karen King of Morvillo Abramowitz Grand Lason & Anello PC. *See id.* ¶ 21 & Ex. 19.

On July 18, 2022, North Field notified Ms. King of Binance's ongoing violations of the Permanent Injunction. This notice also advised that "as recently as July 14, 2022 . . . , Vernon moved an additional 47 BTC onto Binance's exchange without consequence[.]" *Id.* ¶ 22 & Ex. 20. Beginning in mid-July 2022, North Field's and Binance's attorneys engaged in discussions focused on safeguarding the Stolen Bitcoin to allow for its return to North Field—and ultimately the Plaintiff Class—in accordance with the Permanent Injunction. *Id.* ¶ 23. Binance's counsel acknowledged receipt of North Field's July 18 email on August 1, 2022. *Id.* Ex. 23.

At the time, Binance refused to indicate whether it had frozen the Stolen Bitcoin as required by the Permanent Injunction. Instead, Binance demanded certain tracing information from North Field, which North Field provided for the ten wallets receiving the largest amount of the Stolen Bitcoin.[7] *Id.* ¶ 24. On March 27, 2023, North Field informed Binance that as of March 27, at least

---

[7] North Field was not obligated to provide this information because it had *already* provided Binance with detailed spreadsheets identifying the transaction hash, associated BTC wallet address, and transfer date for every transaction. *See id.* ¶¶ 5, 8, 10, 12, 14, 17, 18, 22, 23, 25 & Exs. 2, 4, 6, 8, 10, 13, 14, 15, 16, 20, 21, 22, 25, 26. However, at significant expense to North Field, North Field commissioned and provided the requested tracing information to Binance for the Stolen Bitcoin as to the 10 largest addresses. *Id.* ¶ 24 & Exs. 24 & 25; Bieda Decl. App'x. D.

618 BTC of Stolen Bitcoin had been deposited on Binance's platform. *Id.* at ¶ 25 & Exs. 26 & 27.

**V.      Binance allowed Vernon and others to launder the Stolen Bitcoin**

Incredibly, instead of complying with the Permanent Injunction, Binance allowed Vernon and his associates to illicitly transfer the Stolen Bitcoin onto Binance's platform.

During the year-plus that Binance has been on notice of the Permanent Injunction and Vernon's improper transfer of the Stolen Bitcoin onto its platform, Binance failed to freeze the vast majority of the Stolen Bitcoin deposited with Binance, or transfer any of it to North Field's digital wallet, as mandated by the Permanent Injunction. During that period of disobedience, Vernon continued to use Binance's platform to traffic and launder the Plaintiff Class's Stolen Bitcoin. From March 30, 2022 until today, Vernon and/or others acting in concert with him transferred at least 669.7 BTC onto the Binance platform in violation of this Court's Orders. *Id.* ¶ 26 & Ex. 28; Bieda Decl. ¶ 11 & App'x E.

By failing to act to immediately freeze these assets, Binance is now complicit in Vernon's fraud. While Binance refused to indicate whether it had frozen the accounts that received Stolen Bitcoin, it is now apparent that Binance did not immediately freeze the Stolen Bitcoin upon receiving notice that it had received Stolen Bitcoin. Rather, it only started to disable service for some accounts on November 22, 2022, many months after receiving notice. But even then, Binance shockingly gave its customers advance warning that it would freeze their accounts and instructed them to move the Stolen Bitcoin before Binance implemented this freeze. Kapp Decl. ¶ 29.

Specifically, North Field learned that Binance actually encouraged its customers to "fully withdraw [their] funds" from their Binance accounts that contained Stolen Bitcoin *before* Binance would freeze the Stolen Bitcoin. On May 27, 2023, North Field received an email from "Fengying Tong" ("Tong"), a Binance customer whose Binance account had been disabled.[8] Kapp Decl. ¶ 29. Tong informed North Field that he received the following November 15, 2022 email from Binance:

---

[8] Apparently, a Binance customer service representative told Tong that he would need to contact North Field's counsel for more information about why Binance disabled Tong's account. *Id.* ¶ 29.



