# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| BRANDON LEIDEL, individually,<br>And on behalf of All others Similarly Situated,<br><br>Plaintiff,<br><br>- v. -<br>PROJECT INVESTORS, INC., d/b/a<br>CRYPTSY, a Florida corporation, and<br>PAUL VERNON, an individual,<br><br>Defendants. | Case No. 9:16-cv-80060 (KAM)<br><br>Hon. Kenneth A. Marra |

**NON-PARTY BINANCE HOLDINGS, LTD.'S OPPOSITION TO
NORTH FIELD'S MOTION FOR AN ORDER TO SHOW CAUSE WHY
<u>CONTEMPT SANCTIONS SHOULD NOT BE IMPOSED AGAINST BINANCE</u>**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ........................................................................................... 1

    A. Cryptsy Users Are Defrauded by Paul Vernon ................................................... 1

    B. Assignee North Field Obtains a Permanent Injunction ................................... 2

    C. Binance ............................................................................................................... 3

ARGUMENT ...................................................................................................................... 9

  I.   This Court Lacks Personal Jurisdiction Over Binance ..................................... 10

  II.  Conclusory Allegations of "Aiding and Abetting" Do Not Cure the Jurisdictional
      Defect ..................................................................................................................... 12

    A. Binance was under no obligation to freeze accounts, but nonetheless voluntarily
       froze individual accounts for which tracing was finally provided by North Field ..... 14

    B. The Allegation that Binance Encouraged its Customers to Withdraw Stolen Funds
       is Baseless ............................................................................................................ 16

  III.  Binance Does Not Fall Under the Scope of the Injunction............................... 17

  IV.  North Field Does Not Meet the High Burden for Civil Contempt ................... 19

CONCLUSION .................................................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

**<u>Cases</u>**

*ABI Jaoudi and Azar Trading Corp. v. Cigna Worldwide Ins. Co.*,
  2016 WL 3959078 (E.D. Pa. July 22, 2016) ...................................................... 13

*Absolute Nevada, LLC v. Grand Majestic Riverboat Co. LLC*,
  2020 WL 7480621 (S.D.N.Y. Dec. 18, 2020) .................................................. 13

*Alderwoods Grp., Inc. v. Garcia*,
  682 F.3d 958 (11th Cir. 2012) ................................................................. 13, 14

*Aronson v. Celebrity Cruises, Inc.*,
  30 F. Supp. 3d 1379 (S.D. Fla. 2014) ............................................................. 12

*Aviv v. Brainard*
  2018 WL 4927912 (S.D.N.Y. Oct. 11, 2018) .................................................. 13

*BMW of N. Am., LLC v. Issa*,
  2020 WL 1325278 (D. Utah Mar. 20, 2020) .................................................... 17

*Carmouche v. Tamborlee Mgmt., Inc.*,
  789 F.3d 1201 (11th Cir. 2015) .................................................................... 12

*Chang v. JPMorgan Chase Bank, N.A.*,
  845 F.3d 1087 (11th Cir. 2017) .................................................................... 15

*Citronelle-Mobile Gathering, Inc. v. Watkins*,
  943 F.2d 1297 (11th Cir. 1991) .................................................................... 19

*Commodity Futures Trading Com'n v. Wellington Precious Metals, Inc.*,
  950 F.2d 1525 (11th Cir. 1992) .................................................................... 19

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014) ...................................................................................... 12

*E.A. Renfroe & Co., Inc. v. Moran*,
  338 F. App'x 836 (11th Cir. 2009) ................................................. 11, 12, 13, 17

*E.A. Renfroe & Co., Inc. v. Moran*,
  2007 WL 9724842 (N.D. Ala. Jan. 19, 2007) .................................................. 14

*Federal Trade Commission v. Acquinity Interactive, LLC*,
  2021 WL 4840585 (S.D. Fla. Sept. 29, 2021) .................................................. 18

*Gadasalli v. Bulasa*,
  2023 WL 3586424 (E.D. Tex. May 22, 2023) ................................................... 4, 11

*Golden State Bottling Co. v. N.L.R.B.*,
  414 U.S. 168 (1973) ........................................................................................... 17

*Guarini v. Doe*,
  2022 WL 20180341 (S.D. Fla. Apr. 5, 2022) ....................................... 3, 4, 11, 12

*Gutescu v. Carey Intern., Inc.*,
  2003 WL 25589034 (S.D. Fla. June 24, 2003) ................................................... 11

*Heptinstall v. Monsanto Co., Inc.*,
  2007 WL 9697587 (N.D. Ala. Feb. 8, 2007) ...................................................... 11

*Hines v. FiServ, Inc.*,
  2010 WL 1249838 (M.D. Fla. Mar.25, 2010) ..................................................... 15

*In re Daymark Realty Advisors, Inc.*,
  2022 WL 703963 (11th Cir. 2022) ...................................................................... 17

*JTR Enterprises, LLC v. Columbian Emeralds*,
  697 F. App'x 976 (11th Cir. 2017) ...................................................................... 13

*Miro v. Doe*,
  2023 WL 2734374 (S.D. Fla. March 31, 2023) .................................... 3, 4, 11, 12

*Popular Bank of Florida v. Banco Popular de Puerto Rico*,
  180 F.R.D. 461 (S.D. Fla. 1998) ......................................................................... 19

*Reynolds v. Binance Holdings Ltd.*,
  481 F. Supp. 3d 997 (N.D. Cal. 2020) ................................................................ 11

