```
  1                    UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
  2                     WEST PALM BEACH DIVISION
                       CASE NO. 9:16-cv-80060-KAM
  3

  4   BRANDON LEIDEL, individually, and on   West Palm Beach, Florida
      behalf of others similarly situated,
  5
                        Plaintiffs,          August 29, 2023
  6
              vs.                            9:57 AM - 11:18 AM
  7
      PROJECT INVESTORS, INC. D/b/a CRYPYSY,
  8   a Florida corporation, and PAUL
      VERNON, an individual.,
  9
                        Defendants.          Pages 1 to 64
 10   _____

 11                          ZOOM HEARING
                   BEFORE THE HONORABLE KENNETH A. MARRA
 12                   UNITED STATES DISTRICT JUDGE

 13   APPEARANCES:

 14

 15   FOR THE PLAINTIFF:          Samuel Lewis, Esq.
                                  John Sullivan, Esq.
 16                               Kara Kapp, Esq.
                                  Cozen O'Connor
 17                               200 S Biscayne Boulevard
                                  Suite 3000
 18                               Miami, FL 33131
                                       -and-
 19                               David Silver, Esq.
                                  Silver Law Group
 20                               11780 W Sample Rd
                                  Coral Springs, FL 33065
 21                                    - and-
                                  Marc Wites, Esq.
 22                               Wites & Rogers, P.A.
                                  4400 N Federal Hwy
 23                               Lighthouse Point, FL 33064

 24

 25
```

```
 1   FOR THE DEFENDANTS:              Karen King, Esq.
                                     Mary Vitale, Esq.
 2                                   Morvillo Abramowitz, et al.
                                     565 Fifth Avenue
 3                                   New York, NY 10017
                                          - and-
 4                                   Henry Bell, Esq.
                                     Bell Rosquete Reyes, PLLC
 5                                   999 Ponce De Leon Boulevard
                                     Suite 810
 6                                   Coral Gables, FL 33134

 7

 8

 9   STENOGRAPHICALLY REPORTED BY:

10                       PATRICIA BAILEY-ENTIN, RPR, FPR
                         Official Court Reporter
11                       United States District Court
                         Southern District of Florida

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Call to the Order of the Court.)

 2          THE COURT:  Good morning, everyone.  This is the case of

 3   Leidel v. Project Investors, Inc. et al.  Case number

 4   16-80060-cv- Marra.  This is a proceeding that really is

 5   between North Field and Binance.  So it's on a motion for

 6   sanctions and contempt against Binance by North Field.

 7          So if I can have counsel state their appearances for

 8   the record, please, so I know who I'm speaking with.

 9          MS. LEWIS:  Good morning, Your Honor.  Samuel Lewis

10   with Cozen O'Connor on behalf of North Field Technology

11   Limited.  With me today are my colleagues John Sullivan and

12   Kara Kapp.

13          MR. SILVER:  Good morning, Judge.  David Silver and

14   Marc Wites on behalf of the Class.

15          THE COURT:  Good morning.

16          MR. BELL:  Good morning, Judge.  Henry Bell with Bell

17   Rosquete firm in the Coral Gables on behalf of Binance.  With

18   me here today is Karen King and Mary Vitale.

19          Ms. King, who is lead counsel for Binance, will be

20   handling the hearing primarily for us.

21          And good morning again.

22          THE COURT:  Good morning.

23          All right.  So we are here on a motion for contempt by

24   North Field against Binance.  So who's going to be arguing for

25   North Field?
```

```
 1          MR. LEWIS:  Your Honor, I will be.  And good morning.
 2   May it please the Court, Binance had an obligation to show good
 3   cause why contempt sanctions should not be imposed for its
 4   willful disregard of the Court's permanent injunction.  In
 5   order --
 6          THE COURT:  Can I interrupt you for a second?
 7          MR. LEWIS:  Absolutely, Your Honor.
 8          THE COURT:  And I don't mean to cut you off, but I have
 9   a number of questions that I want to pose to both sides, and
10   I'd rather start off with my questions.  I already read the
11   brief; so I know what your positions are.
12          So I want to understand the issue on jurisdiction.  Is
13   it your position that, regardless of the contacts that Binance
14   might have with either the United States or the Southern
15   District of Florida, that anytime a nonparty receives notice of
16   an injunction order and that person or entity takes steps in
17   violation of the injunction order, regardless of where that
18   person or entity is, that this Court would have jurisdiction to
19   impose sanctions against a violator of the injunction,
20   regardless of where it might be and what context it might have
21   with either the United States or this jurisdiction?
22          MR. LEWIS:  Yes, Your Honor.  And let me explain.  Rule
23   65 provides for different jurisdictional analysis than the one
24   that would ordinarily be associated with personal jurisdiction.
25   The cases that Binance cited to you supporting the proposition
```

1    that there is no jurisdiction here are cases dealing with

2    motions to dismiss a complaint for lack of personal

3    jurisdiction.  That's a completely different standard than what

4    we're dealing with here.

5         Injunctions under Rule 65 extend to other persons in

6    active concert or participation with the parties or their

7    agents.  And, quite frankly, I can't imagine a situation that

8    is more apt to that language than one where you have an

9    exchange that is absolutely facilitating the transfer of stolen

10   Bitcoin and in effect laundering of the stolen Bitcoin.

11        There is clear participation.  Binance cannot take the

12   position that it is not participating because without that

13   participation, the stolen Bitcoin could not move, at least

14   through Binance's exchange, and an awful lot moved through

15   Binance's exchange.

16        Now, under some of the case law that we've cited to

17   Your Honor in reply, the Developers Surety and Indemnity case,

18   the HPC US Fund case -- it's routine for courts to render

19   orders that prohibit transfers from accounts that require

20   parties to freeze accounts even though they're not parties to

21   the litigation.  The mere possession of the stolen funds or the

22   proceeds from the stolen funds is sufficient to bring that

23   party within the ambit of the Court's jurisdiction.

24        THE COURT:  So what cases do you -- tell me what cases

25   you believe are the strongest cases for your position that it

1    doesn't matter where the nonparty entity or person is in the

2    world, if they get notice of the injunction and they take an

3    act inconsistent with the dictates of the injunction, that I,

4    in West Palm Beach, Florida, can impose sanctions against that

5    entity or person?  What are the strongest cases that you've got

6    for that proposition?

7         MR. LEWIS:  Well, HPC US Fund 1, LP v. Wood.  It's one

8    of Judge Rosenberg's decisions from 2014.  It stands for the

9    proposition that the geographic scope of the Court's contempt

10   powers over third parties extends beyond the geographic

11   boundaries of the Court.

12        The other one is the Developers Surety and Indemnity

13   Co. v. Bi-Tech Construction.  That's another Southern District

14   of Florida 2013 decision.  And then you have the FTC v. Leshin

15   decision out of the Eleventh Circuit.

16        THE COURT:  Okay.  I will take a look at those cases,

17   but are there any cases that specifically articulate the

18   position that you started out saying that under Rule 65, we

19   don't need to look at the personal jurisdiction analysis that

20   would apply in a motion to dismiss where you're bringing in a

21   defendant?

22        MR. LEWIS:  Those decisions interpret that rule to mean

23   that.

24        THE COURT:  Okay.  All right.  So let's assume that

25   I've got jurisdiction and I'm able to impose sanctions against

```
 1    Binance --

 2           MR. LEWIS:  Let me throw in one other concept because

 3    I'm sure at some point in the proceeding, you're going to hear

 4    that Binance has no operations; it doesn't do any business in

 5    the U.S.

 6           The fact of the matter is Binance has now a series of

 7    federal trademark registrations, which could only be acquired

 8    by submitting sworn statements to the government, to the U.S.

 9    Patent and Trademark Office, confirming that Binance is in

10    effect using those marks in commerce in the U.S.  Binance is

11    doing business here.  It's part of the reason why the CFTC is

12    going after it.  It's part of the reason why the SEC is going

13    after it.  There is no question that Binance is in the U.S. and

14    is subject to this Court's orders.

15           THE COURT:  All right.  Well, assume then, again for

16    the purpose of discussion, that I do have to make a

17    determination as to whether Binance has sufficient context with

18    the United States or with the Southern District of Florida for

19    me to impose sanctions on it.  I just want to make that --

20           MR. LEWIS:  The real point is --

21           THE COURT:  Can I finish my --

22           MR. LEWIS:  The real point that has to be made here

23    with --

24           THE COURT:  Can I finish my --

25           MR. LEWIS:  I'm sorry, Your Honor.
```

1          THE COURT:  Assume that I have to go through that

2     analysis -- and I understand that's not your position, and I

3     want to move past this for now.

4          But assume I do have to make that analysis, am I in a

5     position, on this record, to make that decision that they

6     they're doing business in the United States and there is

7     sufficient context, or do I have to have an evidentiary hearing

8     to make that determination?

9          MR. LEWIS:  Your Honor, part of what we submitted to

10    Your Honor with our moving papers was in fact a reference to

11    the trademark -- one of the trademark registrations.  Your

12    Honor can take judicial notice of that.  It requires no

13    evidentiary hearing for you to make that finding.

14         THE COURT:  And you think -- again, assuming that I

15    have to go through an analysis, which I understand you're

16    saying I do not, but you're saying that that would be

17    sufficient evidence of context for me to decide that, yes, I'm

18    able to enforce the order against Binance?

19         MR. LEWIS:  Yes, Your Honor.  The real question, when

20    it comes to Rule 65, becomes did the nonparty have notice of

21    the order and was it in a position to comply with it.

22         THE COURT:  Okay.

23         MR. LEWIS:  So --

24         THE COURT:  Regardless of where they are or what --

25         MR. LEWIS:  Regardless of where they are.

```
 1            THE COURT:  All right.  So let's move past that.  And
 2      I'll have to sort that out.  But let's assume that I can impose
 3      sanctions on Binance under the facts of this case, tell me
 4      about whether there is any dispute or fact between your client
 5      and Binance regarding the chronology that was laid out by
 6      Binance in its response of all the things that they did and the
 7      request for tracing information that they made and whether
 8      their representations or descriptions of the information you
 9      did provide was accurate in terms of there not being able to
10      find out whether any of these Bitcoins were in these wallets.
11      And I don't understand all the technicalities of how Bitcoin
12      operates.
13            But I'm interested in knowing whether or not it's your
14      position that they get the injunction and it's on them to go
15      through all of their clients' accounts and try and figure out
16      whether any of the Bitcoin that is subject to the injunction is
17      in their clients' accounts or whether the burden is on you to
18      show it to them that, yes, the stolen Bitcoin is in some of
19      their clients' accounts.
20            So that's kind of multiple questions.  But do you agree
21      or disagree with their chronology and description of what
22      happened and the information that was being exchanged between
23      the parties, or do you dispute that?  And then who has the
24      burden of trying to figure out where this Bitcoin is and who's
25      got possession it?
```

```
 1          MR. LEWIS:  Your Honor, I respectfully disagree with

 2    the chronology that was put forth.  But let me unpack this, and

 3    let me explain it I think in a way that will start answering

 4    some of your questions as well as point out some of the issues.

 5          First things first, you have, with Binance's

 6    chronology, conflating of two different streams or two

 7    different sets of issues.  There were issues stemming from a

 8    subpoena where we wanted to obtain certain information from

 9    Binance.  There separately was the proceedings dealing with the

10    injunction and the freezing and the turnover of the assets.

11          Now, with regard to what was provided -- with each of

12    the notices that we had provided to Binance, North Field gave

13    notice at least six times between March 30th and March --

14    pardon me, March 30th and May 20, 2022.

15          In each case, as far as I recall and as far as the

16    exhibits confirm, the -- pardon me, North Field provided the

17    transactions hashes, identifying the location of the stolen

18    Bitcoin on Binance's exchange.

19          So we weren't expecting Binance to just receive an

20    order and have to go rummaging through its clients' accounts to

21    try and find it.  We gave them the information to know which

22    accounts were involved.  They had the information with each set

23    of hashes, with -- I'm sure Your Honor, if you looked at the

24    papers, have seen there's a document that looks like a

25    spreadsheet that's been printed out with a bunch of long
```

1    numbers on it row by row by row.  Those are the transaction

2    hashes.  Those are the details of each of the transactions

3    where stolen Bitcoin was moved onto Binance's exchange.

4         And that information was given to Binance.  And with

5    each successive notice, that information was updated to reflect

6    additional deposits that were making their way onto Binance's

7    exchange.

8         Binance doesn't dispute receiving that.  They said,

9    "Well, it's a little bit confusing if you have to look at the

10   different spreadsheets."  They also complain that the

11   spreadsheets were different.  Yes, they were different.  We

12   kept adding transactions as Binance continued to receive.

13        When we started this thing, Binance had only

14   received -- I believe it was less than or right around 400

15   stolen BTC.  By the time we finished and by the time we gave up

16   our efforts to try and resolve things with Binance, it had

17   received 669.7 stolen BTC.

18        Now, Binance received the notices.  It doesn't dispute

19   receiving the notices.  It doesn't dispute receiving the

20   hashes.  What it decided to do, though, was really kind of

21   interesting.  Instead of saying, "Okay.  We'll comply," it

22   said, "No, no, no, no.  We're now imposing our own

23   requirements.  We don't care what the order says.  We want you

24   to provide us with visualizations or tracings, showing how

25   these coins made their way onto our exchange."

1          Now, Your Honor's order does not include that

2     requirement at all.  But they demanded it.  And again, after

3     some back-and-forth, we finally decided to give it to them,

4     notwithstanding that they had their own tracing company and

5     could have developed all this information on their own if they

6     really wanted to know and really wanted to be certain that the

7     accounts actually had stolen Bitcoin.

8          And more to the point, what they should have done was

9     to freeze those accounts while they were arguing about what

10    additional information they might need to prove that, in fact,

11    those contained stolen Bitcoin.  But they didn't do that.

12         Next, we give them the visualizations.  We gave them

13    the visualizations for the top ten accounts that amounted to

14    about 400 BTC.  They came back, and they said, "Oh, okay.  Of

15    the ten accounts that you've now given us visualizations for,

16    we'll go ahead and freeze seven, but we're not going to freeze

17    the other three because we decided on our own, regardless of

18    what the Court's order is, that two of those are exchange

19    accounts on our exchange and we're not going to shut down those

20    accounts," even though we've now provided them additional proof

21    that they have received stolen Bitcoin.

22         And then there was a third account, a merchant account,

23    that they also said they weren't going to shut down.

24         Now, when they told us they weren't going to shut down

25    or freeze some of these accounts, that's when we issued a

1    subpoena looking for KYC information.  And as a result of

2    that -- and this is where the second part of this chronology

3    comes in -- the chronology -- the position that Binance took

4    was, "Well, we can give you the KYC, but we have objections to

5    doing it.  In effect, we're not going to cooperate, but we

6    would like to do it informally.  You withdraw your subpoena,

7    we'll give you the information."

8            Well, that seemed fine.  It would allow us to advance

9    the ball here, try to make some progress in following and

10   pursuing some of the stolen Bitcoin; so we agreed that that

11   makes sense.

12           The next thing was Ms. King was supposed to be

13   providing us with a letter confirming that deal.  It's not a

14   complicated letter.  However, what they finally came back with

15   three weeks later was a letter that said, "Oh, we'll give you

16   this information, but you can never come back and ask us for

17   information again."  And that we couldn't agree to.

18           No lawyer representing or, you know, trying to collect

19   on behalf of the class could possibly reach an agreement with

20   one of the largest exchanges that exist, to never ask it for

21   any more information as we're attempting to pursue this

22   judgment.

23           So that's where there is a divergence.  But in terms of

24   what they did -- they didn't have to go searching.  They didn't

25   have to go hunting.  We gave it to them on a silver platter.

1    They still imposed additional requirements.  We satisfied the

2    additional requirements, and they still failed to comply.  They

3    still failed -- knowingly and willfully failed to freeze three

4    accounts, and they have not turned over any of the ten.

5         What they said -- and this is, again, part of what they

6    tried to conflate.  Going back to May, they said, "Well, okay.

7    You've given us the tracings.  Now what we're willing to do is

8    if you get an order specifically identifying these accounts,

9    we'll turn them over."

10        I said, "Well, okay.  If that's what you really feel

11   what you need, I can look into that.  Will you accept service

12   of the order?"

13        "Oh, no, no, no, no.  We can't do that.  If you're

14   going to have to do this, you're going through formal rounds."

15        Well, if I'm going through formal rounds, I might as

16   well pursue the contempt because, frankly, that's the position

17   they're in.

18        So again, this was not hard.  The information was

19   provided that -- sufficient information was provided.  The

20   order itself was clear and unambiguous.  They don't dispute

21   that.  And the fact of the matter is no matter how much they

22   try, they cannot dispute that they have failed to freeze even

23   the ten accounts that they now have had clearly traced into

24   their exchange.

25        One final point -- and this is the other thing that's a

1    little bit off with the chronology and, frankly, if not for the

2    fact that Binance tried playing games with this point, we would

3    never known about this.  This was the other thing that I think

4    really, for whatever reason, is not accurately represented in

5    Binance's chronology.

6          Binance, at some point, I guess, decided instead of

7    telling customers, who were good-faith purchasers, to contact

8    the Court if it had a complaint -- and mind you, we've always

9    taken the position -- we took the position, in fact, before

10   Your Honor two years ago that if somebody is a good-faith

11   purchaser and comes forward with any evidence suggesting that,

12   we'll agree to release them from the order.  We're not trying

13   to pursue innocent victims here.  So we've done that.

14         In fact, Your Honor's order Docket Number 170

15   specifically relates to that point.  We relieved certain

16   parties of their obligation to comply with Your Honor's order

17   because they were able to present evidence that they were

18   good-faith purchasers.

19         Well, Binance, instead of instructing its customers to

20   contact the Court, instructed their customers whose accounts

21   were frozen to contact me, as counsel for North Field.  And one

22   such customer did.  Somebody by the name of Fenying Tong.

23         Now, I ask -- I first gave Mr. Tong the information for

24   the Court so that he could send his information to Your Honor.

25   I have done that now repeatedly.  But I asked Mr. Tong for

1    evidence of his being, in effect, a good-faith purchaser and

2    what happened to his account.

3          Mr. Tong was the one who sent us the screen capture

4    showing the message he received from Binance on November 15th,

5    alerting it -- November 15, 2022, mind you, alerting him to the

6    fact that his account was going to be shut down and that he

7    should remove all of his assets from the account before

8    November 22nd, 2022.  And according to Mr. Tong, his account

9    has been frozen since November 22nd, 2022.

