UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

BRANDON LEIDEL, individually and
on behalf of all others similarly situated,

CASE NO. 9:16-CV-80060-KAM

Plaintiffs,

v.

PROJECT INVESTORS, INC. d/b/a
CRYPTSY, a Florida corporation, and
PAUL VERNON, an individual,

Defendants.
_____/

## MOTION FOR RECONSIDERATION OF
## ORDER DENYING MOTION FOR CONTEMPT SANCTIONS

North Field Technology Ltd. ("North Field"), respectfully moves this Court pursuant to Fed.R.Civ.P. 60(b) to reconsider the Order Denying Motion for Contempt Sanctions [ECF No. 227] (the "Order Denying Contempt") because recently discovered evidence, previously unavailable to North Field, establishes that Binance Holdings Limited ("Binance") is subject to this Court's jurisdiction, and that Binance materially misrepresented its presence in the U.S. and issues relating to jurisdiction when opposing North Field's Motion for Contempt Sanctions.

Specifically, Binance recently entered a plea agreement with the United States Department of Justice and agreed to pay over $4 billion dollar in fines.[1] *See* Exhibit 1[2] ("Plea Agreement"). In the same Plea Agreement, Binance admitted, *inter alia,* that it has substantial operations throughout the United States and knowingly facilitated money laundering and other illegal activities by failing to employ any Know Your Customer ("KYC") or Anti Money Laundering

---

[1] *See* https://www.justice.gov/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution.

[2] Given the size of the Plea Agreement and its various attachments, only the main Plea Agreement and its Statement of Facts have been attached as Exhibits. The complete Plea Agreement, including all attachments, may be found at: https://ecf.wawd.uscourts.gov/doc1/197010963726.

("AML") procedures on its cryptocurrency exchange. As incredible as such admissions sound, Binance stipulated to such facts and many others as part of such Plea Agreement. A copy of Binance's Stipulated Facts in the Plea Agreement is attached as Exhibit 2.

Although Binance's new admissions establish that it is subject to this Court's jurisdiction, if this Court has any doubts, Binance's Plea Agreement provides more than enough evidence to justify jurisdictional discovery to address any factual issues that this Court deems warrant discovery, and so this Court may determine that it has personal jurisdiction over Binance as part of the Court's reconsideration of the Order Denying Contempt.

## I.      INTRODUCTION.

Based on admissions that Binance made in a recent Plea Agreement, it is now apparent that Binance intentionally withheld material facts relating to its jurisdictional contacts with the U.S., and permitted this Court (and others) to believe what amounts to a fiction. Binance has now admitted that it **_has_** operations in the U.S., that it **_has_** engaged in extensive and substantial business with U.S. citizens, it is now apparent that Binance is subject to personal jurisdiction in the U.S. Indeed, the volume of Binance's business in the U.S. is so significant that Binance agreed to pay **over $4 billion** in fines as part of its plea agreement.

In addition to admitting facts relating to jurisdiction, Binance's Plea Agreement now also admits, *inter alia,* that it willfully disregarded U.S. KYC procedures and failed to implement an effective AML program. By doing so, Binance not only facilitated its users' illicit transactions, it also received fees from users in connection with the illicit transactions it facilitated. Had Binance complied with the U.S. law it has now admitted to violating, Vernon and others in concert would not have been able to launder the Stolen Bitcoin through Binance's exchange.

North Field sincerely believes that if Binance had been honest with the Court, the Court would have found that it had personal jurisdiction over Binance and proceeded to the merits of North Field's contempt motion. If, after reviewing Binance's admissions in the Plea Agreement, the Court still has doubts as to whether it has personal jurisdiction over Binance, North Field respectfully suggests that the Court should require Binance to come forward with jurisdictional discovery so that the Court may satisfy itself that it has sufficient jurisdiction.

Accordingly, North Field respectfully requests that the Court reconsider the Order Denying Contempt, or in the alternative, order Binance to come forward with jurisdictional discovery so that the Court may satisfy itself that it has jurisdiction.