Ms. King, Binance's counsel, confirmed that Tong is the user associated with wallet address 1LfRxXHH93wBKnY3uPSpZGAFg2EJQtzRep, one address for which North Field provided tracings to confirm that Stolen Bitcoin had been deposited into that account. *Id.* ¶ 30.

Thus, Binance was aware that it was receiving Stolen Bitcoin, failed to freeze the Stolen Bitcoin, as required by the Permanent Injunction, and (worst of all) willfully violated the Injunction by actively encouraging its customers to withdraw their funds before their accounts would be frozen. Indeed, it misused its knowledge of the Permanent Injunction to give advance warning to the wrongdoers and allow them an opportunity to complete the theft. In other words, Binance not only willfully refused to comply with the Permanent Injunction; it enabled and assisted in violation of this order. It is difficult to imagine how Binance could have shown greater contempt for this Court than by encouraging those laundering the Stolen Bitcoin to withdraw the laundered assets. Thanks to Binance's willful disobedience of the Injunction, Vernon was able to launder 669.7 BTC through Binance's exchange. *Id.* ¶ 26 & Ex. 28; Bieda Decl. ¶ 11 & App'x E.

## ARGUMENT

### I.   The Court's Contempt Power

"Contempt of court is the disregard of judicial authority." *Popular Bank of Florida v. Banco Popular de Puerto Rico,* 180 F.R.D. 461, 465 (S.D. Fla. 1998) (citation omitted). The

Eleventh Circuit has recognized that federal courts have inherent authority to enforce its orders and judgments by holding violators of those orders and judgments in contempt of court. *See, e.g.*, *Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 823, 828-29 (11th Cir. 2010); *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991) (federal "[c]ourts have inherent power to enforce compliance with their lawful orders through civil contempt"). "Frequently used in injunction actions, civil contempt proceedings are useful methods for enforcing judicial orders." *Popular Bank of Florida*, 180 F.R.D. at 465; [ECF No. 210, at 3-4].

This authority extends to non-parties, both foreign and domestic, who are made aware of an injunction requiring them to take action or refrain from taking action and who, with knowledge of the injunction, continue to aid in its violation. Courts in the Eleventh Circuit have found personal jurisdiction over non-parties made aware of an injunction requiring them to take action or refrain from taking action and who, with knowledge of the injunction, have continued to aid in its violation. *See, e.g.*, *JTR Enters., LLC v. Colombian Emeralds*, 697 Fed. App'x 976, 988 (11th Cir. 2017) (affirming personal jurisdiction over non-party who lived outside the territorial jurisdiction of the forum state, concluding that the court had personal jurisdiction based on its inherent powers to issue sanctions); *Alderwoods Group, Inc. v. Garcia*, 682 F.3d 958, 971-72 (11th Cir. 2012) (concluding that Delaware court that had issued order had personal jurisdiction over nonparty contemnors who lived outside territorial jurisdiction of Delaware to adjudicate compliance with order where non-party had notice of the order and engaged in enjoined conduct that would frustrate the court's "ability to render a binding judgment" against defendant); *E.A. Renfroe & Co. v. Moran*, No. 06-AR-1752-S, 2007 U.S. Dist. LEXIS 118287, at *9 (N.D. Ala. Jan. 19, 2007) (finding jurisdiction over non-party residing outside the territorial jurisdiction of the court where non-party had actual notice of court order and aided and abetted in its violation); [ECF No. 210, at 4].

Under the court's inherent contempt authority, "[t]he court has the power to impose coercive and compensatory sanctions." *Citronelle-Mobile Gathering, Inc.*, 943 F.2d at 1304.