*Richter v. Wells Fargo Bank NA*,
  2015 WL 163086 (M.D. Fla. Jan. 13, 2015) ....................................................... 15

*RJ's International Trading, LLC v. Crown Castle South LLC*,
  2021 WL 6135124 (S.D. Fla. Dec. 14, 2021) ..................................................... 18

*Wolf v. Celebrity Cruises, Inc.*,
  683 Fed. App'x 786 (11th Cir. 2017) .................................................................. 12

**Statutes**

Fla. Stat. § 48.193 .................................................................................................... 12

**<u>Rules</u>**

Fed. R. Civ. P. 65(d) ................................................................................................................. 17

**<u>Other Authorities</u>**

Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2956 (3d ed. 2020) ................................................................................................................. 10, 13

## INTRODUCTION

Binance Holdings, Ltd. ("Binance") is a non-party and a non-U.S. company that had no involvement in the underlying fraud perpetrated by Paul Vernon in 2014 on Cryptsy users. Binance is neither subject to personal jurisdiction in Florida nor—under Rule 65(d) and the provisions of this Court's order—subject to the permanent injunction issued in this case on June 22, 2021.

Notwithstanding its varied objections and defenses, Binance voluntarily cooperated with assignee North Field Technology Ltd. ("North Field") for over a year, provided a freeze on individual accounts, disclosed account holdings, and was in the process of producing account records. The present motion seeking sanctions against Binance for contempt was filed mere hours after a draft production letter was shared with North Field's counsel for review. The motion was filed without a premotion conference or warning, lacks any evidentiary foundation, has imposed unreasonable legal costs and burden on a non-party, and is indicative of bad faith conduct by North Field, not Binance.

## FACTUAL BACKGROUND

### A. **Cryptsy Users Are Defrauded by Paul Vernon**

This action arises from a multi-million-dollar fraud perpetrated by defendant Paul Vernon, who ran a cryptocurrency exchange known as Cryptsy; in June 2014, Vernon stole the digital assets of Cryptsy's users. (ECF No. 94 ¶¶ 1-7, 19-36). Vernon is under federal indictment and has apparently fled the country. *See United States v. Vernon*, 19 Cr. 20509 (S.D. Fla.), ECF No. 3 (Indictment), ¶ 8.

On January 13, 2016, Plaintiffs Brandon Leidel and Michael Wilson commenced this class action lawsuit in an attempt to recover their stolen assets. (ECF No. 1). Neither Vernon

1

nor Cryptsy answered or otherwise appeared in this lawsuit.  Accordingly, on July 27, 2017, this Court entered a default judgment against Vernon authorizing the recovery of 11,325.0961 Bitcoin ("Originally Identified Assets") that Vernon stole from Cryptsy customers (ECF No. 123) using 12 wallet addresses ("Original Wallet Addresses").

### B.  Assignee North Field Obtains a Permanent Injunction

Three years later, in September 2020, plaintiffs assigned the judgment to North Field to pursue collection efforts on a "contingency, non-recourse basis."  (ECF No. 139; ECF No. 142). Nine months after that, on May 18, 2021, the Court issued a temporary restraining order freezing the 12 Original Wallet Addresses and 10 additional wallets ("Newly Discovered Wallets") with respect to the stolen Bitcoin and associated "forked assets"[1] (collectively, the "Stolen Bitcoin and Forked Digital Assets").  (ECF No. 155).  The Court also issued an amended judgment on May 24, 2021 to include the Newly Identified Assets.  (ECF No. 157).

On June 22, 2021, the temporary restraining order was replaced with a permanent injunction (1) enjoining Vernon and "all persons in active concert or participation" with him from directly or indirectly transferring "Stolen Bitcoin and Forked Digital Assets" that were originally held in the 12 Original Wallet Addresses or the 10 Newly Discovered Wallet Addresses and (2) ordering "[a]ny persons, firms, corporations, or other entities, including digital asset trading platforms [and] cryptocurrency exchanges . . ." receiving notice of the Injunction to locate and freeze the "Stolen Bitcoin and Forked Digital Assets."  (ECF No. 177).

---

[1] "Digital Forked Assets" was defined by the Court as "amounts of Bitcoin Cash (BCH), Bitcoin Gold (BTG), Bitcoin Diamond (BCD), Super Bitcoin (SBTC), Bitcoin2 (BTC2), Bitcoin Private (BCTP), Bitcoin Dark(BTCD), and Bitcoin SV (BSV) equivalent to the amount of BTC in" the Newly Discovered Wallets and "an amount of Bitcore (BTX) equal to one-half the amount of BTC identified in" the Newly Discovered Wallets.  (ECF No. 177 at 3-4).

2

Ten months later, on April 14, 2022, the Court issued a clarifying order ("Clarification Order") extending the June 2021 permanent injunction to any digital wallet that obtained custody or control over the "Stolen Bitcoin or Forked Digital Assets" (*i.e.*, not limited to the Original Wallet Addresses and Newly Discovered Wallet Addresses).  (ECF No. 193).