10          When I asked Ms. King if, in fact, Mr. Tong -- if his

11    account was one of the accounts frozen because of the order,

12    the response that came back was yes, and she specifically

13    confirmed the account -- the account -- reference of the

14    account hash number so that we were able to put two and two

15    together to see that Mr. Tong's account was actually one of the

16    accounts for which we provided tracing information.

17          Now, Mr. Tong has not provided us with any information

18    indicating that he's a good-faith purchaser.  He was involved

19    in the receipt of somewhere between 600 and $800,000 worth of

20    stolen BTC.  I don't know whether he's going to provide it to

21    me.  If he does, I'll forward it on to Your Honor.  If he

22    provides it to Your Honor, we can look at it and assess it at

23    that time.

24          But it raises an interesting question as to why it is

25    that Binance was freezing accounts in November; why it is that

1    it was instructing its account holders to empty their assets

2    from their accounts, particularly when, according to the

3    chronology in Binance's papers, it didn't freeze anything until

4    after it got the tracers.

5           So that's, frankly, I think where this all fits

6    together.  Binance cannot defend its refusal to freeze three

7    accounts even of the ten.  It has not done anything to comply

8    with the rest of Your Honor's order.  To date, it has not

9    turned over to North Field any of the stolen BTC on the

10   accounts, and it can't deny that there's something in those

11   accounts.  It could have turned over something.  So --

12          THE COURT:  Was -- I'm sorry.  Go ahead.

13          MR. LEWIS:  Your Honor, I mean, they've admitted all

14   you need to have in order to be able to hold them in contempt.

15   They had notice.  The order was clear and unambiguous.  We gave

16   them the information to help them find it.  They willfully

17   decided to impose additional requirements and then wilfully

18   refused to comply with the order even after we jumped through

19   their additional hoops.  That's contempt.

20          THE COURT:  So they froze seven accounts.  They didn't

21   freeze three accounts, and the Bitcoin in the seven accounts

22   that they did freeze -- none of it has been turned over?  Is

23   that what you're saying?

24          MR. LEWIS:  Yes, Your Honor.  That is exactly what I'm

25   saying.

1       THE COURT:  And the three that they didn't freeze, do

2  you know whether or not any Bitcoin -- stolen Bitcoin has been

3  removed or transferred out of those accounts?

4       MR. LEWIS:  We do not, Your Honor.  We don't know what

5  the subsequent -- what the subsequent status of those accounts

6  was.  We know what went into them.  All together it was, I

7  believe, roughly 42.8 BTC, which is just, you know -- I know --

8  using small numbers with BTC, we can kind of lose track of what

9  these things are, but that alone is in excess of $1 million

10 worth of BTC.

11      THE COURT:  So I'm sure I'm going to hear from Ms. King

12 as to her position of why they couldn't comply and they tried

13 to and they attempted to and weren't able to and you didn't

14 give them enough information.  And so I'll wait to hear from

15 her.

16      But what I'm trying to figure out is when there's a

17 dispute as to whether they had sufficient information or didn't

18 have sufficient information -- you're telling me they did, and

19 I'm sure she's going to tell me they didn't.  And frankly, I

20 don't understand all the intricacies of how these exchanges

21 work and whether this hash -- whatever you call it, whatever

22 that term is -- is sufficient or isn't.

23      Am I going to need an evidentiary hearing to hear from

24 individuals that can explain to me what all this means and for

25 me to then sort out whether I agree with you that they had

1  sufficient information or I'm going to agree with them that

2  they didn't and whether they wilfully violated?

3      Can I make these decisions on the information that you

4  provided me, or am I going to have to listen to some testimony

5  from people who understand this so that I can decide whether

6  you're right or not?

7      MR. LEWIS:  Let me, I think, offer one additional point

8  that might help.  And frankly, it's a reason that I was

9  surprised that Binance was willing to have this hearing via

10  Zoom, knowing that Your Honor would not allow this to be an

11  evidentiary hearing.

12      We, with our moving papers, included the declaration of

13  Roman Bieda, who had actually traced the assets into accounts

14  at Binance.  And it's his firm, coin firm that was producing

15  the reports that identified the accounts that received the

16  stolen Bitcoin -- the hashes, as they're called.

17      Binance did not present any information to the

18  contrary.  The only declaration that they presented at all was

19  from Ms. King, who has no firsthand knowledge of any of the

20  information as to what Binance was able to do with the hashes

21  or not.

22      Binance came forward basically having its lawyer

23  present a declaration, trying to tap dance around some

24  technicalities and wasn't willing to come forward with sworn

25  statements from Binance itself confirming that, "Oh, the

1      information that coin firm generated was not sufficient."

2            I think part of the reason they failed to come forward

3      with that evidence is they couldn't refute that.  The

4      information the coin firm produced was sufficient to allow

5      Binance to identify the accounts.  And, in fact, the

6      information that Binance ultimately used with the tracings was

7      the same hash information that we have provided to them more

8      than six months earlier.

9            So it gave them all the information they needed to know

10     to go find Mr. Tong and the other nine accounts and every other

11     account on their exchange to find out then who those people

12     were, what they were doing, and why they were involved.  It

13     gave them more than information to freeze them.

14           And again, that's why the only declaration you have is

15     from the lawyer, not from the client.  It's not evidence.

16     There is no firsthand knowledge of that.  And Ms. King, to her

17     credit, doesn't attest to the fact that she has firsthand

18     knowledge.

19           So, Your Honor, we're here on what would have been an

20     evidentiary hearing had Binance decided to come forward with

21     some evidence.  But all of the evidence in front of Your Honor

22     is what's already been provided in the papers.

23           THE COURT:  All right.  Thank you.

24           Ms. King.

25           MS. KING:  Your Honor, we certainly do disagree with

1  Mr. Lewis on his rendition of the facts and much of the

2  speculation that he's offered the Court.

3       Let me just start by addressing personal jurisdiction

4  because that was Your Honor's first question.  We definitely

5  disagree with Mr. Lewis in his assertion that Rule 65(d) has

6  basically gutted the personal jurisdiction requirements that

7  are founded in constitutional principles in U.S. juris

8  prudence.  We think that the threshold question before you even

9  Rule 65(d) is whether or not there's personal jurisdiction over

10  Binance, a nonparty, non-U.S. entity.

11       There didn't seem to be a dispute that under

12  traditional analysis of personal jurisdiction, that there is no

13  personal jurisdiction over Binance.  I'm surprised to hear this

14  theory that a trademark application somehow gives rise to

15  personal jurisdiction.  I don't think that is accurate, and I

16  don't think that the factual record here supports a finding of

17  personal jurisdiction.

18       And we noted in our papers that two other judges in

19  this Court have already rejected the plaintiffs' theories of

20  personal jurisdiction as in Guarini and the Muroke (ph) case.

21  And I would also note the irony that, in that case, one of the

22  reasons that they thought there was personal jurisdiction over

23  Binance was that it assisted regularly U.S. law enforcement in

24  finding bad actors, and now they seemed to have flipped their

25  theory and trying to assert personal jurisdiction by

1    speculating that Binance is now assisting bad actors.  Again,

2    it's a stretch.  It has no basis in fact, and we definitely

3    dispute their assertion of personal jurisdiction based on

4    trademark or other context.  There is this very narrow

5    exception --

6            THE COURT:  I'm sorry.  All right.  Go ahead.  Tell me

7    about the exception, and then I'll ask you.

8            MS. KING:  Right.  This is where I think our sort of

9    dispute really falls -- this aiding and abetting a bad actor or

10   if you even reach 65(d), the idea of acting in concert with a

11   bad actor.  That is the very narrow exception rarely applied.

12   All of the cases that North Field has cited and that we have

13   discussed in our papers deal with a situation where you're

14   essentially an agent to the bad actor.  You're closely tried to

15   the bad actor.  I don't think that standard is anywhere met in

16   this case.

17           We're not even talking about Paul Vernon's accounts.

18   There's no connection between Paul Vernon and Binance.  Binance

19   wasn't even in existence at the time of the underlying fraud.

20   And so we don't think North Field has even come close to trying

21   to show that we've aided and abetted; we're really a bad actor

22   who's committing fraud in the U.S.; or that we're acting in

23   concert with a fraudster in the U.S. to get around the

24   threshold personal jurisdiction requirements needed for this

25   Court to exert power over Binance.

1          So that was just the first matter.

2          THE COURT:  So what cases do you point me to that you

3    think are your strongest cases for the proposition that I don't

4    have jurisdiction to enforce this order against Binance?

5          MS. KING:  Right.  So those are the sort of black

6    letter law of personal jurisdiction being the first, you know,

7    threshold issue for any court to assert action over a party.

8    Those are the ones that we cited in our brief.  I'd be happy

9    to --

10          THE COURT:  Mr. Lewis says the analysis is different

11   when you're dealing with Rule 65 than if you're dealing with a

12   12(b) motion to dismiss.

13          MS. KING:  Yeah.  I would submit that those cases that

14   he referred to do not say that and that if Your Honor reads

15   those cases, they do not say that personal jurisdiction goes

16   out the door if you can assert, you know, some kind of action

17   over using Rule 65(d).

18          The two cases that Mr. Lewis referred Your Honor to --

19   HPC and FTC -- both involve close ties -- and again, this is

20   already in the 65(d) realm, not the personal jurisdiction

21   realm -- close ties to the bad actor, acting in concert.

22          So HPC involved the attorney for the bad actor, and the

23   nonparty involved in the FTC case was wholly owned, completely

24   controlled by the defendant and party.

25          So those cases do not support the proposition, which we

1  think is unprecedented, that a court has jurisdiction by going

2  through a Rule 65(d) analysis and does not need to address the

3  threshold constitutional and personal jurisdiction

4  requirements.

5       In fact, I think North Field's argument is quite

6  extreme if we think about.  It would really have this Court

7  rule that any private plaintiff lawyers can blast email

8  spreadsheets with thousands of lines of account numbers and a

9  foreign financial institution is obligated to simply freeze all

10 of those accounts without question, without regard for

11 accuracy, without regard for customers' rights, or risk being

12 labeled an aider and abettor or acting in concert and be

13 subjected to the jurisdiction of any U.S. court.

14      That proposition, you know, is antithetical to basic

15 constitutional principles, and I think is untenable and

16 unprecedented.

17      THE COURT:  So do you agree that if there was

18 sufficient facts in this record for me to conclude that Binance

19 was an aider and an abetter of the -- I forget the person's

20 name who stole --

21      MS. KING:  Paul Vernon.

22      THE COURT:  Vernon.

23      MS. KING:  Correct.

24      THE COURT:  Then your lack of ties to the United States

25 or contacts with the United States would not make a difference.

```
 1          MS. KING:  Yes, Your Honor.  If the record supported a

 2   finding that Binance was aiding and abetting Paul Vernon

 3   specifically and closely tied to Paul Vernon, then that would

 4   give Your Honor jurisdiction to make a ruling or sanctions.

 5          But, you know, we respectfully submit that that is not

 6   what those record show.  It's quite the contrary because

 7   Binance has been consistently responsive; has been providing

 8   information to North Field; offered explanations for what it

 9   needed; why it needed it; and actually gave information about

10   the accounts for which tracing was provided; told North Field

11   how much was in those accounts and in what currencies.

12          And I do want to correct the record because Mr. Lewis

13   says there's BTC still left in those frozen accounts.  That is

14   not true.  I specifically told North Field that there was no

15   BTC in any of those accounts.  That's in paragraph 16 of my

16   declaration, and we refer to that in our papers.  There is no

17   BTC.  That really goes to the second layer of analysis, which

18   is if you have jurisdiction and you could show that BTC was

19   still in the accounts, that would be one thing.  But they don't

20   even show and they cannot show that the BTC, the stolen assets,

21   are actually in the accounts that they reference or in any

22   account at Binance.

23          And as to the transaction hash sort of concept -- there

24   been a lot of terminology that has been floating back and

25   forth.  What a transaction hash does is merely identify one
```

link, a downstream for what they're trying to show.  So they've
essentially told Binance we have an anonymous, unnamed User X,
who was transferred one Bitcoin to an anonymous User Y, who has
an account on Binance and on that bases alone, you have to
freeze all of the assets in Customer Y accounts without
requiring and asking for more detail, actually linking that one
Bitcoin all the way back to Paul Vernon's 11,000 Bitcoin that
he stole in 2014.

And it is customary to ask for more detail.  Whether
it's traditional currencies or in cryptocurrency, you have to
actually trace the funds to the actual fraud.  That is not a
new concept.  It is not a crypto concept.  It's just
complicated now that we have different terminology and
different data fields.  But the idea that a financial
institution would request actual tracing back to the fraud is
not unusual.  It is not some huge burden to place on the party
that is seeking a freeze.

And as they admit, they had an expert working with them
that did provide the tracing information that we requested,
albeit eight months later.  They were able to do it.  They had
an expert to do it.  And this notion that Binance should have
hired an expert and expended resources to go through their
thousands of lines of hashes is just absurd.  It's not a
reasonable burden to place on a nonparty and a non-U.S.
institution.  So requesting the tracing is pretty standard.  We

1    do it in a lot of cases, including with law enforcement.  They

2    agreed to provide it, and they did, in fact, provide it, and

3    now they're claiming it was unreasonable to request, and that's

4    just not borne out by the facts.  They also provide --

5         THE COURT:  I'm sorry to interrupt you.  Do you have

6    any cases in the attempt context that would support your

7    position that requesting tracing information from the person

8    trying to enforce the injunction against the nonparty is

9    perfectly reasonable, or do you have any case -- even not in

10   the context of a contempt but just in any cases that suggest

11   that that's a standard practice and reasonable in order to be

12   held in contempt for failing to abide by an injunction in the

13   financial realm -- excuse me, you know, it's perfectly

14   reasonable to request tracing information before you have to

15   put a freeze on your customers' accounts?

16        MS. KING:  I don't have a specific case talking about

17   tracing in a contempt context.  We do cite a few third-party

18   resources in Footnote 6 of our opposition brief, which is on

19   page 4, that talks about the concept of tracing.  And that

20   article actually cites to many other examples and references to

21   sort of provide some background on what tracing means.

22        It is something I'm sure -- their expert doesn't say,

23   "Tracing is unheard of and super unusual."  That's a notable

24   omission from their expert's affidavit.  If Your Honor does

25   seek some kind of evidentiary hearing where we have to find

```
1    someone to tell you about how tracing is necessary and why it's

2    necessary to ensure accuracy -- and again, I refer to

3    Your Honor to the fact that they agreed to provide the tracing.

4    No doubt it has an extra burden to it, but accuracy and

5    customer rights are also very important.  They agreed to

6    provide it, and they waited, but they did provide it in the

7    end.  They didn't say last year, last summer, "Oh, no.  This is

8    unreasonable.  I'm going to the Court."

9         They said, "Okay.  I'll give you the tracing."  And

10   then they sat on their rights for, you know, eight months

11   before they actually came back and reengaged with us.

12        So, you know, we did --

13        THE COURT:  Can I ask you a question?

14        MS. KING:  Yeah.

15        THE COURT:  So Mr. Lewis says that they provided their

16   expert's affidavit and you provided nothing other than your

17   affidavit in terms of tracing and the need for tracing in order

18   for you to comply.  And so I only have his declarations in

19   support of his motion, and I really have nothing in opposition

20   from you other than your declaration.

21        MS. KING:  Right.  Well, we do have my declaration.  We

22   did refer to other references and citations to third-party

23   sources for the concept tracing.  I don't think this motion

24   hinges on tracing.  We told them we wanted tracing.  They

25   didn't say we refused to provide it.  "You're being
```

1    unreasonable.  I'm going to the Court."

2           They said, "Okay.  We'll give you the tracing."  And

3    then they did provide the tracing.  And as promised, we

4    provided freezes and account information based on that tracing.

5           And I explained to North Field exactly what types of

6    accounts are at issue; why a freeze was appropriate for certain

7    accounts and not others.  That all is showing active

8    engagement -- active assistance to North Field, notwithstanding

9    our jurisdictional defenses.

10           And this is a motion for sanctions.  This is not

11    evidence of aiding and abetting a bad actor, the fact we have a

12    dispute over whether or not, you know, we should be doing the

13    tracing or they should be doing the tracing.

14           The facts here and the chronology and the constant

15    interaction over the last year all goes to the fact that this

16    is not a situation where sanctions are appropriate.  And that's

17    where I think the actual dispute really lies, not with the

18    nature of tracing.

19           THE COURT:  I was going to ask you something, and it

20    slipped my mind.  So hold on.  Let me see if I can recall what

21    I was going to ask you.

22           MS. KING:  Sure.

23           THE COURT:  I lost my train of thought.  I apologize.

24           MS. KING:  That's okay.

25           THE COURT:  Hopefully, I'll remember.

1          MS. KING:  No worries.

2          I did want to point out that --

3          THE COURT:  I'm sorry.  I do remember now what I wanted

4     to ask you.

5          MS. KING:  Go ahead.

6          THE COURT:  What about the three accounts that you

7     didn't freeze?

8          MS. KING:  Right.

9          THE COURT:  Explain to me why you didn't freeze those

10    three accounts and why your failure to freeze them once you

11    knew there might be Bitcoin in there isn't a violation of the

12    order.

13         MS. KING:  Right.  So there were ten accounts.  Seven

14    of them are individual customer accounts.  So Bitcoin came in,

15    and they went out.  There's no Bitcoin in the accounts

16    remaining, but we froze them so that they could pursue their

17    rights and go back to Your Honor.

18         On the other three accounts, those are other crypto

19    exchanges or in one case, a merchant account.  So those are

20    accounts with high-volume activity, and things just go in and

21    out, and there's different exchanges.