## II. FACTUAL BACKGROUND.

On September 14, 2023, this Court rendered the Order Denying Contempt. In the Order Denying Contempt, the Court noted that there was no question about whether Binance received notice. *See* Order Denying Contempt, at 4 ("With respect to jurisdiction under the Court's sanction power, the parties agree that Binance was on actual notice of the Court's order given that the parties were in communication about the bitcoins at issue."). However, the Court also noted that "North Field has not challenged Binance's assertion that it is a non-U.S. cryptocurrency exchange with no headquarters, offices, or operations in the United States." *Id.* at 3. Ultimately, the Court ruled that it did not have personal jurisdiction over Binance. *Id.* at 4. The Court also ruled that "there is insufficient evidence" to support a finding that "Binance acted in concert with Vernon." *Id.*

At the time that North Field filed the Motion for Order to Show Cause [ECF No. 213] (the "Contempt Motion"), and at the time of the Order Denying Contempt, Binance perpetuated the fiction that it was not subject to personal jurisdiction in District. Indeed, Binance even cited to decisions rendered by courts in this District that further perpetuated the fiction regarding

jurisdiction over Binance. *See, e.g.,* Binance's Opposition [ECF No. 217], at p. 11 (citing to *Miro v. Doe,* 2023 WL 2734374 (S.D. Fla.) and *Guarini v. Doe,* 634 F.Supp.3d 1100 (S.D. Fla. 2022)). Binance also speciously emphasized that "there are no allegations that Binance's contacts with Florida are 'so continuous and systematic' as to render it essentially at home in Florida." *Id.* at 11-12. Certainly, Binance did not come forward with any facts at the time that would reveal its fiction as the falsehood that it was, and none of the evidence establishing Binance's U.S.-based operations and Binance's continuous, systematic and significant contacts with the U.S. and U.S. customers were available to North Field or the Court until November 21, 2023.

On November 21, 2023, Binance entered into the Plea Agreement in connection with a criminal prosecution brought in the matter styled *U.S.A. v. Binance Holdings Limited, d/b/a Binance.com,* U.S. District Court (Western District of Washington) Case No. 23-178RAJ (the "Prosecution"). *See* Exhibit 1. As part of the Plea Agreement, Binance agreed to a Statement of Facts attached to the Plea Agreement. *See* Exhibit 2. The facts that Binance admitted in the Prosecution now cast serious doubt on the factual findings that Binance encouraged this Court to make when denying the Contempt Motion.

In the Statement of Facts, Binance admits that beginning August 2017 and continuing until at least October 2022—during the time that Binance's exchange received some of the Stolen Bitcoin referenced in the Court's Final Judgment [ECF No. 123], Amended Judgment [ECF No. 157], and Permanent Injunction [ECF No. 177], and during the time that Binance admitted having received notices from North Field as detailed in the Motion for Order to Show Cause [ECF No. 213]—it failed "to implement and maintain effective anti-money laundering ('AML') program…in a deliberate and calculated effort to profit from the U.S. market without

4

implementing controls required by U.S. law." *See* Exhibit 2, ¶1.  Specifically, Binance has admitted that during this time:

- Binance "operated a cryptocurrency exchange wholly or in substantial part in the United States by serving a substantial number of U.S. users." *Id.,* ¶1.

- "[Binance] operated as an unlicensed money transmitting business in part to prevent U.S. regulators from discovering that [Binance] facilitated billions of dollars of cryptocurrency transactions on behalf of its customers, including U.S. customers, without implementing appropriate 'know your customer' ('KYC') procedures, conducting adequate transaction monitoring, or establishing sufficient control that would have prevented its U.S. customers from engaging in transactions in violation of U.S. sanctions and other criminal laws." *Id.*

- "Due to its willful failure to implement an effective AML program, [Binance] processed transactions by users who operated illicit mixing services and laundered proceeds [of illicit activity]." *Id.*

- Binance had a financial incentive for allowing its users to engage in transactions involving the proceeds of illicit activity, as "Binance charged its users fees on transactions…." *Id.*, ¶16.

- Binance "chose to do business wholly or in substantial part in the United States." *Id.*, ¶25.

- Binance "served millions of customers located in the United States, including in the Western District of Washington." *Id.,* ¶27.