Compensatory sanctions include a compensatory fine to make the party protected by the order whole. *Id.* These sanctions comport with due process as long as they are proportionate to the need to ensure compliance with the court's order. *Id.*

The sanction of civil contempt is appropriate for failure to comply with a valid court order where: (i) the order is clear and unambiguous, (ii) the alleged contemnor received actual notice of the order; (iii) clear and convincing proof is presented of the alleged contemnor's noncompliance, and (iv) the alleged contemnor has not "diligently attempt[ed] to comply." *Popular Bank of Florida*, 180 F.R.D. at 465. The movant has the burden to make a prima facie showing as to the first three elements—that the order is clear and unambiguous, that the alleged contemnor received actual notice, and to present clear and convincing proof of the alleged contemnor's noncompliance. *Citronelle-Mobile Gathering*, 943 F.2d at 1301. Once those three showings are made, the burden shifts to the alleged contemnor to produce evidence regarding the fourth element—that it made all reasonable efforts to comply. *Id.* As to Binance, all of the three prima facie criteria are satisfied.

## II. This Court should hold Binance in contempt.

Issuing contempt sanctions here is proper and necessary to protect the Stolen Bitcoins from Vernon's ongoing and active theft and liquidation of those assets, to stop Binance's facilitation of that theft and liquidation effort, and to return the Stolen Bitcoins to the Plaintiff Class.

### A. The Permanent Injunction Is Clear and Unambiguous.

First, the Permanent Injunction is clear and unambiguous in its application to secondary wallet addresses, as this Court has already held. *See* [ECF No. 210, at 3]. Indeed, the Court specifically found "that the Permanent Injunction and Clarification Order were sufficiently clear and unambiguous." *Id.* This conclusion is supported by the following rationale:

The Amended Judgment "declares that the 11,325.0961 Bitcoin which were stolen from Cryptsy customers on July 29, 2014 and which, as of the date of the initial Final Judgment, were stored in the cryptocurrency or digital wallet addresses identified in Table 1[], are property of the Plaintiff Class and subject to and encompassed within this Amended Final Default Judgment[.]"

[ECF No. 157, ¶ 4(d)]. It also "adds and includes as property of the Plaintiff Class an additional 500.052319 Bitcoin that were stolen from Cryptsy customers on July 29, 2014[.]" [*Id.* ¶ 5].

The Clarification Order also makes clear that "the Amended Judgment by its terms awards the 11,825.1484 Stolen Bitcoin and Forked Digital Assets to the Plaintiff Class as its property, regardless of which digital wallet addresses presently holds those assets[.]" [ECF No. 193].

In addition, the Permanent Injunction requires, *inter alia,* all cryptocurrency exchanges, including Binance, to "freeze . . . the Stolen Bitcoin[,] . . . all customer accounts[,]" and "transfer . . . the Stolen Bitcoin and Forked Digital Assets to a digital wallet or account held by North Field." [ECF No. 177, at 7-8, ¶ 4]. It also prohibits Binance from transferring, disbursing, assigning, dissipating, disposing of, validating, or participating in or assisting in the validation of, any transaction in the Stolen Bitcoin . . . to any other individual or entity. [*Id.*] Thus, the Amended Judgment and Permanent Injunction plainly and unambiguously apply to the Stolen Bitcoin that has been deposited onto Binance's platform through secondary wallet addresses. Further, this language clearly ordered Binance to freeze any Stolen Bitcoin it receives, transfer it to North Field, and **not** assist in the transfer of the Stolen Bitcoin to anyone **other than** North Field.

### B.  Binance received repeated notice of the Court's Orders.

Binance has repeatedly received actual notice of the Permanent Injunction, the Amended Judgment, and Clarification Order. [9] The notice was sent via email to Binance's legal and customer support email addresses and informed Binance that on information and belief, Vernon has accounts on Binance's platform holding assets "subject to the Court's Order." Kapp Decl. ¶ 2 & Ex. 1.