### C. <u>Binance</u>

Binance Holdings Ltd. ("Binance") is a non-U.S. cryptocurrency exchange with no headquarters, offices, or operations in the United States. (ECF No. 213 at 18); *see also Miro v. Doe*, 22-80399, 2023 WL 2734374, at *1, *3 (S.D. Fla. March 31, 2023); *Guarini v. Doe*, No. 21-cv-81890, 2022 WL 20180341, at *3 (S.D. Fla. Apr. 5, 2022).  None of the Original Wallet Addresses or the Newly Discovered Wallets were held on Binance's exchange.  Indeed, Binance did not exist in 2014.[2]  On May 22, 2021, plaintiffs' counsel (the Silver Miller firm) allegedly emailed a letter to "Legal@Binance.com" reporting the entry of the temporary restraining order and asserting "upon information and belief, Mr. Vernon (individually or acting in concert with/through one of the people or entities cited in the Order) has an account(s) at your institution in which he holds assets that are subject to the Court's Order" and demanding a freeze of any such accounts.  (ECF No. 213-2, Ex. 1.).[3]  The Silver Miller firm attached a 26-page spreadsheet with 533 transaction hashes[4] labeled "Binance" purportedly representing transactions from

---

[2] Binance was created in July of 2017.  *See* https://www.binance.com/en/about (last visited July 27, 2023).

[3] North Field's motion papers attach a cover letter prepared by the Silver Miller firm that lists the email address as a recipient but did not attach any affidavit from Silver Miller or the actual email transmission.  (ECF No. 213-2, Ex. 1.).

[4] A transaction hash is a unique sequence of letters or numbers that identify a specific transaction on a blockchain that serves as a record that the transaction has taken place.

unknown sender accounts into unknown Binance accounts during the period of February 2021 through May 2021.

During the 2021 and 2022 time period, the Silver Miller firm had multiple matters in which it requested a freeze of assets from Binance.[5]  (Declaration of Karen R. King ("King Decl.") ¶ 5).  Counsel for Binance had numerous communications with the Silver Miller firm in which it conveyed that, for private plaintiffs requesting a freeze, Binance requires tracing information showing that the assets transferred in the identified transactions originated from accounts proven to have held the stolen assets (here, the Original Wallets and Newly Discovered Wallets).[6]  (*Id.*).  Although Silver Miller provided such tracing for other matters, they did not provide any tracing for this matter.  (*Id.*).

_____

[5] It also included Binance as a defendant in three lawsuits seeking recovery of stolen crypto assets.  In each of those cases—two of which were in the Southern District of Florida—the courts dismissed Binance from the action for lack of personal jurisdiction.  *See Guarini v. Binance*, No. 21-CV-81890, 2022 WL 20180341 (S.D. Fla. Apr. 5, 2022) (granting Binance's motion to dismiss on jurisdictional grounds); *Miro v. Binance*, No. 22-80399-CIV, 2023 WL 2734374 (S.D. Fla. Mar. 31, 2023) (granting Binance's motion to dismiss on jurisdictional grounds); *Gadasalli v. Bulasa*, No. 4:22-CV-249, 2023 WL 3586424 (E.D. Tex. May 22, 2023) (granting Binance's motion to dismiss on jurisdictional grounds).

[6] Tracing crypto assets is similar to tradition financial investigation tracing, and involves "follow[ing] crypto assets across different wallets, chains and jurisdictions with the help of sophisticated blockchain analytics tools and intelligence software." *Crypto and Forensics*, CDR: ESSENTIAL INTELLIGENCE – FRAUD, ASSET TRACING & RECOVERY 2023 at 21-22, *available at*, https://www.bdo.com/getmedia/c2d6d723-9b4f-4662-9b50-8e4f9b225b84/CDR-EI-FATR23-Chapter-3-BDO.pdf?ext=.pdf.  Simply providing a transaction hash, without tracing information, does not demonstrate a transfer of illicit funds because it only provides information about a single downstream transfer unconnected to the original account.  There are typically multiple transactions, multiple accounts, and multiple amounts that combine and split along the way.  Tracing is therefore needed to avoid the inherent flaws and potential misidentification when trying to draw conclusions based on a single downstream transaction hash.  This is particularly true when merchant or cryptocurrency exchange accounts are part of the transaction "chain."  Gathering tracing information is common in the industry.  (*Id.*).

On March 30, 2022, counsel for North Field (the Cozen firm) emailed three different Binance e-mail addresses (Legal@ Binance.com, Corporate@Binance.com, and Support@Binance.Zendesk.com), requesting that "certain assets subject to the Amended Final Default Judgment that ha[d] been recently transferred to [Binance's] exchange" and "any and all assets originating from the wallet addresses listed in the Amended Final Default Judgment and Permanent Injunction should they hereafter make their way to [Binance's] exchange" be immediately frozen.  (ECF No. 213-2, Ex. 2.).  The correspondence merely attached the prior court orders along with a list of 599 transaction hashes—many of which differed from the hashes provided by the Silver Miller firm 10 months earlier—purportedly identifying transfers from unknown senders to wallets on the Binance platform from February 16, 2021 through March 28, 2022.  (ECF No. 213-2, Ex. 2.)  None of the correspondence included tracing to show that the assets originated from the Original Wallets and Newly Identified Wallets, or otherwise were part of the Stolen Bitcoin and Forked Digital Assets subject to the injunction.  The Cozen firm claims to have sent repeated additional notices to Binance by email on April 4, 2022, April 8, 2022, April 20, 2022, April 22, 2022, and May 20, 2022.  (ECF No. 213-2 ¶¶ 8-16)  In addition to being generally confusing, none of the "notices" were properly served, none of the attached spreadsheets with hashes were the same, and **none provided underlying tracing information**.[7]

In July 2022, the Cozen firm directly emailed an in-house lawyer at Binance and requested a freeze of any account that received assets stolen by Paul Vernon, again, without

---

[7] In the present motion, the Cozen Firm claims to have provided Binance with "tracing report[s] showing all of the deposits of the Stolen Bitcoin on Binance's Platform" (ECF No. 213-2 ¶ 8) but the documents referenced list only the transaction hashes for the final transaction hop and do not constitute "tracing."  *See* fn. 6, *supra*.  North Field acknowledges as much in its Memorandum of Law in support of the motion.  *See* ECF No. 213 at 7 fn.7 (acknowledging that "transaction hash[es]" are different from "tracing information").

providing any tracing information. (ECF No. 213-2 ¶ 20).  Binance directed the communication to outside counsel who then promptly contacted the Cozen firm and had a telephone conference on July 18, 2022.  (King Decl. ¶ 8).