22         You cannot see -- or Binance cannot see who the

23    ultimate customer or individual at issue who may have received

24    the Bitcoin and dispensed with it or did whatever with it

25    because those are accounts that don't belong to the sort of end

```
 1   user.  They're sort of intermediary accounts.

 2         And so what I did was I explained this, again

 3   transparency, explained this issue and the problems you can't

 4   freeze another exchange.

 5         And we actually disclosed the name of the exchange to

 6   North Field so that they could pursue those exchanges to try

 7   and figure out the ultimate users.

 8         On the merchant account that was part of the subpoena,

 9   that was part of -- you know, we can't freeze it because it's

10   an active business, but we will provide you with account

11   information that was part of the compromise that I thought we

12   had reached with North Field, which also would have given them

13   information about the account.

14         And I do want to speak a bit about this compromise

15   because they issued a subpoena.  It wasn't as Mr. Lewis was

16   suggesting, that we simply said, "We're not going to accept it.

17   We'll just give you everything that you have asked for."

18         There was a negotiation.  We objected to parts of the

19   subpoena.  And the proposal I offered, which provided robust

20   information about each of the accounts -- the eight accounts

21   that were subject to the subpoena -- was meant to resolve our

22   disputes regarding the subpoena.  That was, like, language in

23   my email to him.  That was my understanding -- that by

24   producing all of this account information, that would resolve

25   our disputes.
```

1            And so the reason why there was a line in the cover

2     letter saying that, "Okay.  This is going to resolve things,

3     and you're not coming back and asking for a ton of other

4     stuff" -- that's why that line was in there.

5            If they objected to the way that sentence was phrased,

6     if they wanted to carve out sort of additional accounts, if

7     they wanted to clarify their position, that could have been

8     easily done.

9            But instead, I was served with, like, a box full of

10    paper seeking sanctions, just mere hours after I had shared the

11    cover letter.  And that's where I think that this sort of

12    good-faith negotiation really fell apart because clearly, this

13    motion had been prepared well in advance.  They complain about

14    the two-week delay in giving them the production, but they

15    themselves sat on things for eight months.

16           And I don't understand where any of this is coming from

17    when we have been actively assisting North Field for the last

18    year.  And that's ultimately, I think, why this motion fails,

19    you know, setting aside the personal jurisdiction issue, which

20    is a threshold issue.

21           THE COURT:  So you said the one account was a merchant

22    account and you didn't freeze --

23           MS. KING:  Right.  There were three accounts that were

24    not frozen.  Two of them are other exchanges, and one of them

25    was a merchant account, which is one of these high-volume

businesses; so they go in and out.  And the fact that one

Bitcoin went into the account doesn't really justify

terminating an entire business.

They can go to the business and try to seek information

about that one transaction, but we can't freeze the entire

account without doing great damage to the customer.

THE COURT:  Okay.  All right.

So do you think in order for me to sort this out, we

need an evidentiary hearing and I decide what are on the papers

that are presented to me?

MS. KING:  I do not think there needs to be an

evidentiary hearing.  The sort of questions about the specifics

of this or that on the technical points don't really change the

legal analysis, which is you have to start with jurisdiction.

There is no jurisdiction.  There's no evidence of

aiding and abetting.  If you get jurisdiction and go to 65(d),

you still have this problem where Binance isn't a bad -- isn't

one of the parties; isn't acting in concert with one of the

parties; isn't sort of subject in the framework.

And you have the terminology of the injunction itself,

which only freezes things that have the stolen Bitcoin in

them -- the stolen assets.  They don't even have evidence that

any of these accounts still have the stolen assets in them.  So

that's an additional problem to finding that Binance has

violated the junction.  There are no Bitcoins in these

accounts.

And so, you know, on multiple layers, I think, the sanction's motion is faulty.  It can't sustain itself.  And the chronology of facts showing our, you know, constant assistance, I think, itself defeats this notion that Binance is conspiring with bad actors and not trying to act appropriately.

THE COURT:  And I know that there's no Bitcoin in these accounts because you say so?

MS. KING:  I said so.  I told that to North Field. They have not disputed that.  They refused a production that would show that.  We're about to produce all of the account holdings; and, you know, because they're taking issue with Mr. Tong's account -- and actually, I should address that before sort of resting.

Mr. Tong's account -- I put their account file into the record here, which shows that there was no Bitcoin in his account.  It also shows there was no movement in his account in or out, you know, during the period that they say we're trying to get Mr. Tong to move all his money out.  That's just not the case.

And the email that they refer to doesn't say anything about this matter.  It's a completely separate matter.  If Your Honor wants to understand sort of the nuances of other alerts, we can make an in camera submission.  It's a law enforcement issue that I don't think is sort of relevant to

1   this case.

2       As to this case, none of those accounts were frozen

3   until the tracing was provided in April of this year.  And the

4   fact that I gave the information to Mr. Lewis that Mr. Tong was

5   the owner of one of the accounts that he had listed -- I

6   certainly didn't say we froze in November based on this case.

7   That's just not true.  I didn't say that.  I made that clear in

8   my declaration.

9       The name was provided.  His name was provided.  This

10  case was provided to Mr. Tong because there's clearly a mix-up.

11  He is the owner of one of these accounts that had recently, in

12  April, had been frozen pursuant to the tracing.  That, again,

13  simply shows that we were trying to be transparent with the

14  customer and trying to be transparent with North Field.  And if

15  my error was not providing Your Honor's name instead of

16  Mr. Lewis's name, then I own up to that.  But I think providing

17  the name of counsel that had requested a freeze and was

18  litigating the issue in this court was appropriate.

19      And, you know, I don't -- I can't speak to Mr. Tong's

20  communications with Mr. Lewis, but they don't put that in the

21  record, and I think that's because Mr. Tong doesn't say that,

22  you know, we froze his account because of this matter or that

23  we told him to move the assets out to avoid compliance with

24  Your Honor's injunction.  That's just not the case.

25      The timing is off.  And they're just speculating and

1    making a lot out of this sort of automatic email that Mr. Tong

2    received back in November.  So I really can't say more to that

3    other than the timing doesn't match up and the words don't

4    actually say what North Field is characterizing them to say.

5           THE COURT:  All right.  Thank you.

6           MR. LEWIS:  Your Honor, may I respond to a few points?

7           THE COURT:  Sure.

8           MR. LEWIS:  First things first, Ms. King says she

9    doesn't know where this is coming from; that they had been,

10   quote, "Actively assisting for the last year."  I wasn't an

11   English major, but I'm pretty sure that what we had to do with

12   Binance does not involve active assistance.

13          The refusal to freeze all of the accounts as they were

14   required -- the refusal to even freeze the ten after we jumped

15   through the additional hoops and the refusal to turn over

16   assets, those refusals were made clear to us by the end of May,

17   beginning of June, and that's what set this contempt motion on

18   its path.

19          THE COURT:  All right.  May I interrupt you for just a

20   second before you go to the next point.

21          They say there's no Bitcoin in there; so what are they

22   supposed to turn over?

23          MR. LEWIS:  That's actually what I'm getting to as my

24   next point, Your Honor.  They say now there's no BTC.  When Ms.

25   King and I had the conversation at the end of May, we were --

1    she advised us that they were BTC equivalent.

2           Now, we don't know what subsequent transactions

3    occurred on these accounts after they should have frozen the

4    accounts, but certainly, there were assets there.  And if these

5    assets were received for purposes of then further laundering

6    the money, then, again, the freeze would have allowed us to get

7    to the bottom of it and to perhaps recover some of that,

8    regardless of what form it had been transferred into.

9           If this is BTC Tether or this is some other form, Ms.

10   King is the only one who knew apparently what BTC equivalent

11   was, but it was my understanding that there was still something

12   there.

13          We weren't told at all what was in the merchant account

14   or the two other exchange accounts.  That's another point.

15   Quite frankly, I guess if you want to launder money, all you

16   have to do is send it to an exchange account on an exchange and

17   therefore, nobody ever gets to trace it.  The fact that those

18   are high-volume accounts doesn't exempt them from the

19   obligation of freezing.

20          Now -- and if I may share my screen just for one

21   second, Your Honor?

22          THE COURT:  Before you do that, are you saying that

23   they were obligated or should have frozen the exchange accounts

24   as well?

25          MR. LEWIS:  They should have frozen the accounts with

whatever assets were in them.  If I was Mr. Tong and I received

$500,000 of stolen Bitcoin, I shouldn't be able to immediately

turn around, sell that now for Tethered BTC or some other token

that is somehow tied to the BTC, have the BTC leave my

account -- I have $500,000 that I can give back to Mr. Berman,

and I'm not responsible and Binance isn't responsible and

nobody has an obligation to freeze anything.  That can't

possibly be right.

THE COURT:  I'm talking about the exchanges, not

Mr. Tong.  The exchanges.  Are you saying that they should have

frozen the exchanges themselves?

MR. LEWIS:  To the extent that the exchange had an

account on Binance, yes, they should have frozen that account.

If that account received stolen Bitcoin and still had assets in

it, they should at the very least freeze up to the amount of

the stolen Bitcoin that we identified.

Now that's the next point that I want to make here,

Your Honor.  Again, the documents that we provided here with

regard to what Binance needed to do to look up the account or

did they need to freeze all of the assets in the account -- it

really overstates the point.  The documents we provided --

that's why I would like to be able to just pull up on screen

here for a moment if I may.

THE COURT:  Sure.

MR. LEWIS:  This is actually Exhibit E to Mr.  Bieda's

```
 1    declaration.  It may be a little bit hard to see on your

 2    screen, but it indicates the exchange that received it, the

 3    wallet address, the transaction and hash ID, the date and time

 4    of the transaction.

 5         THE COURT:  I'm sorry.  I'm losing you.  I'm not

 6    understanding what you're saying.  So can you repeat this

 7    again?

 8         MR. LEWIS:  Oh, yes, Your Honor.  And forgive me.  Let

 9    me just walk you through this.

10         The first column here identifies the exchange that

11    received the stolen Bitcoin.  The second column here, these

12    long numbers or combinations of letters and numbers -- these

13    are actually wallet addresses or account addresses.

14         And these are the accounts that received stolen Bitcoin

15    through a transaction.  The middle -- big middle number here is

16    a transaction ID.

17         So I don't know if you ever ran a credit card and on

18    the receipt, it has a number transaction ID.  It's just an

19    internal way of tracking.  This is the blockchain way of

20    tracking the transaction.  It's got the date --

21         THE COURT:  I'm sorry.  So the second column on the

22    left is the account number, and the next column to the right is

23    the transaction number?  Is that what you're saying?

24         MR. LEWIS:  Yes, Your Honor.

25         THE COURT:  Okay.
```

1          MS. KING:  Just to be clear, it's the sender account.

2     It's an anonymous sender account that's in the second column.

3          MR. LEWIS:  Whether it's the anonymous sender or

4     whether it's the transaction ID, the first account -- the first

5     column here with numbers is the account that received the

6     stolen Bitcoin.

7          MS. KING:  It is not.

8          MR. LEWIS:  It is.

9          MS. KING:  I can't see your full exhibit.

10          THE COURT:  Ms. King, let him --

11          MS. KING:  Okay.

12          THE COURT:  -- give his explanation and --

13          MR. LEWIS:  These are the accounts.  Mr. Tong's

14     accounts are in this list.  It then includes the date and time

15     of the transaction, and it includes the amount of the BTC that

16     went in with the transaction.

17          And in some cases, you have multiples.  Here you've got

18     four transactions in a row involving different amounts but the

19     same address.  So you have all of this information.  Each time

20     Binance received notice, it received one of these.  All it

21     needed to do was go look at the account number.

22          And if it was concerned about freezing more than it

23     needed to, it could have added up the number of BTC that those

24     accounts received and froze -- and frozen that much in the

25     equivalent.

1        Frankly, had they done it even that much, we wouldn't

2   be here on a contempt motion.  But they didn't do that.  They

3   weren't willing to do that.

4        Now, if Binance's view on jurisdiction is correct, we

5   can always avoid Rule 65(d) by simply depositing stolen assets

6   with somebody who isn't subject to the personal jurisdiction of

7   the Court.  Go to a bank that's a regional bank that has no

8   jurisdiction or no context with South Florida and suddenly,

9   that's beyond the scope, according to Ms. King.  That can't

10  possibly be the limitation on Rule 65(d).

11       Rule 65(d) does not involve minimal context.  And you

12  can't take the position that Binance was not somehow

13  participating.  Had its exchange not existed, Vernon would not

14  have been able to transfer a significant portion of the 11,000

15  stolen BTC to it.

16       Now, as I did hear Ms. King say that this Court's

17  decision does not turn on the tracings.  I agree with that

18  wholeheartedly.  There are all of these accounts that we have

19  identified that received stolen Bitcoin.  Binance has had those

20  account numbers for more than a year.  Binance has done nothing

21  to try to freeze those or try to prevent assets from

22  dissipating.

23       They can talk about what they did with the ten

24  accounts; that they narrowed it down where they required the

25  tracings.  The fact of the matter is they were obligated to

1   freeze these accounts and freeze the assets going back to last

2   March, April, and May, and they didn't do that.

3        They were in a position to freeze them back then, and

4   they didn't do it.  And even by their own admission, after they

5   received even the additional tracings, they refused to freeze

6   three accounts.

7        I can't believe it's that simple to launder coins,

8   although this may explain with the CFTC and SEC are going after

9   Binance the way they are and why Binance supposedly, at least

10  in the CFTC proceeding, had people acknowledge that, yeah,

11  Binance turns a blind eye to the use of the platform to

12  facilitate illegal activities.

13       Binance is in the U.S.  If Ms. King is correct and

14  she's willing to go on -- make a statement under oath that

15  Binance is not doing business in the U.S., I'll be happy to

16  take that to the California Bar.  There's a lawyer who is going

17  to lose her license for submitting false statements under

18  penalty of perjury to the trademark office.

19       But the final point is here, Your Honor, nothing that

20  Ms. King has given you justifies their position.  And I do

21  agree this case does not turn on the tracings.  The fact of the

22  matter is Binance did not pony over any evidence indicating

23  that it could not comply with Your Honor's order.

24       THE COURT:  On the jurisdictional issue, do you agree

25  or disagree with Ms. King that in order to have my order extend

1    to nonparties that are not within the personal jurisdiction

2    concept of the Court, they have to have been aiders or abetters

3    of the wrongdoer in order for my jurisdiction to extend to that

4    type of a person?

5         MR. LEWIS:  Your Honor, if Rule 65(d) required them to

6    be aiders and abetters, then the rule would have been phrased

7    differently from the way it was phrased.

8         The rule talks about in active concert or

9    participation.  It doesn't talk about aiding and abetting.  It

10   doesn't require you to show aiding and abetting, which is,

11   frankly, a higher standard.  The aiding and abetting is more

12   like active concert.

13        All you have to do is participate.  If you're aware of

14   the order and you are receiving and facilitating the transfer

15   of funds, you are participating.  That is almost definitional

16   participation.  And that's all that is necessary under Rule 65.

17   If you're going to take the position that you can only have

18   Rule 65 extend the stolen assets where there's aiding and

19   abetting -- again, all you have to do is go deposit it with

20   somebody who doesn't know anything about the case or anything

21   about the theft, and they get to say, "oh, sorry.  I'm beyond

22   the scope of the court's order.  I don't have to listen to the

23   court's order.  I don't have to turn over the stolen assets

24   even if I know they're stolen after the fact."

25        That's not the standard.  The standard is in active

1    concert or participation.  And they participated.  There is no

2    question that they actively participated.

3          THE COURT:  All right.  And so if there was no Bitcoin

4    in these seven accounts, is there any wrongdoing as far as

5    you're concerned as far as those seven?

6          MR. LEWIS:  Yes, Your Honor.  There still is.  And

7    it's, unfortunately, an evidentiary point that Binance has not

8    wished to put before you.  But it's a question of when whatever

9    assets were moved out of there.

10         If those assets were moved out of the accounts after

11   they received notice between March 30th and May 20th, then

12   there is no question they were obligated to freeze those.  If

13   the account happened to be emptied afterwards, they needed to

14   come forward with evidence showing when it was empty.

15         But I think, frankly, Your Honor the reason they didn't

16   is they can't.  They don't have the ability to come forward and

17   say, "Oh, yeah, all of the assets were emptied out of all of

18   these accounts immediately and before we ever received notice

19   at all."  And that's not what they come forward with.  They

20   come forward with no evidence.  They come forward with Ms.

21   King's declaration, which is not evidence.

22         THE COURT:  So you don't think I need an evidentiary

23   hearing to sort that out?  You think the lack of evidence by

24   them allows me to make an affirmative finding that there was

25   Bitcoin that was moved out of those accounts after they got

1   notice and before they were frozen?

2       MR. LEWIS:  Your Honor, today was the day for the

3   evidentiary hearing.  We came forward with evidence showing the

4   stolen Bitcoin going into Binance accounts.  Binance did not

5   come forward with any evidence establishing what was in those

6   accounts, whether it froze any of those accounts or not; what

7   it did to comply with that order; and what's left.  It didn't

8   come forward with any evidence on that point.  And today was

9   its day to do so.

10      THE COURT:  Well --

11      MR. LEWIS:  Again, I was surprised that -- I'm sorry,

12  Your Honor.  Again, I was surprised that Binance agreed to do

13  this via Zoom knowing that it was not going to be evidentiary

14  because it means that Binance had to rest on nothing.

15      MS. KING:  Your Honor, if he could --

16      THE COURT:  Well, I'm trying to understand.  I don't

17  know who it was that asked if this could be done by Zoom or

18  not.  All I know is that I was willing to do it by Zoom if

19  everyone agreed it was not going to be an evidentiary hearing.

20  And I think that was expressly put in the order.  So --

21      MR. LEWIS:  Your Honor, Binance is the one --

22      THE COURT:  Go ahead.

23      MR. LEWIS:  To answer your question, Binance requested

24  the possible hearing dates via Zoom.  And we had no objection,

25  given Your Honor's condition, that they would not be able to

1   present evidence at the hearing; that this would not be an

2   evidentiary hearing.  But it was Binance's request to do it

3   this way.

4          MS. KING:  Yes, Your Honor.  And I maintain that an

5   evidentiary hearing is not required.  And just to be clear:

6   Whatever standard, even under their view of the world, applies

7   here, the burden is on North Field.  They need to show aiding

8   and abetting, or they need to show acting in concert if you

9   don't accept that personal jurisdiction as a precursor.  They

10  need to show that we've engaged in contemptible behavior.

11         Now, the evidentiary standard on all of these

12  thresholds are extremely high.  And I submit that what they've

13  submitted to Your Honor in their opening papers and the brief

14  reply do not rise to meeting that evidentiary standard.  And we

15  object to the suggestion that Binance was the one required to

16  prove the negative, to prove the opposite, to prove innocence.