- Binance "intentionally maintained substantial connections to the United States, from which it generated, among other things, web traffic, user base, transaction volume, and profit." *Id.*

- By March 2018, Binance "had approximately three million U.S. users—more than a third of Binance's eight million total users at that time." *Id.*, ¶30.

- "According to Binance's own transaction data, U.S. users conducted trillions of dollars in transactions on [Binance's] platform between August 2017 and October 2022— transactions that generated approximately $1,612,031,763 in profit for Binance." *Id.*, ¶48.

These newly admitted facts strongly suggest that Binance likely has sufficient customers in the U.S. and in this District to justify this Court's exercise of personal jurisdiction over Binance. Certainly, these facts stand in stark contrast to the "facts" that Binance presented to this Court

regarding personal jurisdiction. At best, Binance was content not to disturb the fiction that it perpetuated that it was not subject to personal jurisdiction in this District. In light of the factual admissions in the Plea Agreement, it strains credulity for Binance to suggest that it does not have sufficient customers in the District to justify this Court's exercise of personal jurisdiction over it.[3]

The newly admitted facts also establish that Binance willfully disregarded U.S. KYC and AML regulations so as to facilitate illicit transactions, including allowing Vernon and those in concert with him to launder Stolen Bitcoin through Binance's exchange. In the Plea Agreement, Binance has admitted and conceded that:

- "Binance and its co-conspirators did not implement an effective AML program while it operated in substantial part in the United States as required by the BSA. Despite facilitating a significant number of suspicious transactions, Binance has never filed a SAR with FinCEN. Binance did not collect full KYC information from a large share of its users until May 2022." *Id.*, ¶51

- "For much of the relevant period, Binance.com had two 'levels' or 'tiers' of user accounts. Until in or around August 2021, Binance and its co-conspirators allowed users to open a 'Level l' or 'Tier 1' accounts without submitting any KYC information. Instead, users could open Level 1 accounts simply by providing an email address and a password. Binance required no other information, including the user's name, citizenship, or location. A Level 1 account holder could deposit virtual currency into their account, and then transact in, an unlimited amount of virtual currency. While Level 1 accounts had certain limitations, including a crypto withdrawal limit of up to the value of two Bitcoins ('BTC') per day, Binance allowed users to open multiple Level 1 accounts by providing a new email address for each account, which effectively circumvented the withdrawal limit. Even if a user adhered to the daily two BTC withdrawal limit on a single account, for most of Binance's existence, the user could still withdraw thousands-and sometimes many tens of thousands-of U.S. dollars due to the rising value of a single Bitcoin, which increased from approximately $3,000 to $63,000 in value between December 2018 and April 2021. To access greater withdrawal limits within a single account, users could open a 'Level 2' or 'Tier 2' account by submitting KYC information, including the user's name, citizenship, residential address, or government issued identification document or number. During

---

[3] Similarly, Binance's willful failure to obtain KYC information precludes Binance from stating with any authority that it knows who all of its customers are and where they are located. Thus, Binance is not in a position to rule out that it has customer and engaged in substantial and significant transactions with persons in this District so as to justify this Court's personal jurisdiction over Binance.

the relevant period, Level 1 accounts comprised the vast majority of the user accounts on Binance.com." *Id.*, ¶52.

- "In or about August 2021, Binance announced that it would require all new users to submit full KYC information. But Binance allowed existing users who had not submitted KYC information-including for all Level 1 accounts, which was most of the user accounts-to trade on the platform without providing full KYC information until in or about May 2022." *Id.*, ¶53.

As a result, Binance almost certainly knew it was acting in concert with all bad actors:

- "For example, in a February 2019 chat conversation, one compliance employee wrote, **"we need a banner 'is washing drug money too hard these days - come to [B]inance we got cake for you.'"** *Id.,* ¶55 (emphasis added).

- "Due in part to Binance's failure to implement an effective AML program, illicit actors used Binance's exchange in various ways, including: operating mixing services that obfuscated the source and ownership of cryptocurrency; transacting illicit proceeds from ransomware variants; and moving proceeds of darknet market transactions, exchange hacks, and various internet-related scams." *Id.,* ¶56.