Then, shortly after Vernon began actively moving the Stolen Bitcoin on March 29, 2022, North Field emailed the Permanent Injunction to Binance's legal and customer support email addresses on March 30, 2022. *See id.* ¶ 5 & Ex. 2. On March 30, 2022, Cozen received an auto-

---

[9] Binance has received far more notice than Ren received, and the Court found North Field's notice to Ren was sufficient. [ECF No. 210, at 3]. Binance received notice of this Court's Orders earlier than Ren, and repeated notices over an extended period of time.

reply from Binance confirming receipt of the March 30 email. *Id.* ¶ 7 & Ex. 3.

On April 4 and 8, 2022, North Field sent Binance a second and third notice at its legal and customer support email addresses alerting it that more Stolen Bitcoin had been deposited on Binance's exchange. *Id.* ¶¶ 8, 10 & Exs. 4, 6. Cozen received auto-replies from Binance's legal email address confirming receipt of the April 4 & 8 emails. *Id.* ¶¶ 9, 11 & Exs. 5, 7.

On April 20, North Field sent a fourth notice to Binance alerting it that the Permanent Injunction's requirements applied to all wallet addresses, including those secondary wallet addresses to which Stolen Bitcoin are subsequently transferred, and that since March 30, 2022, an additional 62.9 Stolen Bitcoin had been deposited by Vernon on Binance's exchange. *Id.* ¶ 12 & Ex. 8. Cozen received auto-replies from Binance address acknowledging receipt. *Id.* ¶ 13 & Ex. 9.

On April 22, North Field sent Binance a fifth notice alerting it that a further 10.7 BTC of the Stolen Bitcoin had been sent to Binance since North Field's April 20 notice. *Id.* ¶ 14 & Ex. 10. Cozen received auto-replies from Binance again confirming receipt. *Id.* ¶ 15 & Ex. 11.

On April 25, Binance replied for the first time to North Field's April 20 notice, confirming receipt. *Id.* ¶ 16 & Ex. 12. In its response, Binance ignored North Field's request to freeze the Stolen Bitcoin, misread it as a request for KYC, and demanded to speak with law enforcement. *Id.*

North Field replied on April 27, clarifying that it was not requesting KYC data, but was "requesting that Binance simply freeze the criminal proceeds belonging to the Cryptsy class as required of Binance by the attached court order and injunction." *Id.* ¶ 17 & Ex. 13. North Field informed Binance that since April 20, "an additional **41.97 BTC** [had] made their way onto [Binance's] exchange" and that as of April 27, a total of "116 BTC" of the Stolen Bitcoin had been deposited with Binance. North Field attached a tracing report showing the same and requested that Binance confirm by April 28, 2022 that the assets had been frozen. *Id.* ¶ 17 & Exs. 13 & 14. April 28 came and went and Binance failed to confirm that it had frozen the assets. *Id.* ¶ 17.

On May 20, 2022, North Field sent a sixth notice to a point-of-contact at Binance.US,

Audrey Tran, ccing case@binance.com, notifying Binance that as of May 20, 2022, a total of 193.69 BTC of the stolen Bitcoin had been deposited with Binance.com. *Id.* ¶ 18 & Ex. 15. We "simply ask[ed] that [Ms. Tran] provide us with contact information for a specific person within Binance.com's legal team so that we [could] directly discuss with them this extremely time-sensitive issue." *Id.* We also warned Binance that "[i]f Binance.com continues to ignore our repeated requests that they honor the injunction at issue and freeze these assets, we will have no choice but to hold Binance.com in contempt, a result [North Field was] diligently working to avoid[.]" *Id.* On May 20, 2022, Cozen received an auto-reply from Binance's case email. *Id.* ¶ 19.