During the July 18 call, counsel for Binance made clear that Binance reserved its defenses, including lack of personal jurisdiction and proper service, but was willing to voluntarily assist North Field with a freeze *if* tracing information was provided showing that stolen assets had been transferred from the Original Wallet Addresses or the Newly Discovered Wallets referenced in the injunction to specific accounts at Binance.  (King Decl. ¶ 9).  The Cozen firm thereafter sent an unwieldy 103-page Excel spreadsheet with over 4,500 transaction hashes—1,650 of which were labeled "Binance"—purportedly representing transactions from unknown sender accounts into unknown Binance accounts during the period of February 16, 2021 through July 18, 2022, but *no* tracing.  In a follow-up phone call discussion on August 4, 2022, counsel for Binance conveyed to the Cozen firm that the Excel spreadsheet did not constitute tracing and Binance could not be expected to investigate thousands of transactions hashes for North Field.  (King Decl. ¶ 10).[8]  In response, the Cozen firm agreed to focus on those transactions of 1 Bitcoin or more (what the Cozen firm referred to as "non-dust" transactions) and to provide tracing that would link those non-dust transactions to the Original Wallet Addresses or the Newly Discovered Wallets used in the Cryptsy fraud.  (*Id*.).

**Notwithstanding the stated plan, Binance did not hear from the Cozen firm (or anyone else representing North Field or plaintiffs) for over eight months.**  (King Decl. ¶ 11). After this prolonged silence, on March 27, 2023, North Field emailed Binance's counsel,

---

[8] Subsequent email correspondence reflected in Exhibit 3, annexed to the King Decl., shows that this conversation took place and that the Cozen firm agreed to provide tracing information back in August 2022.

suddenly threatening to move for an order of contempt unless Binance confirmed within two days that it had frozen 618 Bitcoin that was allegedly transferred through Binance's exchange. (*Id.*).  Cozen then attached another spreadsheet, this time with 2,793 transaction hashes labeled "Binance"—*again* without any tracing information.  (*Id.*)  Counsel for Binance reminded the Cozen firm that it had not provided the tracing information agreed upon eight months ago.  (King Decl. ¶ 12).

Nearly a month later, **on April 21, 2023, the Cozen firm finally provided a list of select "non-dust" transaction hashes, much of which were not on the spreadsheet from July 2022, as well as tracing information for only ten of the destination accounts** (labeled "Top Ten"). (King Decl. ¶ 13).  Binance reviewed the information and, as promised, promptly implemented a freeze on the individual customer accounts that had, at some point, received assets traced back to the Original Wallet Addresses or Newly Discovered Wallets, even though those assets were no longer in the accounts.  (King Decl. ¶ 14).

On May 2, 2023, counsel for Binance informed the Cozen firm of the freeze on seven of the ten accounts and explained that the remaining three accounts were not individual customer accounts, but rather belonged to merchant businesses or other cryptocurrency exchanges (and therefore Binance could not identify the underlying users who made the transactions at issue). (King Decl. ¶ 15).  Binance further provided the names of those exchanges to North Field so that it could seek further information from them directly.  (*Id.*).

With respect to the seven frozen accounts, Binance also voluntarily disclosed to North Field the assets that remained in each of the accounts and noted that the frozen assets did not include the Stolen Bitcoin or the Forked Digital Assets identified in the Injunction and Clarifying Order.  (King Decl. ¶ 16).

On May 16, 2023, North Field issued a subpoena to Binance seeking "all account information associated with [eight] wallet addresses and hashes" and "all communications to affected customers regarding the institution of the freeze in compliance with the Permanent Injunction." (King Decl. ¶ 17). The subpoena was not properly served[9] and was objectionable to Binance for a variety of reasons including lack of jurisdiction, lack of service, burden, and relevance. Nonetheless, the following day, counsel for Binance offered to discuss a potential voluntary production of certain account information. (King Decl. ¶ 18). When no response was received from North Field, Binance's counsel followed up the following week, on May 24, and asked "Did you want to have a follow up discussion about voluntary production?" (*Id*.).

Ultimately, Binance offered to make a "voluntary production (without waiver of any defense and subject to further discussions on terms of any such resolution)" of "Customer Information (including email, mobile number and registration time), Current Assets & Wallets, Order History (including price, quantity, time, and status of all orders), Deposit History (including source address and time), Withdrawal History (including destination address and time), and KYC-related information (ex: government issued identification and photo)." (King Decl. ¶ 19). **On June 5, 2023, the Cozen firm stated that it was "amenable" to a voluntary production of the information offered.** (King Decl. ¶ 22). Counsel for Binance responded the same day stating Binance would "work up a cover letter for your review, the gist of which is that the production is voluntary, reserve's Binance's rights, and that this is to resolve our disputes over the subpoena." (*Id*.).