17  That is not the standard here.

18         North Field brought this motion, and they need to meet

19  their evidentiary burden.  And let me just clarify that in

20  talking about 65(d), which we still maintain you don't reach

21  because of personal jurisdiction, but in talking about 65(d),

22  if you talk about acting in concert, it's not participation by

23  itself.  It's not the fact that you are a financial

24  institutional and people send funds to you and transfer funds

25  to you all the time.  That is not enough to be acting in

1    concert.  And there are cases that we have cited, including the

2    FTC v. Aquinity Interactive case, that make clear they need to

3    establish knowingly assisting the party that is enjoined.

4         Knowingly assisting -- there is sort of an intent

5    involved in the type of "acting in concert" proof, not just

6    participation because you are a financial institutional.  And

7    again, Mr. Lewis put up the spreadsheet -- one page of the

8    spreadsheet, which is thousands of pages.  And you can see how

9    there is fine line data points trying to assert that there's a

10   transaction between an unknown sender and an unknown recipient

11   of a tiny bit of Bitcoin and based on that, he's asserting that

12   Binance was not allowed to question whether or not that Bitcoin

13   could be traced to the fraud itself and that Binance was not

14   allowed to engage on a voluntary basis and request more

15   information but instead, it was required to go through each

16   line on their spreadsheet and freeze everything and then do it

17   again every week when they sent updates, which include

18   thousands of more lines.  And that is not a reasonable

19   proposition for any financial institution -- to be burdened

20   with this type of an investigation; that the plaintiffs have

21   the burden of actually showing.

22        We asked them to actually trace back to the fraud.

23   That is an elementary request.  It is a common request.  We

24   have cited to references to make that clear, but if Your Honor

25   requires an evidentiary hearing on that, we're happy to do so.

1    Again, we're a nonparty, not in the United States.  We

2    already expended enormous resources trying to assist North

3    Field and now enormous resources trying to defend ourselves

4    against a contempt.  If you need an evidentiary hearing, we

5    will invest that because this is a very important matter of

6    principle for Binance and, frankly, for all financial

7    institutions that are non-U.S. based.

8         THE COURT:  Okay.  How do I know whether there was any

9    Bitcoin that was in these seven accounts that were frozen, that

10   was transferred out after you got notice of the order?  How do

11   I know that fact or not?

12        MS. KING:  Right.  For the accounts that were traced,

13   we had begun preparing and were about to produce the account

14   records for those eight accounts that they subpoenaed.  I would

15   be happy to provide them to Your Honor if you require

16   additional proof.  I don't think that North Field at this point

17   is entitled to any additional information, but if that is a

18   turning point for Your Honor, I'm happy to substantiate that

19   with an evidentiary production of those accounts preferably

20   confidentially to Your Honor only.

21        THE COURT:  And why wouldn't you just give them to them

22   to show that nothing went out of these accounts after you got

23   notice of the order?

24        MS. KING:  Because that was our agreement.  And instead

25   of not negotiating in good faith, they served us with a

1    contempt motion.  And part of our agreement in good faith was

2    we will gather -- and it's burdensome to gather this -- all of

3    the -- it's not just account information.  It's KYC.  It's the

4    current asset holdings and wallets.  It's transfers in.  It's

5    deposits.  It's withdrawals.  It's transfers out.  That's a

6    burdensome amount of information that took a few weeks.

7         We engaged and invested the resources to get that

8    information offshore for them.  And like I said, we were

9    slapped with this motion and continuously bullied with these

10   threats and these speculative assertions.

11        So I think from Binance's perspective, it is not

12   subject to U.S. jurisdiction.  It acted in good faith and tried

13   to voluntarily assist, and it's offended by the conduct of

14   opposing counsel.

15        THE COURT:  Okay.  So if I'm hearing you correctly, you

16   got the information.  You went through the trouble of gathering

17   it, and then when you got it, you were going to turn it over.

18        MS. KING:  Absolutely.

19        THE COURT:  But when they filed a contempt motion, you

20   did not submit the information to them.  Is that --

21        MS. KING:  Well, yeah.  I sent them a production letter

22   that had gone through the client and had been approved.  I sent

23   it the day it was approved.  They responded three hours later

24   saying, "We don't like the sentence.  This is new.  You're

25   clearly acting in bad faith."

```
 1          I then say, "Well, can you please explain.  This was
 2    meant to be a compromise.  We can't just give you a bunch of
 3    information only to be subjected to follow-ons and continuous
 4    requests."
 5          THE COURT:  I understand all that.
 6          MS. KING:  And they went silent and filed this motion,
 7    and so now we're kind of at a loss.
 8          THE COURT:  But you have the information.  It's been
 9    gathered.
10          MS. KING:  Absolutely.  On the ten accounts -- well, on
11    the eight accounts that were subject to the subpoena.  We
12    didn't -- yeah.
13          THE COURT:  So presumably, the information would show
14    them that no Bitcoin went out of these accounts after you got
15    notice of the order, presumably.
16          MS. KING:  It certainly doesn't show that any Bitcoins
17    exists in the accounts currently or existed in the accounts at
18    the time they provided their tracing.  One thing that hasn't
19    come up is that their goalpost keep moving, and so the notice
20    on each of those accounts actually varied.
21          When they gave us the tracing or the -- yeah, the
22    tracing on the ten accounts, many of them were new.  They were
23    not previously noticed.  So I don't know what the notice
24    date -- the notice date, according to them, is on each of those
25    accounts.  But certainly by the time we got tracing
```

1   information, which is what we asked for, there was no Bitcoin

2   in those accounts; and, you know, we would be happy to show

3   that.

4          THE COURT:  Okay.  And so what I'm hearing, if I'm

5   reading between the lines from what you're saying, it is

6   possible that there was some Bitcoin that left those accounts

7   after you got notice of the order but before you got the

8   tracing information.  That's again, I don't want to put you --

9          MS. KING:  Yes.  Let me specify.  I just don't want to

10  misrepresent anything.  It is possible.  I think unlikely but

11  possible that after receiving a spreadsheet exhibit with a

12  line, in hundreds of pages, identifying a particular account,

13  that after that moment, that there was Bitcoin in the account.

14  It's definitely not the case that after receiving tracing,

15  providing the detail to link things, that there was any Bitcoin

16  in the account.

17         And as these things go and as shown in the Tong

18  account, which we did submit publicly on the docket, what

19  typically happens is things transfer in and transfer out within

20  minutes.  So I think that's by far the more likely -- and

21  before any notice or spreadsheet arrived by email to Binance.

22         THE COURT:  And I guess from Mr. Lewis's standpoint,

23  he's saying, "Well, when you knew about the order, you should

24  have frozen all of these accounts and nothing should have

25  left --

1          MS. KING:  Yes, I think so.

2          MR. LEWIS:  Yes, Your Honor.  Again, these were not

3    thousands of pages.  Even the last of the reports, the last of

4    these listings is only 70 pages, and that is for 669 BTC.

5    These are transactions that go back into 2022 and then run all

6    the way into -- into 2023 and up to the time that they received

7    the tracing.

8          The fact of the matter is they didn't freeze any of

9    these.  It's not just about the seven or the ten.  The seven or

10   the ten just happen to be the most painful examples.  And in

11   light of this comment about the production, I'm happy to file a

12   copy of the production letter that Ms. King sent us with the

13   Court, if Your Honor wishes to see it for yourself.

14         But the condition was that again, from one of the

15   larger exchanges that still exists, that in exchange for this

16   agreement, the turnover information of that seven or eight

17   accounts, we would never make another request on behalf of the

18   class in this case.  And that's just not possible.  The

19   transactions show that they are continuing, even today, to

20   receive additional stolen BTC.

21         MS. KING:  Your Honor, I quote that the letter in

22   paragraph 24 of my declaration, we're not hiding anything about

23   that.  The sentence that Mr. Lewis is referring to is quoted

24   there.  And I responded six months later asking for

25   clarification as to what, you know, he would like to carve out,

1    and that's where we ended up -- in silence.

2            THE COURT:  Anything else from either side before we

3    recess?

4            MR. LEWIS:  I think you have a pretty good idea,

5    Your Honor.

6            MS. KING:  Thank you, Your Honor.

7            THE COURT:  All right.  Thank you all.  And I'll try

8    and get a ruling out as soon as I can.

9            MR. LEWIS:  Thank you very much.  Have a good day.

10            MS. KING:  Have a nice day.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

C E R T I F I C A T E

2

3

4          I hereby certify that the foregoing is an

5    accurate transcription of the proceedings in the

6    above-entitled matter.

7              This hearing was via Zoom and is therefore subject

8    to the technological limitations of reporting remotely.

9

10

11   DATE:  9/10/2023        /s/PATRICIA BAILEY-ENTIN
                             PATRICIA BAILEY-ENTIN, RPR, FPR
12                           Official Court Reporter
                             United States District Court
13                           Southern District of Florida

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$500,000** [2] - 38:2, 38:5
**$800,000** [1] - 16:19

## /

**/s/PATRICIA** [1] - 54:11

## 1

**1** [3] - 1:9, 6:7, 18:9
**10017** [1] - 2:3
**11,000** [2] - 26:7, 41:14
**11780** [1] - 1:20
**11:18** [1] - 1:6
**12(b** [1] - 23:12
**15** [1] - 16:5
**15th** [1] - 16:4
**16** [1] - 25:15
**16-80060-cv** [1] - 3:4
**170** [1] - 15:14

## 2

**20** [1] - 10:14
**200** [1] - 1:17
**2013** [1] - 6:14
**2014** [2] - 6:8, 26:8
**2022** [5] - 10:14, 16:5, 16:8, 16:9, 52:5
**2023** [2] - 1:5, 52:6
**20th** [1] - 44:11
**22nd** [2] - 16:8, 16:9
**24** [1] - 52:22
**29** [1] - 1:5

## 3

**3000** [1] - 1:17
**30th** [3] - 10:13, 10:14, 44:11
**33064** [1] - 1:23
**33065** [1] - 1:20
**33131** [1] - 1:18
**33134** [1] - 2:6

## 4

**4** [1] - 27:19
**400** [2] - 11:14, 12:14
**42.8** [1] - 18:7
**4400** [1] - 1:22

## 5

**565** [1] - 2:2

## 6

**6** [1] - 27:18
**600** [1] - 16:19
**65** [7] - 4:23, 5:5, 6:18, 8:20, 23:11, 43:16, 43:18
**65(d** [11] - 21:5, 21:9, 22:10, 23:20, 24:2, 33:16, 41:5, 41:11, 43:5, 46:20, 46:21
**65(d)** [2] - 23:17, 41:10
**669** [1] - 52:4
**669.7** [1] - 11:17

## 7

**70** [1] - 52:4

## 8

**810** [1] - 2:5

## 9

**9/10/2023** [1] - 54:11
**999** [1] - 2:5
**9:16-cv-80060-KAM** [1] - 1:2
**9:57** [1] - 1:6

## A

**abetted** [1] - 22:21
**abetter** [1] - 24:19
**abetters** [2] - 43:2, 43:6
**abetting** [9] - 22:9, 25:2, 29:11, 33:16, 43:9, 43:10, 43:11, 43:19, 46:8
**abettor** [1] - 24:12
**abide** [1] - 27:12
**ability** [1] - 44:16
**able** [13] - 6:25, 8:18, 9:9, 15:17, 16:14, 17:14, 18:13, 19:20, 26:20, 38:2, 38:22, 41:14, 45:25
**above-entitled** [1] - 54:6
**Abramowitz** [1] - 2:2
**absolutely** [4] - 4:7, 5:9, 49:18, 50:10
**absurd** [1] - 26:23
**accept** [3] - 14:11, 31:16, 46:9
**according** [4] - 16:8, 17:2, 41:9, 50:24

**account** [57] - 12:22, 16:2, 16:6, 16:7, 16:8, 16:11, 16:13, 16:14, 16:15, 17:1, 20:11, 24:8, 25:22, 26:4, 29:4, 30:19, 31:8, 31:10, 31:13, 31:24, 32:21, 32:22, 32:25, 33:2, 33:6, 34:11, 34:13, 34:15, 34:17, 35:22, 37:13, 37:16, 38:5, 38:13, 38:14, 38:19, 38:20, 39:13, 39:22, 40:1, 40:2, 40:4, 40:5, 40:21, 41:20, 44:13, 48:13, 49:3, 51:12, 51:13, 51:16, 51:18
**accounts** [104] - 5:19, 5:20, 9:15, 9:17, 9:19, 10:20, 10:22, 12:7, 12:9, 12:13, 12:15, 12:19, 12:20, 12:25, 14:4, 14:8, 14:23, 15:20, 16:11, 16:16, 16:25, 17:2, 17:7, 17:10, 17:11, 17:20, 17:21, 18:3, 18:5, 19:13, 19:15, 20:5, 20:10, 22:17, 24:10, 25:10, 25:11, 25:13, 25:15, 25:19, 25:21, 26:5, 27:15, 29:6, 29:7, 30:6, 30:10, 30:13, 30:14, 30:15, 30:18, 30:20, 30:25, 31:1, 31:20, 32:6, 32:23, 33:23, 34:1, 34:8, 35:2, 35:5, 35:11, 36:13, 37:3, 37:4, 37:14, 37:18, 37:23, 37:25, 39:14, 40:13, 40:14, 40:24, 41:18, 41:24, 42:1, 42:6, 44:4, 44:10, 44:18, 44:25, 45:4, 45:6, 48:9, 48:12, 48:14, 48:19, 48:22, 50:10, 50:11, 50:14, 50:17, 50:20, 50:22, 50:25, 51:2, 51:6, 51:24, 52:17
**accuracy** [3] - 24:11, 28:2, 28:4
**accurate** [5] - 9:9, 21:15, 54:5
**accurately** [1] - 15:4
**acknowledge** [1] - 42:10
**acquired** [1] - 7:7

**act** [2] - 6:3, 34:6
**acted** [1] - 49:12
**acting** [10] - 22:10, 22:22, 23:21, 24:12, 33:18, 46:8, 46:22, 46:25, 47:5, 49:25
**action** [2] - 23:7, 23:16
**active** [8] - 5:6, 29:7, 29:8, 31:10, 36:12, 43:8, 43:12, 43:25
**actively** [2] - 32:17, 44:2
**Actively** [1] - 36:10
**activities** [1] - 42:12
**activity** [1] - 30:20
**actor** [8] - 22:9, 22:11, 22:14, 22:15, 22:22, 23:21, 23:22, 29:11
**actors** [3] - 21:24, 22:1, 34:6
**actual** [3] - 26:11, 26:15, 29:17
**added** [1] - 40:23
**adding** [1] - 11:12
**additional** [15] - 11:6, 12:10, 12:20, 14:1, 14:2, 17:17, 17:19, 19:7, 32:6, 33:24, 36:15, 42:5, 48:16, 48:17, 52:20
**address** [4] - 4:2, 34:13, 39:3, 40:19
**addresses** [2] - 39:13
**addressing** [1] - 21:3
**admission** [1] - 42:4
**admit** [1] - 26:18
**admitted** [1] - 17:13
**advance** [2] - 13:8, 32:13
**advised** [1] - 37:1
**affidavit** [3] - 27:24, 28:16, 28:17
**afterwards** [1] - 44:13
**agent** [1] - 22:14
**agents** [1] - 5:7
**ago** [1] - 15:10
**agree** [9] - 9:20, 13:17, 15:12, 18:25, 19:1, 24:17, 41:17, 42:21, 42:24
**agreed** [6] - 13:10, 27:2, 28:3, 28:5, 45:12, 45:19
**agreement** [4] - 13:19, 48:24, 49:1, 52:16
**ahead** [5] - 12:16, 17:12, 22:6, 30:5, 45:22
**aided** [1] - 22:21

**aider** [2] - 24:12, 24:19
**aiders** [2] - 43:2, 43:6
**aiding** [9] - 22:9, 25:2, 29:11, 33:16, 43:9, 43:10, 43:11, 43:18, 46:7
**al** [2] - 2:2, 3:3
**albeit** [1] - 26:20
**alerting** [2] - 16:5
**alerts** [1] - 34:24
**allow** [3] - 13:8, 19:10, 20:4
**allowed** [3] - 37:6, 47:12, 47:14
**allows** [1] - 44:24
**almost** [1] - 43:15
**alone** [2] - 18:9, 26:4
**AM** [2] - 1:6
**ambit** [1] - 5:23
**amount** [3] - 38:15, 40:15, 49:6
**amounted** [1] - 12:13
**amounts** [1] - 40:18
**analysis** [10] - 4:23, 6:19, 8:2, 8:4, 8:15, 21:12, 23:10, 24:2, 25:17, 33:14
**anonymous** [4] - 26:2, 26:3, 40:2, 40:3
**answer** [1] - 45:23
**answering** [1] - 10:3
**antithetical** [1] - 24:14
**anytime** [1] - 4:15
**apart** [1] - 32:12
**apologize** [1] - 29:23
**appearances** [1] - 3:7
**APPEARANCES** [1] - 1:13
**application** [1] - 21:14
**applied** [1] - 22:11
**applies** [1] - 46:6
**apply** [1] - 6:20
**appropriate** [3] - 29:6, 29:16, 35:18
**appropriately** [1] - 34:6
**approved** [2] - 49:22, 49:23
**April** [3] - 35:3, 35:12, 42:2
**apt** [1] - 5:8
**Aquinity** [1] - 47:2
**arguing** [3] - 3:24, 12:9
**argument** [1] - 24:5
**arrived** [1] - 51:21
**article** [1] - 27:20
**articulate** [1] - 6:17

**aside** [1] - 32:19
**assert** [4] - 21:25, 23:7, 23:16, 47:9
**asserting** [1] - 47:11
**assertion** [2] - 21:5, 22:3
**assertions** [1] - 49:10
**assess** [1] - 16:22
**asset** [1] - 49:4
**assets** [23] - 10:10, 16:7, 17:1, 19:13, 25:20, 26:5, 33:22, 33:23, 35:23, 36:16, 37:4, 37:5, 38:1, 38:14, 38:20, 41:5, 41:21, 42:1, 43:18, 43:23, 44:9, 44:10, 44:17
**assist** [2] - 48:2, 49:13
**assistance** [3] - 29:8, 34:4, 36:12
**assisted** [1] - 21:23
**assisting** [5] - 22:1, 32:17, 36:10, 47:3, 47:4
**associated** [1] - 4:24
**assume** [5] - 6:24, 7:15, 8:1, 8:4, 9:2
**assuming** [1] - 8:14
**attempt** [1] - 27:6
**attempted** [1] - 18:13
**attempting** [1] - 13:21
**attest** [1] - 20:17
**attorney** [1] - 23:22
**August** [1] - 1:5
**automatic** [1] - 36:1
**Avenue** [1] - 2:2
**avoid** [2] - 35:23, 41:5
**aware** [1] - 43:13
**awful** [1] - 5:14