- "For example, between August 2017 and April 2022, there were direct transfers of approximately $106 million in bitcoin to Binance.com wallets from Hydra, a popular Russian darknet marketplace frequently utilized by criminals that facilitated the sale of illegal goods and services. These transfers occurred over time to a relatively small number of unique addresses, which indicates 'cash out' activity by a repeat Hydra user, such as a vendor selling illicit goods or services." *Id.,* ¶57

- "Similarly, from February 2018 to May 2019, Binance processed more than $275 million in deposits and more than $273 million in withdrawals from BestMixer-one of the largest cryptocurrency mixers in the world until it was shut down by Dutch authorities in May 2019." *Id.,* ¶58.

- "In some instances, when illicit actors or high-risk users were identified, Defendant and some of its co-conspirators allowed those individuals to continue to access the platform—particularly if they were VIP users. For example, in July 2020, Individual 1 and others discussed a VIP user who was offboarded after being publicly identified as among the 'top contributors to illicit activity.' [Binance's Chief Compliance Officer] wrote that, as a general matter, Binance's compliance and investigation teams should check a user's VIP level before offboarding them, and then Binance could 'give them a new account (if they are important/VIP)' with the instructions 'not to go through XXX channel again.' In another conversation, [Binance's Chief Compliance Officer] referenced Hydra. With respect to the same specific VIP user, [Binance's Chief Compliance Officer] wrote, "[c]an let him know to be careful with his flow of funds, especially from darknet like hydra ... [h]e can come back with a new account ... [b]ut this current one has to go, its tainted." *Id.,*¶59.

Based on these admissions, it strains credulity for Binance to argue that it was not acting in concert with Vernon, when the plea agreement establishes that Binance's entire business model was to invite and facilitate transactions from any and all illicit actors willing to establish an account on Binance's cryptocurrency exchange and pay transaction fees to Binance. Had Binance complied with U.S. KYC and AML regulations, it would not have allowed Vernon and others working in concert with him to deposit the Stolen Bitcoin on Binance's cryptocurrency exchange, and would not have accepted Vernon's transactions run through mixers to be deposited on Binance's exchange. Thus, the newly admitted facts establish that Binance's willful disregard of U.S. regulations facilitated Vernon's laundering of the Stolen Bitcoin. Without Binance's complicity, Vernon would not have been able to launder and exchange the Stolen Bitcoin.

None of these facts were available to North Field prior to Binance's Plea Agreement.

### III.   ARGUMENT.

#### A.  The Court should reconsider the Order Denying Contempt.

In light of Binance's Plea Agreement and the significant factual admissions contained therein, this Court is well within its discretion to reconsider the Order Denying Contempt. Had Binance come forward with such evidence earlier, and if Binance had not sought to perpetuate a fiction that it was not subject to personal jurisdiction, North Field respectfully believes that this Court would have reached a different conclusion when ruling on the Contempt Motion.

Rule 60(b) enumerates various reasons why the Court may relief a party from an order. *See* Fed.R.Civ.P. 60(b). These reasons include: "(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time" to seek relief under Rule 59(b); "(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing

party"; and "(6) any other reason that justifies relief." *Id.*; *see also American Bankers Ins. Co. of Fla. v. Northwest Nat. Ins. Co.,* 198 F.3d 1332, 1337 n.4 (11th Cir. 1999).

In the instant case, each of the grounds for relief from the Order Denying Contempt noted above are applicable.[4] Binance's Plea Agreement contains significant evidence that despite North Field's diligence could not have been discovered. Likewise, it is now apparent that Binance engaged in fraud or misrepresentation, before both this Court and other courts in this District, when it perpetuated the fiction that it was not subject to personal jurisdiction in this District. At the very least, Binance's Plea Agreement contains sufficient admissions to raise a very real question as to whether Binance failed to correct facts regarding jurisdiction that it knew were false, and intentionally omitted facts that would tend to establish that it is subject to personal jurisdiction.