By mid-July, North Field was connected with counsel for Binance. *Id.* ¶ 21 & Ex. 19. On July 18, 2022, North Field sent Binance's counsel an email again providing notice of Binance's violations of the Permanent Injunction, including that "as recently as July 14, 2022 . . . , Vernon moved an additional 47 BTC onto Binance's exchange without consequence[.]" *Id.* ¶ 22 & Ex. 20. Binance's counsel confirmed receipt of North Field's July 18 email on August 1, 2022. *Id.* Ex. 23.

On March 27, 2023, North Field notified Binance that as of March 27, 2023, at least 618 BTC from the Stolen Bitcoin had been deposited on Binance's platform, and provided a tracing report showing the same. *Id.* ¶ 25 & Exs. 26 & 27. North Field asked Binance to confirm by March 29, 2023 that it had frozen the 618 BTC. *Id* ¶ 25 & Ex. 26. North Field further warned that "[i]f we [did] not receive confirmation by Wednesday March 29, 2023 that these 618 BTC have been frozen on behalf of the Cryptsy class, we will take that as a refusal to comply with the attached federal court judgment and permanent injunction[.]" *Id.* March 29 came and went and Binance failed to confirm that it had frozen the Stolen Bitcoin, as required by this Court's Order. *Id.* ¶ 25.

On information and belief, during the intervening period, Binance did nothing to safeguard the Stolen Bitcoin to allow for its return to North Field and the Plaintiff Class, as required by the Permanent Injunction. *Id.* ¶ 24. Instead of freezing the Stolen Bitcoin, Binance demanded a tracing visualization report. North Field was not obligated to provide such a report because it had *already*

provided Binance with several detailed spreadsheets identifying the transaction hash, BTC wallet address, and transfer date for every transaction. *See id.* ¶¶ 5, 8, 10, 12, 14, 17, 18, 22, 25 & Exs. 2, 4, 6, 8, 10, 13, 14, 15, 16, 20, 21, 22, 26, 27. However, at significant expense to North Field, North Field did commission and provide the additional requested tracing information to Binance for all of the largest transactions deposited with Binance. *See id.* ¶ 24 & Exs. 24 & 25.

On April 21, 2023, North Field provided Binance with the tracing visualizations Binance had demanded, which show that the Stolen Bitcoin is traceable to the wallets listed in the Amended Judgment. *Id.* ¶ 24 & Exs. 24 & 25. North Field requested that Binance confirm that the assets had been frozen by April 24, 2023. *Id.* ¶ 24 & Ex. 24. April 24, 2023 came and went and Binance again failed to confirm that it has frozen the Class's Stolen Bitcoin. *Id.* ¶ 24.

**C. There is clear and convincing evidence of Binance's non-compliance.**

The Order, by its terms, requires Binance, upon actual notice, to "immediately": (i) "freeze, or assist in or facilitate the freezing of, the Stolen Bitcoin", (ii) "freeze all customer accounts related to the Stolen Bitcoin", and (iii) "take all steps necessary to transfer . . . the Stolen Bitcoin . . . to a digital wallet or account held by North Field." [ECF No. 177, at 7-8, ¶ 4].

Actual notice of the Permanent Injunction and Amended Judgment were provided to Binance on at least 8 occasions, May 22, 2021 and March 30, April 4, April 8, April 20, April 22, May 20, and July 18, 2022. Kapp Decl. ¶¶ 2, 8, 10, 12, 14, 18. Binance's legal team confirmed receipt in each instance with an auto-reply. Further, Binance expressly confirmed receipt of notice on April 25, July 14, July 15, and August 1, 2022. *Id.* Exs. 12, 18, 19, 23. However, Binance did not immediately freeze the Stolen Bitcoin or transfer it to North Field, as the Permanent Injunction required. *Id.* ¶¶ 17, 24, 25. Instead, Binance delayed taking action for months, and when it did, in willful violation of the Injunction, it notified its customers, including Tong, to empty their accounts prior to when Binance planned to freeze the Stolen Bitcoin. *Id.* ¶ 29 & Ex. 30. As a result, at least 669.7 BTC of Stolen Bitcoin were laundered through Binance's exchange.