---

[9] Undersigned counsel told the Cozen Firm that it was not authorized to accept service. (King Decl. ¶ 17).

Over the following ten days, Binance began the process of gathering the agreed upon information and preparing it for production.  Counsel for Binance provided the Cozen firm with status updates on June 9, 2023 and on June 15, 2023.  **On Friday, June 16, 2023, at 1:33pm, as promised, Binance's counsel shared a draft production cover letter with North Field's counsel, asking, "Can you take a look at the attached production letter and let me know if our understanding is accurate?"**  (King Decl. ¶ 24).  Four hours later, at 5:39pm, the Cozen firm sent an abrupt email, refusing to "forgo any further discovery requests to Binance in this litigation in exchange for receiving information for 8 addresses," complaining that "[w]e have waited more than two weeks for discovery from Binance", and declaring that "it appears we will need to pursue the formal route after all."  (*Id*.).  Binance counsel responded *6 minutes later* requesting clarification:  "If we are agreeing to produce this information as a compromise, it would be unfair for you to then just follow up with more requests and threats.  What more do you plan to seek from Binance?  We cannot agree to anything without transparency from you."  (*Id*.).

**The Cozen firm did not respond, did not try to explain or resolve the issues, and did not initiate a pre-motion conference before filing the present motion for sanctions at 9:06pm the same day.**  (King Decl. ¶ 25).  Obviously, the papers had already been prepared well in advance.

## ARGUMENT

The present motion is frivolous.  Binance is a non-U.S. entity with no operations or offices in the United States, and no involvement in the underlying fraud perpetrated by Paul Vernon in 2014.  There is no basis for personal jurisdiction over Binance.

Furthermore, this court's order granting a permanent injunction is limited by Rule 65(d) of the Federal Rules of Civil Procedure to the parties, their agents, or those acting in active

9

concert or participation with them.  Binance is none of the above.  Separately, but no less significantly, the order is expressly limited to accounts that hold the Stolen Bitcoin and Forked Digital Assets.  North Field was specifically informed that none of the identified accounts currently hold any of the Stolen Bitcoin or Forked Digital Assets.

North Field's post-hoc attempt to manufacture personal jurisdiction and extend the injunction to Binance by raising baseless and inflammatory accusations of aiding and abetting a violation of the court order is both circular and improper.  None of the supporting papers submitted by North Field demonstrate contemptable conduct by Binance.  To the contrary, despite the lack of personal jurisdiction over it, Binance has consistently engaged in discussions with North Field, voluntarily froze the individual accounts identified, provided information to North Field about account holdings, and was on the cusp of making a detailed production to North Field when it was blind-sided by North Field's motion for sanctions.

North Field's behavior—claiming urgency, then disappearing for eight months, requesting information and then plotting to use it against Binance, and agreeing to a compromise and then abruptly filing a motion for sanctions—reveals North Field's bad faith.  For all of the above reasons, discussed in more detail below, North Field's motion for contempt and sanctions lacks merit and should be denied.

## I.
## THIS COURT LACKS PERSONAL JURISDICTION OVER BINANCE

As a threshold matter, North Field has not established that this court has personal jurisdiction over Binance—a non-U.S. company who is not headquartered and does not operate in Florida, and who had nothing to do with the underlying fraud on Cryptsy users.  It is black letter law that courts "do[] not have power to issue an order against a person who is not a party and over whom it has not acquired in personam jurisdiction."  Charles A. Wright and Arthur R.

Miller, *Federal Practice and Procedure* § 2956 (3d ed. 2020); *see also E.A. Renfroe & Co., Inc. v. Moran*, 338 F. App'x 836, 838-39 (11th Cir. 2009); *Gutescu v. Carey Intern., Inc.*, No. 01-cv-4026, 2003 WL 25589034, at *2 (S.D. Fla. June 24, 2003); *Heptinstall v. Monsanto Co., Inc.*, 06-cv-1564, 2007 WL 9697587, at *1 (N.D. Ala. Feb. 8, 2007).

Indeed, multiple federal courts—**including the Southern District of Florida in two separate cases brought by Plaintiffs' counsel in this action**—have found that Binance is not subject to personal jurisdiction in Florida.  *See Miro*, *supra*, 2023 WL 2734374, at *3 ("Plaintiff has failed to provide anything more than conclusory allegations of attenuated contacts to Florida, if any" and "presented no evidence to establish that [Binance] has continuous and systematic general business contact with Florida"); *Guarini*, *supra*, 2022 WL 20180341, at *2, *6 (Binance's contacts were "woefully inadequate to support the exercise of jurisdiction over" Binance in the Southern District of Florida); *see also Gadasalli*, *supra*, 2023 WL 3586424, at *5 (noting that it was undisputed that "Binance is a foreign corporation, incorporated in the Cayman Islands" and that customers' ability to use "third-party VPNs" to access Binance did not subject it to jurisdiction in Texas); *Reynolds v. Binance Holdings Ltd.*, 481 F. Supp. 3d 997, 1003-04 (N.D. Cal. 2020) (finding that Binance is not subject to general personal jurisdiction in California and allegations about serving U.S. customers "do not illustrate that Binance has the requisite affiliations with California to be essentially at home in the state and subject to general jurisdiction in it").