## B

**back-and-forth** [1] - 12:3
**background** [1] - 27:21
**bad** [13] - 21:24, 22:1, 22:9, 22:11, 22:14, 22:15, 22:21, 23:21, 23:22, 29:11, 33:17, 34:6, 49:25
**BAILEY** [3] - 2:10, 54:11, 54:11
**BAILEY-ENTIN** [3] - 2:10, 54:11, 54:11
**ball** [1] - 13:9
**bank** [2] - 41:7
**Bar** [1] - 42:16
**based** [5] - 22:3, 29:4,

35:6, 47:11, 48:7
**bases** [1] - 26:4
**basic** [1] - 24:14
**basis** [2] - 22:2, 47:14
**BEACH** [1] - 1:2
**Beach** [2] - 1:4, 6:4
**becomes** [1] - 8:20
**BEFORE** [1] - 1:11
**beginning** [1] - 36:17
**begun** [1] - 48:13
**behalf** [6] - 1:4, 3:10, 3:14, 3:17, 13:19, 52:17
**behavior** [1] - 46:10
**BELL** [1] - 3:16
**Bell** [4] - 2:4, 2:4, 3:16
**belong** [1] - 30:25
**Berman** [1] - 38:5
**between** [9] - 3:4, 9:4, 9:22, 10:13, 16:19, 22:18, 44:11, 47:10, 51:5
**beyond** [2] - 6:10, 41:9, 43:21
**Bi** [1] - 6:13
**Bi-Tech** [1] - 6:13
**Bieda** [1] - 19:13
**Bieda's** [1] - 38:25
**big** [1] - 39:15
**Binance** [90] - 3:5, 3:6, 3:17, 3:19, 3:24, 4:2, 4:13, 4:25, 5:11, 7:1, 7:4, 7:6, 7:9, 7:10, 7:13, 7:17, 8:18, 9:3, 9:5, 9:6, 10:9, 10:12, 10:19, 11:4, 11:8, 11:12, 11:13, 11:16, 11:18, 13:3, 15:2, 15:6, 15:19, 16:4, 16:25, 17:6, 19:9, 19:14, 19:17, 19:20, 19:22, 19:25, 20:5, 20:6, 20:20, 21:10, 21:13, 21:23, 22:1, 22:18, 22:25, 23:4, 24:18, 25:2, 25:7, 25:22, 26:2, 26:4, 26:21, 30:22, 33:17, 33:24, 34:5, 36:12, 38:6, 38:13, 38:19, 40:20, 41:12, 41:19, 41:20, 42:9, 42:11, 42:13, 42:15, 42:22, 44:7, 45:4, 45:12, 45:14, 45:21, 45:23, 46:15, 47:12, 47:13, 48:6, 51:21
**Binance's** [11] - 5:14, 5:15, 10:5, 10:18, 11:3, 11:6, 15:5,

17:3, 41:4, 46:2, 49:11
**Biscayne** [1] - 1:17
**bit** [5] - 11:9, 15:1, 31:14, 39:1, 47:11
**Bitcoin** [47] - 5:9, 5:10, 5:13, 9:11, 9:16, 9:18, 9:24, 10:18, 11:3, 12:7, 12:11, 12:21, 13:10, 17:21, 18:2, 19:16, 26:3, 26:7, 30:11, 30:14, 30:15, 30:24, 33:2, 33:21, 34:7, 34:16, 36:21, 38:2, 38:14, 38:16, 39:11, 39:14, 40:6, 41:19, 44:3, 44:25, 45:4, 47:11, 47:12, 48:9, 50:14, 51:1, 51:6, 51:13, 51:15
**Bitcoins** [3] - 9:10, 33:25, 50:16
**black** [1] - 23:5
**blast** [1] - 24:7
**blind** [1] - 42:11
**blockchain** [1] - 39:19
**borne** [1] - 27:4
**bottom** [1] - 37:7
**Boulevard** [2] - 1:17, 2:5
**boundaries** [1] - 6:11
**box** [1] - 32:9
**BRANDON** [1] - 1:4
**brief** [4] - 4:11, 23:8, 27:18, 46:13
**bring** [1] - 5:22
**bringing** [1] - 6:20
**brought** [1] - 46:18
**BTC** [25] - 11:15, 11:17, 12:14, 16:20, 17:9, 18:7, 18:8, 18:10, 25:13, 25:15, 25:17, 25:18, 25:20, 36:24, 37:1, 37:9, 37:10, 38:3, 38:4, 40:15, 40:23, 41:15, 52:4, 52:20
**bullied** [1] - 49:9
**bunch** [2] - 10:25, 50:2
**burden** [8] - 9:17, 9:24, 26:16, 26:24, 28:4, 46:7, 46:19, 47:21
**burdened** [1] - 47:19
**burdensome** [2] - 49:2, 49:6
**business** [7] - 7:4, 7:11, 8:6, 31:10,

33:3, 33:4, 42:15
**businesses** [1] - 33:1
**BY** [1] - 2:9

## C

**California** [1] - 42:16
**camera** [1] - 34:24
**cannot** [6] - 5:11, 14:22, 17:6, 25:20, 30:22
**capture** [1] - 16:3
**card** [1] - 39:17
**care** [1] - 11:23
**carve** [2] - 32:6, 52:25
**case** [25] - 3:2, 3:3, 5:16, 5:17, 5:18, 9:3, 10:15, 21:20, 21:21, 22:16, 23:23, 27:9, 27:16, 30:19, 34:20, 35:1, 35:2, 35:6, 35:10, 35:24, 44:21, 43:20, 47:2, 51:14, 52:18
**CASE** [1] - 1:2
**cases** [20] - 4:25, 5:1, 5:24, 5:25, 6:5, 6:16, 6:17, 22:12, 23:2, 23:3, 23:13, 23:15, 23:18, 23:25, 27:1, 27:6, 27:10, 40:17, 47:1
**certain** [4] - 10:8, 12:6, 15:15, 29:6
**certainly** [5] - 20:25, 35:6, 37:4, 50:16, 50:25
**certify** [1] - 54:4
**CFTC** [3] - 7:11, 42:8, 42:10
**change** [1] - 33:13
**characterizing** [1] - 36:4
**chronology** [11] - 9:5, 9:21, 10:2, 10:6, 13:2, 13:3, 15:1, 15:5, 17:3, 29:14, 34:4
**Circuit** [1] - 6:15
**citations** [1] - 28:22
**cite** [1] - 27:17
**cited** [6] - 4:25, 5:16, 22:12, 23:8, 47:1, 47:24
**cites** [1] - 27:20
**claiming** [1] - 27:3
**clarification** [1] - 52:25
**clarify** [2] - 32:7, 46:19
**class** [2] - 13:19,

52:18
**Class** [1] - 3:14
**clear** [9] - 5:11, 14:20, 17:15, 35:7, 36:16, 40:1, 46:5, 47:2, 47:24
**clearly** [4] - 14:23, 32:12, 35:10, 49:25
**client** [3] - 9:4, 20:15, 49:22
**clients'** [4] - 9:15, 9:17, 9:19, 10:20
**close** [2] - 22:20, 23:19, 23:21
**closely** [2] - 22:14, 25:3
**Co** [1] - 6:13
**coin** [3] - 19:14, 20:1, 20:4
**coins** [2] - 11:25, 42:7
**colleagues** [1] - 3:11
**collect** [1] - 13:18
**column** [6] - 39:10, 39:11, 39:21, 39:22, 40:2, 40:5
**combinations** [1] - 39:12
**coming** [2] - 32:3, 32:16, 36:9
**comment** [1] - 52:11
**commerce** [1] - 7:10
**committing** [1] - 22:22
**common** [1] - 47:23
**communications** [1] - 35:20
**company** [1] - 12:4
**complain** [2] - 11:10, 32:13
**complaint** [2] - 5:2, 15:8
**completely** [3] - 5:3, 23:23, 34:22
**compliance** [1] - 35:23
**complicated** [2] - 13:14, 26:13
**comply** [10] - 8:21, 11:21, 14:5, 15:16, 17:7, 17:18, 18:12, 28:18, 42:23, 45:7
**compromise** [3] - 31:11, 31:14, 50:2
**concept** [7] - 7:2, 25:23, 26:12, 27:19, 28:23, 43:2
**concerned** [2] - 40:22, 44:5
**concert** [13] - 5:6, 22:10, 22:23, 23:21, 24:12, 33:18, 43:8,

43:12, 44:1, 46:8, 46:22, 47:1, 47:5
**conclude** [1] - 24:18
**condition** [2] - 45:25, 52:14
**conduct** [1] - 49:13
**confidentially** [1] - 48:20
**confirm** [1] - 10:16
**confirmed** [1] - 16:13
**confirming** [3] - 7:9, 13:13, 19:25
**conflate** [1] - 14:6
**conflating** [1] - 10:6
**confusing** [1] - 11:9
**connection** [1] - 22:18
**consistently** [1] - 25:7
**conspiring** [1] - 34:5
**constant** [2] - 29:14, 34:4
**constitutional** [3] - 21:7, 24:3, 24:15
**Construction** [1] - 6:13
**contact** [3] - 15:7, 15:20, 15:21
**contacts** [2] - 4:13, 24:25
**contained** [1] - 12:11
**contempt** [15] - 3:6, 3:23, 4:3, 6:9, 14:16, 17:14, 17:19, 27:10, 27:12, 27:17, 36:17, 41:2, 48:4, 49:1, 49:19
**contemptible** [1] - 46:10
**context** [10] - 4:20, 7:17, 8:7, 8:17, 22:4, 27:6, 27:10, 27:17, 41:8, 41:11
**continued** [1] - 11:12
**continuing** [1] - 52:19
**continuous** [1] - 50:3
**continuously** [1] - 49:9
**contrary** [2] - 19:18, 25:6
**controlled** [1] - 23:24
**conversation** [1] - 36:25
**cooperate** [1] - 13:5
**copy** [1] - 52:12
**Coral** [3] - 1:20, 2:6, 3:17
**corporation** [1] - 1:8
**correct** [4] - 24:23, 25:12, 41:4, 42:13
**correctly** [1] - 49:15
**counsel** [5] - 3:7,

3:19, 15:21, 35:17, 49:14
**COURT** [68] - 1:1, 3:2, 3:15, 3:22, 4:6, 4:8, 5:24, 6:16, 6:24, 7:15, 7:21, 7:24, 8:1, 8:14, 8:22, 8:24, 9:1, 17:12, 17:20, 18:1, 18:11, 20:23, 22:6, 23:2, 23:10, 24:17, 24:22, 24:24, 27:5, 28:13, 28:15, 29:19, 29:23, 29:25, 30:3, 30:6, 30:9, 32:21, 33:7, 34:7, 36:5, 36:7, 36:19, 37:22, 38:9, 38:24, 39:5, 39:21, 39:25, 40:10, 40:12, 42:24, 44:3, 44:22, 45:10, 45:16, 45:22, 48:8, 48:21, 49:15, 49:19, 50:5, 50:8, 50:13, 51:4, 51:22, 53:2, 53:7
**court** [4] - 23:7, 24:1, 24:13, 35:18
**Court** [20] - 2:10, 2:11, 3:1, 4:2, 4:18, 6:11, 15:8, 15:20, 15:24, 21:2, 21:19, 22:25, 24:6, 28:8, 29:1, 41:7, 43:2, 52:13, 54:12, 54:12
**court's** [2] - 43:22, 43:23
**Court's** [6] - 4:4, 5:23, 6:9, 7:14, 12:18, 41:16
**courts** [1] - 5:18
**cover** [2] - 32:1, 32:11
**Cozen** [2] - 1:16, 3:10
**credit** [2] - 20:17, 39:17
**crypto** [2] - 26:12, 30:18
**cryptocurrency** [1] - 26:10
**CRYPSY** [1] - 1:7
**currencies** [2] - 25:11, 26:10
**current** [1] - 49:4
**customary** [1] - 26:9
**customer** [6] - 15:22, 28:5, 30:14, 30:23, 33:6, 35:14
**Customer** [1] - 26:5
**customers** [3] - 15:7, 15:19, 15:20
**customers'** [2] - 24:11, 27:15

**cut** [1] - 4:8

**D**

**d/b/a** [1] - 1:7
**damage** [1] - 33:6
**dance** [1] - 19:23
**data** [2] - 26:14, 47:9
**date** [6] - 17:8, 39:3, 39:20, 40:14, 50:24
**DATE** [1] - 54:11
**dates** [1] - 45:24
**David** [2] - 1:19, 3:13
**De** [2] - 2:5
**deal** [2] - 13:13, 22:13
**dealing** [5] - 5:1, 5:4, 10:9, 23:11
**decide** [3] - 8:17, 19:5, 33:9
**decided** [6] - 11:20, 12:3, 12:17, 15:6, 17:17, 20:20
**decision** [4] - 6:14, 6:15, 8:5, 41:17
**decisions** [3] - 6:8, 6:22, 19:3
**declaration** [11] - 19:12, 19:18, 19:23, 20:14, 25:16, 28:20, 28:21, 35:8, 39:1, 44:21, 52:22
**declarations** [1] - 28:18
**defeats** [1] - 34:5
**defend** [2] - 17:6, 48:3
**defendant** [2] - 6:21, 23:24
**Defendants** [1] - 1:9
**DEFENDANTS** [1] - 2:1
**defenses** [1] - 29:9
**definitely** [3] - 21:4, 22:2, 51:14
**definitional** [1] - 43:15
**delay** [1] - 32:14
**demanded** [1] - 12:2
**deny** [1] - 17:10
**deposit** [1] - 43:19
**depositing** [1] - 41:5
**deposits** [2] - 11:6, 49:5
**description** [1] - 9:21
**descriptions** [1] - 9:8
**detail** [3] - 26:6, 26:9, 51:15
**details** [1] - 11:2
**determination** [2] - 7:17, 8:8
**developed** [1] - 12:5
**Developers** [2] - 5:17,

6:12
**dictates** [1] - 6:3
**difference** [1] - 24:25
**different** [12] - 4:23, 5:3, 10:6, 10:7, 11:10, 11:11, 23:10, 26:13, 26:14, 30:21, 40:18
**differently** [1] - 43:7
**disagree** [5] - 9:21, 10:1, 20:25, 21:5, 42:25
**disclosed** [1] - 31:5
**discussed** [1] - 22:13
**discussion** [1] - 7:16
**dismiss** [3] - 5:2, 6:20, 23:12
**dispensed** [1] - 30:24
**dispute** [13] - 9:4, 9:23, 11:8, 11:18, 11:19, 14:20, 14:22, 18:17, 21:11, 22:3, 22:9, 29:12, 29:17
**disputed** [1] - 34:10
**disputes** [2] - 31:22, 31:25
**disregard** [1] - 4:4
**dissipating** [1] - 41:22
**District** [7] - 2:11, 2:11, 4:15, 6:13, 7:18, 54:12, 54:13
**DISTRICT** [3] - 1:1, 1:1, 1:12
**divergence** [1] - 13:23
**DIVISION** [1] - 1:2
**docket** [1] - 51:18
**Docket** [1] - 15:14
**document** [1] - 10:24
**documents** [2] - 38:18, 38:21
**done** [8] - 12:8, 15:13, 15:25, 17:7, 32:8, 41:1, 41:20, 45:17
**door** [1] - 23:16
**doubt** [1] - 28:4
**down** [5] - 12:19, 12:23, 12:24, 16:6, 41:24
**downstream** [1] - 26:1
**during** [1] - 34:18

**E**

**easily** [1] - 32:8
**effect** [4] - 5:10, 7:10, 13:5, 16:1
**efforts** [1] - 11:16
**eight** [7] - 26:20, 28:10, 31:20, 32:15, 48:14, 50:11, 52:16

**either** [3] - 4:14, 4:21, 53:2
**elementary** [1] - 47:23
**Eleventh** [1] - 6:15
**email** [5] - 24:7, 31:23, 34:21, 36:1, 51:21
**emptied** [2] - 44:13, 44:17
**empty** [2] - 17:1, 44:14
**end** [4] - 28:6, 30:25, 36:16, 36:25
**ended** [1] - 53:1
**enforce** [3] - 8:18, 23:4, 27:8
**enforcement** [3] - 21:23, 27:1, 34:25
**engage** [1] - 47:14
**engagement** [2] - 46:10, 49:7
**engagement** [1] - 29:8
**English** [1] - 36:11
**enjoined** [1] - 47:3
**enormous** [2] - 48:2, 48:3
**ensure** [1] - 28:2
**ENTIN** [3] - 2:10, 54:11, 54:11
**entire** [2] - 33:3, 33:5
**entitled** [2] - 48:17, 54:6
**entity** [5] - 4:16, 4:18, 6:1, 6:5, 21:10
**equivalent** [2] - 37:1, 37:10, 40:25
**error** [1] - 35:15
**Esq** [8] - 1:15, 1:15, 1:16, 1:19, 1:21, 2:1, 2:1, 2:4
**essentially** [2] - 22:14, 26:2
**establish** [1] - 47:3
**establishing** [1] - 45:5
**et** [2] - 2:2, 3:3
**evidence** [20] - 8:17, 15:11, 15:17, 16:1, 20:3, 20:15, 20:21, 29:11, 33:15, 33:22, 42:22, 44:14, 44:20, 44:21, 44:23, 45:3, 45:5, 45:8, 46:1
**evidentiary** [21] - 8:7, 8:13, 18:23, 19:11, 20:20, 27:25, 33:9, 33:12, 44:7, 44:22, 45:3, 45:13, 45:19, 46:2, 46:5, 46:11, 46:14, 46:19, 47:25, 48:4, 48:19
**exactly** [2] - 17:24, 29:5

examples [2] - 27:20, 52:10
exception [3] - 22:5, 22:7, 22:11
excess [1] - 18:9
exchange [22] - 5:8, 5:14, 5:15, 10:18, 11:3, 11:7, 11:25, 12:18, 12:19, 14:24, 20:11, 31:4, 31:5, 37:14, 37:16, 37:23, 38:12, 39:2, 39:10, 41:13, 52:15
exchanged [1] - 9:22
exchanges [10] - 13:20, 18:20, 30:19, 30:21, 31:6, 32:24, 38:9, 38:10, 38:11, 52:15
excuse [1] - 27:13
exempt [1] - 37:18
exert [1] - 22:25
Exhibit [1] - 38:25
exhibit [2] - 40:9, 51:11
exhibits [1] - 10:16
exist [1] - 13:20
existed [2] - 41:13, 50:17
existence [1] - 22:19
exists [2] - 50:17, 52:15
expecting [1] - 10:19
expended [2] - 26:22, 48:2
expert [4] - 26:18, 26:21, 26:22, 27:22
expert's [2] - 27:24, 28:16
explain [6] - 4:22, 10:3, 18:24, 30:9, 42:8, 50:1
explained [3] - 29:5, 31:2, 31:3
explanation [1] - 40:12
explanations [1] - 25:8
expressly [1] - 45:20
extend [4] - 5:5, 42:25, 43:3, 43:18
extends [1] - 6:10
extent [1] - 38:12
extra [1] - 28:4
extreme [1] - 24:6
extremely [1] - 46:12
eye [1] - 42:11