### B. Binance's Admissions In The Plea Agreement Warrant Reconsideration Of The Key Factual Findings In This Court's Order.

This Court found that Binance was not subject to general or specific jurisdiction based on facts the Court found uncontested, such as that "North Field has not challenged Binance's assertion that it is a non-U.S. cryptocurrency exchange with no headquarters, offices, or operations in the United States." Order at 3.

Further, while North Field still does not contest that "Binance did not exist in 2014, when the fraud which is the basis for the Final Judgment occurred," Binance's admissions in the plea agreement establish that during the time period that Vernon was laundering through Binance the Stolen Bitcoin subject to the Final Judgment that Binance was knowingly and intentionally aiding

---

[4] North Field acknowledges that "[r]elief under the catch-all provision of Rule 60(b)(6) 'is an extraordinary remedy which may be involved only upon a showing of exceptional circumstances." *Guevara v. NCL (Bahamas) Ltd.,* 2017 WL 6597978 (S.D. Fla.), *quoting Cavaliere v. Allstate Inc. Co.,* 996 F.2d 1111, 1115 (11th Cir. 1993). In view of Binance's willingness to accept as true allegations that it knew to be false, and perpetuation of a fiction that it was not subject to jurisdiction in this District, North Field respectfully suggests that exceptional circumstances exist.

9

and abetting all bad actors by failing to employ KYC or AML measures. In short, the alarming and excruciatingly detailed admissions in the plea agreement warrant reconsideration of this Court's analysis of whether Binance is subject to the jurisdiction of this Court, if not an outright admissions by Binance that it is so subject.

1. <u>New Evidence Shows that Binance is Subject to General Jurisdiction</u>.

While the Plea Agreement speaks to Binance's activities throughout the United States and the District of Washington, the depth and magnitude of such activities demonstrate that Binance was very likely engaged in "substantial and not isolated activity" activity in this District during the time period at issue. With millions of customers throughout the United States generating more than a billion dollars in profit for Binance, Binance simply had too many customers to credibly claim that it was not engaged in "substantial and not isolated activity" in any major metropolitan area, including in this District.

2. <u>Evidence Shows That Binance Is Subject To Specific Jurisdiction</u>.

This Court found that it did not have personal jurisdiction over Binance, relying on the record that existed prior to the Plea Agreement, and case law established prior to the Plea Agreement and without the benefit of the factual admissions contained in the Plea Agreement. The Plea Agreement now establishes that while Binance protested to every court in the land that it was not subject to personal jurisdiction anywhere in the United States, Binance knew very well that the opposite was true. The Plea Agreement establishes with virtual, if not actual, certainty, that Binance was "[o]perating, conducting, engaging in, [and] carrying on a business" in this state, and causing injury to persons in this state through its unlawful conduct outside of this state, establishing jurisdiction under Fla. Stat. § 48.193.

3. <u>Binance Acted In Concert With All Unlawful Actors</u>.

Binance's admissions in the Plea Agreement establish that Binance was aware that it was an open door to illicit actors, which necessarily included Vernon. By its complete failure to observe KYC and AML requirements, Binance encouraged illicit actors to launder money and use Binance as a conduit for illicit funds, the result of which was a huge financial reward for Binance to the detriment of the Class. Such information was known to Binance at the time this Court considered the instant Contempt Motion, but withheld by Binance from the Court, North Field and the Class. Moreover, Binance's lack of candor—both to the Court and to North Field—make clear that Binance's so-called efforts to work cooperatively with North Field were a ruse; Binance knew well the evidence and illicit conduct it was hiding at the same time it successfully portrayed itself to the Court as a company willing to help those who fell victim to its unlawful actions.

**C. Alternatively, the Court should require Binance to come forward with sufficient jurisdictional discovery.**

It is now apparent that Binance has far greater contacts with the U.S., and certainly within the District, than it originally admitted. Indeed, since Binance admitted that it had "served millions of customers located in the United States including in the Western District of Washington" (*id.,* ¶27), there can be no question that Binance had more than sufficient customers in Florida and in this District to establish both General and Specific Jurisdiction. Indeed, given that Binance certainly has this information at its fingertips, Binance should disclose such data in response to this Motion, or simply concede to the jurisdiction of this Court.