### D. Binance has not been reasonably diligent in attempting to comply with the Court's Permanent Injunction, and, in fact, has encouraged its violation.

As North Field has satisfied its burden to establish the first three elements, the burden shifts to Binance to show that it has been reasonably diligent in attempting to comply with the Permanent Injunction. *Citronelle-Mobile Gathering*, 943 F.2d at 1301. Binance cannot meet this burden, and it in fact took efforts to undermine the Permanent Injunction. To date, Binance has still not turned over to North Field the 669.7 BTC of Stolen Bitcoin, despite its knowledge that this is required under the Permanent Injunction. Notably, "a violation of the order need not be willful for a party to be found in civil contempt." *Popular Bank of Florida*, 180 F.R.D. at 466. Here, however, Binance's failure to comply appears willful. Rather than ensure compliance with this Court's Permanent Injunction by freezing the accounts that contained the Stolen Bitcoin, Binance did the opposite. It notified customers, like Tong, that their accounts had been "flagged" and were subject to a discontinuation of service and gave them a full week to empty their accounts of the Stolen Bitcoin before service was discontinued. In light of Binance's manifest disregard and intentional violation of the Permanent Injunction, the only effective way that this Court can enforce it is by exercising its traditional right to hold Binance in civil contempt and impose appropriate sanctions.

### III. Approving notice to Binance by mail is reasonably calculated to give notice and avoids any argument that Binance did not receive adequate notice.

The notice requirement of the Due Process Clause of the Fourteenth Amendment is met where service is "'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *City Cab Co. of Orlando, Inc. v. All City Yellow Cab, Inc.*, 581 F. Supp. 2d 1197, 1199 (M.D. Fla. 2008) (citation omitted). Under these requirements, mailing a motion for relief to a nonparty in a civil contempt proceeding can satisfy the Federal Rules of Civil Procedure. *Id.* at 1200; *accord* F.R.C.P. 4(f) & 5(b). North Field has satisfied that notice requirement here. However, out of an abundance of caution, as discussed below, North Field respectfully asks that the Court authorize service via international mail upon Binance at its known address in the Cayman Islands. That method is

reasonably calculated to give notice for the following reasons.

**A.  The Amended Judgment and Permanent Injunction applies to Binance.**

The *City Cab Co. of Orlando* Court considered the sufficiency of notice received by a nonparty against whom a contempt proceeding was brought to enforce the court's injunctive relief. 581 F. Supp. 2d at 1199. It found that service by mail upon the nonparty and service by mail upon the nonparty's counsel were each sufficient under Federal Rule of Civil Procedure 5(b). *Id.* The court reasoned that the injunction at issue included nonparties like the one before it by including "'the parties' officers, agents, servants, employees and attorneys' and 'other persons who are in active concert or participation with anyone' previously listed who receive actual notice of the injunction by personal service or otherwise." *Id.* Even more explicitly than in *City Cab*, the injunction here includes Binance by including "digital asset trading platforms, cryptocurrency exchanges" and "other parties receiving notice of this order" in control of the Stolen Bitcoin. Binance is just such a platform or exchange. [ECF No. 157, ¶ 4].

**B.  North Field served Binance in compliance with 5(b).**

The *City Cab* Court further reasoned that, under Federal Rule of Civil Procedure 71, "the procedure for enforcing" the injunction against a nonparty "is the same as it would be for enforcing it against [any defendant]." 581 F. Supp. 2d at 1200. Accordingly, it reasoned that Rule 5 applied, including 5(b). *Id.* Under Rule 5(b), if the alleged contemnor is "represented by an attorney," pleadings filed after the original complaint and other motions may, and indeed must, be served upon their counsel. F.R.C.P. 5(b)(1) ("If a party is represented by an attorney, service under this rule must be made on the attorney unless the court orders service on the party."); *see also City Cab*, 581 F. Supp. 2d at 1200. Under F.R.C.P. 5, "[s]ervice is considered complete upon mailing." *City Cab*, 581 F. Supp. 2d at 1200; *accord* F.R.C.P. 5(b)(2)(C).