North Field concedes that Binance is a foreign corporation incorporated in the Cayman Islands.  (ECF No. 213 at 18).  There are no allegations that Binance has offices, employees, property, or any other continuous contacts with Florida.  Certainly, there are no allegations that Binance's contacts with Florida are "so continuous and systematic" as to render it essentially at

home in Florida.  *Aronson v. Celebrity Cruises, Inc.*, 30 F. Supp. 3d 1379, 1386 (S.D. Fla. 2014) (a court may assert general jurisdiction over a foreign corporation only if the corporation's connections to the forum state are "so 'continuous and systematic' as to render it essentially at home in the forum state" (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 138 (2014)); *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1204 (11th Cir. 2015) (requiring that defendant must be engaged in "substantial and not isolated activity" in Florida to be subject to general jurisdiction); *Wolf v. Celebrity Cruises, Inc.*, 683 Fed. App'x 786, 791 (11th Cir. 2017) (same, citing Fla. Stat. § 48.193(2)).

There is also no basis for specific jurisdiction over Binance.  North Field does not allege that Binance had any activity in Florida, much less activity that gave rise to Paul Vernon's fraud. *See* Fla. Stat. § 48.193(1)(a)(1)–(9) (specific jurisdiction can only be exercised over a defendant in causes of action that "aris[e] from" a list of enumerated acts, such as "carrying on business" in Florida); *see also Miro*, *supra*, 2023 WL 2734371, at *4 ("No basis exists to exert specific jurisdiction over [Binance] under Florida's long-arm statute.").  The mere fact that some plaintiffs are Florida residents, or that they sustained an injury in Florida, is insufficient for specific jurisdiction.  *Guarini, supra*, 2022 WL 20180341, at *4 (allegation that plaintiff suffered harm in Florida is not a sufficient basis for specific jurisdiction over Binance under the Florida long-arm statute).

## II.
## CONCLUSORY ALLEGATIONS OF "AIDING AND ABETTING" DO NOT CURE THE JURISDICTIONAL DEFECT

North Field attempts to manufacture a jurisdictional hook by alleging that Binance (1) "aid[ed] in the violation of the Injunction" by failing to freeze accounts that allegedly contained stolen assets and (2) "actively encourag[ing] its customers to withdraw their funds

before their accounts would be frozen." (ECF No. 213 at 9-10). These baseless, conclusory allegations are wholly insufficient to establish jurisdiction over Binance.

The exercise of jurisdiction based on aiding and abetting the violation of a court order is an exception that must be applied narrowly so as to not violate the Due Process rights of a non-party who would otherwise not be subject to the court's jurisdiction. *See, e.g.*, *Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 971 (11th Cir. 2012); *E.A. Renfroe & Co., Inc. v. Moran*, 338 F. App'x 836, 838-39 (11th Cir. 2009); *see also* 11A Charles Alan Wright et al., *Federal Practice and Procedure*, Section 2956 (3d ed. Aug. 2019 update). Accordingly, the exception is typically limited to circumstances when the nonparty is acting as an agent to one of the parties to the litigation. *See, e.g.*, *JTR Enterprises, LLC v. Columbian Emeralds*, 697 F. App'x 976, 987 (11th Cir. 2017) (exercising personal jurisdiction over litigant's foreign attorneys who actively assisted litigant in engaging in the enjoined conduct); *Absolute Nevada, LLC v. Grand Majestic Riverboat Co. LLC*, 2020 WL 7480621, at *1-*2 (S.D.N.Y. Dec. 18, 2020) (exercising personal jurisdiction over the president, owner, and sole member of defendant entity who assisted defendant with violating an injunction); *Aviv v. Brainard*, 18 Civ. 5088 (PKC), 2018 WL 4927912, at *2 (S.D.N.Y. Oct. 11, 2018) (exercising personal jurisdiction over party's law firm and agent who violated a temporary restraining order on the party's behalf); *ABI Jaoudi and Azar Trading Corp. v. Cigna Worldwide Ins. Co.*, 2016 WL 3959078, at *1, *7 (E.D. Pa. July 22, 2016) (exercising personal jurisdiction over two foreign lawyers who plaintiff specifically hired to enforce a Liberian judgment against defendant in violation of an injunction).

Indeed, two of the three cases cited by North Field in support of its assertion of jurisdiction involved foreign non-parties who were serving as the litigants' attorneys and actively assisted or represented the litigants in engaging in the enjoined conduct. *See JTR Enterprises*,

13

697 F. App'x at 987; *Moran*, 2007 WL 9724842, at \*1-\*3.[10]  (ECF No. 213 at 10).  The third

case, *Alderwoods Group*, was a bankruptcy action in which the court cited the general rule that a

court can sanction a non-party under certain circumstances, but then did not engage in any type

of personal jurisdiction analysis because the court also had *in rem* jurisdiction.  682 F.3d at 971-

72.

Here, no agency relationship exists between Binance and any of the parties to this case,

and North Field's conclusory allegations fall far short of meeting the narrow exception in which

district courts exercise personal jurisdiction over a foreign non-party.

**A.  Binance was under no obligation to freeze accounts, but nonetheless voluntarily froze individual accounts for which tracing was finally provided by North Field**

Far from aiding and abetting the violation of a court order, Binance has been assisting

counsel for North Field for nearly a year on a voluntary basis.  It retained U.S. counsel who has

been actively engaged and, while explicitly preserving its objections and defenses, Binance

agreed to voluntarily assist North Field with a freeze and production of account information once

North Field produced the tracing information connecting the transaction hashes to the Original

Wallets Addresses and the Newly Discovered Wallets.  Such tracing is customary in the industry

and is provided by requesting parties regularly.