**F**

facilitate [1] - 42:12
facilitating [2] - 5:9, 43:14
fact [27] - 7:6, 8:10, 9:4, 12:10, 14:21, 15:2, 15:9, 15:14, 16:6, 16:10, 20:5, 20:17, 22:2, 24:5, 27:2, 28:3, 29:11, 29:15, 33:1, 35:4, 37:17, 41:25, 42:21, 43:24, 46:23, 48:11, 52:8
facts [6] - 9:3, 21:1, 24:18, 27:4, 29:14, 34:4
factual [1] - 21:16
failed [5] - 14:2, 14:3, 14:22, 20:2
failing [1] - 27:12
fails [1] - 32:18
failure [1] - 30:10
faith [10] - 15:7, 15:10, 15:18, 16:1, 16:18, 32:12, 48:25, 49:1, 49:12, 49:25
falls [1] - 22:9
false [1] - 42:17
far [5] - 10:15, 44:4, 44:5, 51:20
faulty [1] - 34:3
Federal [1] - 1:22
federal [1] - 7:7
fell [1] - 32:12
Fenying [1] - 15:22
few [3] - 27:17, 36:6, 49:6
Field [26] - 3:5, 3:6, 3:10, 3:24, 3:25, 10:12, 10:16, 15:21, 17:9, 22:12, 22:20, 25:8, 25:10, 25:14, 29:5, 29:8, 31:6, 31:12, 32:17, 34:9, 35:14, 36:4, 46:7, 46:18, 48:3, 48:16
Field's [1] - 24:5
fields [1] - 26:14
Fifth [1] - 2:2
figure [4] - 9:15, 9:24, 18:16, 31:7
file [2] - 34:15, 52:11
filed [2] - 49:19, 50:6
final [2] - 14:25, 42:19
finally [2] - 12:3, 13:14
financial [7] - 24:9, 26:14, 27:13, 46:23, 47:6, 47:19, 48:6

fine [2] - 13:8, 47:9
finish [2] - 7:21, 7:24
finished [1] - 11:15
firm [5] - 3:17, 19:14, 20:1, 20:4
first [11] - 10:5, 15:23, 21:4, 23:1, 23:6, 36:8, 39:10, 40:4
firsthand [3] - 19:19, 20:16, 20:17
fits [1] - 17:5
FL [4] - 1:18, 1:20, 1:23, 2:6
flipped [1] - 21:24
floating [1] - 25:24
FLORIDA [1] - 1:1
Florida [9] - 1:4, 1:8, 2:11, 4:15, 6:4, 6:14, 7:18, 41:8, 54:13
follow [1] - 50:3
follow-ons [1] - 50:3
following [1] - 13:9
Footnote [1] - 27:18
FOR [2] - 1:15, 2:1
foregoing [1] - 54:4
foreign [1] - 24:9
forget [1] - 24:19
forgive [1] - 39:8
form [2] - 37:8, 37:9
formal [2] - 14:14, 14:15
forth [3] - 10:2, 12:3, 25:25
forward [14] - 15:11, 16:21, 19:22, 19:24, 20:2, 20:20, 44:14, 44:16, 44:19, 44:20, 45:3, 45:5, 45:8
founded [1] - 21:7
four [1] - 40:18
FPR [2] - 2:10, 54:11
framework [1] - 33:19
frankly [11] - 5:7, 14:16, 15:1, 17:5, 18:19, 19:8, 37:15, 41:1, 43:11, 44:15, 48:6
fraud [6] - 22:19, 22:22, 26:11, 26:15, 47:13, 47:22
fraudster [1] - 22:23
freeze [40] - 5:20, 12:9, 12:16, 12:25, 14:3, 14:22, 17:3, 17:6, 17:21, 17:22, 18:1, 20:13, 24:9, 26:5, 26:17, 27:15, 29:6, 30:7, 30:9, 30:10, 31:4, 31:9, 32:22, 33:5, 35:17,

36:13, 36:14, 37:6, 38:7, 38:15, 38:20, 41:21, 42:1, 42:3, 42:5, 44:12, 47:16, 52:8
freezes [2] - 29:4, 33:21
freezing [4] - 10:10, 16:25, 37:19, 40:22
front [1] - 20:21
froze [6] - 17:20, 30:16, 35:6, 35:22, 40:24, 45:6
frozen [16] - 15:21, 16:9, 16:11, 25:13, 32:24, 35:2, 35:12, 37:3, 37:23, 37:25, 38:11, 38:13, 40:24, 45:1, 48:9, 51:24
FTC [4] - 6:14, 23:19, 23:23, 47:2
full [2] - 32:9, 40:9
Fund [2] - 5:18, 6:7
funds [6] - 5:21, 5:22, 26:11, 43:15, 46:24

**G**

Gables [2] - 2:6, 3:17
games [1] - 15:2
gather [2] - 49:2
gathered [1] - 50:9
gathering [1] - 49:16
generated [1] - 20:1
geographic [2] - 6:9, 6:10
given [6] - 11:4, 12:15, 14:7, 31:12, 42:20, 45:25
goalpost [1] - 50:19
good-faith [6] - 15:7, 15:10, 15:18, 16:1, 16:18, 32:12
government [1] - 7:8
great [1] - 33:6
Group [1] - 1:19
Guarini [1] - 21:20
guess [3] - 15:6, 37:15, 51:22
gutted [1] - 21:6

**H**

handling [1] - 3:20
happy [2] - 23:8, 42:15, 47:25, 48:15, 48:18, 51:2, 52:11
hard [2] - 14:18, 39:1
hash [6] - 16:14, 18:21, 20:7, 25:23,

25:25, 39:3
hashes [7] - 10:17, 10:23, 11:2, 11:20, 19:16, 19:20, 26:23
hear [6] - 7:3, 18:11, 18:14, 18:23, 21:13, 41:16
hearing [2] - 3:20, 8:7, 8:13, 18:23, 19:9, 19:11, 20:20, 27:25, 33:9, 33:12, 44:23, 45:3, 45:19, 45:24, 46:1, 46:2, 46:5, 47:25, 48:4, 49:15, 51:4, 54:7
HEARING [1] - 1:11
held [1] - 27:12
help [2] - 17:16, 19:8
Henry [2] - 2:4, 3:16
hereby [1] - 54:4
hiding [1] - 52:22
high [4] - 30:20, 32:25, 37:18, 46:12
high-volume [1] - 30:20, 32:25, 37:18
higher [1] - 43:11
hinges [1] - 28:24
hired [1] - 26:22
hold [2] - 17:14, 29:20
holders [1] - 17:1
holdings [2] - 34:12, 49:4
Honor [56] - 3:9, 4:1, 4:7, 4:22, 5:17, 7:25, 8:9, 8:10, 8:12, 8:19, 10:1, 10:23, 15:10, 15:24, 16:21, 16:22, 17:13, 17:24, 18:4, 19:10, 20:19, 20:21, 20:25, 23:14, 23:18, 25:1, 25:4, 27:24, 28:3, 30:17, 34:23, 36:6, 36:24, 37:21, 38:18, 39:8, 39:24, 42:19, 43:5, 44:6, 44:15, 45:2, 45:12, 45:15, 45:21, 46:4, 46:13, 47:24, 48:15, 48:18, 48:20, 52:2, 52:13, 52:21, 53:5, 53:6
Honor's [9] - 12:1, 15:14, 15:16, 18:8, 21:4, 35:15, 35:24, 42:23, 45:25
HONORABLE [1] - 1:11
hoops [2] - 17:19, 36:15
hopefully [1] - 29:25

**hours** [2] - 32:10, 49:23
**HPC** [4] - 5:18, 6:7, 23:19, 23:22
**huge** [1] - 26:16
**hundreds** [1] - 51:12
**hunting** [1] - 13:25
**Hwy** [1] - 1:22

## I

**ID** [4] - 39:3, 39:16, 39:18, 40:4
**idea** [3] - 22:10, 26:14, 53:4
**identified** [3] - 19:15, 38:16, 41:19
**identifies** [1] - 39:10
**identify** [2] - 20:5, 25:25
**identifying** [3] - 10:17, 14:8, 51:12
**illegal** [1] - 42:12
**imagine** [1] - 5:7
**immediately** [2] - 38:2, 44:18
**important** [2] - 28:5, 48:5
**impose** [6] - 4:19, 6:4, 6:25, 7:19, 9:2, 17:17
**imposed** [2] - 4:3, 14:1
**imposing** [1] - 11:22
**Inc** [1] - 3:3
**INC** [1] - 1:7
**include** [2] - 12:1, 47:17
**included** [1] - 19:12
**includes** [2] - 40:14, 40:15
**including** [2] - 27:1, 47:1
**inconsistent** [1] - 6:3
**Indemnity** [2] - 5:17, 6:12
**indicates** [1] - 39:2
**indicating** [2] - 16:18, 42:22
**individual** [3] - 1:8, 30:14, 30:23
**individually** [1] - 1:4
**individuals** [1] - 18:24
**informally** [1] - 13:6
**information** [61] - 9:7, 9:8, 9:22, 10:8, 10:21, 10:22, 11:4, 11:5, 12:5, 12:10, 13:1, 13:7, 13:16, 13:17, 13:21, 14:18,

14:19, 15:23, 15:24, 16:16, 16:17, 17:16, 18:14, 18:17, 18:18, 19:1, 19:3, 19:17, 19:20, 20:1, 20:4, 20:5, 20:7, 20:9, 20:13, 25:8, 25:9, 26:19, 27:7, 27:14, 29:4, 31:11, 31:13, 31:20, 31:24, 33:4, 35:4, 40:19, 47:15, 48:17, 49:3, 49:6, 49:8, 49:16, 49:20, 50:3, 50:8, 50:13, 51:1, 51:8, 52:16
**injunction** [13] - 4:4, 4:16, 4:17, 4:19, 6:2, 6:3, 9:14, 9:16, 10:10, 27:8, 27:12, 33:20, 35:24
**injunctions** [1] - 5:5
**innocence** [1] - 46:16
**innocent** [1] - 15:13
**instead** [7] - 11:21, 15:6, 15:19, 32:9, 35:15, 47:15, 48:24
**institution** [4] - 24:9, 26:15, 26:25, 47:19
**institutional** [2] - 46:24, 47:6
**institutions** [1] - 48:7
**instructed** [1] - 15:20
**instructing** [2] - 15:19, 17:1
**intent** [1] - 47:4
**interaction** [1] - 29:15
**Interactive** [1] - 47:2
**interested** [1] - 9:13
**interesting** [1] - 11:21, 16:24
**intermediary** [1] - 31:1
**internal** [1] - 39:19
**interpret** [1] - 6:22
**interrupt** [3] - 4:6, 27:5, 36:19
**intricacies** [1] - 18:20
**invest** [1] - 48:5
**invested** [1] - 49:7
**investigation** [1] - 47:20
**INVESTORS** [1] - 1:7
**Investors** [1] - 3:3
**involve** [3] - 23:19, 36:12, 41:11
**involved** [6] - 10:22, 16:18, 20:12, 23:22, 23:23, 47:5
**involving** [1] - 40:18
**irony** [1] - 21:21
**issue** [11] - 4:12, 23:7,

29:6, 30:23, 31:3, 32:19, 32:20, 34:12, 34:25, 35:18, 42:24
**issued** [1] - 12:25, 31:15
**issues** [1] - 10:4, 10:7
**itself** [7] - 14:20, 19:25, 33:20, 34:3, 34:5, 46:23, 47:13

## J

**John** [2] - 1:15, 3:11
**Judge** [3] - 3:13, 3:16, 6:8
**JUDGE** [1] - 1:12
**judges** [1] - 21:18
**judgment** [1] - 13:22
**judicial** [1] - 8:12
**jumped** [2] - 17:18, 36:14
**junction** [1] - 33:25
**June** [1] - 36:17
**juris** [1] - 21:7
**jurisdiction** [42] - 4:12, 4:18, 4:21, 4:24, 5:1, 5:3, 5:23, 6:19, 6:25, 21:3, 21:6, 21:9, 21:12, 21:13, 21:15, 21:17, 21:20, 21:22, 21:25, 22:3, 22:24, 23:4, 23:6, 23:15, 23:20, 24:1, 24:3, 24:13, 25:4, 25:18, 32:19, 33:14, 33:15, 33:16, 41:4, 41:6, 41:8, 43:1, 43:3, 46:9, 46:21, 49:12
**jurisdictional** [3] - 4:23, 29:9, 42:24
**justifies** [1] - 42:20
**justify** [1] - 33:2

## K

**Kapp** [2] - 1:16, 3:12
**Kara** [2] - 1:16, 3:12
**Karen** [2] - 2:1, 3:18
**keep** [1] - 50:19
**KENNETH** [1] - 1:11
**kept** [1] - 11:12
**kind** [6] - 9:20, 11:20, 18:8, 23:16, 27:25, 50:7
**King** [19] - 2:1, 3:18, 3:19, 13:12, 16:10, 18:11, 19:19, 20:16, 20:24, 36:8, 36:25, 37:10, 40:10, 41:9,

41:16, 42:13, 42:20, 42:25, 52:12
**KING** [37] - 20:25, 22:8, 23:5, 23:13, 24:21, 24:23, 25:1, 27:16, 28:14, 28:21, 29:22, 29:24, 30:1, 30:5, 30:8, 30:13, 32:23, 33:11, 34:9, 40:1, 40:7, 40:9, 40:11, 45:15, 46:4, 48:12, 48:24, 49:18, 49:21, 50:6, 50:10, 50:16, 51:9, 52:1, 52:21, 53:6, 53:10
**King's** [1] - 44:20
**knowing** [3] - 9:13, 19:10, 45:13
**knowingly** [1] - 14:3, 47:3, 47:4
**knowledge** [3] - 19:19, 20:16, 20:18
**known** [1] - 15:2
**KYC** [3] - 13:1, 13:4, 49:3

## L

**labeled** [1] - 24:12
**lack** [3] - 5:2, 24:24, 44:23
**laid** [1] - 9:5
**language** [2] - 5:8, 31:22
**larger** [1] - 52:15
**largest** [1] - 13:20
**last** [8] - 28:7, 29:15, 32:17, 36:10, 42:1, 52:3
**launder** [1] - 37:15, 42:7
**laundering** [2] - 5:10, 37:5
**Law** [1] - 1:19
**law** [5] - 5:16, 21:23, 23:6, 27:1, 34:24
**lawyer** [4] - 13:18, 19:22, 20:15, 42:16
**lawyers** [1] - 24:7
**layer** [1] - 25:17
**layers** [1] - 34:2
**lead** [1] - 3:19
**least** [4] - 5:13, 10:13, 38:15, 42:9
**leave** [1] - 38:4
**left** [5] - 25:13, 39:21, 45:7, 51:6, 51:25
**legal** [1] - 33:14
**LEIDEL** [1] - 1:4
**Leidel** [1] - 3:3

**Leon** [1] - 2:5
**Leshin** [1] - 6:14
**less** [1] - 11:14
**letter** [9] - 13:13, 13:14, 13:15, 23:6, 32:2, 32:11, 49:21, 52:12, 52:21
**letters** [1] - 39:12
**Lewis** [13] - 1:15, 3:9, 21:1, 21:5, 23:10, 23:18, 25:12, 28:15, 31:15, 35:4, 35:20, 47:7, 52:23
**LEWIS** [39] - 3:9, 4:1, 4:7, 4:22, 6:7, 6:22, 7:2, 7:20, 7:22, 7:25, 8:9, 8:19, 8:23, 8:25, 10:1, 17:13, 17:24, 18:4, 19:7, 36:6, 36:8, 36:23, 37:25, 38:12, 38:25, 39:8, 39:24, 40:3, 40:8, 40:13, 43:5, 44:6, 45:2, 45:11, 45:21, 45:23, 52:2, 53:4, 53:9
**Lewis's** [2] - 35:16, 51:22
**license** [1] - 42:17
**lies** [1] - 29:17
**light** [1] - 52:11
**Lighthouse** [1] - 1:23
**likely** [1] - 51:20
**limitation** [1] - 41:10
**limitations** [1] - 54:8
**Limited** [1] - 3:11
**line** [5] - 32:1, 32:4, 47:9, 47:16, 51:12
**lines** [4] - 24:8, 26:23, 47:18, 51:5
**link** [2] - 26:1, 51:15
**linking** [1] - 26:6
**list** [1] - 40:14
**listed** [1] - 35:5
**listen** [2] - 19:4, 43:22
**listings** [1] - 52:4
**litigating** [1] - 35:18
**litigation** [1] - 5:21
**location** [1] - 10:17
**look** [7] - 6:16, 6:19, 11:9, 14:11, 16:22, 38:19, 40:21
**looked** [1] - 10:23
**looking** [1] - 13:1
**looks** [1] - 10:24
**lose** [2] - 18:8, 42:17
**losing** [1] - 39:5
**loss** [1] - 50:7
**lost** [1] - 29:23
**LP** [1] - 6:7