Binance's admissions in the Plea Agreement now reveal the knowing falsity of Binance's fiction that it lacks jurisdictional contacts with the U.S. Since the Court determined, based on Binance's specious assertions, that it lacked personal jurisdiction over Binance, the Plea Agreement justifies the Court ordering jurisdictional discovery from Binance while the Court is

11

reconsidering its Order Denying Contempt. If, as North Field suspects, Binance has far greater and substantial contacts than previously disclosed, this Court may ultimately find that it has jurisdiction over Binance.

The Eleventh Circuit recognizes a "qualified right to conduct jurisdictional discovery." *Eaton v. Dorchester Dev., Inc.,* 692 F.2d 727, 730 (11th Cir. 1982) ("federal courts have the power to order, at their discretion, the discovery of facts necessary to ascertain their competency to entertain the merits…. We have held that such jurisdictional discovery is not entirely discretionary…." (internal citations omitted)); *see also Sizemore v. Zhao,* --- F.Supp.3d ---, 2023 WL 5087341, *1 (S.D. Fla.). Indeed, the Eleventh Circuit has gone so far as to hold that "a district court abuses its discretion if it completely denies a party jurisdictional discovery…." *American Civil Liberties Union of Florida, Inc. v. City of Sarasota,* 859 F.3d 1337, 1341 (11th Cir. 2017).

In the instant case, Binance allowed the Court to believe a fiction, namely, that it had no offices in the U.S., and no basis for an exercise of jurisdiction. It now apparent that the fiction was a lie.

At the very least, Binance's admissions in the Plea Agreement justify this Court requiring that Binance come forward with evidence relating to its contacts with the District. Under such circumstances, the Court should permit North Field to obtain jurisdictional discovery from Binance as part of the Court's reconsideration of the Order Denying Contempt. If the jurisdictional discovery reveals that this Court has jurisdiction over Binance, then the Court will be able to address the merits of Binance's willful disregard of the Court's Orders. If such discovery ultimately reveals that Binance's transactions with people in this District are sufficient to justify this Court's personal jurisdiction over Binance, then the Court will be justified in reversing Binance's previously successful jurisdictional challenge.

### IV. CONCLUSION.

For these reasons, and those set forth in North Field's Motion for Contempt, North Field respectfully requests that the Court reconsider the Order Denying Contempt and/or order Binance to come forward with jurisdictional discovery so that the Court may satisfy itself that personal jurisdiction exists as part of its reconsideration of the Order Denying Contempt.

Respectfully submitted,

By: s/ Samuel A. Lewis
    Samuel A. Lewis / Fla. Bar No. 55360
    E-mail:  slewis@cozen.com
    COZEN O'CONNOR
    Southeast Financial Center
    200 South Biscayne Blvd., Suite 3000
    Miami, Florida 33131
    Phone:  305-704-5940

    John Sullivan
    E-mail:  jsullivan@cozen.com
    COZEN O'CONNOR
    3 World Trade Center
    175 Greenwich Street, 55th Fl
    New York, NY 10007
    Phone: 212-453-3729
    *Admitted Pro Hac Vice*

    L. Barrett Boss
    E-mail:  bboss@cozen.com
    Jonathan Grossman
    E-mail:  jgrossman@cozen.com
    Kara L. Kapp
    E-mail:  kkapp@cozen.com
    COZEN O'CONNOR
    1200 19th Street NW, 3rd Floor
    Washington, D.C. 20036
    Phone:  202-912-4818

    ***Counsel for North Field***

**WITES & ROGERS**
MARC A. WITES
Florida Bar No. 24783
E-mail: mwites@witeslaw.com
4400 N. Federal Highway
Lighthouse Point, Florida 33064
Telephone: (954) 933-4400

**SILVER MILLER**
DAVID C. SILVER
Florida Bar No. 572764
E-mail: DSilver@SilverMillerLaw.com
JASON S. MILLER
Florida Bar No. 072206
E-mail: JMiller@SilverMillerLaw.com
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:         (954) 516-6000

*Class Counsel*