North Field complied with Rule 5(b) by serving notice upon counsel for Binance by mail. Specifically, on June 16, 2023, North Field provided Binance's counsel with a copy of the Motion and supporting declarations by mailing a hard copy of the Motion and supporting declarations to

Ms. King at her office in New York. Kapp Decl. ¶ 32 & Ex. 31. Accordingly, the service via mail effectuated upon Binance's counsel suffices under Rule 5(b).

### C. North Field also served Binance in Compliance with Rule 4(f) via international mail, a method reasonably calculated to give notice.

Under Rule 4, a corporation may be served by any internationally agreed means of service that is reasonably calculated to give notice. Under 4(h)(2), "a domestic or foreign corporation . . . must be served . . . at a place not within any judicial district of the United States, in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)." Fed. R. Civ. P. 4(h)(2). Under Rule 4(f)(1), "an individual . . . may be served at a place not within any judicial district of the United States . . . by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents[.]" Further, under Rule 4(f)(3), "an individual . . . may be served at a place not within any judicial district of the United States . . . by other means not prohibited by international agreement, as the court orders."

Binance Holdings Limited is incorporated in the Cayman Islands. *CFTC v. Zhao*, Doc. 1, at 7. It has a registered address of Governors Square Ste 5-204 23 Lime Tree Bay Avenue, PO Box 2547, Grand Cayman, Cayman Islands KY1-1104.[10] Kapp Decl. ¶ 31.

Service via international mail is reasonably calculated to provide notice and permitted under Cayman Islands law. The Cayman Islands is a territory of the United Kingdom ("the UK"), which is a signatory of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents. *GhostBed, Inc. v. Casper Sleep, Inc.*, 315 F.R.D. 689, 691 & n.1 (S.D. Fla. 2016) (authorizing service on Caymans Island company via international mail at last-known address as manner reasonably calculated to give notice). Under the Hague Convention Article 10(a), service of process via mail channels is permitted. *Id.* at 691. As the UK has not objected to Article 10(a),

---

[10] *See* U.S. PTO Trademark No. 7,049,328, awarded to Binance Holdings Limited (May 9, 2023), available at https://tmsearch.uspto.gov/bin/showfield?f=doc&state=4805:zgy2nn.3.1.

Cayman Islands law does not prohibit service via mail channels. *Id.* at 692.

The *GhostBed* Court held that "where the destination country does not object, service to individuals abroad can be made via postal channel (such as international mail)" under Rule 4. *Id.* The *GhostBed* court thus held that service via international mail on a Cayman Islands company was permitted under Rule 4(f)(1) and 4(f)(3) as constitutionally acceptable. *Id.* at 693.

In determining whether to permit alternative service, courts consider whether (1) the proposed method of service is "'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections'" (2) the proposed method of service "minimizes offense to foreign law" and (3) "the facts and circumstances warrant exercise of its discretion" under Rule 4(f)(3). *Id.* at 693-94. Under this rule, courts regularly authorize service by mail. *Id.* at 693 (citation omitted).

The *GhostBed* Court found the first factor satisfied because the mailing address was one that the company used for registering its corporate web domain. *Id.* at 694. Similarly, here the address for serving Binance,[11] is the same address that Binance provided to the U.S. Patent and Trademark Office ("the USPTO") in connection with U.S. trademark applications submitted under oath. *See* Binance Holdings Limited, USPTO Trademark & Patent Filings, https://uspto.report/company/Binance-Holdings-L-T-D.[12] In fact, this address is listed in the U.S Patent & Trademark Office's grant of an application as recently as last month.[13] Thus, international

---

[11] Governors Square Ste 5-204 23 Lime Tree Bay Avenue, PO Box 2547, Grand Cayman, Cayman Islands KY1-1104.