Indeed, in August 2022, **North Field promised to provide the tracing information, but**

**failed to follow up for eight months.**  It did not supply the requested information until

Binance's counsel reminded the Cozen firm of the prior discussion.  On April 21, 2023, a tracing

analysis was finally provided for ten destination accounts (but not others) and Binance froze

---

[10] The *Moran* court was reversed by the Eleventh Circuit on the grounds that the non-party's actions did not fall within the "narrowly-defined" aiding and abetting exception.  338 F. App'x 836, 838 (11th Cir. 2009).

seven individual accounts shortly thereafter (and explained that the other three accounts were merchant and exchange accounts and that Binance therefore could not identify the underlying users).

North Field claims that simply sending blast emails to various general email addresses at Binance imparted the necessary knowledge to Binance to make it an aider and abettor of Vernon's illicit conduct. This argument is flawed for several reasons. First, even if these blast emails were sufficient to impart knowledge—which they were not—a financial institution's failure to freeze assets of an individual accused of stealing from a complaining third party does not constitute aiding and abetting conversion. *See, e.g. Richter v. Wells Fargo Bank NA,* No. 11-cv-695-FTM-29, 2015 WL 163086, at *4 (M.D. Fla. Jan. 13, 2015) (dismissing aiding and abetting claims against bank for failing to freeze assets of an individual who stole from the plaintiff because such "inaction would not support a determination that [the bank] provided substantial assistance for the conversion"); *see also Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1098 (11th Cir. 2017) (inaction does not constitute substantial assistance unless there is a separate fiduciary duty owed to the plaintiff); *Hines v. FiServ, Inc.*, No. 08-cv-2569, 2010 WL 1249838, at *4 (M.D. Fla. Mar.25, 2010) ("[A] failure to act, where there is no duty to act, is not substantial assistance.").

Second, as set forth above, Binance did not have sufficient evidence that specific accounts had received Bitcoin that originated in the Original Wallets or Newly Discovered Wallets until it was provided with tracing information on April 21, 2023. Once tracing was received, Binance froze the individual accounts identified in the tracing.

Finally, North Field has not identified anything to suggest an affiliation between Binance and Vernon, or any allegation that Binance was involved in the underlying fraud. None of the

Original Wallets or Newly Discovered Wallet Addresses used in the fraud were on the Binance platform.  The allegation that Binance "allowed" Paul Vernon to launder 669.7 Bitcoin through Binance's exchange by failing to freeze accounts is baseless and misleading.  North Field's own ever-evolving lists of transaction hashes and destination accounts make clear that the stolen Bitcoin are not flowing through the same accounts.  (ECF No. 213-2, Exs. 2, 10, 13, 14, 16, 21, 27-29).  Even if tracing had been provided and a freeze implemented on destination accounts identified in 2021, those were not the accounts used in 2022, nor the ones used in 2023.  Thus, all North Field can reasonably allege is that some of the stolen funds, at some point downstream, passed through certain accounts at Binance.  This is hardly surprising given that Binance is a large cryptocurrency exchange.  But it is a far cry from facts that might warrant the very narrow exception of creating jurisdiction for aiding and abetting a violation of a court order.

**B.  The Allegation that Binance Encouraged its Customers to Withdraw Stolen Funds is Baseless**

North Field also makes the inflammatory accusation that Binance "willfully violated the Injunction by actively encouraging its customers to withdraw their funds before their accounts would be frozen."  (ECF No. 213 at 9).  This is a blatant mischaracterization of an automated email sent to Fengying Tong ("Tong"), a Binance customer, on November 15, 2022 (months before North Field provided the tracing that caused Binance to review and freeze the seven individual accounts), informing Tong that he may withdraw his funds before his Binance account would be "permanently deactivated." (*Id.*).  The email plainly states that Tong's account "ha[d] been flagged by a ***third-party compliance tool***" for deactivation; it has nothing to do with the tracing provided by North Field five months later in April 2023.  Moreover, had North Field waited to review the transaction log for Mr. Tong's account, it would have seen that there were no transfers or withdrawals made from that account after August 2022.  (King Decl. ¶ 21).  North

16

Field's tactic of rejecting an offer to receive actual account information, only to seek sanctions based on wild conjectures about transactions in that account, shows that it filed its motion for sanctions without investigating its suppositions and speculative suspicions.

In short, North Field cannot manufacture personal jurisdictional hook over a non-party, non-U.S. company simply by labeling it an aider and abettor. North Field's arguments are meritless given the documented history of voluntary cooperation by Binance, and a factual record which contradicts its assertions.

### III.
### BINANCE DOES NOT FALL UNDER THE SCOPE OF THE INJUNCTION

Even if there were a basis of personal jurisdiction over Binance—and there is not—North Field's motion for contempt fails for the additional reason that Binance does not fall under the scope of the Court's June 22, 2021 injunction.

*First*, under Federal Rule of Civil Procedure 65(d), injunctions and restraining orders can only bind "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with" the parties or their officers, agents, servants, employees, or attorneys and who have "actual notice" of the order. Fed. R. Civ. P. 65(d)(2). The rule "limits the extent to which an injunction may be enforced against nonparties and enacts the policy of not having order(s) or injunction(s) so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law." *BMW of N. Am., LLC v. Issa*, 2020 WL 1325278, at *4 (D. Utah Mar. 20, 2020) (quotations, alterations, and citations omitted); *see also*, *e.g.*, *Golden State Bottling Co. v. N.L.R.B.*, 414 U.S. 168, 180 (1973); *In re Daymark Realty Advisors, Inc.*, 2022 WL 703963, at *3 (11th Cir. 2022); *E.A. Renfroe & Co., Inc.*, *supra*, 338 F. App'x at 838-39.