## M

**maintain** [2] - 46:4, 46:20
**major** [1] - 36:11
**Marc** [2] - 1:21, 3:14
**March** [5] - 10:13, 10:14, 42:2, 44:11
**marks** [1] - 7:10
**Marra** [1] - 3:4
**MARRA** [1] - 1:11
**Mary** [2] - 2:1, 3:18
**match** [1] - 36:3
**matter** [13] - 6:1, 7:6, 14:21, 23:1, 34:22, 35:22, 41:25, 42:22, 48:5, 52:8, 54:6
**mean** [3] - 4:8, 6:22, 17:13
**means** [3] - 18:24, 27:21, 45:14
**meant** [2] - 31:21, 50:2
**meet** [1] - 46:18
**meeting** [1] - 46:14
**merchant** [6] - 12:22, 30:19, 31:8, 32:21, 32:25, 37:13
**mere** [2] - 5:21, 32:10
**merely** [1] - 25:25
**message** [1] - 16:4
**met** [1] - 22:15
**Miami** [1] - 1:18
**middle** [2] - 39:15
**might** [7] - 4:14, 4:20, 12:10, 14:15, 19:8, 30:11
**million** [1] - 18:9
**mind** [3] - 15:8, 16:5, 29:20
**minimal** [1] - 41:11
**minutes** [1] - 51:20
**misrepresent** [1] - 51:10
**mix** [1] - 35:10
**mix-up** [1] - 35:10
**moment** [2] - 38:23, 51:13
**money** [3] - 34:19, 37:6, 37:15
**months** [5] - 20:8, 26:20, 28:10, 32:15, 52:24
**morning** [8] - 3:2, 3:9, 3:13, 3:15, 3:16, 3:21, 3:22, 4:1
**Morvillo** [1] - 2:2
**most** [1] - 52:10
**motion** [17] - 3:5, 3:23, 6:20, 23:12,

28:19, 28:23, 29:10, 32:13, 32:18, 34:3, 36:17, 41:2, 46:18, 49:1, 49:9, 49:19, 50:6
**motions** [1] - 5:2
**move** [5] - 5:13, 8:3, 9:1, 34:19, 35:23
**moved** [5] - 5:14, 11:3, 44:9, 44:10, 44:25
**movement** [1] - 34:17
**moving** [3] - 8:10, 19:12, 50:19
**MR** [40] - 3:13, 3:16, 4:1, 4:7, 4:22, 6:7, 6:22, 7:2, 7:20, 7:22, 7:25, 8:9, 8:19, 8:23, 8:25, 10:1, 17:13, 17:24, 18:4, 19:7, 36:6, 36:8, 36:23, 37:25, 38:12, 38:25, 39:8, 39:24, 40:3, 40:8, 40:13, 43:5, 44:6, 45:2, 45:11, 45:21, 45:23, 52:2, 53:4, 53:9
**MS** [38] - 3:9, 20:25, 22:8, 23:5, 23:13, 24:21, 24:23, 25:1, 27:16, 28:14, 28:21, 29:22, 29:24, 30:1, 30:5, 30:8, 30:13, 32:23, 33:11, 34:9, 40:1, 40:7, 40:9, 40:11, 45:15, 46:4, 48:12, 48:24, 49:18, 49:21, 50:6, 50:10, 50:16, 51:9, 52:1, 52:21, 53:6, 53:10
**multiple** [1] - 9:20, 34:2
**multiples** [1] - 40:17
**Muroke** [1] - 21:20

## N

**name** [8] - 15:22, 24:20, 31:5, 35:9, 35:15, 35:16, 35:17
**narrow** [2] - 22:4, 22:11
**narrowed** [1] - 41:24
**nature** [1] - 29:18
**necessary** [3] - 28:1, 28:2, 43:16
**need** [16] - 6:19, 12:10, 14:11, 17:14, 18:23, 24:2, 28:17, 33:9, 38:20, 44:22,

46:7, 46:8, 46:10, 46:18, 47:2, 48:4
**needed** [8] - 20:9, 22:24, 25:9, 38:19, 40:21, 40:23, 44:13
**needs** [1] - 33:11
**negative** [1] - 46:16
**negotiating** [1] - 48:25
**negotiation** [2] - 31:18, 32:12
**never** [4] - 13:16, 13:20, 15:3, 52:17
**new** [3] - 26:12, 49:24, 50:22
**New** [1] - 2:3
**next** [6] - 12:12, 13:12, 16:20, 36:24, 38:17, 39:22
**nice** [1] - 53:10
**nine** [1] - 20:10
**NO** [1] - 1:2
**nobody** [2] - 37:17, 38:7
**non** [3] - 21:10, 26:24, 48:7
**non-U.S** [3] - 21:10, 26:24, 48:7
**none** [2] - 17:22, 35:2
**nonparties** [1] - 43:1
**nonparty** [8] - 4:15, 6:1, 8:20, 21:10, 23:23, 26:24, 27:8, 48:1
**North** [27] - 3:5, 3:6, 3:10, 3:24, 3:25, 10:12, 10:16, 15:21, 17:9, 22:12, 22:20, 24:5, 25:8, 25:10, 25:14, 29:5, 29:8, 31:6, 31:12, 32:17, 34:9, 35:14, 36:4, 46:7, 46:18, 48:2, 48:16
**notable** [1] - 27:23
**note** [1] - 21:21
**noted** [1] - 21:18
**nothing** [7] - 28:16, 28:19, 41:20, 42:19, 45:14, 48:22, 51:24
**notice** [19] - 4:15, 6:2, 8:12, 8:20, 10:13, 11:5, 17:15, 40:20, 44:11, 44:18, 45:1, 48:10, 48:23, 50:15, 50:19, 50:23, 50:24, 51:7, 51:21
**noticed** [1] - 50:23
**notices** [3] - 10:12, 11:18, 11:19
**notion** [2] - 26:21,

34:5
**notwithstanding** [2] - 12:4, 29:8
**November** [7] - 16:4, 16:5, 16:8, 16:9, 16:25, 35:6, 36:2
**nuances** [1] - 34:23
**number** [9] - 3:3, 4:9, 16:14, 39:15, 39:18, 39:22, 39:23, 40:21, 40:23
**Number** [1] - 15:14
**numbers** [7] - 11:1, 18:8, 24:8, 39:12, 40:5, 41:20
**NY** [1] - 2:3

## O

**O'Connor** [2] - 1:16, 3:10
**oath** [1] - 42:14
**object** [1] - 46:15
**objected** [2] - 31:18, 32:5
**objection** [1] - 45:24
**objections** [1] - 13:4
**obligated** [4] - 24:9, 37:23, 41:25, 44:12
**obligation** [4] - 4:2, 15:16, 37:19, 38:7
**obtain** [1] - 10:8
**occurred** [1] - 37:3
**OF** [1] - 1:1
**offended** [1] - 49:13
**offer** [1] - 19:7
**offered** [3] - 21:2, 25:8, 31:19
**Office** [1] - 7:9
**office** [1] - 42:18
**Official** [2] - 2:10, 54:12
**offshore** [1] - 49:8
**omission** [1] - 27:24
**once** [1] - 30:10
**one** [36] - 4:23, 5:8, 6:7, 6:12, 7:2, 8:11, 13:20, 14:25, 15:21, 16:3, 16:11, 16:15, 19:7, 21:21, 25:19, 25:25, 26:3, 26:6, 30:19, 32:21, 32:24, 32:25, 33:1, 33:5, 33:18, 35:5, 35:11, 37:10, 37:20, 40:20, 45:21, 46:15, 47:7, 50:18, 52:14
**ones** [1] - 23:8
**ons** [1] - 50:3
**opening** [1] - 46:13

**operates** [1] - 9:12
**operations** [1] - 7:4
**opposing** [1] - 49:14
**opposite** [1] - 46:16
**opposition** [2] - 27:18, 28:19
**Order** [1] - 3:1
**order** [39] - 4:5, 4:16, 4:17, 8:18, 8:21, 10:20, 11:23, 12:1, 12:18, 14:8, 14:12, 14:20, 15:12, 15:14, 15:16, 16:11, 17:8, 17:14, 17:15, 17:18, 23:4, 27:11, 28:17, 30:12, 33:8, 42:8, 42:23, 42:25, 43:3, 43:14, 43:22, 43:23, 45:7, 45:20, 48:10, 48:23, 50:15, 51:7, 51:23
**orders** [2] - 5:19, 7:14
**ordinarily** [1] - 4:24
**ourselves** [1] - 48:3
**overstates** [1] - 38:21
**own** [6] - 11:22, 12:4, 12:5, 12:17, 35:16, 42:4
**owned** [1] - 23:23
**owner** [2] - 35:5, 35:11

## P

**P.A** [1] - 1:22
**page** [2] - 27:19, 47:7
**pages** [4] - 47:8, 51:12, 52:3, 52:4
**Pages** [1] - 1:9
**painful** [1] - 52:10
**PALM** [1] - 1:2
**Palm** [2] - 1:4, 6:4
**paper** [1] - 32:10
**papers** [10] - 8:10, 10:24, 17:3, 19:12, 20:22, 21:18, 22:13, 25:16, 33:9, 46:13
**paragraph** [2] - 25:15, 52:22
**pardon** [2] - 10:14, 10:16
**part** [10] - 7:11, 7:12, 8:9, 13:2, 14:5, 20:2, 31:8, 31:9, 31:11, 49:1
**participate** [1] - 43:13
**participated** [2] - 44:1, 44:2
**participating** [3] - 5:12, 41:13, 43:15
**participation** [8] - 5:6,

5:11, 5:13, 43:9, 43:16, 44:1, 46:22, 47:6
**particular** [1] - 51:12
**particularly** [1] - 17:2
**parties** [8] - 5:6, 5:20, 6:10, 9:23, 15:16, 33:18, 33:19
**parts** [1] - 31:18
**party** [7] - 5:23, 23:7, 23:24, 26:16, 27:17, 28:22, 47:3
**past** [2] - 8:3, 9:1
**Patent** [1] - 7:9
**path** [1] - 36:18
**PATRICIA** [2] - 2:10, 54:11
**Paul** [6] - 22:17, 22:18, 24:21, 25:2, 25:3, 26:7
**PAUL** [1] - 1:8
**penalty** [1] - 42:18
**people** [4] - 19:5, 20:11, 42:10, 46:24
**perfectly** [2] - 27:9, 27:13
**perhaps** [1] - 37:7
**period** [1] - 34:18
**perjury** [1] - 42:18
**permanent** [1] - 4:4
**person** [6] - 4:16, 4:18, 6:1, 6:5, 27:7, 43:4
**person's** [1] - 24:19
**personal** [24] - 4:24, 5:2, 6:19, 21:3, 21:6, 21:9, 21:12, 21:13, 21:15, 21:17, 21:20, 21:22, 21:25, 22:3, 22:24, 23:6, 23:15, 23:20, 24:3, 32:19, 41:6, 43:1, 46:9, 46:21
**persons** [1] - 5:5
**perspective** [1] - 49:11
**ph** [1] - 21:20
**phrased** [3] - 32:5, 43:6, 43:7
**place** [2] - 26:16, 26:24
**PLAINTIFF** [1] - 1:15
**plaintiff** [1] - 24:7
**plaintiffs** [1] - 47:20
**Plaintiffs** [1] - 1:5
**plaintiffs'** [1] - 21:19
**platform** [1] - 42:11
**platter** [1] - 13:25
**playing** [1] - 15:2
**Point** [1] - 1:23

**point** [22] - 7:3, 7:20, 7:22, 10:4, 12:8, 14:25, 15:2, 15:6, 15:15, 19:7, 23:2, 30:2, 36:20, 36:24, 37:14, 38:17, 38:21, 42:19, 44:7, 45:8, 48:16, 48:18
**points** [3] - 33:13, 36:6, 47:9
**Ponce** [1] - 2:5
**pony** [1] - 42:22
**portion** [1] - 41:14
**pose** [1] - 4:9
**position** [19] - 4:13, 5:12, 5:25, 6:18, 8:2, 8:5, 8:21, 9:14, 13:3, 14:16, 15:9, 18:12, 27:7, 32:7, 41:12, 42:3, 42:20, 43:17
**positions** [1] - 4:11
**possession** [2] - 5:21, 9:25
**possible** [5] - 45:24, 51:6, 51:10, 51:11, 52:18
**possibly** [3] - 13:19, 38:8, 41:10
**power** [1] - 22:25
**powers** [1] - 6:10
**practice** [1] - 27:11
**precursor** [1] - 46:9
**preferably** [1] - 48:19
**prepared** [1] - 32:13
**preparing** [1] - 48:13
**present** [4] - 15:17, 19:17, 19:23, 46:1
**presented** [2] - 19:18, 33:10
**presumably** [2] - 50:13, 50:15
**pretty** [3] - 26:25, 36:11, 53:4
**prevent** [1] - 41:21
**previously** [1] - 50:23
**primarily** [1] - 3:20
**principle** [1] - 48:6
**principles** [2] - 21:7, 24:15
**printed** [1] - 10:25
**private** [1] - 24:7
**problem** [2] - 33:17, 33:24
**problems** [1] - 31:3
**proceeding** [3] - 3:4, 7:3, 42:10
**proceedings** [2] - 10:9, 54:5
**proceeds** [1] - 5:22
**produce** [2] - 34:11,

48:13
**produced** [1] - 20:4
**producing** [2] - 19:14, 31:24
**production** [6] - 32:14, 34:10, 48:19, 49:21, 52:11, 52:12
**progress** [1] - 13:9
**prohibit** [1] - 5:19
**PROJECT** [1] - 1:7
**Project** [1] - 3:3
**promised** [1] - 29:3
**proof** [3] - 12:20, 47:5, 48:16
**proposal** [1] - 31:19
**proposition** [7] - 4:25, 6:6, 6:9, 23:3, 23:25, 24:14, 47:19
**prove** [4] - 12:10, 46:16
**provide** [15] - 9:9, 11:24, 16:20, 26:19, 27:2, 27:4, 27:21, 28:3, 28:5, 28:6, 28:25, 29:3, 31:10, 48:15
**provided** [23] - 10:11, 10:12, 10:16, 12:20, 14:19, 16:16, 16:17, 19:4, 20:7, 20:22, 25:10, 28:15, 28:16, 29:3, 31:19, 35:3, 35:9, 35:10, 38:18, 38:21, 50:18
**provides** [2] - 4:23, 16:22
**providing** [5] - 13:13, 25:7, 35:15, 35:16, 51:15
**prudence** [1] - 21:8
**publicly** [1] - 51:18
**pull** [1] - 38:22
**purchaser** [3] - 15:11, 16:1, 16:18
**purchasers** [1] - 15:7, 15:18
**purpose** [1] - 7:16
**purposes** [1] - 37:5
**pursuant** [1] - 35:12
**pursue** [5] - 13:21, 14:16, 15:13, 30:16, 31:6
**pursuing** [1] - 13:10
**put** [9] - 10:2, 16:14, 27:15, 34:15, 35:20, 44:8, 45:20, 47:7, 51:8

## Q

**questions** [5] - 4:9, 4:10, 9:20, 10:4, 33:12
**quite** [4] - 5:7, 24:5, 25:6, 37:15
**quote** [2] - 36:10, 52:21
**quoted** [1] - 52:23

## R

**raises** [1] - 16:24
**ran** [1] - 39:17
**rarely** [1] - 22:11
**rather** [1] - 4:10
**Rd** [1] - 1:20
**reach** [3] - 13:19, 22:10, 46:20
**reached** [1] - 31:12
**read** [1] - 4:10
**reading** [1] - 51:5
**reads** [1] - 23:14
**real** [3] - 7:20, 7:22, 8:19
**really** [17] - 3:4, 11:20, 12:6, 14:10, 15:4, 22:9, 22:21, 24:6, 25:17, 28:19, 29:17, 32:12, 33:2, 33:13, 36:2, 38:21
**realm** [3] - 23:20, 23:21, 27:13
**reason** [7] - 7:11, 7:12, 15:4, 19:8, 20:2, 32:1, 44:15
**reasonable** [5] - 26:24, 27:9, 27:11, 27:14, 47:18
**reasons** [1] - 21:22
**receipt** [2] - 16:19, 39:18
**receive** [3] - 10:19, 11:12, 52:20
**received** [23] - 11:14, 11:17, 11:18, 12:21, 16:4, 19:15, 30:23, 36:2, 37:5, 38:1, 38:14, 39:2, 39:11, 39:14, 40:5, 40:20, 40:24, 41:19, 42:5, 44:11, 44:18, 52:6
**receives** [1] - 4:15
**receiving** [6] - 11:8, 11:19, 43:14, 51:11, 51:14
**recently** [1] - 35:11
**recess** [1] - 53:3
**recipient** [1] - 47:10

**record** [9] - 3:8, 8:5, 21:16, 24:18, 25:1, 25:6, 25:12, 34:16, 35:21
**records** [1] - 48:14
**recover** [1] - 37:7
**reengaged** [1] - 28:11
**refer** [4] - 25:16, 28:2, 28:22, 34:21
**reference** [3] - 8:10, 16:13, 25:21
**references** [3] - 27:20, 28:22, 47:24
**referred** [2] - 23:14, 23:18
**referring** [1] - 52:23
**reflect** [1] - 11:5
**refusal** [4] - 17:6, 36:13, 36:14, 36:15
**refusals** [1] - 36:16
**refused** [4] - 17:18, 28:25, 34:10, 42:5
**refute** [1] - 20:3
**regard** [4] - 10:11, 24:10, 24:11, 38:19
**regarding** [2] - 9:5, 31:22
**regardless** [7] - 4:13, 4:17, 4:20, 8:24, 8:25, 12:17, 37:8
**regional** [1] - 41:7
**registrations** [2] - 7:7, 8:11
**regularly** [1] - 21:23
**rejected** [1] - 21:19
**relates** [1] - 15:15
**release** [1] - 15:12
**relevant** [1] - 34:25
**relieved** [1] - 15:15
**remaining** [1] - 30:16
**remember** [2] - 29:25, 30:3
**remotely** [1] - 54:8
**remove** [1] - 16:7
**removed** [1] - 18:3
**render** [1] - 5:18
**rendition** [1] - 21:1
**repeat** [1] - 39:6
**repeatedly** [1] - 15:25
**reply** [2] - 5:17, 46:14
**REPORTED** [1] - 2:9
**Reporter** [2] - 2:10, 54:12
**reporting** [1] - 54:8
**reports** [2] - 19:15, 52:3
**representations** [1] - 9:8
**represented** [1] - 15:4