[12] The Court may take judicial notice of the existence, and statements contained in, trademark applications and registration documents on file with the USPTO. *See, e.g., Knowles-Carter v. Feyonce, Inc.,* 347 F.Supp.3d 213, 221 n.2 (S.D.N.Y. 2018) (taking "judicial notice of the trademark registration and other publicly available USPTO" records). Thus, North Field respectfully requests that the Court take judicial notice of the cited trademark registrations that the USPTO issued to Binance, and the trademark applications that Binance submitted to the USPTO.

[13] See fn. 10, *supra*. Moreover, the trademark registrations reflect that Binance is conducting business in the U.S. To receive the May 9, 2023 trademark registration, Binance had to submit verified statements to the USPTO that, *inter alia*: (1) the facts recited in the application are accurate; and (2) the trademark is in use in commerce in the U.S. *See* 15 U.S.C. §1051(a)(3).

mail to this address is reasonably calculated to provide notice to Binance.

The *GhostBed* Court also found that service by international mail in the Cayman Islands would "minimize offense" to Cayman Islands law. 315 F.R.D. at 694. It reasoned that the Cayman Islands Grand Court Rules of 1995 do not prohibit service of process by international mail, and indeed explicitly accepts the Hague Convention, without objecting to Article 10(a)'s permission of service by international mail. As in *GhostBed*, service by international mail in the Cayman Islands does not offend Cayman Islands law and is reasonable.

Finally, the *GhostBed* Court concluded that authorizing service by international mail was warranted because it was consistent with the primary purpose of Cayman Islands service method, which is to ensure that the recipient has notice of the action. *Id.* Here too, authorizing service by international mail is warranted to ensure that Binance will receive notice of the motion. *Id.*

Accordingly, the Court should authorize service via international mail upon Binance at its known address in the Cayman Islands as a method reasonably calculated to give notice.

## CONCLUSION

North Field respectfully requests that this Court enter an order (i) requiring Binance to appear before the Court and show good cause why it should not be held in contempt for its willful disregard of the Permanent Injunction and (ii) authorizing as a method reasonably calculated to give notice, service upon (a) counsel for Binance retained to represent Binance in this Action, Karen King, via mail service at her law firm's mailing address, 565 Fifth Avenue, New York, NY 10017, and (b) Binance at its registered mailing address in the Cayman Islands, Governors Square Ste 5-204 23 Lime Tree Bay Avenue, PO Box 2547, Grand Cayman, Cayman Islands KY1-1104. If Binance is unable to show good cause, North Field respectfully requests that contempt sanctions be imposed against Binance, including without limitation, requiring Binance to immediately return to North Field a monetary sum of 669.7 BTC and/or its equivalent value in U.S. Dollars.

Dated: June 16, 2023

Respectfully submitted,

By: _____*s/Samuel A. Lewis*_____
      Samuel A. Lewis / Fla. Bar No. 55360
      E-mail:  slewis@cozen.com
      COZEN O'CONNOR
      Southeast Financial Center
      200 South Biscayne Blvd., Suite 3000
      Miami, Florida 33131
      Phone:  305-704-5940

      John Sullivan
      E-mail:  jsullivan@cozen.com
      COZEN O'CONNOR
      3 World Trade Center
      175 Greenwich Street, 55th Fl
      New York, NY 10007
      Phone: 212-453-3729
      *Admitted Pro Hac Vice*

      - and -

      L. Barrett Boss
      E-mail:  bboss@cozen.com
      Jonathan Grossman
      E-mail:  jgrossman@cozen.com
      Kara L. Kapp
      E-mail:  kkapp@cozen.com
      COZEN O'CONNOR
      1200 19th Street NW, 3rd Floor
      Washington, D.C. 20036
      Phone:  202-912-4818

      **Counsel for North Field Tech**