Accordingly, "to be bound by an injunction under Rule 65(d)(2)(C), the [non-party] need to have played an essential role in knowingly assisting the party to the injunction carry out the prohibited acts." *Federal Trade Commission v. Acquinity Interactive, LLC*, 14-60166, 2021 WL 4840585, at *4 (S.D. Fla. Sept. 29, 2021) (quotation marks and citation omitted); *see also RJ's International Trading, LLC v. Crown Castle South LLC*, 2021 WL 6135124, at *2 (S.D. Fla. Dec. 14, 2021) ("A court cannot generally enjoin a non-party to the litigation unless . . . the injunction extends to a non-party in privity with the enjoined party or agents of the enjoined party." (citation omitted)).

Here, Binance is not a party, is not an agent of a party, and, as discussed at length above, was not in active concert or participation with defendants.  Binance cannot be held in contempt of a court order that does not apply to it.

*Second*, by its own terms, the Injunction only restricts "11,825.1484 Bitcoin stolen from the Plaintiff Class on July 29, 2014 and then held . . . in the digital wallets identified" as the 12 Original Wallet Addresses and the 10 Newly Discovered Wallets (the "Stolen Bitcoin") and "forked digital assets associated with the Stolen Bitcoin" as identified in the Amended Final Default Judgment.  (ECF No. 177 at 1-2).  **By the time North Field sent tracing information to Binance on April 21, 2023—*nearly nine years after the alleged fraud on Cryptsy users*—none of the Stolen Bitcoin or Forked Digital Assets were in the accounts identified.**  This information was specifically conveyed and confirmed to North Field in early June of 2023 (King Decl. ¶ 16), and North Field ignored it in order to file the present motion.  Binance could not have violated an injunction prohibiting the transfer of stolen assets when those assets were not in the accounts identified by the time the tracing information was shared.

Indeed, North Field has not even shown that any of the Bitcoin originating from the Original Wallets or Newly Discovered Wallets were held in any of the destination accounts at the time North Field purportedly notified Binance of those accounts.  Taking the account of Fengying Tong as an example, North Field traced four transfers of Bitcoin into Tong's account on July 14, 2022, totaling 63.6 Bitcoin.  (King Decl. ¶ 13, Ex. 6).  Those transfers were followed immediately by transfers of Bitcoin out of Tong's account within minutes, which also emptied the account of all Bitcoin.  The first North Field spreadsheet that included Tong's account number was dated July 18, 2022, but there was no Bitcoin in the account at that time.  Tracing was not provided to Binance about the account until April 21, 2023, at which point no Bitcoin had been in the account for over nine months.  (Exs. 6 and 17).

## IV.
## NORTH FIELD DOES NOT MEET THE HIGH BURDEN FOR CIVIL CONTEMPT

In addition to all of the fatal defects discussed above, North Field's motion should be rejected because it does not even come close to satisfying the high burden of proof necessary to justify holding Binance in contempt.

The party seeking civil contempt bears the burden of proving by clear and convincing evidence that the alleged contemnor has violated an outstanding court order. *Commodity Futures Trading Com'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525 (11th Cir. 1992); *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991); *Popular Bank of Florida v. Banco Popular de Puerto Rico*, 180 F.R.D. 461, 465 (S.D. Fla. 1998).

As discussed above, the Injunction did not apply to Binance because Binance is not subject to personal jurisdiction in Florida, it is not a party, an agent of the party, or someone acting in concert with a party, and the assets that were the subject of the Injunction were not in

the Binance accounts.  Notwithstanding these threshold objections and defenses, Binance voluntarily cooperated and assisted North Field.  All the delay in this assistance was due to North Field's unexplained disappearance for eight months.  There is no evidence that Binance has done anything to thwart the injunction.

North Field nonetheless filed this motion and presented a highly misleading narrative, knowing that Binance was voluntarily cooperating, had frozen accounts, provided information to North Field, and was preparing a production of account records pursuant to a compromise and agreement reached with North Field.  It is North Field, not Binance, whose actions are contemptable.

## CONCLUSION

Accordingly, for all the reasons set forth above, North Field's motion for civil contempt against non-party Binance should be denied.

Dated: August 4, 2023

                                        Respectfully submitted,

                                        */s/ Henry P. Bell*
                                        Henry P. Bell
                                        **BELL ROSQUETE REYES ESTEBAN, PLLC**
                                        999 Ponce de Leon Boulevard, Suite 810
                                        Coral Gables, FL 33134
                                        Tel:  (305) 570-1610 / Fax: (305) 570-1599
                                        hbell@brresq.com

                                        **MORVILLO ABRAMOWITZ GRAND IASON & ANELLO, P.C.**
                                        Karen R. King (*pro hac pending*)
                                        565 Fifth Avenue
                                        New York, New York 10017
                                        Tel: (212) 856-9600
                                        kking@maglaw.com

                                        *Counsel for Defendant Binance Holdings, Ltd.*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this 4th day of August 2023, a copy of the foregoing was filed electronically by using the CM/ECF system, and that notification of this filing is to be provided to all counsel of record who have registered to receive notices from the court under the CM/ECF system.

/s/ Henry P. Bell
Henry P. Bell
Fl. Bar No. 090689

21