**representing** [1] - 13:18
**request** [9] - 9:7, 26:15, 27:3, 27:14, 46:2, 47:14, 47:23, 52:17
**requested** [3] - 26:19, 35:17, 45:23
**requesting** [2] - 26:25, 27:7
**requests** [1] - 50:4
**require** [3] - 5:19, 43:10, 48:15
**required** [6] - 36:14, 41:24, 43:5, 46:5, 46:15, 47:15
**requirement** [1] - 12:2
**requirements** [7] - 11:23, 14:1, 14:2, 17:17, 21:6, 22:24, 24:4
**requires** [2] - 8:12, 47:25
**requiring** [1] - 26:6
**resolve** [4] - 11:16, 31:21, 31:24, 32:2
**resources** [5] - 26:22, 27:18, 48:2, 48:3, 49:7
**respectfully** [2] - 10:1, 25:5
**respond** [1] - 36:6
**responded** [2] - 49:23, 52:24
**response** [2] - 9:6, 16:12
**responsible** [1] - 38:6
**responsive** [1] - 25:7
**rest** [2] - 17:8, 45:14
**resting** [1] - 34:14
**result** [1] - 13:1
**Reyes,PLLC** [1] - 2:4
**rights** [4] - 24:11, 28:5, 28:10, 30:17
**rise** [2] - 21:14, 46:14
**risk** [1] - 24:11
**robust** [1] - 31:19
**Rogers** [1] - 1:22
**Roman** [1] - 19:13
**Rosenberg's** [1] - 6:8
**Rosquete** [2] - 2:4, 3:17
**roughly** [1] - 18:7
**rounds** [2] - 14:14, 14:15
**routine** [1] - 5:18
**row** [4] - 11:1, 40:18
**RPR** [2] - 2:10, 54:11
**rule** [5] - 4:22, 6:22, 24:7, 43:6, 43:8

**Rule** [14] - 5:5, 6:18, 8:20, 21:5, 21:9, 23:11, 23:17, 24:2, 41:5, 41:10, 41:11, 43:5, 43:16, 43:18
**ruling** [2] - 25:4, 53:8
**rummaging** [1] - 10:20
**run** [1] - 52:5

## S

**Sample** [1] - 1:20
**Samuel** [2] - 1:15, 3:9
**sanction's** [1] - 34:3
**sanctions** [11] - 3:5, 4:3, 4:19, 6:4, 6:25, 7:19, 9:3, 25:4, 29:10, 29:16, 32:10
**sat** [2] - 28:10, 32:15
**satisfied** [1] - 14:1
**scope** [3] - 6:9, 41:9, 43:22
**screen** [4] - 16:3, 37:20, 38:22, 39:1
**searching** [1] - 13:24
**SEC** [2] - 7:12, 42:8
**second** [8] - 4:6, 13:2, 25:17, 36:20, 37:21, 39:11, 39:21, 40:2
**see** [8] - 16:15, 29:20, 30:22, 39:1, 40:9, 47:8, 52:13
**seek** [2] - 27:25, 33:4
**seeking** [2] - 26:17, 32:10
**seem** [1] - 21:11
**sell** [1] - 38:3
**send** [3] - 15:24, 37:16, 46:24
**sender** [4] - 40:1, 40:2, 40:3, 47:10
**sense** [1] - 13:11
**sent** [5] - 16:3, 47:17, 49:21, 49:22, 52:12
**sentence** [3] - 32:5, 49:24, 52:23
**separate** [1] - 34:22
**separately** [1] - 10:9
**series** [1] - 7:6
**served** [2] - 32:9, 48:25
**service** [1] - 14:11
**set** [2] - 10:22, 36:17
**sets** [1] - 10:7
**setting** [1] - 32:19
**seven** [10] - 12:16, 17:20, 17:21, 30:13, 44:4, 44:5, 48:9, 52:9, 52:16

**share** [1] - 37:20
**shared** [1] - 32:10
**show** [18] - 4:2, 9:18, 22:21, 25:6, 25:18, 25:20, 26:1, 34:11, 43:10, 46:7, 46:8, 46:10, 48:22, 50:13, 50:16, 51:2, 52:19
**showing** [7] - 11:24, 16:4, 29:7, 34:4, 44:14, 45:3, 47:21
**shown** [1] - 51:17
**shows** [3] - 34:16, 34:17, 35:13
**shut** [4] - 12:19, 12:23, 12:24, 16:6
**side** [1] - 53:2
**sides** [1] - 4:9
**significant** [1] - 41:14
**silence** [1] - 53:1
**silent** [1] - 50:6
**SILVER** [1] - 3:13
**Silver** [3] - 1:19, 1:19, 3:13
**silver** [1] - 13:25
**similarly** [1] - 1:4
**simple** [1] - 42:7
**simply** [4] - 24:9, 31:16, 35:13, 41:5
**situated** [1] - 1:4
**situation** [3] - 5:7, 22:13, 29:16
**six** [3] - 10:13, 20:7, 52:24
**slapped** [1] - 49:9
**slipped** [1] - 29:20
**small** [1] - 18:8
**someone** [1] - 28:1
**somewhere** [1] - 16:19
**soon** [1] - 53:8
**sorry** [9] - 7:25, 17:12, 22:6, 27:5, 30:3, 39:5, 39:21, 43:21, 45:11
**sort** [19] - 9:2, 18:25, 22:8, 23:5, 25:23, 27:21, 30:25, 31:1, 32:6, 32:11, 33:8, 33:12, 33:19, 34:14, 34:23, 34:25, 36:1, 44:23, 47:4
**sources** [1] - 28:23
**South** [1] - 41:8
**SOUTHERN** [1] - 1:1
**Southern** [5] - 2:11, 4:14, 6:13, 7:18, 54:13
**speaking** [1] - 3:8
**specific** [1] - 27:16

**specifically** [6] - 6:17, 14:8, 15:15, 16:12, 25:3, 25:14
**specifics** [1] - 33:12
**specify** [1] - 51:9
**speculating** [2] - 22:1, 35:25
**speculation** [1] - 21:2
**speculative** [1] - 49:10
**spreadsheet** [6] - 10:25, 47:7, 47:8, 47:16, 51:11, 51:21
**spreadsheets** [3] - 11:10, 11:11, 24:8
**Springs** [1] - 1:20
**standard** [5] - 5:3, 22:15, 26:25, 27:11, 43:11, 43:25, 46:6, 46:11, 46:14, 46:17
**standpoint** [1] - 51:22
**stands** [1] - 51:4
**start** [4] - 4:10, 10:3, 21:3, 33:14
**started** [2] - 6:18, 11:13
**state** [1] - 3:7
**statement** [1] - 42:14
**statements** [3] - 7:8, 19:25, 42:17
**States** [9] - 2:11, 4:14, 4:21, 7:18, 8:6, 24:24, 24:25, 48:1, 54:12
**STATES** [2] - 1:1, 1:12
**status** [1] - 18:5
**stemming** [1] - 10:7
**STENOGRAPHICALLY** [1] - 2:9
**steps** [1] - 4:16
**still** [12] - 14:1, 14:2, 14:3, 25:13, 25:19, 33:17, 33:23, 37:11, 38:14, 44:6, 46:20, 52:15
**stole** [2] - 24:20, 26:8
**stolen** [36] - 5:9, 5:10, 5:13, 5:21, 5:22, 9:18, 10:17, 11:3, 11:15, 11:17, 12:7, 12:11, 12:21, 13:10, 16:20, 17:9, 18:2, 19:16, 25:20, 33:21, 33:22, 33:23, 38:2, 38:14, 38:16, 39:11, 39:14, 40:6, 41:5, 41:15, 41:19, 43:18, 43:23, 43:24, 45:4, 52:20
**streams** [1] - 10:6
**stretch** [1] - 22:2

**strongest** [3] - 5:25, 6:5, 23:3
**stuff** [1] - 32:4
**subject** [8] - 7:14, 9:16, 31:21, 33:19, 41:6, 49:12, 50:11, 54:7
**subjected** [2] - 24:13, 50:3
**submission** [1] - 34:24
**submit** [5] - 23:13, 25:5, 46:12, 49:20, 51:18
**submitted** [2] - 8:9, 46:13
**submitting** [2] - 7:8, 42:17
**subpoena** [9] - 10:8, 13:1, 13:6, 31:8, 31:15, 31:19, 31:21, 31:22, 50:11
**subpoenaed** [1] - 48:14
**subsequent** [3] - 18:5, 37:2
**substantiate** [1] - 48:18
**successive** [1] - 11:5
**suddenly** [1] - 41:8
**sufficient** [12] - 5:22, 7:17, 8:7, 8:17, 14:19, 18:17, 18:18, 18:22, 19:1, 20:1, 20:4, 24:18
**suggest** [1] - 27:10
**suggesting** [2] - 15:11, 31:16
**suggestion** [1] - 46:15
**Suite** [2] - 1:17, 2:5
**Sullivan** [2] - 1:15, 3:11
**summer** [1] - 28:7
**super** [1] - 27:23
**support** [3] - 23:25, 27:6, 28:19
**supported** [1] - 25:1
**supporting** [1] - 4:25
**supports** [1] - 21:16
**supposed** [2] - 13:12, 36:22
**supposedly** [1] - 42:9
**Surety** [5] - 5:17, 6:12
**surprised** [4] - 19:9, 21:13, 45:11, 45:12
**sustain** [1] - 34:3
**sworn** [2] - 7:8, 19:24

## T

**talks** [2] - 27:19, 43:8
**tap** [1] - 19:23
**Tech** [1] - 6:13
**technical** [1] - 33:13
**technicalities** [2] - 9:11, 19:24
**technological** [1] - 54:8
**Technology** [1] - 3:10
**ten** [12] - 12:13, 12:15, 14:4, 14:23, 17:7, 30:13, 36:14, 41:23, 50:10, 50:22, 52:9, 52:10
**term** [1] - 18:22
**terminating** [1] - 33:3
**terminology** [3] - 25:24, 26:13, 33:20
**terms** [5] - 9:9, 13:23, 28:17
**testimony** [1] - 19:4
**Tether** [1] - 37:9
**Tethered** [1] - 38:3
**THE** [70] - 1:11, 1:15, 2:1, 3:2, 3:15, 3:22, 4:6, 4:8, 5:24, 6:16, 6:24, 7:15, 7:21, 7:24, 8:1, 8:14, 8:22, 8:24, 9:1, 17:12, 17:20, 18:1, 18:11, 20:23, 22:6, 23:2, 23:10, 24:17, 24:22, 24:24, 27:5, 28:13, 28:15, 29:19, 29:23, 29:25, 30:3, 30:6, 30:9, 32:21, 33:7, 34:7, 36:5, 36:7, 36:19, 37:22, 38:9, 38:24, 39:5, 39:21, 39:25, 40:10, 40:12, 42:24, 44:3, 44:22, 45:10, 45:16, 45:22, 48:8, 48:21, 49:15, 49:19, 50:5, 50:8, 50:13, 51:4, 51:22, 53:2, 53:7
**theft** [1] - 43:21
**themselves** [2] - 32:15, 38:11
**theories** [1] - 21:19
**theory** [2] - 21:14, 21:25
**therefore** [2] - 37:17, 54:7
**they've** [3] - 17:13, 26:1, 46:12
**third** [4] - 6:10, 12:22, 27:17, 28:22

**third-party** [2] - 27:17, 28:22
**thousands** [5] - 24:8, 26:23, 47:8, 47:18, 52:3
**threats** [1] - 49:10
**three** [12] - 12:17, 13:15, 14:3, 17:6, 17:21, 18:1, 30:6, 30:10, 30:18, 32:23, 42:6, 49:23
**threshold** [5] - 21:8, 22:24, 23:7, 24:3, 32:20
**thresholds** [1] - 46:12
**throw** [1] - 7:2
**tied** [2] - 25:3, 38:4
**ties** [3] - 23:19, 23:21, 24:24
**timing** [1] - 35:25, 36:3
**tiny** [1] - 47:11
**today** [5] - 3:11, 3:18, 45:2, 45:8, 52:19
**together** [3] - 16:15, 17:6, 18:6
**token** [1] - 38:3
**ton** [1] - 32:3
**Tong** [16] - 15:22, 15:23, 15:25, 16:3, 16:8, 16:10, 16:17, 20:10, 34:19, 35:4, 35:10, 35:21, 36:1, 38:1, 38:10, 51:17
**Tong's** [5] - 16:15, 34:13, 34:15, 35:19, 40:13
**took** [3] - 13:3, 15:9, 49:6
**top** [1] - 12:13
**trace** [3] - 26:11, 37:17, 47:22
**traced** [4] - 14:23, 19:13, 47:13, 48:12
**tracers** [1] - 17:4
**Tracing** [1] - 27:23
**tracing** [35] - 9:7, 12:4, 16:16, 25:10, 26:15, 26:19, 26:25, 27:7, 27:14, 27:17, 27:19, 27:21, 28:1, 28:3, 28:9, 28:17, 28:23, 28:24, 29:2, 29:3, 29:4, 29:13, 29:18, 35:3, 35:12, 50:18, 50:21, 50:22, 50:25, 51:8, 51:14, 52:7
**tracings** [7] - 11:24, 14:7, 20:6, 41:17, 41:25, 42:5, 42:21

**track** [1] - 18:8
**tracking** [2] - 39:19, 39:20
**trademark** [6] - 7:7, 8:11, 21:14, 22:4, 42:18
**Trademark** [1] - 7:9
**traditional** [2] - 21:12, 26:10
**train** [1] - 29:23
**transaction** [15] - 11:1, 25:23, 25:25, 33:5, 39:3, 39:4, 39:15, 39:16, 39:18, 39:20, 39:23, 40:4, 40:15, 40:16, 47:10
**transactions** [7] - 10:17, 11:2, 11:12, 37:2, 40:18, 52:5, 52:19
**transcription** [1] - 54:5
**transfer** [6] - 5:9, 41:14, 43:14, 46:24, 51:19
**transferred** [4] - 18:3, 26:3, 37:8, 48:10
**transfers** [5] - 5:19, 49:4, 49:5
**transparency** [1] - 31:3
**transparent** [2] - 35:13, 35:14
**tried** [5] - 14:6, 15:2, 18:12, 22:14, 49:12
**trouble** [1] - 49:16
**true** [2] - 25:14, 35:7
**try** [10] - 9:15, 10:21, 11:16, 13:9, 14:22, 31:6, 33:4, 41:21, 53:7
**trying** [17] - 9:24, 13:18, 15:12, 18:16, 19:23, 21:25, 22:20, 26:1, 27:8, 34:6, 34:18, 35:13, 35:14, 45:16, 47:9, 48:2, 48:3
**turn** [8] - 14:9, 36:15, 36:22, 38:3, 41:17, 42:21, 43:23, 49:17
**turned** [4] - 14:4, 17:9, 17:11, 17:22
**turning** [1] - 48:18
**turnover** [2] - 10:10, 52:16
**turns** [1] - 42:11
**two** [11] - 10:6, 12:18, 15:10, 16:14, 21:18, 23:18, 32:14, 32:24,

37:14
**two-week** [1] - 32:14
**type** [3] - 43:4, 47:5, 47:20
**types** [1] - 29:5
**typically** [1] - 51:19

## U

**U.S** [15] - 7:5, 7:8, 7:10, 7:13, 21:7, 21:10, 21:23, 22:22, 22:23, 24:13, 26:24, 42:13, 42:15, 48:7, 49:12
**ultimate** [2] - 30:23, 31:7
**ultimately** [2] - 20:6, 32:18
**unambiguous** [2] - 14:20, 17:15
**under** [9] - 5:5, 5:16, 6:18, 9:3, 21:11, 42:14, 42:17, 43:16, 46:6
**underlying** [1] - 22:19
**unfortunately** [1] - 44:7
**unheard** [1] - 27:23
**UNITED** [2] - 1:1, 1:12
**United** [9] - 2:11, 4:14, 4:21, 7:18, 8:6, 24:24, 24:25, 48:1, 54:12
**unknown** [2] - 47:10
**unlikely** [1] - 51:10
**unnamed** [1] - 26:2
**unpack** [1] - 10:2
**unprecedented** [2] - 24:1, 24:16
**unreasonable** [3] - 27:3, 28:8, 28:25
**untenable** [1] - 24:15
**unusual** [2] - 26:16, 27:23
**up** [12] - 11:15, 35:10, 35:16, 36:3, 38:15, 38:19, 38:22, 40:23, 47:7, 50:19, 52:6, 53:1
**updated** [1] - 11:5
**updates** [1] - 47:17
**US** [2] - 5:18, 6:7
**user** [1] - 31:1
**User** [2] - 26:2, 26:3
**users** [1] - 31:7

## V

**varied** [1] - 50:20

**Vernon** [6] - 22:18, 24:21, 24:22, 25:2, 25:3, 41:13
**VERNON** [1] - 1:8
**Vernon's** [2] - 22:17, 26:7
**via** [4] - 19:9, 45:13, 45:24, 54:7
**victims** [1] - 15:13
**view** [2] - 41:4, 46:6
**violated** [2] - 19:2, 33:25
**violation** [2] - 4:17, 30:11
**violator** [1] - 4:19
**visualizations** [4] - 11:24, 12:12, 12:13, 12:15
**Vitale** [2] - 2:1, 3:18
**volume** [3] - 30:20, 32:25, 37:18
**voluntarily** [1] - 49:13
**voluntary** [1] - 47:14
**vs** [1] - 1:6

## W

**wait** [1] - 18:14
**waited** [1] - 28:6
**walk** [1] - 39:9
**wallet** [2] - 39:2, 39:13
**wallets** [2] - 9:10, 49:4
**wants** [1] - 34:23
**week** [2] - 32:14, 47:17
**weeks** [2] - 13:15, 49:6
**WEST** [1] - 1:2
**West** [2] - 1:4, 6:4
**wholeheartedly** [1] - 41:18
**wholly** [1] - 23:23
**wilfully** [2] - 17:17, 19:2
**willful** [1] - 4:4
**willfully** [2] - 14:3, 17:16
**willing** [6] - 14:7, 19:9, 19:24, 41:3, 42:14, 45:18
**wished** [1] - 44:8
**wishes** [1] - 52:13
**Wites** [3] - 1:21, 1:22, 3:14
**withdraw** [1] - 13:6
**withdrawals** [1] - 49:5
**wood** [1] - 6:7
**words** [1] - 36:3
**world** [2] - 6:2, 46:6
**worries** [1] - 30:1

**worth** [2] - 16:19,
18:10
**wrongdoer** [1] - 43:3
**wrongdoing** [1] - 44:4

## Y

**year** [6] - 28:7, 29:15,
32:18, 35:3, 36:10,
41:20
**years** [1] - 15:10
**York** [1] - 2:3
**yourself** [1] - 52:13

## Z

**Zoom** [6] - 19:10,
45:13, 45:17, 45:18,
45:24, 54:7
**ZOOM** [1] - 1:11